**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| City of Evanston, an Illinois Municipal Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Case No. 16-cv-5692 |
| Northern Illinois Gas Company, an Illinois corporation, and Commonwealth Edison Company, an Illinois corporation. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Now comes Plaintiff, City of Evanston (the "City" or "Evanston"), by its attorneys, Michael S. Blazer, Jeffery D. Jeep, and Jeep & Blazer, LLC, and for its Complaint against Defendant Northern Illinois Gas Company ("Nicor"), and its Complaint against Defendant Commonwealth Edison Company ("ComEd"), states:

### Allegations Common To All Counts

### Nature of Action

1.     This is a civil action for declaratory and injunctive relief and damages brought pursuant to: (1) Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6972, *et seq.*; (2) Title 9, Section 12 of the Evanston Code of Ordinances ("Hazardous Substances Ordinance"); (3) the Illinois common law of trespass and nuisance and (4) breach of contract.

2.     This Complaint concerns the release and migration of hazardous substances, specifically "Manufactured Gas Waste Oils" or "MG Waste Oils" from what is known as the Skokie Manufactured Gas Plant (the "Skokie MGP"), and pipelines used to distribute

manufactured gas, into soil and groundwater at James Park, Dawes Elementary School, Levy Senior Center, Dodge Avenue, Mulford Street and Oakton Street, and surrounding properties in Evanston, Illinois (the "Impacted Area"). The Impacted Area comprises approximately 300 acres of land and is generally bounded by Oakton Street to north, Dodge Avenue to the east, Mulford Street on the south and the North Shore Canal on the west. The MG Waste Oils have coated and penetrated the Dodge Avenue Water Line, causing the contamination of, and threatening additional contamination to, the City's drinking water.

3.      In addition, methane, a gas that is a byproduct of degradation or digestion of the MG Waste Oils, is present at high concentration and pressure in and around James Park, including in close proximity to the Dawes Elementary School and Levy Senior Center.

4.      Aerial photographs depicting specific locations in the Impacted Area are attached hereto as **Exhibit A** and **Exhibit A-1**, including the following locations, listed from West to East:

a.  The Terrence J. O'Brien Water Reclamation Plant (the "O'Brien Plant"), owned and operated by the Metropolitan Water Reclamation District of Greater Chicago (the "MWRD");

b.  Soil and gas sample locations at the O'Brien Plant collected in 2013 (the "Reclamation Plant Borings");

c.  The Skokie MGP;

d.  McCormick Boulevard;

e.  Oakton Street;

f.  North Shore Channel;

g. A tunnel (78" x 84") running under North Shore Channel constructed by Northwestern Gas Light & Coke Company in 1910 to convey manufactured gas produced by the Skokie MGP (the "1910 Tunnel");

h. A twenty-four inch (24") gas main located five (5) feet below the surface of the North Shore Channel that was constructed by Nicor in approximately 1968 (the "North Shore Channel Main");

i. James Park;

j. The James Park Landfill;

k. A forty-eight inch (48") abandoned pipeline located near the southwest corner of James Park, as identified on the Mulford Street Sewer Plan and Profile, Drawing 5221D-RS26 R1, prepared by Harza Environmental Services, Inc. dated February 1991 (the "48" Pipeline");

l. Borings and Probes with MG Waste Oils or methane in and around James Park;

m. A twenty-four Inch (24") Gas Main in Oakton Street, identified on a Ciorba, Spies & Gustafson drawing dated May 24, 1960 (the "Oakton Street Main");

n. Mulford Street;

o. Dawes Elementary School;

p. Levy Senior Center;

q. Dodge Avenue;

r. A twenty four inch (24") pipe running East/West in Oakton Street encountered at the intersection with Dodge Avenue and three twenty four inch (24") pipes running North/South encountered on the west side of Dodge Avenue (the "Dodge Avenue Pipes");

3

s.   A twelve inch (12") cast iron gas main constructed in approximately 1951 and abandoned in 2014, running North/South along the east side of Dodge Avenue (the "Dodge Avenue Gas Main");

t.   The City's Water Distribution System running North/South down the center of Dodge Avenue (the "Dodge Avenue Water Line"), that portion of the Dodge Avenue Water Line that was replaced as part of the 2015 Water Main Replacement and Street Resurfacing Project, including connector lines (the "2015 Work") and that portion of the Dodge Avenue Water Line abandoned by reason of the 2015 Work (the "Dodge Avenue Water Line (Abandoned)");

u.   The combined sewer running along Mulford Street that was cleaned and lined in the Spring of 2016 (the "Mulford Street Sewer");

v.   The locations where Black Crust and sediments were collected from the Mulford Street Sewer and tested for constituents of MG Waste Oils (the "Sewer Sampling Locations");

w.   The locations where MG Waste Oils have been observed in and around James Park, including Oakton Street, Dodge Avenue, Mulford Street and on the outside or inside, or both, of the Dodge Avenue Pipes, Dodge Avenue Gas Main, the Dodge Avenue Water Line and the Mulford Street Sewer;

x.   The locations where constituents of MG Waste Oils, specifically fluoranthene and phenanthrene, were detected in samples collected from the City's Water Distribution System.

5.      James Park is owned by the City and is located at Oakton Street and Dodge Avenue. James Park has a playground for children, eight baseball fields, five soccer/football fields, six tennis courts, a basketball court, field house and public gardens.

6.      The Dawes Elementary School is located at 440 Dodge Avenue in Evanston, and enrolls approximately 375 students in kindergarten through the fifth grade.

7.      The Levy Senior Center is located at 300 Dodge Avenue, and offers social services and programs for seniors, including exercise classes and lunch programs.

8.      The oils used, and the wastes produced, at the Skokie MGP, and oils, contaminants and impurities entrained in the gas manufactured and distributed from the Skokie MGP, are referred to variously as Lowe Process Waste Oil, "carbureted water gas", "tar" and "coal tar", among others.

9.      MG Waste Oils were produced by the Skokie MGP and, on information and belief, were conveyed by gas distribution infrastructure associated with the Skokie MGP, that are owned and operated, or were owned and operated, by the ComEd Companies or Nicor Companies.

10.     On information and belief, MG Waste Oils have been released from the Skokie MGP and its gas distribution infrastructure, and have come to be located in, on, under and in the vicinity of the Impacted Area. These locations are depicted in Exhibit A to this Complaint.

11.     Constituents of MG Waste Oils, specifically fluoranthene and phenanthrene, are present in the City's drinking water. The locations where samples were collected from the City's Water Distribution System, and location where constituents of MGP Waste Oils, specifically fluoranthene and phenanthrene, were detected in samples collected from the City's Water Distribution System, are depicted in Exhibit A to this Complaint.

12.     Methane is present at high concentrations and pressure in James Park and just outside Dawes Elementary School and the Levy Senior Center.  Methane has a lower explosive limit ("LEL"), the level at which an ignition source will cause an explosion, of only 5%. The City has been measuring methane at an average concentration of 85.25% and pressure at an average of 11 pounds per square inch ("psi") and 13 psi immediately in front of the School. The locations where methane is present at high concentrations and pressure are depicted in Exhibit A to this Complaint.

13.     Pursuant to Section 7002 of RCRA, 42 U.S.C. §6972, the City has served an amended notice of intent to sue ("Amended NOITS") [1] on Nicor and ComEd. A copy of the Amended NOITS, without attachments, is attached hereto as **Exhibit B.** [2]

14.     In general terms, the City seeks to have Nicor and ComEd held responsible for (i) the MG Waste Oils contamination in and around the Impacted Area and (ii) the methane, both of which threaten public health and safety. The City also seeks to recover:

     a.     Injunctive relief under RCRA and common law compelling the Nicor and ComEd to abate the contamination, including methane, they caused or contributed to, by their acts and omissions, by the release of MG Waste Oils from the Skokie MGP and Skokie MGP Distribution Infrastructure;

     b.     Compensatory damages caused by Nicor's and ComEd's acts and omissions; and

     c.     Punitive damages for the willful and wanton conduct of Nicor and ComEd that has threatened, and continues to threaten, the safety of the City's residents.

---

[1]     The original NOITS that the City served on Nicor and ComEd was the subject of an order of dismissal without prejudice entered by Judge John Z. Lee on February 10, 2016 in Civil Action No. 14-cv-9227.

[2]     The Amended NOITS, with attachments, is 889 pages long.

**Jurisdiction and Venue**

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 42 U.S.C. §6972(a), because this case arises under the laws of the United States. Specifically, Count I is predicated upon and seeks relief pursuant to RCRA.

16.     This Court has supplemental jurisdiction over the State and local law claims herein pursuant to 28 U.S.C. §1367, in that said claims are so related to the RCRA claim that they form part of the same case or controversy under Article III of the U.S. Constitution. The claim in Count II is predicated upon and seeks relief pursuant to the City's Hazardous Substances Ordinance. The claims in Counts III and IV are predicated upon and seek relief pursuant to the common law of trespass and nuisance, including punitive damages related to the wilful and wanton conduct of Nicor and ComEd. The claim in Count V is predicated on Nicor's breach of an August 24, 1982 franchise agreement between the City and Nicor.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §6972(a), because the events or omissions giving rise to the claims herein occurred in this judicial district and the properties that are the subject of this action are also situated in this judicial district.

**The Parties**

18.     The City is an Illinois home rule municipal corporation.

19.     On February 21, 1867, the Northwestern Gas Light and Coke Company ("NGLC") was organized under a special act of the Illinois General Assembly.

20.     On March 12, 1896, the articles of incorporation of NGLC were amended to expand its corporate purpose to include, inter alia, "manufacture...distribute...gas...coke, tar...and

to erect, lay, maintain and operate all...pipes...and apparatus necessary or convenient for such purposes...."

21.     On information and belief, Nicor and ComEd are the corporate successors to NGLC.

22.     NGLC acquired Cicero Gas Company in 1902, and those two companies then merged, with NGLC being the surviving corporation.

23.     Commonwealth Electric Company and Chicago Edison Company merged in 1907 to form ComEd.

24.     Public Service Company of Northern Illinois ("PSCNI") was incorporated in 1911 as an Illinois corporation. NGLC merged with PSCNI in 1913, the latter being the surviving corporation.

25.     PSCNI merged with ComEd in 1953.

26.     Nicor was created in 1954. Prior to 1954, the then-existing assets of Nicor were held by ComEd. On January 22, 1954, ComEd and Nicor entered into a Separation Agreement. On February 9, 1954, ComEd and Nicor entered into a General Conveyance, pursuant to which ComEd transferred and assigned to Nicor all right, title and interest in certain gas and heating assets previously held by ComEd.

27.     On February 9, 1954, ComEd and Nicor entered into a General Assignment and Assumption Agreement, addressing, among other issues, the allocation of responsibility between the two companies for obligations, liabilities, and duties with respect to the former manufactured gas plant sites.

28.     Nicor and ComEd have implemented a manufactured gas plant remediation program, including development of a list of potential sites, and assessment of remediation

responsibility. Because some of Nicors' assets were at one time owned by ComEd or its corporate predecessors, Nicor and ComEd have entered agreements in order to jointly manage certain common manufactured gas plant sites, including the Skokie MGP.

29.     On July 20, 2007, ComEd and Nicor entered into a "Memorandum of Understanding" to reflect their agreement concerning allocating costs associated with manufactured gas plants operated by their corporate predecessors, including the Skokie MGP. A copy of the Memorandum of Understanding is attached hereto as **Exhibit C**.

30.     On January 3, 2008, ComEd and Nicor entered into a "Final Allocation Agreement," which supersedes the "Memorandum of Understanding" and which was approved by the Illinois Commerce Commission ("ICC") on June 9, 2009. A copy of the joint petition filed by Nicor and ComEd with the ICC, including the Final Allocation Agreement, is attached hereto as **Exhibit D**. Pursuant to the Final Allocation Agreement, Nicor is responsible for 51.73% and ComEd is responsible for 48.27% of all remedial costs incurred in connection with the Skokie MGP.

31.     On information and belief, Nicor is wholly owned by Ottawa Acquisition LLC, an Illinois limited liability company that is wholly owned by AGL Resources Inc., a publicly traded Georgia corporation.

32.     On information and belief, ComEd is a wholly owned subsidiary of Exelon Energy Delivery Company, LLC, a Delaware limited liability company that is a wholly owned subsidiary of Exelon Corporation, a publicly traded Pennsylvania corporation.

## Facts Relating to MG Waste Oils and Methane
### History of Evanston MGP

33.     In approximately 1871, NGLC, or its predecessor Evanston Gas Light Company, commenced operation of the "North Western Gas Works," a manufactured gas plant (the

"Evanston MGP") located at the intersection of Maple Avenue and Clark, bounded by University Place at the North, Maple Street at the West, Clark Street at the South and railway spurs on the East.

34.     The Evanston MGP ceased operation in 1913.  From 1913, until approximately 1957, the Evanston MGP property was used by NGLC and PSCNI for offices and equipment storage.

### History and Operations of the Skokie MGP

35.     NGLC constructed the Skokie MGP in 1910, in what was then known as Niles Center. Niles Center changed its name to Skokie in 1940.

36.     The Skokie MGP ceased operation in or about the early 1950s.

37.     The Lowe Process was employed at the Skokie MGP and utilized oil in conjunction with water gas to enhance the caloric value of the manufactured gas.

38.     The oil used in the Lowe Process was stored in a number of large above ground tanks on the Skokie MGP property.

39.     The Lowe Process produced an oily waste with a relatively low viscosity (the waste is very liquid). The MG Waste Oils are also dense (heavy).  The combination of low viscosity and high specific gravity (density) allows the oil to travel through soil, clay, groundwater and bedrock.

40.     Due to its low viscosity (liquidity) and high density (weight), it only takes between a few years to approximately two decades for MG Waste Oils to travel through glacial tills and groundwater to reach bedrock.

41.     MG Waste Oil is also likely to have leaked into the environment from releases from the above ground storage tanks at the Skokie MGP and its distribution infrastructure.

42.     On information and belief, the Skokie MGP distribution infrastructure historically transported manufactured gas from the Skokie MGP and consisted of multiple structures located in the vicinity of the Impacted Area. These structures are depicted in Exhibits A and A-1.

43.     MG Waste Oils were suspended in the gas distributed through the Skokie MGP's distribution infrastructure in the vicinity of the Impacted Area.  This entrained gas would form a condensate in the transmission lines, which would leak through defective or damaged joints in the distribution lines into the surrounding environment.

44.     Evanston is informed and believes that a significant amount of the gas produced by the Skokie MGP was also "lost" during distribution via leakage into the environment.

45.     Analysis of samples from the bedrock formation in and around James Park confirms the presence of fuel oil product or a weathered crude oil, matching the physical state and chemistry of MG Waste Oils. The locations where MG Waste Oils have been observed in and around James Park are depicted in Exhibits A and A-1.

46.     The MG Waste Oils degrade in soil, groundwater and the bedrock formation. Methane is a byproduct of the degradation of MG Waste Oils. The confining clay layer above the bedrock, combined with the downward pressure of groundwater, may contribute to the high concentration and pressure of methane in and around James Park. The locations where methane has been detected at high concentration and pressure are depicted in Exhibit A to this Complaint.

47.     On information and belief, various portions of the Skokie MGP's distribution infrastructure conveyed manufactured gas that contained MG Waste Oils that was suspended in and leaked into the Impacted Area.

48.     The Dodge Avenue Water Line conveys potable water to City residents.

49.     The release of MG Waste Oils from the Skokie MGP and its distribution infrastructure is the source of the MG Waste Oils in, under and around James Park, including the MG Waste Oils in soil, groundwater and the bedrock formation, and the Black Crust inside of and coating the Dodge Avenue Water Line.

50.     The release of MG Waste Oils from the Skokie MGP and its distribution infrastructure is the source of the constituents of MG Waste Oils detected in the City's drinking water, specifically fluoranthene and phenanthrene.

### Discovery of MG Waste Oils and Methane at the O'Brien Plant and In the Area of James Park

51.     A June 2012 subsurface investigation revealed oil and tar like material at depth in bedrock at the O'Brien Plant, approximately 1000 feet southwest of James Park. On information and belief, this oil and tar like material is MG Waste Oils that was released by the Skokie MGP and its distribution infrastructure. The locations where MG Waste Oils were detected at the O'Brien Plant are depicted on Exhibit A.

52.     On August 12, 2013, representatives of the Illinois Environmental Protection Agency ("IEPA") observed methane gas at high concentration and pressure in a boring at the O'Brien Plant.

53.     The City also began monitoring concentrations of methane as a percent of the lower explosive limit of methane (5%) at the Dawes Elementary School, Levy Senior Center and other locations.

### Nicor and ComEd Have Willfully Obstructed the City's Investigation into the Location of The Skokie MGP Distribution Infrastructure

54.     The City's efforts to work cooperatively with Nicor have been rebuffed. Nicor has refused and failed to cooperate with the City's efforts to identify the location of the Skokie

MGP's distribution infrastructure. Nicor, in bad faith, has delayed providing information to assist in the City's investigation into the location of the infrastructure, refused to provide information, and provided misinformation.

55.     ComEd has simply ignored the City's communications.

56.     On May 13, 2014 the City tendered a request to Nicor for information relating to the Skokie MGP Distribution Infrastructure. Nicor did not respond to that request.

57.     During subsequent discussions and meetings, Nicor failed to identify the existence or location of various parts of the Skokie MGP's distribution infrastructure.

58.     The City has, without the assistance of Nicor and ComEd, learned of the existence of the components of the Skokie MGP's distribution infrastructure.

59.     The City nevertheless continued to provide information to Nicor pertaining to portions of the distribution infrastructure, and to request information from Nicor. This included numerous requests for meetings among technical representatives of the City and Nicor to discuss the locations of the distribution infrastructure. These requests were continually evaded or rebuffed.

60.     As a result of Nicor's and ComEd's refusal to respond in good faith to the City's repeated requests for information pertaining to the Skokie MGP's distribution infrastructure, on July 3, 2014 the City's Fire Chief issued an Administrative Order to AGL and Nicor (the "Administrative Order"). A copy of the Administrative Order, without attachments, is attached hereto as **Exhibit E**[3].

61.     The Administrative Order requested documents relating to the Skokie MGP's distribution infrastructure and the disposal of solid waste within a 1-mile radius of the

---

[3]     The Administrative Order, with attachments, is 739 pages long.

intersection of Oakton Street and McCormick Boulevard. The requested documents relate directly to the leakage of MG Waste Oils.

62.    On July 29, 2014, Nicor responded to the Administrative Order. Nicor refused to comply with the Administrative Order, and failed to provide any information pertaining to the location of the Skokie MGP's distribution infrastructure. AGL has never responded to the Order.

63.    Instead, Nicor served the City with a lengthy document production request and interrogatories (well before this action and its predecessor were filed).

64.    The City nevertheless provided Nicor and ComEd with reports prepared by its outside consultants, which explained the causal connection between the MG Waste Oils observed in and around James Park and the leakage of MG Waste Oils.

65.    Nicor and ComEd also collected samples from the Impacted Area. Since no later than the Fall of 2015, when Nicor and ComEd received the laboratory analyses of their samples, Nicor and ComEd knew or should have known that MG Waste Oils not only coat, but have penetrated, the Dodge Avenue Water Line.

66.    The Amended NOITS, which included as attachments several reports and data sources, notified Nicor and ComEd that constituents of MG Waste Oils, specifically fluoranthene and phenanthrene, are present in the City's drinking water.

67.    Nicor and ComEd continue to ignore the Administrative Order and the City's requests for information pertaining to the location of the Skokie MGP's distribution infrastructure.

### COUNT I
### RCRA INJUNCTION AGAINST NICOR AND COMED

1-67.    The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67 of this Count I.

68.     42 U.S.C. §6972 confers upon any person the right to file suit:

> (B) against any person...or past or present owner or operator of a...facility...who has contributed or who is contributing to the past or present handling, storage, treatment...or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

69.     The City is a "person" under §6903(15) of RCRA.

70.     Nicor and ComEd are "persons" under §6903(15) of RCRA.

71.     On information and belief, during the period of time that Nicor and ComEd owned and/or operated the Skokie MGP and its distribution infrastructure, or during the time their corporate predecessors, NGLC and PSCNI, owned and/or operated the Skokie MGP and its distribution infrastructure, MG Waste Oils have leaked or been released from the Skokie MGP and its distribution infrastructure, in the vicinity of James Park, migrated into soil, groundwater and bedrock, and coats the Dodge Avenue Water Line as a Black Crust that threatens to penetrate, and has in fact penetrated, the Water Line.

72.     On information and belief, leakage of MG Waste Oils in the vicinity of James Park, has caused levels of hazardous substances to be present (a) in groundwater in excess of groundwater remediation objectives established by IEPA, (b) in soil in excess of soil remediation objectives established by IEPA, and (c) above construction worker exposure standards established by IEPA, and may present an imminent and substantial endangerment to human health and the environment, including employees of the City that routinely maintain and repair James Park, Dodge Avenue, Oakton Street, Mulford Street, the Mulford Street Sewer, the Dodge Avenue Water Line and other work.

73.     On information and belief, the leakage of MG Waste Oils in the vicinity of James Park that has caused levels of hazardous substances to be present in soil and groundwater at

levels exceeding IEPA standards, including Volatile Organic Compounds (VOCs) and Semi-Volatile Organic Compounds (SVOCs), may also present an imminent and substantial endangerment to public health and the environment, including seniors who utilize the Levy Senior Center and students who attend the Dawes Elementary School, for the following reasons:

   a. VOCs and SVOCs in soil and groundwater may volatilize and migrate into the subsurface structures (e.g., vaults and utility corridors), aboveground structures (e.g. the Dawes Elementary School and Levy Senior Center) and the atmosphere. See 35 IAC §§ 742.310 and 742.312 (Outdoor and Indoor Inhalation Exposure Routes, respectively)

   b. The VOCs and SVOCs, such as benzo[a]Pyrene, may degrade into compounds that are also toxic and hazardous.

   c. VOCs and SVOCs may degrade to form volatile and possibly combustible gases, such as methane.

74.    On information and belief, the leakage has caused hazardous substances contained in MG Waste Oils to be present in soil, groundwater and the bedrock formation in and around James Park, including Dodge Avenue, Mulford Street and Oakton Street, at levels in excess of soil saturation levels (abundant levels of free product) and in excess of soil remediation objectives established by the IEPA, and may present an imminent and substantial endangerment to human health and the environment.

75.    On information and belief, as a consequence of the leakage, MG Waste Oils have come to be located in soil, groundwater and the bedrock formation, and have degraded to form methane that is present at high pressure and high concentrations in and around James Park, including inside Dawes Elementary School and Levy Senior Center.

76.     On information and belief, as a consequence of the actions of Nicor and ComEd, or their corporate predecessors, NGLC and PSCNI, the Skokie MGP's distribution infrastructure serves as conduits for conveying methane that is present at high pressure and high concentrations in and around James Park, including inside Dawes Elementary School and Levy Senior Center.

77.     These released and migrating MG Waste Oils have contaminated soil, groundwater and the bedrock formation in, under and around the Impacted Area, resulting in the presence of contaminants, including methane, in soil, groundwater and the bedrock formation, which are solid or hazardous waste as defined in §§6903(5) and (27) of RCRA and regulated by Subchapter III of RCRA and the regulations promulgated or authorized thereunder.

78.     These released and migrating MG Waste Oils have contaminated the City's drinking water with fluoranthene and phenanthrene, and, on information and belief, other constituents of MG Waste Oils, which are solid or hazardous waste as defined in §§6903(5) and (27) of RCRA and regulated by Subchapter III of RCRA and the regulations promulgated or authorized thereunder.

79.     In accordance with 42 U.S.C. §6972, on February 22, 2016, the City sent the Amended NOITS, via registered mail with return receipt requested, to Nicor, ComEd, Exelon Corporation, AGL, the Administrator of the USEPA, the USEPA Region 5 Administrator, the U.S. Attorney General and the Director of the IEPA. Copies of the proofs of service *via* Registered Mail are attached hereto as **Exhibit F**.

80.     On information and belief, Nicor and ComEd, or their corporate predecessors, NGLC and PSCNI, have engaged in the handling, treatment, storage and/or disposal of solid or hazardous waste in a manner that has contributed to and is contributing to the contamination with

MG Waste Oils and methane of soil, groundwater and the bedrock formation in, under and around the Impacted Area.

81.     On information and belief, Nicor's and ComEd's handling, treatment, storage, and/or disposal of solid or hazardous waste may present, and may continue to present, an imminent and substantial endangerment to public health and the environment as defined in RCRA, which condition will remain until the solid or hazardous wastes, namely MG Waste Oils and methane, are removed and/or remediated from soil, groundwater and the bedrock formation in, under and around the Impacted Area.

82.     On information and belief, Nicor and ComEd, or their corporate predecessors, NGLC and PSCNI, are responsible for the contamination of soil, groundwater and the bedrock formation in, under and around the Impacted Area, by failing to properly handle, dispose, contain and abate the solid or hazardous waste present at and released from the Skokie MGP and distribution infrastructure, namely MG Waste Oils and methane, as required by the applicable hazardous waste management regulations promulgated and authorized pursuant to Subchapter III of RCRA.

83.     Since the issuance of the Amended NOITS, no action has been taken by the USEPA Administrator, the USEPA Region 5 Administrator, the U.S. Attorney General or the IEPA Director, which would preclude the City from pursuing a claim under RCRA Section 7002(a)(1)(B).

84.     Pursuant to 42 U.S.C. §6972(b)(2)(F), a copy of this Complaint will be served upon the U.S. Attorney General and the USEPA Administrator.

85.     This Court has jurisdiction pursuant to 42 U.S.C. §6972(a) of RCRA to enter injunctive relief and to assess any appropriate civil penalties, including:

d.    Restraining and enjoining Nicor and ComEd from allowing continued contamination of soil, groundwater and the bedrock formation in, under and around the Impacted Area;

e.    Compelling Nicor and ComEd to take any and all actions necessary to abate the conditions they have caused or contributed to which may present an imminent and substantial endangerment to public health or the environment; and

f.    Restraining Nicor and ComEd from taking any actions in violation of RCRA and the regulations promulgated or authorized thereunder.

WHEREFORE, the City prays for judgment in its favor and against Nicor and ComEd as follows:

A.    For a declaration that Nicor and ComEd are liable for the subject contamination under 42 U.S.C. §6972 of RCRA;

B.    For injunctive relief restraining and enjoining Nicor and ComEd from allowing continued contamination of soil, groundwater and the bedrock formation in, under and around the Impacted Area, and compelling Nicor and ComEd to take any and all actions necessary to abate the conditions they have caused or contributed to, which may present an imminent and substantial endangerment to public health and the environment;

C.    For injunctive relief restraining and enjoining Nicor and ComEd from taking any actions in violation of RCRA and the regulations promulgated or authorized thereunder;

D.  For an award of the City's attorneys' fees, expert costs and costs of suit, and to impose any appropriate civil penalties; and

E.  For such further relief as this Court deems appropriate.

## COUNT II
## VIOLATION OF HAZARDOUS SUBSTANCES ORDINANCE

1-67.  The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67 of this Count II.

68.  The Impacted Area is located within the City limits.

69.  A copy of the City's Hazardous Substances Ordinance is attached hereto as **Exhibit G**. Nicor and ComEd are "persons" as defined in §9-12-1 of the Hazardous Substances Ordinance.

70.  Acenaphthene, Benzene Ethylbenzene, Fluoranthene, Naphthalene, Pyrene and Toluene are listed as toxic pollutants under 40 C.F.R. 401.15, and therefore qualify as "hazardous substances" as defined in §9-12-1 of the Hazardous Substances Ordinance.

71.  Benzene, Ethylbenzene, Naphthalene, Toluene, Xylenes and Explosive Substances, which includes methane as a byproduct of the degradation of MG Waste Oils, are listed as hazardous materials under 49 C.F.R. 172.101, Table of Hazardous Materials, and therefore qualify as "hazardous substances" as defined in §9-12-1 of the Hazardous Substances Ordinance.

72.  Acenaphthene, Acenaphthylene, Anthracene, Benzene, Benzo(a)anthracene, Benzo(a)pyrene, Chrysene, Dibenzo(a,h)anthracene, Ethylbenzene, Fluoranthene, Fluorine Indeno (1,2,3-cd)pyrene, Naphthalene, Phenanthrene, Pyrene, Toluene and Xylenes are listed as hazardous substances under 40 C.F.R. 302.4, Designation of hazardous substances, and therefore qualify as "hazardous substances" as defined in §9-12-1 of the Hazardous Substances Ordinance.

73.     Nicor and ComEd, or their corporate predecessors, NGLC and PSCNI, are persons "owning or in control of any real property from which a hazardous substance is or may be released" pursuant to §9-12-2(A)(4) of the Hazardous Substances Ordinance, namely the MG Waste Oils released from the Skokie MGP and its distribution infrastructure, and its degraded form, methane.

74.     Nicor and ComEd, or their corporate predecessors, NGLC and PSCNI, are persons "who owned or had custody or control of the hazardous substance at the time of such release" pursuant to §9-12-2(A)(2) of the Hazardous Substances Ordinance, namely the MG Waste Oils released from the Skokie MGP's distribution infrastructure.

75.     As a result of the releases of hazardous substances, the City has incurred and will continue to incur removal and abatement costs under §§9-12-1 and 9-12-3 of the Hazardous Substances Ordinance. These costs include, among other things, the cost of consultants and experts to monitor, assess and evaluate the threat of release of hazardous substances, as well as attorneys' fees.

76.     Nicor and ComEd are jointly and severally liable to the City for all costs incurred and to be incurred by the City for removal and/or abatement activity pursuant to §9-12-2(A) of the Hazardous Substances Ordinance.

WHEREFORE, the City prays for judgment in its favor and against Nicor and ComEd as follows:

A.     For a declaration that Nicor and ComEd are liable under §9-12-2 of the Hazardous Substances Ordinance;

B.     For an award of all removal and abatement costs incurred in connection with the release of hazardous substances described herein, including

prejudgment interest and attorneys' fees through the trial of this matter; and

C.    For such further relief as this Court deems appropriate.

### COUNT III
### TRESPASS

1-67.    The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67 of this Count III.

68.    Nicor and ComEd have caused and allowed, and continue to cause and allow, contaminants to migrate and enter soil, groundwater and the bedrock formation in, under and around the Impacted Area.

69.    Nicor and ComEd did not have permission, authority or right to allow any contaminants to enter upon the property owned by the City, and the migration of contaminants onto property owned by the City is unlawful and without the consent of the City.

70.    Notwithstanding Nicor's and ComEd's knowledge that the Contaminants originated from the Skokie MGP and its distribution infrastructure, and migrated and entered onto property owned by the City, contaminating the soil, groundwater, bedrock and structures thereon with MG Waste Oils and methane, and despite demand by the City, Nicor and ComEd have failed to remove or otherwise remediate the contamination on the City owned property.

71.    Nicor and ComEd have willfully and wantonly failed to provide information pertaining to the location of the Skokie MGP's distribution infrastructure , the source of the MG Waste Oils and methane, and have obstructed the City's efforts to locate the infrastructure.

72.    Nicor's and ComEd's negligent, willful and wanton actions and omissions have interfered with and continue to interfere with the City's property rights.

73.     Nicor's and ComEd's negligent, willful and wanton actions and omissions have caused and will continue to cause damage to the City, including, but not limited to, unreimbursed expenses and costs and other violations of the City's rights as owner of its property.

WHEREFORE, the City prays for judgment in its favor and against Defendants as follows:

> A.     For injunctive relief restraining and enjoining Nicor and ComEd from allowing continued contamination of the City owned property and compelling Nicor and ComEd to take any and all actions necessary to abate the contamination of the City owned property;
>
> B.     For an award of punitive damages in an amount deemed appropriate by this Court;
>
> C.     For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law; and
>
> D.     For such further relief as this Court deems appropriate.

## COUNT IV
## PRIVATE NUISANCE

1-67.   The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67of this Count IV.

68.     The actions and omissions of Nicor and ComEd constitute a nuisance, which has substantially interfered with the City's use and enjoyment of City owned property.

69.     Nicor and ComEd have willfully and wantonly failed to provide information pertaining to the location of the Skokie MGP Distribution Infrastructure, the source of the MG Waste Oils and methane, and have obstructed the City's efforts to locate the Infrastructure.

70.     Nicor's and ComEd's negligent, willful and wanton actions have caused and will continue to cause damage to the City, including but not limited to unreimbursed expenses and costs, and other violations of the City's property rights as owner of property.

WHEREFORE, the City prays for judgment in its favor and against Nicor and ComEd as follows:

> A.      For injunctive relief restraining and enjoining Nicor and ComEd from allowing continued contamination of the City owned property and compelling Nicor and ComEd to take any and all actions necessary to abate the contamination of the City owned property;
>
> B.      For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;
>
> C.      For an award of punitive damages in an amount deemed appropriate by this Court; and
>
> D.      For such further relief as this Court deems appropriate.

## COUNT V
## PUBLIC NUISANCE

1-67.   The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67 of this Count V.

68.     The actions and omissions of Nicor and ComEd constitute a public nuisance, which unreasonably interferes with the public's rights to the use and enjoyment of facilities within the City and with the public's right to be free from exposure to the dangers associated with the Contaminants at issue.

69.     Nicor and ComEd have willfully and wantonly failed to provide information pertaining to the location of the Skokie MGP Distribution Infrastructure, the source of the MG Waste Oils and methane, and have obstructed the City's efforts to locate the Infrastructure.

70.     Nicor's and ComEd's negligent, willful and wanton actions have caused and will continue to cause damage to the general public.

WHEREFORE, the City prays for judgment in its favor and against Nicor and ComEd as follows:

>   A.     For injunctive relief restraining and enjoining Nicor and ComEd from allowing continued contamination in the City and compelling Nicor and ComEd to take any and all actions necessary to abate the contamination of the City owned property;

>   B.     For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

>   C.     For an award of punitive damages in an amount deemed appropriate by this Court; and

>   D.     For such further relief as this Court deems appropriate.

### COUNT VI
### BREACH OF CONTRACT

1-67.   The City adopts and re-alleges paragraphs 1 through 67 of the Allegations Common to all Counts as Paragraphs 1 through 67 of this Count VI.

68.     On August 20, 1982, the City and Nicor entered into an agreement relating to Nicor's construction, operation and maintenance of a gas distribution system within the City (the "Franchise Agreement"). A copy of the Franchise Agreement is attached hereto as **Exhibit H**.

69.     Section 2 of the Franchise Agreement provides, in pertinent part, as follows:

> All pipes, mains, conductors and other appliances shall be so located as not to injure unnecessarily any drains, sewers, catch basins, water pipes, pavements or other like public improvements, but should any drain, sewer, catch basin, water pipe, pavement or other like public improvement be injured by such location, [Nicor] shall forthwith repair the damage caused by such injury to the satisfaction of the Committee on Streets and Alleys, or such other duly authorized agent, as the case may be, and in default thereof the Municipality may repair such damage and charge the cost thereof to, and collect the same from, the Grantee.

70.     Nicor's failure to maintain that portion of the Skokie MGP's distribution infrastructure located within the City so as to prevent the leakage of MG Waste Oils into the environment, and to create methane as a byproduct thereof, has damaged City owned property, and caused the City to incur costs to investigate and mitigate such damage, including costs to investigate the location of the pipes, mains, conductors and other appliances that are components of the Skokie MGP's distribution infrastructure.

71.     Section 3 of the Franchise Agreement provides, in pertinent part, as follows:

> [Nicor] shall indemnify, become responsible for and forever save harmless the [City] from any and all judgments, damages, decrees, costs and expenses, including attorneys' fees, which the [City] may legally suffer or incur, or which may be legally obtained against the [City], for or by reason of the use and occupation of any street, alley, avenue or other public place in the [City] by the Grantee pursuant to the terms of this ordinance or legally resulting from the exercise by the Grantee of any of the privileges herein granted. This indemnity shall extend to and include judgments, damages, decrees, costs and expenses, including attorneys' fees which may be obtained or assessed against the [City] resulting from the [City's] right of supervision and control, whether or not exercised, over the excavation, installation or construction carried forth by [Nicor] under Section 2 of this franchise.

72.     The City has incurred damages, costs, expenses and attorney's fees by reason of the placement of pipes, namely the Skokie MGP's distribution infrastructure, in locations in the City that have leaked MG Waste Oils into the environment and degraded to form methane.

WHEREFORE, the City prays for judgment in its favor and against Nicor as follows:

A.    For injunctive relief restraining and enjoining Nicor from continued breach of the Franchise Agreement;

B.    For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

C.    For such further relief as this Court deems appropriate.

Dated:    May 31, 2016

The City of Evanston

By: /s/ Michael S. Blazer
    One of its Attorneys

Michael S. Blazer (ARDC No. 6183002)
Jeffery D. Jeep (ARDC No. 6182830)
Jeep & Blazer, L.L.C.
3023 N. Clark Street, No. 214
Chicago, IL 60657
(773) 857-1843
mblazer@enviroatty.com
jdjeep@enviroatty.com

# EXHIBIT A



LEGEND

+++++++++  SKOKIE SWIFT TRAIN LINE

   ABANDONED FUEL TANKS AT WATER TREATMENT PLANT

   BORINGS AND PROBES WITH MG WASTE OILS OR BYPRODUCT GAS

   DRINKING WATER SAMPLE LOCATIONS

   DRINKING WATER SAMPLE LOCATION WHERE MG WASTE OIL CONSTITUENTS WERE DETECTED (FLUORANTHENE AND PHENANTHRENE)

   SEWER SAMPLE LOCATIONS

———  MULFORD STREET SEWER

☐  APPROXIMATE FACILITY BOUNDARIES BASED UPON CURRENTLY AVAILABLE INFORMATION

☐  AREA INCLUDED IN EXHIBIT A-1

N

500    0    500

SCALE: 1" = 500'

| PROJECT NO. | 25214107.00 | DRAWN BY: | AHB |
| DRAWN: | 01/15/15 | CHECKED BY: | PH |
| REVISED: | 05/24/16 | APPROVED BY: | |

**SCS ENGINEERS**
2830 DAIRY DRIVE MADISON, WI 53718–6751
PHONE: (608) 224–2830

JEEP & BLAZER, LLC.
24 N. HILLSIDE AVE.
HILLSIDE, IL 60162

JAMES PARK
OAKTON ST. & DODGE AVE.
EVANSTON, ILLINOIS

EXHIBIT A
MG WASTE OILS AND BYPRODUCT
GAS IN THE JAMES PARK VICINITY

EXHIBIT
A

# EXHIBIT A-1



# EXHIBIT B

*Jeep & Blazer, L.L.C.*
**environmental law**

**Jeffery D. Jeep***
**Michael S. Blazer****

\*  Also admitted in Massachusetts
\*\* Also admitted in New York, Pennsylvania and
Washington

3023 N. Clark Street, #214
Chicago, Illinois 60657

(708) 857-1843 (Main)
(708) 236-0828 (Fax)
(708) 505-3801 (Direct)
(708) 404-9090 (Cell)

Jeffery D. Jeep
email: jdjeep@enviroatty.com

Web Site:
http://www.jeepandblazer.com

February 22, 2016

**<u>DELIVERY VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED</u>**

To:

Commonwealth Edison Company
c/o Corporate Creations Network Inc.
Registered Agent
350 S Northwest Highway 300
Park Ridge, IL 60068
Phone: (773) 649-9240

Northern Illinois Gas Company doing
business as Nicor Gas
c/o Illinois Corporation Service Company
Registered Agent
801 Adlai Stevenson Drive
Springfield, Il 62703-4261
Phone: (217) 492-2700

Exelon Corporation
c/o Corporate Creations Network Inc.
Registered Agent
350 S Northwest Highway 300
Park Ridge, IL 60068
Phone: (773) 649-9240

AGL Resources Inc.
c/o Paul R. Shlanta
Registered Agent
General Counsel
10 Peachtree Place, N.E.
Location 1466, Fulton
Atlanta, GA 30309
Phone: (302) 636-5401

**Re:      Amended Notice of Intent to Sue under RCRA,
CERCLA, et al.**

THIS IS TO NOTIFY YOU THAT:

1.     The undersigned is counsel for, and serves this notice on behalf of:

City of Evanston
2100 Ridge Avenue
Evanston, IL 60201
(the "City" or "Evanston")

2.     This Notice is issued to:

Commonwealth Edison Company, an Illinois corporation, Illinois
Secretary of State File No. 07636466 ("**ComEd**");

Exelon Corporation, a Pennsylvania Corporation, Pennsylvania Secretary of State File Number 2859390 ("**Exelon**");

Northern Illinois Gas Company, an Illinois corporation, Illinois Secretary of State File No. 50814173 ("**Nicor**"); and

AGL Resources Inc., a Georgia corporation, Georgia Secretary of State File Number K53433 ("**AGL**").

3.     **ComEd** and **Exelon** are hereafter referred to collectively as the "**ComEd Companies**."

4.     **Nicor** and **AGL** are hereafter referred to collectively as the "**Nicor Companies**."

## I.     INTRODUCTION

5.     On information and belief, one or more of the ComEd Companies and Nicor Companies are the corporate successor to Northwestern Gas Light & Coke Company ("**NGLC**"). The corporate history of NGLC is described in **Attachment 1**[1].

6.     This Notice pertains to the following waste disposal sites that may present an imminent and substantial endangerment to public health and the environment:

a.    **First Endangerment - Disposal of Methane**. The presence of methane gas at high concentration and pressure around the perimeter of James Park in Evanston is caused by the escape of methane gas from operating and inactive gas distribution infrastructure owned and operated by the ComEd Companies or Nicor Companies, as described in (i) the Order issued on July 3, 2014 (the "Order") by Evanston's Fire Chief to ComEd and AGL, enclosed as **Attachment 2**, (ii) the January 30, 2015 report from David M. Hendron, PE, Senior Project Manager, SCS Engineer ("Hendron"), entitled "Opinion on the Source of the Occurrence of Petroleum and Gas in Monitor Wells and Borings in the James Park Area" (the "2015 Hendron Report"), enclosed as **Attachment 3**, and (iii) the February 10, 2016 report prepared by Hendron entitled "Sampling and Analytical Report for Dodge Avenue Water Main Replacement" (the "2016 Hendron Report"), enclosed as **Attachment 4**. See Section II, below

b.    **Second Endangerment - Methane Created by the Disposal and Degradation of MG Waste Oils**. The presence of methane gas at high concentration and pressure in and around James Park is created as a byproduct of the biodegradation or digestion of oil, tar

---

[1]     The enclosed CD-ROM contains this letter and the referenced Attachments as an Acrobat PDF file. The PDF file is bookmarked for ease of navigation.

and petroleum materials (hereafter "MG Waste Oils"[2]) produced by the former Skokie Manufactured Gas Plant (hereafter the "Skokie MGP") and conveyed by gas distribution infrastructure associated with the Skokie MGP, including Unidentified 24-Inch Pipes located in Oakton Street and Dodge Avenue, that are owned and operated, or were owned and operated, by the ComEd Companies or Nicor Companies, as described in the 2015 and 2016 Hendron Reports, Attachments 3 and 4, respectively. See Section III, below. The City is informed and believes that NGLC, and its successors, owned and operated the Skokie MGP from approximately 1910 to 1950.

c. **Third Endangerment - Contamination of Soil, Groundwater, Atmosphere and Drinking Water Caused by Disposal of MG Waste Oils**. MG Waste Oils are present in soil and groundwater in and around James Park, and, specifically appearing as a crustaceous coating ("black crust") on a potable water line running along Dodge Avenue in Evanston (the "Dodge Avenue Water Line") which (1) threatens to penetrate the Dodge Avenue Water Line and contaminate drinking water with constituents of MG Waste Oils and which (2) has in fact penetrated the Dodge Avenue Water Line and released constituents of MG Waste Oils to the drinking water therein, specifically fluoranthene and phenanthrene, as described in (i) the 2015 Hendron Report, Attachment 3, (ii) the September 25, 2015 correspondence to Ms. Susan Hedman, then Region 5 Administrator (the "Hedman Letter"), enclosed as **Attachment 5**, (iii) the 2016 Hendron Report, (iv) the email addressed to Leveret Nelson, Regional Counsel, U.S. EPA Region 5 dated February 12, 2016 (the "Nelson Email"), enclosed as **Attachment 6**, and (v) Table 1, "Drinking Water and Internal Pipe Crust Results - Detected VOCs and SVOCs Water and Internal Crust Samples from Sites Near Dodge Avenue Water Main Replacement Project" and associated Laboratory Reports (the "Drinking Water Data"), enclosed as **Attachment 7**. See Section IV, below

## II.    FIRST ENDANGERMENT – DISPOSAL OF METHANE GAS

7.    James Park is owned by the City and is located at Oakton Street and Dodge Avenue. James Park has a playground for children, eight baseball fields, five soccer/football fields, toboggan hill, six tennis courts, a basketball court, field house and public gardens. For the location of James Park, see Order, Attachment 10, Boring Locations. See also http://cityofevanston.org/parks-recreation/parks/

---

[2]    The oils used, and the wastes produced, at the Skokie MGP, and oils, contaminants and impurities entrained in the gas manufactured and distributed from the Skokie MGP, are referred to variously as Lowe Process Waste Oil (after the "Lowe (Williamson) process), "carbureted water gas", "tar" and "coal tar", among others. *See* 2015 Hendron Report, Attachment 3. This Notice letter will refer to these substances, and substances entrained in the manufactured gas produced at the Skokie MGP, as "Manufactured Gas Waste Oils" or "MG Waste Oils". This letter will also refer specifically to Lowe Process Waste Oil when appropriate.

8.     Dawes Elementary School is located at 440 Dodge Avenue in Evanston, operated by Evanston/Skokie School District 65, and enrolls approximately 375 students in kindergarten through the fifth grade. For the location of the Dawes Elementary School, see Order, Attachment 10, Boring Locations. See also http://dawes.district65.net

9.     The Levy Senior Center is located at 300 Dodge Avenue, operated by the City, and offers social services and programs for seniors, including exercise classes and lunch programs. For the location of the Levy Senior Center, see Order, Attachment 10, Boring Locations.  See also  http://cityofevanston.org/parks-recreation/levy-senior-center/

10.     From approximately the 1890's until the early 1940's clay was mined from the area now known as James Park. From approximately the 1940's until 1965 the clay mining excavation was filled with what is believed to be non-putrescible solid waste (the "James Park Landfill" or "JPL").

11.     In November 2012, the Metropolitan Water Reclamation District of Greater Chicago ("MWRDGC") detected methane gas in high concentration (86%) in boring B-11, located to the southwest of the JPL.  For the location of boring B-11 in relationship to the JPL, see Order, Attachment 10, Boring Locations. See also August 12, 2014 Memorandum from Thomas Rivera, Illinois Environmental Protection Agency ("IEPA"), enclosed as **Attachment 8** (methane gas encountered in boring B-11 at a concentration of 100% and at pressure that filled a black garbage bag in less than one minute).  On November 29, 2012, the MWRDGC advised the City that the James Park Landfill was purportedly the likely source of the methane gas detected in boring B-11.  A copy of the November 29, 2012 letter is enclosed as **Attachment 9**.

12.     On May 14, 2014, the City informed Nicor that methane gas had been detected at high concentration and pressure at James Park and that a natural gas transmission line may be the source. Nicor was informed that methane gas was detected at a static pressure of 300 inches in GMP10, a pressure much higher than typically found inside a landfill. GMP10 is located directly east of Dawes School. See Order, Chronology, May 13, 2014, and Attachment 10 for the location of GMP10.

13.     The City continues to measure methane gas in high concentrations and pressure in four gas monitoring wells located around the perimeter of James Park, in GMP1 (87%), GMP10 (87%), GMP 19 (85%) and GMP11 (82%). See Boring Map for James Park dated August 18, 2014, Figure 2, enclosed as **Attachment 10** and the 2015 Hendron Report, Attachment 3.  GMP1 is located at the southwest corner of James Park. GMP10, GMP19 and GMP11 are all located in close proximity to Dawes School. GMP19 is located less than 20 feet from the entrance to the School.

14.     Methane gas at the concentrations and pressures detected around the perimeter of James Park and in close proximity to the Dawes Elementary School and Levy Senior Center may present an imminent and substantial endangerment to human health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B). For current

references on some of the hazards resulting from leaking natural gas conveyance lines, see:

    a.    Combined NBC News and USA Today Investigation, "Hidden Danger" that aired on September 22, 2014, on the risk of explosion presented by deteriorating cast iron gas distribution lines.

    b.    September 22, 2014 USA Today report, "Look out below: Danger Lurks Underground From Aging Gas Pipes," enclosed as **Attachment 11.**

    c.    September 29, 2010 New York Times article, "California: Death Toll Rises To 8 In Pipeline Explosion [San Bruno, Calif.]", enclosed as **Attachment 12.**

    d.    April 2, 2014 New York Times article, "California Utility Indicted on 12 Federal Criminal Charges in 2010 Gas Pipeline Explosion", enclosed as **Attachment 13**.

15.    On May 28, 2014, the City advised Nicor that, according to the United States Environmental Protection Agency ("USEPA"), the typical concentration of methane in landfill gas is in the range of 45% - 60%, which means a natural gas pipeline, not the James Park Landfill, is the more likely source of the methane gas detected at concentrations in excess of 85% around the perimeter of James Park. See Order, Chronology, May 28, 2014 and attachments, and USEPA website referenced therein.

16.    The Order directed Nicor to, *inter alia*, (1) provide the City with documentation with respect to natural gas distribution pipelines that Nicor historically operated, or presently operates, in the vicinity of James Park, and (2) undertake an assessment of whether those structures are the source of the methane gas at issue.

17.    On July 29, 2014, Nicor advised the City that it would not comply with the Order, claiming that the James Park Landfill, not its gas distribution lines, is the source of the methane gas detected at high concentration and pressure around the perimeter of James Park. See July 29, 2014 letter from Nicor to the City, enclosed as **Attachment 14**.

18.    Since May 2014, the City's Fire and Life Safety Services has been monitoring methane gas as a percentage of its lower explosive limit in the basements of Dawes Elementary School, the Levy Senior Center and other locations.

## A.    CONTRIBUTOR TO THE ENDANGERMENT PRESENTED BY DISPOSAL OF METHANE GAS – GAS LEAKAGE

19.    On information and belief, the documentation with respect to natural gas distribution pipelines that Nicor historically operated, or presently operates, in the vicinity of James Park reflects that they were installed in the early part of the twentieth century, or earlier, and were constructed of cast iron. See Order, Chronology, February 16, 1910, April 22, 1910, January 23, 1911, August 20, 1969 and December 17, 1969,

and attachments referenced therein (describing cast iron gas distribution pipes installed in the vicinity of James Park by NGLC or Nicor under the North Shore Channel and along Oakton Street).

20. Nicor has publicly acknowledged that its cast iron gas distribution pipes are prone to leakage, endanger public safety, and must be replaced within the next four years. Nicor has developed a "Qualified Infrastructure Plan" and "Distribution Integrity Management Program" which, according to Nicor, are "designed to, among other things, identify threats, evaluate and rank risks, and to identify and implement measures to address risks." See Northern Illinois Gas Company d/b/a Nicor Gas Company, Application for Approval of a Tariff pursuant to Section 9-220.3 of the Public Utilities Act, April 7, 2014, Case Number: 14-0292, enclosed as **Attachment 15**. See also Northern Illinois Gas Company d/b/a Nicor Gas Company, Application for Approval of a Tariff pursuant to Section 9-220.3 of the Public Utilities Act, Illinois Commerce Commission Case No. 14-0292, Final Order (July 30, 2014), p. 4, enclosed as **Attachment 16**.

21. The James Park Landfill, which closed in 1965 and did not receive putrescible waste, is not the cause of the methane gas at issue, which is detected at (a) concentrations in excess of 85%, (b) at a static pressure of up to 300 inches, and (c) in the vicinity of Nicor's aged cast iron gas distribution pipelines, which (d) Nicor admits are prone to leakage, endanger public safety and must be replaced.

22. On information and belief, as of July 29, 2014 when it refused to comply with the Order, Nicor knew or should have known that the source of the methane gas at issue is leakage from its aged gas distribution line(s) in the vicinity of James Park, not the James Park Landfill.

23. Leakage from aged gas distribution line(s) in the vicinity of James Park presents an imminent and substantial endangerment to public safety, specifically occupants, visitors, guests, teachers, parents, students and seniors at James Park, Dawes Elementary School and Levy Senior Center.

24. Hendron conducted an analysis (see 2015 Hendron Report, Attachment 3) to confirm the source of the methane gas at issue. Hendron evaluated the following three sets of data:

    a. Comparison of pressure and concentrations of methane taken from wells around the perimeter of James Park with the pressure and concentrations of methane in monitor wells installed in the JPL;

    b. Comparison of the detailed chemistry from samples taken from wells around the perimeter of James Park with the detailed chemistry of samples taken from wells in the JPL, to determine whether the chemistry of the perimeter samples is consistent with landfill gas; and

c.      Comparison of the relative age of samples taken from wells around the perimeter of James Park with the relative age of samples taken from wells in the JPL, to determine whether the age of the gas in the perimeter wells is similar to the age of the gas taken from the wells in the JPL.

25.     All three data sets confirm that leakage from gas pipeline(s), or the degradation of MG Waste Oils into methane, and not the JPL or natural geologic conditions, are the sources of the methane gas at issue.

**1.      Comparison of Methane Concentrations and Pressure**

26.     Methane gas is found in high concentrations and pressure in wells installed around the JPL. Additional wells were installed around the perimeter of James Park near wells exhibiting methane at high concentrations and pressure. Two wells were installed in waste, GMP18 and GMP17, as close as possible to those perimeter wells exhibiting methane at high concentrations and pressure, GMP10 and GMP1.

27.     If the JPL were the source of the methane gas at issue, methane should be present at comparatively high concentrations and pressure in GMP17 and GMP18. The concentrations and pressures measured in the wells installed in the JPL are in fact *several orders of magnitude less* than those measured in the wells installed around the perimeter of James Park. The methane concentration and pressure data confirms that the methane gas at issue is caused by leakage from gas pipeline(s), or the degradation of MG Waste Oils into methane, and not the JPL.

**2.      Detailed Chemistry**

28.     Chemistry tests were performed on samples taken from wells around the perimeter of James Park and from the two wells installed in the JPL. If the JPL were the source of the methane gas at issue, the "chemical fingerprint" of gasses found in the two sets of chemistry data should be consistent with each other.

29.     The contrast between the "chemical fingerprint" of the gas in the JPL and the gas around the perimeter of James Park confirms that the methane gas at issue is caused by leakage from gas pipeline(s), or the degradation of MG Waste Oils into methane, and not the JPL.

**3.      Relative Age Dating of Methane Gas Using Carbon 14 Testing**

30.     In addition to the detailed chemistry testing of gasses from wells installed on the perimeter of James Park and in the waste in JPL, isotopic and Carbon 14 ("C14") testing was performed on separate samples from these wells.

31.     The C14 testing confirms that gasses collected from the wells installed around the perimeter of James Park *are orders of magnitude older* than gasses collected from waste within the James Park Landfill. The analysis of the age data also confirms that the methane gas at issue is caused by leakage from gas pipeline(s), or the degradation of MG Waste Oils into methane, and not the JPL.

**4.  Gas Pipelines in the Vicinity of James Park**

32.  At a meeting on June 2, 2014, the City provided Nicor with an overview of data relating to the JPL. The City requested that Nicor produce documents describing the tunnel constructed under the North Shore Channel in 1910 and other gas pipelines in the vicinity of the JPL, which Nicor agreed to do.

33.  Since the June 2, 2014 meeting with Nicor, the City has identified the location of other gas lines in the vicinity of the JPL, apart from the 1910 Tunnel:

> a.  An Unidentified 24-inch gas pipe 5 feet below the surface of the Channel, *circa* 1968.  See November 11, 1968, Drawing 2 of 4, prepared by the Northern Illinois Gas Company, enclosed as **Attachment 17**.

> b.  A 48" abandoned gas main located approximately 300 feet west of GMP1 and GMP1A.  See Mulford Street Sewer Plan and Profile, Drawing No. 5221D-RS26 R1, dated February 1991.  See **Attachment 18** hereto depicting location of "48" Exist. Gas Main (Abandoned)" and **Attachment 19** hereto depicting the location of the abandoned gas main in relation to GMP1.

> c.  Another channel/tunnel crossing due west of the 48" abandoned gas main at Mulford Street.  See **Attachment 19** hereto, depicting the location of the tunnel/channel going to the MWRDGC system.  On information and belief, the 48" main is of the type that would have been used in the early twentieth century to convey methane gas at low pressure, such as the methane produced by the Skokie MGP located west of the channel and the crossing at Mulford Street.

> d.  Evanston's Water Division has observed an Unidentified 24-inch Pipe along Dodge Avenue.  See **Attachment 20** hereto, depicting a length of pipe as a blue line, running north and south along Dodge Avenue. See also 2015 and 2016 Hendron Reports, Attachments 3 and 4, respectively, confirming the location of the Unidentified 24-Inch Pipe at three locations in Dodge Avenue and one location in Oakton Street.

34.  Hendron concluded that the JPL and natural geologic conditions are not the source of the methane at high pressure and concentration in and around James Park.  Hendron further concluded the leakage of methane from Leakage of natural gas from existing and abandoned natural gas pipelines in the vicinity of James Park, or the degradation of MG Waste Oils into methane, are the sources of the methane. *See* 2015 Hendron Report, Attachment 3

### III. SECOND ENDANGERMENT - METHANE CREATED BY THE DISPOSAL AND DEGRADATION OF MG WASTE OILS

35.     The Lowe Process, the process employed at the Skokie MGP, produces an oily waste with a relatively low viscosity (the waste is very liquid). The Lowe Process waste oil is also dense (heavy).  The combination of low viscosity and high specific gravity (density) allows the oil to travel through soil, clay, groundwater and bedrock.

36.     Due to its low viscosity (liquidity) and high density (weight), it only takes between a few years to approximately two decades for Lowe Process waste oil to travel through glacial tills and groundwater to reach bedrock.

37.     At least three distribution lines are located in the vicinity of James Park which historically transported manufactured gas from the Skokie MGP: (1) a 48" gas line located immediately south of James Park (the "Abandoned Gas Line"), (2) a tunnel constructed in 1910 by NGLC under what was known as the North Shore Channel, located to the west of James Park and then running along Oakton Street immediately north of James Park (the "1910 tunnel") and (3) the Unidentified 24-inch Pipes encountered in three locations in Dodge Avenue and one location in Oakton Street during the Dodge Avenue Work (as hereafter defined in ¶ 40, below). See 2016 Hendron Report, Attachment 4, Figure 1, "Dodge Avenue Utilities and Sample Locations" (four instances where the Unidentified 24-inch Pipe was encountered appear as red dashed lines)

38.     In August 2014, Hendron observed work that was being performed by the City's Water Division on the west side of Dodge Avenue at Kirk Street to repair a water line break ("2014 Excavation") that had occurred at the intersection of Mulford Avenue, in the vicinity of Dawes Elementary School and Levy Senior Center (the "Dodge Avenue Water Line").  See Attachment 15 hereto, depicting, in blue shading, the location of the August 12, 2014 excavation. The Dodge Avenue Water Line conveys potable water to residents of the City.

39.     The Dodge Avenue Water Line is approximately 5 feet below the location of a 12-inch diameter gas pipeline. The Water Division has had to repair numerous breaks in the Dodge Avenue Water Line. The Dodge Avenue Water Line beneath the gas pipeline has become coated with a black crust. This condition is present at multiple locations along Dodge Avenue. See Attachments 20 and 21 hereto, depicting the locations where the gas pipeline has been encountered since at least 2004. See also **Attachment 20** hereto, depicting, in purple shading, the location where the gas pipeline was observed during the 2014 Excavation. Photographs of the August 2014 excavation, black water in the bottom of the excavation, the water pipe and the black crust are enclosed as **Attachment 22**.

40.     The City was scheduled to replace a portion of the Dodge Avenue Water Line in August 2015 (the "Dodge Avenue Work"). This work presented an opportunity for Hendron to locate the Unidentified 24-inch Pipe(s) and further investigate the disposal of MG Waste Oils in Dodge Avenue, specifically the release of MG Waste Oils from the

Unidentified 24-inch Pipe(s) and other gas distribution infrastructure associated with the Skokie MGP. Prior to commencing the Dodge Avenue Work, on June 17, 2015, Nicor, ComEd and the City entered into an "Evidence Preservation Agreement – City Water Main Project", enclosed as **Attachment 23**. The Evidence Preservation Agreement provided, among other things, for the observation of the Work by Nicor and ComEd and sharing of split samples. The City provided Nicor and ComEd with the 2015 Hendron Report before the Work commenced. Nicor and ComEd collected a split of each sample Hendron collected. Since the Fall of 2015, when Nicor and ComEd received the laboratory analyses of their split samples, if not before, Nicor and ComEd have had the same data contained in the 2016 Hendron Report, and have known that MG Waste Oils not only coat, but have penetrated, the Dodge Avenue Water Line.

41.     The following facts, confirmed in the 2015 and 2016 Hendron Reports, Attachments 3 and 4, respectively, demonstrate that that the Unidentified 24-Inch Pipelines in Dodge Avenue and Oakton Street are the source of the black coal tar crust (black crust) on the outside and inside of the Dodge Avenue Water Line:

    a. The Water Division has historically encountered the Unidentified 24-inch Pipe encrusted with black crust when performing repairs on the Dodge Avenue Water Line. The Dodge Avenue Work confirmed the Unidentified 24-inch Pipe is present in at least four locations in Dodge Avenue and Oakton Street, approximately five feet above the Dodge Avenue Water Line. See 2016 Hendron Report, Attachment 4, Figure 1, "Dodge Avenue Utilities and Sample Locations" (four instances where the Unidentified 24-inch Pipe was encountered is marked in red dashed lines)

    b. On information and belief, the Unidentified 24-inch Pipe extends along Dodge Avenue north from Oakton Street as far south as Howard Street, and perhaps beyond. On information and belief, the Unidentified 24-inch Pipe extends west along Oakton Street from Dodge Avenue to the Skokie MGP.

    c. There is a perfect match between the compounds detected in the black crust on the Unidentified 24-inch Pipe and compounds known to be present in MG Waste Oil. *See e.g.* 2016 Hendron Report, Attachment 4, Table 4, "Summary of Detected Soil Semi-Volatile Organic Compound Analytical Results," Exterior Pipe Crust Sample 78+95+4E/4 (third highest concentration of Benzo[a]Pyrene, a constituent of MG Waste Oil, was detected along the bottom of the exposed Unidentified 24-inch Pipe) See also **Attachment 24**, Table 1 extracted from the 2015 Hendron Report, Attachment 4 and a magnified view of Exterior Pipe Crust Sample 78+95+4E/4 depicted in Figure 1. See also 2015 Hendron Report, Attachment 3, Table 3, "Table 2 Comparison of Black Crust SVOCs with a List of Coal Tar Compounds Typically Found at MGP Sites by the NYSDEC and USEPA and With Compounds Actually Found at the Skokie MGP Site Near James Park"

    d.  Soil samples taken during the Dodge Avenue Work confirm that soil between the Dodge Avenue Water Line and the Unidentified 24-inch Pipe is stained black, similar in appearance to the color of the black crust, and contains the same contaminants found in MG Waste Oil. *See* 2016 Hendron Report, Attachment 4, Tables 3 and 4 See also 2015 Hendron Report, Attachment 3, Table 3, "Table 2 Comparison of Black Crust SVOCs with a List of Coal Tar Compounds Typically Found at MGP Sites by the NYSDEC and USEPA and With Compounds Actually Found at the Skokie MGP Site Near James Park

    e.  Black groundwater was observed oozing into GMP10, which is located immediately west of the August 2014 excavation. Laboratory analysis of the groundwater revealed the same compounds found in the analysis of the black crust. See 2015 Hendron Report, Attachment 3, Figure 6, Photograph of Water Removed from GMP-19Ss.

    42.    The Skokie MGP, by means presently unknown, leaked MG Waste Oil into the environment, including soil, groundwater and bedrock, which may have migrated towards and into James Park and surrounding areas.

    43.    MG Waste Oils, by means presently unknown, escaped from the gas distribution infrastructure associated with the Skokie MGP. On information and belief, the infrastructure associated with the Skokie MGP, including, but not limited to, a 48" gas line, the 1910 Tunnel and the Unidentified 24-inch Pipe, contained traps, meters, valves, vaults and other structures that collected MG Waste Oils, in the form of condensate, from gas manufactured by the Skokie MGP. On information and belief, MG Waste Oils were released into the environment from these traps, meters, valves, vaults and other structures that collected MG Waste Oil condensate.

    44.    MG Waste Oils are present in soil, groundwater and bedrock in and around James Park, including Dodge Avenue and Oakton Street. MG Waste Oils have been observed as a coating ("black crust") on the Dodge Avenue Water Line and the Unidentified 24-inch Pipe encountered during the Dodge Avenue Work at three locations in Dodge Avenue and one location in Oakton Street.

    45.    As result of this disposal of MG Waste Oils, both at the Skokie MGP and from the gas distribution infrastructure associated with the Skokie MGP (including the Unidentified 24-inch Pipe encountered in Dodge Avenue and Oakton Street during the Dodge Avenue Work), MG Waste Oils have biodegraded into methane gas (a Contaminant) that is present at high pressure and concentration in and around James Park, including the Dawes Elementary School and Levy Senior Center.

## III.    THIRD ENDANGERMENT – CONTAMINATION OF SOIL, GROUNDWATER, ATMOSPHERE AND DRINKING WATER CAUSED BY THE DISPOSAL OF MG WASTE OILS

46.  The Dodge Avenue Work revealed that the Dodge Avenue Water Line is coated with MG Waste Oils, in the form of a black crust. See 2015 Hendron Report, Attachment 4.

47.  The MG Waste Oils coating threatens to penetrate the Dodge Avenue Water Line and contaminate the City's drinking water.

48.  MG Waste Oils have penetrated the Dodge Avenue Water Line and contaminated the City's drinking water with constituents of MG Waste Oils, including fluoranthene and phenanthrene. *See* (i) the 2015 Hendron Report, Attachment 3, (ii) the Hedman Letter, Attachment 5, (iii) the 2016 Hendron Report, Attachment 4, (iv) the Nelson Email, Attachment 6, and (v) Drinking Water Data, Attachment 7.

## III.  CONLUSION

49.  On information and belief, the handling, storage, treatment or disposal of solid or hazardous waste, namely natural gas and MG Waste Oils, has caused hazardous substances to be present in soil, groundwater and atmosphere in James Park, Oakton Street, Dodge Avenue and other areas.

50.  On information and belief, methane gas is present in concentrations and pressure (greater than 85% methane and at static pressure as high as 300 inches) that presents a risk of a catastrophic explosion, and may present an imminent and substantial endangerment to human health and the environment.

51.  On information and belief, methane gas is present at high concentration and pressure as a consequence of an historic release, or ongoing release, of natural gas from infrastructure associated with the distribution of natural gas that was owned and operated by ComEd Companies or Nicor Companies or is owned and operated by ComEd Companies or Nicor Companies.

52.  On information and belief, the presence of methane gas at high concentration and pressure is caused by the disposal of MG Waste Oils, by ComEd Companies and Nicor Companies, that has biodegraded into methane gas.

53.  On information and belief, as a consequence of the disposal activities of MG Waste Oils by the ComEd Companies and Nicor Companies, the Dodge Avenue Water Line is coated with MG Waste Oils (a black crust) that threatens to penetrate the Water Line and contaminate drinking water in the City of Evanston.

54.  On information and belief, as a consequence of the disposal activities of MG Waste Oils by the ComEd Companies and Nicor Companies, the Dodge Avenue Water Line is coated with MG Waste Oils (a black crust) that has penetrated the Water Line and contaminated drinking water in the City of Evanston with constituents of MG Waste Oils, including fluoranthene and phenanthrene.

55.  On information and belief, the disposal of MG Waste Oils has caused levels of hazardous substances to be present (a) in groundwater in excess of

groundwater remediation objectives established by IEPA, (b) in soil in excess of soil remediation objectives established by IEPA, and (c) above construction worker exposure standards established by IEPA, and may present an imminent and substantial endangerment to human health and the environment.

56. On information and belief, byproducts of VOCs and SVOCs in soil and groundwater at levels exceeding IEPA soil, groundwater and construction worker standards, may also present an imminent and substantial endangerment to public health and the environment.

    a. VOCs and SVOCs in soil and groundwater may volatilize and migrate into the subsurface structures (*e.g.*, vaults and utility corridors), aboveground structures (*e.g.* the Dawes Elementary School and Levy Senior Center) and the atmosphere. See, *e.g.,* 35 IAC §§ 742.310 and 742.312 (Outdoor and Indoor Inhalation Exposure Routes, respectively)

    b. The VOCs and SVOCs, such as benzo[a]Pyrene, may degrade into compounds that are also toxic and hazardous.

    c. VOCs and SVOCs, including petroleum, may be digested by organisms, through a process known as anaerobic methanogenesis, to form volatile and possibly combustible gases, such as methane.

57. On information and belief, hazardous substances are present in the MG Waste Oils at levels in excess of soil saturation levels (abundant levels of free product) and in excess of soil remediation objectives established by the IEPA, and may present an imminent and substantial endangerment to human health and the environment.

58. On one or more occasions, the particulars of which are not presently known to the City, but occurring as early as 1910 and as recently as the present, one or more of the persons or entities to whom this Notice is directed has caused or allowed the release of a solid or hazardous waste or hazardous substances within the meaning of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.* ("RCRA") and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), respectively, into the soil and groundwater of James Park, Dodge Avenue and other locations in Evanston.

59. As a result of such releases, soils, groundwater and the atmosphere at James Park, Dodge Avenue and other locations in Evanston have become contaminated by, or are threatened to be contaminated by, solid or hazardous wastes or hazardous substances.

60. The parties to whom this Notice is directed have contributed or are contributing to the past or present handling, storage or disposal of substances which are solid waste or hazardous waste, within the meaning of RCRA.

61. The presence of the described unconfined waste disposal sites, and the contamination of the soils, groundwater and atmosphere at James Park, Dodge Avenue

13

and other locations in Evanston, and drinking water within the City, may present an imminent and substantial endangerment to human health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B).

62. The City intends to file suit against each of the persons and entities to whom this Notice of Intent to Sue is directed pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), as well as under applicable common law and equity.

63. The City has incurred necessary response costs, within the meaning of CERCLA, including, but not limited to (a) the cost of the 2015 and 2016 Hendron Reports, Attachments 3 and 4, respectively, and (b) the cost of the City's Fire & Life Safety Services monitoring of methane gas in the basements of Dawes Elementary School, the Levy Senior Center and other locations in Evanston.

City of Evanston

By: _____

Jeffery D. Jeep
One of Its Attorneys

Jeffery D. Jeep
Jeep & Blazer, L.L.C.
3023 N. Clark Street, #214
Chicago, IL 60657
(708) 505-3801
jdjeep@enviroatty.com

cc:  **REGISTERED MAIL, RETURN RECEIPT REQUESTED**

Gina McCarthy
Administrator
United States Environmental Protection Agency
USEPA Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460

Robert A. Kaplan
Acting Regional Administrator
USEPA Region 5
77 West Jackson Boulevard, Mail Code: R-19J
Chicago, IL 60604-3507

Loretta E. Lynch
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Lisa Bonnett
Director
Illinois Environmental Protection Agency
1021 N. Grand Avenue East
P.O. Box 19276
Springfield, IL 62794-9276

# EXHIBIT C

EX-99.01 8 memorandumofunderstanding.htm MEMORANDUM OF UNDERSTANDING BETWEEN NICOR GAS AND COMMONWEALTH EDISON COMPANY

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU") is entered into this 20th day of July, 2007, by and between Northern Illinois Gas Company d/b/a Nicor Gas Company ("Nicor") and Commonwealth Edison Company ("ComEd") (collectively, the "Utilities") to reflect the agreement, in principle, entered into by Nicor and ComEd concerning allocation of certain costs relating to the remediation of particular manufactured gas plant sites ("Sites") in Illinois.

The terms "Shared Costs," "Final Cost Allocation," and "Coordinator/Utility," as used anywhere in this MOU, have the same meaning that they have in the Utilities' Interim Cooperative Agreement dated October 28, 1993, as amended.

1.                    With respect to the Sites listed on Attachment A hereto, the Final Cost Allocation shall be and shall result in Nicor being responsible for 51.73 percent, and ComEd being responsible for 48.27 percent, of any and all past and future Shared Costs.

2.                    With respect to the Sites listed on Attachment B hereto, the Final Cost Allocation shall be and shall result in Nicor being responsible for 0 percent, and ComEd being responsible for 100 percent, of any and all past and future Shared Costs. ComEd will become the Coordinator/Utility at any and all Sites listed on Attachment B other than the site described on Attachment B as "MGP Site at Clinton and Jackson, Ottawa, Illinois."

1

3.                With respect to Shared Costs that do not relate exclusively either to the Sites listed on Attachment A or to the Sites listed on Attachment B, but rather relate to the Utilities' MGP remediation program in general ("Program Costs"), the Final Cost Allocation shall be and shall result in Nicor being responsible for 50 percent, and ComEd being responsible for 50 percent, of any and all past and future Shared Costs.

4.                The Utilities will use the Final Cost Allocations described herein in all future Illinois Commerce Commission ("ICC") rate reconciliation proceedings.

5.                This MOU is subject to the negotiation of a definitive Settlement Agreement inclusive of, but not limited to, terms consistent with those set forth in this MOU. The Utilities agree to use their best efforts and to act in good faith promptly to negotiate and execute such a Settlement Agreement on or before September 10, 2007.

6.                The Settlement Agreement will be subject to and contingent upon approval by the ICC. The Utilities agree to use their best efforts and to act in good faith promptly to seek and obtain such approval. In the event that the ICC does not approve the Settlement Agreement, the Settlement Agreement and this MOU will be void.

7.                On the date of ICC approval of the Settlement Agreement, to the extent that either Utility has paid more or less than the amounts determined by the percentages in paragraphs 1 through 3 of this MOU, appropriate credits and debits, if required, will be made promptly to reflect the agreed upon percentage of each Utility's Final Cost Allocation, as specified in paragraphs 1 through 3 of this MOU. These credits and debits will be reflected in invoices for future remediation costs at Sites listed on Attachment A.

2

8.           If, before the ICC approval contemplated by this MOU becomes final and non-appealable, the Illinois General Assembly approves a change in Illinois law such that either party reasonably anticipates that it may be prevented by such change from obtaining, in whole or in part, recovery from customers of Shared Costs, then either party so potentially affected by such legislative action shall have the right to terminate this MOU and the Settlement Agreement, by giving notice of such termination to the other party within thirty (30) days of such change. In the event of such termination, neither Utility shall have any continuing obligation under either this MOU or the Settlement Agreement.

9.           The Utilities will promptly notify the arbitrators who are presiding over the Arbitration that is currently pending and captioned *Northern Illinois Gas Company v. Commonwealth Edison Company*, CPR File No. G-06-26H, that the Utilities have entered into this MOU, and will request that the arbitrators stay the Arbitration pending negotiation, execution, and ICC review and approval of the Settlement Agreement.

10.           The Settlement Agreement will provide that, subject to the provisions of paragraph 8 hereof, once a final Order of the ICC approving the Settlement Agreement becomes final and non-appealable, (A) the Utilities will request that the Arbitration be dismissed with prejudice, and (B) mutual releases, specified in the Settlement Agreement, releasing all claims for liability with respect to Shared Costs (other than as may arise out of the Settlement Agreement), will become effective.

3

11.        In the event the ICC rejects the Settlement Agreement, or in the event of termination of this MOU and the Settlement Agreement as provided in paragraph 8 hereof, either Utility may reinstate the Arbitration, in which case neither Utility will be deemed to have waived any claim, right, or defense as a result of this MOU or the Settlement Agreement, and neither this MOU nor the Settlement Agreement nor any communication or document related to either will be admissible in any way in any reinstated Arbitration.

Executed as of the date set forth above.

COMMONWEALTH EDISON COMPANY

By /s/ DARRYL M. BRADFORD
Darryl M. Bradford

NORTHERN ILLINOIS GAS COMPANY d/b/a Nicor Gas Company

By /s/ PAUL C. GRACEY, JR.
Paul C. Gracey, Jr.
Senior Vice President and General Counsel
July 24, 2007

4

### ATTACHMENT A*

1. Aurora Gas Light Company, River St. at North Avenue Bridge, Aurora
2. Belvidere Gas, Light & Fuel, Locust Street, Belvidere
3. Chicago Heights Gas Company, 17th & State Street, Chicago Heights
4. Cicero gas Company, Lombard & Garfield, Oak Park
5. Coal Products manufacturing Company, North Broadway, Lockport
6. Freeport Gas, Light & Coke Company, Liberty & Jackson St., Freeport
7. Geneseo Electric Light & Gas Company, Oakwood & First St., Geneseo
8. Illinois Northern Utility Company, Market & 14th, DeKalb
9. Illinois Northern Utilities Company, 227 Miller, Sterling
10. Joliet Gaslight Company, Station B, North Broadway & Ingalls St., Joliet
11. Kankakee Gas Company, Birch & Harrison St., Kankakee
12. LaGrange Gas Company, 47th & Bluff St., LaGrange
13. Lemont Gas, Light Company, Main & Lockport Rd., Lemont
14. Lincoln Water, Light & Gas Company, Sangamon & Dacatur St., Lincoln
15. Lockport Gas Company, 17th & I & M Canal, Lockport
16. Mendota Gas Company, Fifth St. & Ninth Ave., Mendota
17. Morris gas Company, Nettle & Jackson St., Morris
18. Morrison Gas & Electric, Market & S. Orange, Morrison
19. Northwestern Gas, Light & Coke Company, 912 Clark St., Evanston
20. Northwestern Gas, Light & Coke Company, Maple & Vermont, Blue Island
21. Northwestern Gas, Light & Coke Co./Niles Center Station, Oakton St. & McCormick Blvd., Skokie
22. Ottawa Gas, Light & Coke Company, Illinois & Walker St., Ottawa
23. Pontiac Light & Water Company, Vermillion & Water St., Pontiac
24. Streator Gas, Light & Coke Co., Water St. & Vermillion Rr., Streator

---

\*  The Utilities are not admitting at any of these sites or, except as otherwise provided in this MOU, waiving any rights or defenses.

5

## ATTACHMENT B*

1. MGP Site on Coal Gas Road, DuQuoin, Illinois
2. MGP Site on Bluff Street, Joliet, Illinois
3. MGP Site on Center Street, Geneseo, Illinois
4. MGP Site at Clinton and Jackson, Ottawa, Illinois
5. Dixon I (2nd St.)
6. Dixon II (River & Perry)
7. DuQuoin (Chestnut)
8. Elgin TDC-570-0044
9. Kenilworth
10. Mendota (Main St.)
11. Murphysboro I (Walnut)
12. Murphysboro II (Big Muddy)
13. Rockford (Avon & Cedar)
14. Rockford II (Mulberry)

_____

\*       The Utilities are not admitting liability at any of these sites or, except as otherwise provided in this MOU, waiving any rights or defenses.

6

# EXHIBIT D

**STATE OF ILLINOIS**

**ILLINOIS COMMERCE COMMISSION**

| | | |
|---|---|---|
| NORTHERN ILLINOIS GAS COMPANY | ) | |
| d/b/a NICOR GAS COMPANY and | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | |
| | ) | Docket No. 08- |
| Petition pursuant to Section 7-102 of the | ) | |
| Public Utilities Act for consent and approval of | ) | |
| an Agreement concerning the final allocation | ) | |
| of responsibility for costs relating to particular | ) | |
| manufactured gas plant remediation sites. | ) | |

## PETITION

Northern Illinois Gas Company d/b/a Nicor Gas Company ("Nicor Gas") and

Commonwealth Edison Company ("ComEd') (collectively "Joint Petitioners") hereby petition

the Illinois Commerce Commission ("Commission"), pursuant to Section 7-102 of the Public

Utilities Act ("Act") (220 ILCS 5/7-102), for consent and approval of a Final Allocation

Agreement ("FAA") concerning the final allocation of responsibility for certain costs relating to

the remediation of particular manufactured gas plant ("MGP") sites in Illinois, and a finding that

the proposed allocations are prudent and reasonable. In support of the Petition, the Joint

Petitioners state as follows:

1.     Nicor Gas is an Illinois corporation with its principal offices in Naperville,

Illinois. Nicor Gas is engaged in the business of furnishing gas utility service to the public in the

State of Illinois and, as such, is a public utility within the meaning of the Act.

2.     ComEd is an Illinois corporation with its principal offices in Chicago, Illinois.

ComEd is engaged in the business of furnishing electric utility service to the public in the State

of Illinois and, as such, is a public utility within the meaning of the Act.

3.      Prior to 1954, the then-existing assets of Nicor Gas were held by ComEd.  On January 22, 1954, ComEd and Nicor Gas entered into a Separation Agreement.  On February 9, 1954, ComEd and Nicor Gas entered into a General Conveyance, pursuant to which ComEd transferred and assigned to Nicor Gas all right, title and interest in certain gas and heating assets previously held by ComEd.

4.      On February 9, 1954, ComEd and Nicor Gas entered into a General Assignment and Assumption Agreement, addressing, among other issues, the allocation of responsibility between the two companies for obligations, liabilities, and duties with respect to the former MGP sites.

5.      In addition, due to other transactions, such as the merger of Mid-Illinois Gas Company (a former ComEd subsidiary) with Nicor Gas, both ComEd and Nicor Gas have connections to some of the same MGP sites.

6.      Pursuant to the federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Illinois Environmental Protection Act, and other legislation, environmental investigation and remediation were required at some former MGP sites.

7.      In order to facilitate performance of any necessary environmental investigation and remediation activities, Nicor Gas and ComEd entered into an Interim Cooperative Agreement ("ICA") in 1993.  Nicor Gas and ComEd requested and received Commission approval of the ICA in Docket No. 93-0431.

8.      In Docket No. 93-0431, the Commission found that the ICA would promote cost-effective and timely remediation of affected MGP sites.  Further, the ICA would avoid potentially duplicative or inconsistent remediation efforts.  The ICA facilitated prompt action by

2

establishing a mechanism for interim and final costs allocations, and encouraged expeditious investigations and remediation of environmental contamination.  Ultimately the ICA minimized or avoided costly litigation over remediation responsibility, to the benefit of the Joint Petitioners and their ratepayers.

9.      Pursuant to the terms of the ICA, the parties had the option to negotiate the final allocation of costs or to enter into arbitration to determine that allocation.  Specifically the ICA provides:

> 4.1  The final allocation of Shared Costs shall be determined on a site-by-site basis through negotiation or arbitration as set forth in this Agreement, although the Utilities may, if they so agree, aggregate individual sites for Final Cost Allocation.

10.     Arbitration proceedings were initiated by Nicor Gas in April 2006, but shortly afterwards the parties began negotiations in an effort to reach an amicable resolution of the issues surrounding a final allocation of cost responsibility.  Since then, Joint Petitioners have negotiated a final allocation percentage for historic and future shared costs.  These percentages are set forth in the FAA dated January 3, 2008, a copy of which is attached as Exhibit A to this Petition.  Under the FAA, Nicor Gas will be responsible for 51.73%, and ComEd for 48.27%, of all costs at sites that had been transferred to Nicor Gas pursuant to the 1954 General Conveyance referenced in paragraph 3 hereof; and Nicor Gas will be responsible for 0%, and ComEd for 100%, of all costs at sites that had not been transferred to Nicor Gas.  In addition, each of Nicor Gas and ComEd will be responsible for 50% of all costs that do not relate exclusively to either the transferred or the non-transferred sites.

11.     Joint Petitioners request the consent and approval of the FAA and the final cost allocations, as required by Section 7-102 of the Act.  220 ILCS 5/7-102.  Consistent with the

Commission's findings in Docket No. 93-0431, approval of the final cost allocation is in the public interest and the public will be convenienced thereby.  The FAA will allow the parties to continue with the cooperative remediation efforts that have been underway for fifteen years or more without being simultaneously engaged in expensive and time-consuming arbitration(s) over the 42 MGP sites in question.  In the absence of a settlement between the Joint Petitioners, the issues would have been resolved by arbitration, which would only have increased the ultimate costs to ratepayers without providing any offsetting benefits to them.

**WHEREFORE,** Northern Illinois Gas Company d/b/a Nicor Gas Company and Commonwealth Edison Company respectfully request that the Illinois Commerce Commission approve the Final Allocation Agreement, find the final cost allocation percentages set forth therein to be prudent and reasonable, and grant such other relief as may be just, reasonable and appropriate.

Dated:  July 2, 2008

Respectfully submitted,

NORTHERN ILLINOIS GAS COMPANY                    COMMONWEALTH EDISON COMPANY


By:  /s/ John E. Rooney                                        By:  /s/ David M. Stahl

Title:  One of the Attorneys for Nicor                  Title: One of the Attorneys for ComEd

John E. Rooney                                                      David M. Stahl
Phillip A. Casey                                                     Eimer Stahl Klevorn & Solberg LLP
Sonnenschein Nath & Rosenthal LLP               224 S. Michigan Ave. Suite 1100
233 South Wacker Drive                                      Chicago, Illinois 60604
Chicago, Illinois 60606                                        (312) 660-7600
(312) 876-8000                                                     dstahl@eimerstahl.com
jrooney@sonnenschein.com
pcasey@sonnenschein.com

## **VERIFICATION**

I, John E. Rooney, being first duly sworn, depose and state that I am an attorney for Northern Illinois Gas Company d/b/a Nicor Gas Company ("Nicor Gas"), that I have read the foregoing Petition relating to final allocation of costs between Nicor Gas and Commonwealth Edison Company, that I am familiar with the facts stated therein, and that to the best of my information and belief, the facts are true and correct.

John E. Rooney
Attorney for Northern Illinois Gas Company
d/b/a Nicor Gas Company

Subscribed and sworn to before me
this 2nd day of July, 2008.

Notary Public

"OFFICIAL SEAL"
TRINETTE A. GIOVANAZZI
Notary Public, State of Illinois
My Commission Expires 08/23/08

## **VERIFICATION**

I, David M. Stahl, being first duly sworn, depose and state that I am an attorney for Commonwealth Edison Co. ("ComEd"), that I have read the foregoing Petition relating to final allocation of costs between Northern Illinois Gas Company d/b/a Nicor Gas Company and ComEd, that I am familiar with the facts stated therein, and that to the best of my information and belief, the facts are true and correct.

David M. Stahl
Attorney for Commonwealth Edison Co.,

Subscribed and sworn to before me
this ____2____ day of July, 2008.

Notary Public

OFFICIAL SEAL
CATHY GUIMOND
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/31/12

# EXHIBIT A

# FINAL ALLOCATION AGREEMENT

This Final Allocation Agreement ("Agreement") is entered into this 3rd day of January, 2008, by and between Northern Illinois Gas Company d/b/a Nicor Gas Company ("Nicor") and Commonwealth Edison Company ("ComEd") (each a "Utility," and collectively, the "Utilities"), to reflect the Utilities' agreement concerning the final allocation of certain costs relating to particular former manufactured gas plant ("MGP") sites ("Sites") in Illinois.

WHEREAS, without admitting any liability, the Utilities entered into an Interim Cooperative Agreement dated October 28, 1993, and subsequently amended ("ICA"), to allow the Utilities to address certain issues at certain MGP Sites on an interim basis; and

WHEREAS, without admitting any liability, the Utilities have in the past incurred, and expect in the future to incur, Shared Costs relating to these MGP Sites; and

WHEREAS, the ICA provides for a Final Cost Allocation by negotiation or arbitration; and

WHEREAS, to obtain a Final Cost Allocation pursuant to the ICA, Nicor initiated arbitration that is currently pending and captioned *Northern Illinois Gas Company v. Commonwealth Edison Company*, CPR File No. G-06-26H ("Arbitration"); and

WHEREAS, the parties and the arbitration panel have agreed that the Arbitration shall be stayed pending the Illinois Commerce Commission's ("ICC") approval of this Agreement; and

WHEREAS, the Utilities entered into a Memorandum of Understanding ("MOU") on July 20, 2007, to reflect the Utilities' agreement in principle concerning the Final Cost Allocation of Shared Costs relating to these MGP Sites; and

WHEREAS, in the MOU, the Utilities agreed to use their best efforts and to act in good faith promptly to negotiate and execute this Agreement; and

WHEREAS, the Utilities have reached an Agreement, as detailed herein;

NOW THEREFORE, based on the covenants and mutual promises contained herein, Nicor and ComEd agree as follows:

1. Definitions

   1.1. The following terms, as used anywhere in this Agreement, have the same meaning that they have in the ICA: "Shared Costs," "Final Cost Allocation," and "Coordinator/Utility."

2. Final Cost Allocation

   2.1. Except as specified in paragraph 2.3, with respect to the Sites listed on Attachment A to this Agreement, the Final Cost Allocation shall be and shall result in Nicor being responsible for 51.73 percent, and ComEd being responsible for 48.27 percent, of any and all past and future Shared Costs.

   2.2. Except as specified in paragraph 2.3, with respect to the Sites listed on Attachment B to this Agreement, the Final Cost Allocation shall be and shall result in Nicor being responsible for 0 percent, and ComEd being responsible for 100 percent, of any and all past and future Shared Costs. ComEd will become the Coordinator/Utility at any and all Sites listed on Attachment B other than the Site described on Attachment B as "MGP Site at Clinton and Jackson, Ottawa, Illinois."

2.3. The parties recognize that there may be Shared Costs that do not relate exclusively either to the Sites listed on Attachment A or to the Sites listed on Attachment B, but rather relate to the Utilities' MGP remediation program in general ("Program Costs"). Program Costs could include, by way of example and without limitation, costs associated with site prioritization, costs associated with jointly owned equipment and costs associated with producing documentation to provide general instructions to contractors relating to the site investigations and remediations. The Final Cost Allocation shall be and shall result in Nicor being responsible for 50 percent, and ComEd being responsible for 50 percent, of any and all past and future Program Costs.

2.4. On the date of ICC approval of this Agreement, to the extent that either Utility has paid more or less than the amounts determined by the percentages in paragraphs 2.1 through 2.3 of this Agreement, appropriate credits and debits, if required, will be made promptly to reflect the agreed upon percentage of each Utility's Final Cost Allocation, as specified in paragraphs 2.1 through 2.3. These credits and debits will be reflected in invoices for future remediation costs at Sites listed on Attachment A.

3. ICC Approval

3.1. This Agreement, including the prudence and reasonableness of the Final Cost Allocations set forth in section 2 and the indemnities set forth in section 5 below, is subject to and contingent upon approval by the ICC.

3.2. The Utilities agree to use their best efforts, and to act in good faith, promptly to seek and obtain ICC approval of this Agreement, including the Final Cost Allocations and indemnities set forth herein.

3.3. In the event that the ICC does not approve this Agreement, including the Final Cost Allocations and indemnities set forth herein, this Agreement and the MOU shall be void, but the ICA shall remain in full force and effect.

3.4. In the event that the ICC approves this Agreement, including the Final Cost Allocations and indemnities set forth herein, (a) this Agreement shall supersede the MOU, (b) this Agreement shall control in the event of any conflict between this Agreement and the MOU or any conflict between this Agreement and the ICA, and (c) the date of such approval shall be the Effective Date of this Agreement.

3.5. If, before the ICC approvals contemplated by this Agreement become final and non-appealable, the Illinois General Assembly approves a change in Illinois law such that either party reasonably anticipates that it may be prevented by such change from obtaining, in whole or in part, recovery from customers of Shared Costs, then either party so potentially affected by such legislative action shall have the right to terminate the MOU and this Agreement, by giving notice of such termination to the other party within thirty (30) days of such change. In the event of such termination, neither Utility shall have any continuing obligation under either the MOU or this Agreement.

4. Pending Arbitration

4.1. Upon execution of this Agreement, the Utilities will jointly request that the stay of Arbitration be continued pending the ICC's review and approval of this Agreement, including the Final Cost Allocations and the indemnities set forth herein.

4.2. If and when a final Order of the ICC approving this Agreement, including the Final Cost Allocations and indemnities set forth herein, becomes non-appealable, the Utilities will request that the Arbitration be dismissed with prejudice.

4.3. In the event the ICC does not approve this Agreement, including the Final Cost Allocations and indemnities set forth herein, or in the event of termination of this Agreement as provided in paragraph 3.5, either Utility may reinstate the Arbitration, in which case neither Utility will be deemed to have waived any claim, right, or defense as a result of the MOU or this Agreement, and neither the MOU nor this Agreement nor any communication or document related to either will be admissible in any way in any reinstated Arbitration.

5. Release and Indemnity

5.1. Effective upon a final Order of the ICC approving this Agreement, including the Final Cost Allocations and indemnities set forth herein, becoming non-appealable, each Utility releases the other from all claims for liability with respect to Shared Costs (other than as may arise out of the agreed Final Cost Allocations described in section 2 and except as may be necessary to effectuate the indemnities provided in paragraphs 5.2 and 5.3).

5.2. Effective upon a final Order of the ICC approving this Agreement, including the Final Cost Allocations and indemnities set forth herein, becoming non-appealable, each Utility hereby indemnifies and agrees to defend and hold harmless the other against liability, including but not limited to any liability arising out of or relating to remediation, to any third party arising out of or relating to any of the Sites listed on Attachment A, for costs that are recoverable through the indemnifying party's rider

described hereafter (as such rider(s) may be amended from time to time): ComEd's Rider ECR (Ill. C. C. No. 4, sheet nos. 438 through 440.2, filed Aug. 11, 2006) or Nicor's Rider 12 (Ill. C. C. No. 16, sheet nos. 68-70, filed Sept. 30, 2005). The indemnification provided in this paragraph 5.2 is limited to the amount necessary to allow the Utilities to share in such third-party liability in the same proportion as the Final Cost Allocations set out in paragraph 2.1. The indemnification provided in this paragraph is in addition to any other indemnification rights, common law or otherwise, that the parties may have.

5.3. Effective upon a final Order of the ICC approving this Agreement, including the Final Cost Allocations and indemnities set forth herein, becoming non-appealable, ComEd hereby indemnifies and agrees to defend and hold harmless Nicor against liability, including but not limited to any liability arising out of or relating to remediation, to any third party arising out of or relating to any of the Sites listed on Attachment B, for costs that are recoverable through ComEd's Rider ECR (Ill. C. C. No. 4, sheet nos. 438 through 440.2, filed August 11, 2006), as such rider may be amended from time to time. The indemnification provided in this paragraph is in addition to any other indemnification rights, common law or otherwise, that the parties may have.

6. Entire Agreement. This Agreement and the Attachments to this Agreement (which are part of this Agreement) constitute the entire understanding of the Utilities with respect to this Agreement. No modification may be made to this Agreement except one signed by both Utilities that expressly states that it modifies this Agreement.

7. <u>Successors and Assigns.</u> This Agreement shall be binding upon the successors and assigns of the Utilities; provided that neither Utility can assign its rights under this Agreement without the other Utility's consent.

8. <u>Applicable Law.</u> This Agreement shall be interpreted under the laws of the State of Illinois.

9. <u>Dispute Resolution.</u> The parties agree to attempt to resolve any dispute arising out of or relating to this Agreement or its breach through good faith negotiation. If good faith negotiation fails to resolve the dispute, then the parties agree to submit the dispute to non-binding mediation and acknowledge that the role of the mediator is not to render a decision, but to assist the parties in reaching a mutually acceptable resolution. No party shall be bound by anything said or done in the course of mediation other than through an agreement in writing executed by both Utilities. If mediation fails to settle the dispute, then the parties agree that the dispute shall be settled by arbitration under and in accordance with the ICA. .

10. <u>Nonwaiver.</u> The Utilities do not admit liability at any of the Sites listed in Attachments A or B. Except as otherwise provided in this Agreement, the Utilities do not waive any rights or defenses, including rights to seek recovery of any costs that are recoverable through their respective environmental-cost-recovery riders, as described in paragraph 5.2.

11. <u>Method of Execution.</u> This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Executed as of the date set forth above

COMMONWEALTH EDISON COMPANY

By

_J. Barry Mitchell & President & COO ComEd_

[print name and title]

NORTHERN ILLINOIS GAS COMPANY d/b/a Nicor Gas Company

By

Russ M. Strobel, Chairman, President and Chief Executive Officer

[print name and title]

## ATTACHMENT A[1]

1. Aurora Gas Light Company, River St. at North Avenue Bridge, Aurora

2. Belvidere Gas, Light & Fuel, Locust Street, Belvidere

3. Chicago Heights Gas Company, 17th & State Street, Chicago Heights

4. Cicero gas Company, Lombard & Garfield, Oak Park

5. Coal Products manufacturing Company, North Broadway, Lockport

6. Freeport Gas, Light & Coke Company, Liberty & Jackson St., Freeport

7. Geneseo Electric Light & Gas Company, Oakwood & First St., Geneseo

8. Illinois Northern Utility Company, Market & 14th, DeKalb

9. Illinois Northern Utilities Company, 227 Miller, Sterling

10. Joliet Gaslight Company, Station B, North Broadway & Ingalls St., Joliet

11. Kankakee Gas Company, Birch & Harrison St., Kankakee

12. LaGrange Gas Company, 47th & Bluff St., LaGrange

13. Lemont Gas, Light Company, Main & Lockport Rd., Lemont

14. Lincoln Water, Light & Gas Company, Sangamon & Dacatur St., Lincoln

15. Lockport Gas Company, 17th & I & M Canal, Lockport

16. Mendota Gas Company, Fifth St. & Ninth Ave., Mendota

17. Morris gas Company, Nettle & Jackson St., Morris

18. Morrison Gas & Electric, Market & S. Orange, Morrison

---

[1] The Utilities do not admit liability at any of these Sites. Except as otherwise provided in this Final Allocation Agreement, the Utilities do not waive any rights or defenses, including rights to seek recovery of any costs that are recoverable through their respective environmental-cost-recovery riders, meaning ComEd's Rider ECR and Nicor's Rider 12.

19. Northwestern Gas, Light & Coke Company, 912 Clark St., Evanston

20. Northwestern Gas, Light & Coke Company, Maple & Vermont, Blue Island

21. Northwestern Gas, Light & Coke Co./Niles Center Station, Oakton St. & McCormick Blvd., Skokie

22. Ottawa Gas, Light & Coke Company, Illinois & Walker St., Ottawa

23. Pontiac Light & Water Company, Vermillion & Water St., Pontiac

24. Streator Gas, Light & Coke Co., Water St. & Vermillion Rr., Streator

## ATTACHMENT B[2]

1. MGP Site on Coal Gas Road, DuQuoin, Illinois

2. MGP Site on Bluff Street, Joliet, Illinois

3. MGP Site on Center Street, Geneseo, Illinois

4. MGP Site at Clinton and Jackson, Ottawa, Illinois

5. Dixon I (2nd St.)

6. Dixon II (River & Perry)

7. DuQuoin (Chestnut)

8. Elgin TDC-570-0044

9. Kenilworth

10. Mendota (Main St.)

11. Murphysboro I (Walnut)

12. Murphysboro II (Big Muddy)

13. Rockford (Avon & Cedar)

14. Rockford II (Mulberry)

---

[2] The Utilities do not admit liability at any of these Sites. Except as otherwise provided in this Final Allocation Agreement, the Utilities do not waive any rights or defenses, including rights to seek recovery of any costs that are recoverable through their respective environmental-cost-recovery riders, meaning ComEd's Rider ECR and Nicor's Rider 12.

# EXHIBIT E

July 3, 2014



**DELIVERY VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED**

Beth Reese, President
Northern Illinois Gas Company doing business as Nicor Gas
1844 Ferry Road
Naperville, IL 60563

John W. Somerhalder, Chairman, President and Chief Executive Officer
AGL Resources, Inc.
Ten Peachtree Place, N.E.
Atlanta, GA 30309

Paul R. Shlanta, General Counsel and Chief Compliance Officer
AGL Resources, Inc.
Ten Peachtree Place, N.E.
Atlanta, GA 30309

Upon discovery of elevated levels of Methane below James Park in Evanston, my priority concern has been the safety of our residents and those who utilize James Park for recreational purposes.

The City of Evanston, Illinois previously notified your subsidiary company, Nicor, and convened a meeting with Nicor representatives to discuss elevated methane readings at James Park and its environs in the City of Evanston. To this date, despite the City's many requests, Nicor, through its staff attorney, refuses to produce all relevant information related to the City's investigation regarding these elevated methane readings. A chronology of our communications is enclosed as **Attachment 1.**

Nicor, as a subsidiary entity of AGL, is the repository of documents relevant to the methane issues present at James Park. This order is being issued to AGL in its capacity as the parent company of Nicor. Thus any reference to Nicor in this order shall also refer to AGL. Also, any reference to Nicor includes its predecessors, including, but not limited to, Northwestern Gas Light & Coke Company and Public Service Company of Northern Illinois. An information copy of this Order is being provided to Commonwealth Edison Company, which is also a corporate successor to Northwestern Gas Light & Coke Company and Public Service Company of Northern Illinois.

The City of Evanston is a home rule municipality pursuant to Article VII, Section (6)a of the Illinois Constitution of 1970. It is undisputed that, "a home rule unit may exercise any power and perform any function pertaining to its government and affairs…" As a home rule unit, the City of Evanston's powers shall be construed liberally, and its ordinances are

presumed constitutional. Scadron v. City of Des Plaines, 153 Ill.2d 164 (1992). The City's ordinance set forth below further codifies its duty to safeguard the health, safety, and welfare of City residents.

The City of Evanston Code, section 9-12-2, provides in pertinent part:

## 9-12-2. LIABILITY FOR HAZARDOUS SUBSTANCE INCIDENT REMOVAL OR ABATEMENT COSTS.

(A)     The Fire and Life Safety Services Department is authorized to remove or abate the effects of any hazardous substance incident involving the actual or threatened hazardous material 1) upon or into property or facilities in the City or along its lakefront or 2) pursuant to any mutual aid box alarm system (MABAS) agreement in effect, it being understood that such aid will be rendered outside the City limits. The following described persons shall be jointly and severally liable a) to the City for the payment of all costs incurred by the City as a result of such removal and/or abatement activity, and b) to any member unit of the MABAS agreement rendering aid to the City pursuant to said agreement.

1.     The person or persons whose negligent, reckless, or willful act or omission proximately caused such release; and
2.     The person or persons who owned or had custody or control of the hazardous substance at the time of such release, without regard to fault or proximate cause; and
3.     The person or persons who owned or had custody or control of the container, transport vehicle, or transport vessel which held such hazardous substance at the time of, or immediately prior to, such release, without regard to fault or proximate cause; and
4.     **Any person owning or in control of any real property from which a hazardous substance is or may be released.** [emphasis added]

(B)     In the event that any person undertakes, voluntarily or upon order of the Fire Chief remove or abate the effects of any actual or threatened hazardous substance release upon or into any property or facility in the City, or along its lakefront, the Fire Chief may take such action as is necessary to supervise or verify the adequacy of the removal or abatement. The person(s) described in subsections (A)1 through (A)4 of this Section shall be liable to the City for all costs incurred as a result of such supervision or verification.
Pursuant to 49 CFR 172.101, methane is listed as a DOT hazardous material. And, given the elevated readings of methane at James Park (which includes the Levy Senior Center and Dawes Elementary School within the immediate vicinity), I declare that methane is a hazardous substance given the totality of the particular facts and circumstances pursuant to City Code Section 9-12-1. It is critical to the City's investigation that Nicor discharge its obligations pursuant to statute, as well as those of good faith and fair dealing by producing all documents demanded below.

Accordingly, as provided by the Code sections set forth and the City's home rule authority, **I hereby ORDER:**

Nicor shall provide all documentation regarding, inter alia:

1. All structures used in the past (1910 tunnel and 1910 24" line) and currently used (1969 24" main) in connection with the conveyance of manufactured or natural gas under the North Shore Channel in Evanston and Skokie, Illinois, including, but not limited to, Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 1 of 4, Sheet 3 of 4 and Sheet 4 of 4;

2. All chemical additives to natural gas transmitted through its system, including the manner, method and location of introduction;

3. All constituents, other than, methane contained in the natural gas transmitted through its system, including average ranges of concentration;

4. All repairs to its system within a 1 mile radius of James Park within the last 20 years;

5. Any and all subsurface structures at the Skokie Manufactured Gas Plant at a depth below ground surface at or greater than 25 feet; and

6. Any and all documents relating to the on-site and off-site disposal of waste from the Skokie Manufactured Gas Plant at locations within a 1 mile radius of the intersection of Oakton Street and McCormick Boulevard.

As provided by the Code sections set forth and the City's home rule authority, **I hereby further ORDER:**

1. NICOR undertake an assessment and evaluation of whether subsurface structures owned or operated by Nicor, including, but not limited to, the past (1910 tunnel and 1910 24" line) and currently used (1969 24" main) in connection with the conveyance of manufactured or natural gas under the North Shore Channel in Evanston and Skokie, Illinois, as depicted in the Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 2 of 4, are a source and means of conveyance of the methane gas detected at high concentrations and pressure in borings B-11, on MWRDGC property, and GMP1 – GMP13 around the parameter of James Park; or

2. Whether such subsurface structures are a means of conveyance for manufactured gas, natural gas or methane from another source; and

3. To provide all documents reviewed and relied upon by Nicor in undertaking these assessments and evaluations, including, but not limited to, the documents specified in Paragraphs 1 – 5 of this Order, above.

**Nicor shall produce all documents requested in Paragraph 1 – 5, above, to the City of Evanston Corporation Counsel by close of business on July 15, 2014.**

**Nicor shall produce the assessments and evaluations required by this Order to the City of Evanston Corporation Counsel by close of business July 25, 2014.**

The City, and not Nicor, will be the judge of whether the documents produced, and assessments and evaluations performed, comply with the terms of this Order. In light of the circumstances, specifically the detection of methane gas at high concentration and pressure in the vicinity of James Park, and specifically near Dawes Elementary School and

the Levy Senior Center, strict compliance with the deadlines in this Order are required.

Nicor must supplement its response(s) to this Order if, after submission of your response(s), additional information should later become known or available. Should Nicor find at any time after the submission of its response that any portion of the submitted information is false, inaccurate or misrepresents the truth, Nicor shall notify the City of Evanston Corporation Counsel as soon as possible.

The City reserves all rights at law and equity against Nicor and ComEd in the event Nicor fails to fully comply with the terms of this Order. This includes, but shall not be limited to, relief under federal and state laws, rules and regulations.

Very Truly Yours,

Greg Klaiber
Fire Chief, City of Evanston

Encl.

Cc w/out Encl:     The Honorable Elizabeth Tisdahl, Mayor
Wally Bobkiewicz, City Manager
W. Grant Farrar, Corporation Counsel
M. Partee, Staff Attorney, Nicor
D. Decker, Assistant General Counsel, Commonwealth Edison Company

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|------|-------|-----|
| 1871 | Northwestern Gas-Light & Coke Company ("Northwestern Gas") erected the Manufactured Gas Plant site[1] at Oakton Street and McCormick Boulevard in present day Skokie (the "Skokie MGP"). | |
| 1894 | Charles G. Dawes[2] forms Northwestern Gas. | |
| 1907 | Commonwealth Electric Company and Chicago Edison Company merged[3] to form Commonwealth Edison Company (ComEd). | |
| 02/16/1910 | Chicago Sanitary District (referred to collectively with the MWRDGC as the "District") and Northwestern Gas enter into agreement authorizing Northwestern Gas to construct a tunnel under the North Shore Channel (the "Tunnel" and "Channel", respectively). | 1 |
| 04/22/1910 | Drawings of the Channel are prepared by or for the District. The drawings denote a "proposed culvert," which may refer to the Tunnel. The drawing depicts a mining operation at what is now James Park and across Oakton Street. | 2 |
| 05/25/1910 | Northwestern Gas commences construction of the Tunnel under the Channel. | 1 |
| 07/10/1910 | Northwestern Gas completes construction of the Tunnel under the Channel. | 1 |
| 01/23/1911 | A drawing for a proposed water line along Oakton Street depicts the then constructed Tunnel, pipes leading to the Skokie MGP and the Skokie MGP. | 3 |
| 1949 | Sometime prior to 1950, Cicero Gas Company and Northern Illinois Utilities, Inc. were consolidated with Northwestern Gas (and perhaps other companies). Thereafter, the corporate name of Northwestern Gas was changed to Public Service Company of Northern Illinois ("PSCNI"). | 4 |
| 1953 | PSCNI merged[4] with ComEd. | |
| 1954 | ComEd created[5] Northern Illinois Gas Co (Nicor) to own and operate its gas properties. | |

---

[1] Source: http://www.livingplaces.com/IL/Cook_County/Evanston_City.html.

[2] Source: http://evanstonhistorymaven.blogspot.com/2011/02/dawes-house-home-of-renaissance-man_05.html.

[3] Source: http://www.fundinguniverse.com/company-histories/unicom-corporation-history/.

[4] Source: http://www.fundinguniverse.com/company-histories/unicom-corporation-history/.

[5] Source: http://www.fundinguniverse.com/company-histories/unicom-corporation-history/.

**ATTACHMENT 1**

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|------|-------|-----|
| 08/20/1969 | The District approves a "Right-of-Entry" and easement for Nicor to replace the Tunnel, referred to as the "present system installed in 1910," with a new 24-inch gas main. Nicor was to "disconnect, purge and abandon the old gas pipe line and fill the tunnel shafts with crushed stone." The new 24-inch gas main was to be located "five feet below the designed bottom of the Channel, supported by bolted concrete weights." The pipeline was to extend for a distance of approximately 550 linear feet underneath District land and occupy a width of 25 feet. Nicor was to make application for permits to the State of Illinois and United States Army Corp. of Engineers. | 5 |
| 12/17/1969 | Nicor prepares two drawings that depict the 24-inch gas main 5' below surface of the Channel and the Tunnel that is "to be retired." | 6 |
| 10/12/1982 | A District drawing depicts and describes the Tunnel as 7'-0" x 6' - 6" Gas Pipe Tunnel (Abandoned) Top El. -35 ±, located west of the Channel, South of Oakton Street, North of the District's property line, approximately 25 feet south of North Line of the NW 1/4 Sec. 26-41-13, and proceeding east to the edge of drawing to a point north of the then Monarch Asphalt Company. | 7 |
| 06/22/1993 | Nicor requests the District extend the easement for the 24-inch gas main 5' below the surface of the Channel. The request notes that the agreement with the District with respect to the 24-inch gas main expired on 7/9/89. Nicor requested a permanent easement as, "It is anticipated that [Nicor] will continue to require these facilities into the foreseeable future." Nicor refers to District File "E-112 (92W133)". | 8 |
| 03/28/1994 | J. Murray, an Attorney at the District, writes an Interoffice Memorandum to the District's Engineering Department concerning the request by Nicor to renew the easement, including the easement for the Tunnel. | 9 |
| 07/20/2007 | ComEd and Nicor enter into a "Memorandum of Understanding" allocating costs associated with MGPs operated by corporate predecessors, including Site No. 21 identified on Exhibit A as an MGP operated by Northwestern Gas Light & Coke Company at Oakton St. & McCormick Blvd. in Skokie, IL (Nicor being responsible for 51.73% and ComEd being responsible for 48.27%). ComEd and Nicor enter into a definitive agreement on 01/03/2008. | |
| 5/13/2014 | Attorney Jeep, counsel for the City of Evanston, alerts Attorney Partee, in-house counsel at Nicor, to the presence of methane at high concentration and pressure at James Park and that a natural gas transmission line may be a source. | 10 |
| 5/14/2014 | Attorney Partee sends an email to Attorney Jeep asking whether the City smells mercaptan in the gas at James Park. | 11 |

**ATTACHMENT 1**

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|---|---|---|
| 5/14/2014 | Attorney Jeep spoke with Attorney Partee at Nicor. Partee confirmed that Nicor does not have a gas leak (explaining that Nicor has conducted a "leak survey"). Partee also stated that, while there are pipes in the vicinity, there are no pipes in the Park. Nicor is checking with two other companies that have gas pipes in the vicinity of the Park: Peoples Gas and Natural Gas Pipeline Company of America (NGPL-Kinder Morgan). | |
| 5/15/2014 | Attorney Jeep provides Attorney Partee with drawings of City sewers. (**Attachment 12**) Attorney Jeep sends an email to Attorney Partee asking whether Nicor has drawings of the Peoples Gas and NGPL-Kinder Morgan transmission lines. (**Attachment 13**) Attorney Partee replies that a Nicor engineer or field expert will contact the City's engineer on 5/16/14. (**Attachment 14**) Attorney Jeep provides Attorney Partee with the contact information for Dave Hendron, the City's engineer. (**Attachment 15**) | **12, 13, 14 & 15** |
| 05/16/2014 | Attorney Jeep provides Attorney Partee with a drawing, which depicts a Peoples Gas interstate transmission line west of McCormick Boulevard and informs Partee that the City's engineer, Dave Hendron, has not heard from a Nicor engineer. Attorney Jeep explains that Hendron would like to discuss the possibility of a relationship between this gas line and the concentrations of methane at James Park. Attorney Jeep also requests drawings of gas lines in the vicinity of James Park. (**Attachment 16**) | **16** |
| 05/21/2014 | Ken Nance, Director, Regional Operations at Nicor, sends drawings of Nicor lines in the vicinity of James Park to Dave Hendron. (**Attachment 17**) Greg Stiglic, at Nicor, sends an email to Hendron describing the pressure within the Nicor lines. (**Attachment 18**) | **17 & 18** |
| 5/22/2014 | Attorney Jeep transmits to Attorney Partee the results from the samples collected around the parameter of James Park (**Attachment 19**) and a sample location map, as well information on the upcoming City Council meeting. (**Attachment 20**) In a telephone conversation, Attorney Jeep explained James Park is on the agenda for City Council meeting on 5/27 and that, if asked, Dave Hendron will state the data is not consistent with compounds typically found in landfill gas. Jeep stated that the City continues to discuss this issue with Peoples Gas (and provided Attorney Partee with the contact information for Todd Duffield). Partee asked whether Hendron has discussed this issue with an engineer at Nicor. Jeep replied that apart from receiving the drawings, Hendron has not had any discussions with an engineer at Nicor. Partee stated that an engineer at Nicor would call Hendron. | **19 & 20** |
| 05/27/2014 | Attorney Jeep forwarded to Attorney Partee the data the City provided to IEPA and District and requests that questions concerning the data be directed to Dave Hendron. | **21** |

**ATTACHMENT 1**

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|---|---|---|
| 05/28/2014 | Attorney Jeep forwards to Attorney Partee an article that appeared in "Evanston Now" and the link to City's website that discusses the issue at James Park: http://www.cityofevanston.org/news/2014/05/draft-james-park/ (**Attachment 22**) Attorney Jeep sends an email to Attorney Partee requesting a meeting at the Civic Center between the City and Nicor, enclosing another copy of the email sent on 5/27/14, which included methane concentrations in GMP-1 and GMP-10, 87.35% and 83.89%, respectively. Attorney Jeep enclosed another copy of the USEPA's description of the concentration of methane in typical landfill gas (45%-60%). Attorney Jeep further stated the City believes it is appropriate for technical representatives of the City, Nicor and Peoples Gas to meet to discuss the possibility that a transmission line(s) is a source of the methane gas at James Park. (**Attachment 23**) | 22 & 23 |
| 05/29/2014 | In anticipation of the meeting between the City and Nicor, Attorney Jeep provides Attorney Partee with a map of James Park and locations around the Park that are being reviewed, or have been reviewed, by the City as a potential source of the methane detected at James Park. Attorney Jeep also encloses a Phase II Report prepared by Tetra Tech on behalf of the District, and notes that Appendix F contains documents obtained by FOIA, including the Soil Boring Data at James Park. | 24 |
| 05/30/2014 | Richard Lanyon, an Evanston resident, former Alderman, current chair of the Utilities Commission and General Superintendent (Retired) of the District, provided the 1910 Meeting Minutes (**Attachment 1**) to David Stoneback, Utilities Director, City of Evanston. | |
| 06/02/14 | The City meets with Nicor. Hendron provides an overview of data and data gaps, including the importance of locating documents relating to the Tunnel. Hendron states the City has not ruled out a natural gas transmission line, natural geology and the landfill in James Park as potential sources of the methane detected at the Park. Hendron notes that the detection of methane at high concentration and pressure is not consistent with landfill gas being the source. The District meeting minutes (provided by Richard Lanyon) were discussed. Partee and Nance stated that they were unaware of the Tunnel or any other gas line running under the North Shore Channel. The Nicor handout (**Attachment 25**), which depicted Nicor transmission lines, did not depict a transmission line under the North Shore Channel. After the meeting, Attorney Jeep emailed the District meeting minutes to Attorney Partee. (**Attachment 26**) | 25 & 26 |
| 06/03/14 | The City submits a FOIA request[6] to the District regarding the Tunnel. | |

---

[6] The City has also submitted a FOIA requests for documents regarding the tunnel to IDOT, IDNR, IEPA, USDOT and ACOE. The City has also contacted the Village of Skokie with respect to documents regarding the tunnel. The City has also submitted FOIA requests to the Illinois Secretary of State for documents relating the following entities: Cicero Gas Company, Commonwealth Edison Company, Middle

**ATTACHMENT 1**

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|------|-------|-----|
| 06/03/14 | Attorney Jeep submits written requests for information regarding the Tunnel to ComEd and Nicor, which included an earlier version of this Chronology. | 27 |
| 06/04/14 | In telephone conversation with Attorney Jeep, Attorney Partee states, *inter alia*, the Tunnel would not have been in use in 1954, when Northern Illinois Gas Company was created. | 28 |
| 6/4/14 | Attorney Partee responds to the request for documents by Attorney Jeep. Nicor will respond to the request during the week of June 9 and adds, "It's a very long shot that 1910 era records would have traveled through all of those companies to NiGas because the tunnel was taken out of service before NiGas began to serve Evanston (if the tunnel was ever constructed in the first place)." | 29 |
| 6/6/14 | Attorney Jeep responds to the email from Attorney Partee dated 6/4/14, stating it is the City's position that, absent information and data demonstrating the Tunnel was taken out of service, the Tunnel may (1) be a conduit of methane gas from an unknown source or (2) be both a source and a conduit of methane gas. To rule out (1) and (2), "taken out of service" must mean that the Tunnel was filled in and the pipe(s) that ran through it were disconnected or other steps were taken to properly close-out the Tunnel. Since Nicor has not provided any information about the Tunnel, the City will not assume that the Tunnel has been "taken out service" in a manner that rules out scenarios (1) and (2). With respect to Attorney Partee questioning whether the Tunnel was ever constructed, Attorney Jeep states that the City assumes the 7/10/1910 minutes of the Engineering Committee are accurate and that Tunnel was in fact constructed. (**Attachment 30**) | 30 & 31 |
| | Attorney Partee responds to the 6/6/14 email from Attorney Jeep, by stating, "We'll let you know what we have regarding when the tunnel was taken out of service, but it's wild speculation that the tunnel has anything to do with the gas at James Park" (140606 Partee 1.pdf), to which Attorney Jeep responded, "Lets address the issue with facts, not hyperbole." (**Attachment 31**) | |

---

West Utilities Company, Northern Illinois Utilities, Inc., Northwestern Gas Light & Coke Company and Public Service Company of Northern Illinois.

**ATTACHMENT 1**

CHRONOLOGY OF TUNNEL UNDER THE NORTH SHORE CHANNEL,
CORPORATE HISTORY OF NORTHWESTERN GAS LIGHT & COKE COMPANY &
COMMUNICATIONS BETWEEN THE CITY OF EVANSTON AND NICOR

| Date | Event | No. |
|---|---|---|
| 06/12/2014 | Attorney Jeep forwards to Attorney Partee documents obtained from the District *via* FOIA request concerning the Tunnel, which confirm (1) the Tunnel was constructed in 1910, (2) the Tunnel was "retired" in 1969 and (3) a new 24" transmission line may have been constructed in the MWRDGD "easement area" running under the North Shore Channel. Included among the documents was a Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 2 of 4, which depicted the location of the Tunnel.  (**Attachment 32**)  In a follow-up email, Attorney Jeep forwarded documents to Attorney Partee that could assist in Nicor's search for documents concerning the 1910 Tunnel.  (**Attachment 33**) | **32 & 33** |
| 06/16/2014 | Attorney Jeep sends an email to Attorney Partee requesting the documents concerning the Tunnel that Attorney Partee promised to provide the previous week, and added, "I trust the City will receive documents from Nicor today or tomorrow and that Nicor is searching for documents with the same sense of urgency as the City." | **34** |
| 06/19/2004 | Attorney Partee sends a letter to Attorney Jeep stating that Nicor has confirmed "that Nicor's natural gas distribution system is not the source of methane that is currently being detected in soil at depths of 40 feet or more at the James Park landfill site in Evanston" and that Nicor has concluded its investigation.  The only document included with the letter was the Northern Illinois Gas Company Drawing dated June 17, 1967, Sheet 2 of 4, which the City previously obtained from the District. | **35** |

**ATTACHMENT 1**

# EXHIBIT F

00647.3.
Amended RCRA NOITS
2/22/16

```
=========================================
              LAKEVIEW
        1343 W IRVING PARK RD
              CHICAGO
                 IL
              606139998
              1615320131
02/22/2016    (800)275-8777   11:31 AM
=========================================
=========================================
Product              Sale        Final
Description          Qty         Price
-----------------------------------------
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (SPRINGFIELD, IL  62794)
    (Weight:0 Lb 3.50 Oz)
    (Expected Delivery Day)
    (Wednesday 02/24/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RE125120174US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509489)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (PARK RIDGE, IL  60068)
    (Weight:0 Lb 3.60 Oz)
    (Expected Delivery Day)
    (Wednesday 02/24/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251371US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509434)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (SPRINGFIELD, IL  62703)
    (Weight:0 Lb 3.60 Oz)
    (Expected Delivery Day)
    (Wednesday 02/24/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251385US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509441)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (PARK RIDGE, IL  60068)
    (Weight:0 Lb 3.60 Oz)
    (Expected Delivery Day)
    (Wednesday 02/24/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251399US)
```

```
Return                1         $2.60
Receipt
    (USPS Return Receipt #)
    (9590940301285077509458)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (ATLANTA, GA  30309)
    (Weight:0 Lb 3.60 Oz)
    (Expected Delivery Day)
    (Thursday 02/25/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251408US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509465)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (WASHINGTON, DC  20460)
    (Weight:0 Lb 3.60 Oz)
    (Expected Delivery Day)
    (Thursday 02/25/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251411US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509472)
First-Class           1         $1.64
Mail
Large Envelope
    (Domestic)
    (CHICAGO, IL  60604)
    (Weight:0 Lb 3.50 Oz)
    (Expected Delivery Day)
    (Wednesday 02/24/2016)
Registered            1         $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251425US)
Return                1         $2.80
Receipt
    (USPS Return Receipt #)
    (9590940301285077509496)
```

```
First-Class          1        $1.64
Mail
Large Envelope
    (Domestic)
    (WASHINGTON, DC  20530)
    (Weight:0 Lb 3.50 Oz)
    (Expected Delivery Day)
    (Thursday 02/25/2016)
Registered           1        $12.20
    (Amount:$0.00)
    (USPS Registered Mail #)
    (RA392251439US)
Return               1        $2.80
Receipt
    (USPS Return Receipt #)
    (9590940100115071970868)
```

| Total | $133.12 |
|---|---|

```
Credit Card Remitd            $133.12
    (Card Name:MasterCard)
    (Account #:XXXXXXXXXXXX3528)
    (Approval #:94377P)
    (Transaction #:738)
```

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit USPS.com
USPS Tracking or call 1-800-222-1811.

```
****************************************
BRIGHTEN SOMEONE'S MAILBOX. Greeting
cards available for purchase at select
Post Offices.
****************************************
```

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
https://www.usps.com/help/claims.htm.

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to
usps.com/clicknship to print shipping
labels with postage. For other
information call 1-800-ASK-USPS.

```
****************************************
```
Get your mail when and where you want
it with a secure Post Office Box. Sign
up for a box online at
usps.com/poboxes.
```
****************************************
```

All sales final on stamps and postage
Refunds for guaranteed services only
Thank you for your business

HELP US SERVE YOU BETTER

TELL US ABOUT YOUR RECENT
POSTAL EXPERIENCE

Go to:
https://postalexperience.com/Pos

840-5606-0016-003-00004-09110-02

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

```
Bill #:  840-56060016-3-409110-2
Clerk:   07
```



| Registered No. | | | Date Stamp |
|---|---|---|---|
| RA 39 392251371 US | | | 0131 07 |

| | Reg. Fee $1.64 | Special Delivery $ |
|---|---|---|
| To Be Completed By Post Office | Handling Charge $12.20 | Return Receipt $ |
| | Postage $2.80 | Restricted Delivery $ |
| | Received by $0.00 $0400 | |
| | Customer Must Declare Full Value $0.00 $14.64 02/22/ | With Postal Insurance / Without Postal Insurance |

Domestic Insurance is Limited To $25,000; International Indemnity Is Limited (See Reverse)

LAKEVIEW STATION USPS 60613

**FROM**
CHICAGO, IL 60613
Alep & Blazer, LLC
3023 N. Clark Street
#214
Chicago IL 60657

**TO**
Commonwealth Edison Company
c/o Corporate Creations Network Inc.
Registered Agent
60613 S Northwest Highway 300
Park Ridge, IL 60068

PS Form 3806,
February 1995       **Receipt for Registered Mail**       (Customer Copy)
                                                          (See Information on Reverse)

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Commonwealth Edison Company
c/o Corporate Creations Network Inc.
Registered Agent
350 S Northwest Highway 300
Park Ridge, IL 60068

9590 9403 0128 5077 5094 34

2. Article Number (Transfer from service label)

RA 392 251 371 US

PS Form 3811, April 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                        ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☑ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

USPS.com® - USPS Tracking®                                                                                    3/23/16, 9:58 AM

English          Customer Service          USPS Mobile                                              Register / Sign In


**USPS.COM**

# USPS Tracking®


**Customer Service ›**
Have questions? We're here to help.


**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number: RA392251371US**

**On Time**
**Expected Delivery Day: Wednesday, February 24, 2016**

## Product & Tracking Information

**Postal Product:**
First-Class Mail®

**Features:**
Registered Mail™          Return Receipt

See tracking for related item: **9590940301285077509434**

## Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| February 24, 2016 , 11:25 am | **Delivered** | PARK RIDGE, IL 60068 |

Your item was delivered at 11:25 am on February 24, 2016 in PARK RIDGE, IL 60068.

| | | |
|---|---|---|
| February 24, 2016 , 8:12 am | Out for Delivery | PARK RIDGE, IL 60068 |
| February 24, 2016 , 8:02 am | Sorting Complete | PARK RIDGE, IL 60068 |
| February 24, 2016 , 7:06 am | Arrived at Unit | PARK RIDGE, IL 60068 |
| February 24, 2016 , 4:55 am | Departed USPS Facility | PALATINE, IL 60095 |
| February 24, 2016 , 12:01 am | Arrived at USPS Facility | PALATINE, IL 60095 |
| February 23, 2016 , 3:30 pm | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

**Tracking (or receipt) number**

**Track It**

## Manage Incoming Packages

Track all your packages from a dashboard. **Sign up for My**
No tracking numbers necessary. **USPS ›**



**Registered No.**
RA 392 251 385 US

**Date Stamp**

| Reg. Fee $ 1.64 | Special Delivery $ |
| Handling Charge $ 12.20 | Return Receipt $ |
| Postage $ 2.80 | Restricted Delivery $ |
| Received by $ 0.00 | |

Customer Must Declare Full Value $ 0.00

$14.6? With Postal Insurance
Without Postal Insurance

**Domestic Insurance Is Limited To**
$25,000; International Indemnity Is Limited *(See Reverse)*

**FROM**
CHICAGO Blaze, LLC 60613
3023 N. Clark Street
#214
Chicago IL 60657

**TO**
Northern Illinois Gas Company, dba Nicor Gas
c/o Illinois Corporation Service Company
Registered Agent
801 Adlai Stevenson Drive
Springfield, Il 62703-4261

**PS Form 3806,** February 1995    **Receipt for Registered Mail** *(Customer Copy)*
*(See Information on Reverse)*

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Northern Illinois Gas Company, dba Nicor Gas
c/o Illinois Corporation Service Company
Registered Agent
801 Adlai Stevenson Drive
Springfield, Il 62703-4261

9590 9403 0128 5077 5094 41

2. Article Number *(Transfer from service label)*
RA 392 251 385 US

PS Form **3811**, April 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by *(Printed Name)*  Tom Jarvis   C. Date of Delivery  FEB 24 2016

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☒ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

**Domestic Return Receipt**

USPS.com® – USPS Tracking®                                                                  3/23/16, 9:58 AM

English          Customer Service          USPS Mobile                                            Register / Sign In



# USPS Tracking®

**Customer Service ›**
Have questions? We're here to help.

**Get Easy Tracking Updates ›**
Sign up for My USPS.



**Tracking Number: RA392251385US**

**On Time**
**Expected Delivery Day: Wednesday, February 24, 2016**

## Product & Tracking Information

**Postal Product:**
First-Class Mail®

**Features:**
Registered Mail™          Return Receipt

See tracking for related item: 9590940301285077509441

## Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **February 24, 2016 , 9:38 am** | **Delivered** | SPRINGFIELD, IL 62703 |

Your item was delivered at 9:38 am on February 24, 2016 in SPRINGFIELD, IL 62703.

| | | |
|---|---|---|
| February 24, 2016 , 8:25 am | Out for Delivery | SPRINGFIELD, IL 62703 |
| February 24, 2016 , 8:15 am | Sorting Complete | SPRINGFIELD, IL 62703 |
| February 24, 2016 , 8:06 am | Arrived at Unit | SPRINGFIELD, IL 62702 |
| February 24, 2016 , 1:56 am | Arrived at USPS Facility | SPRINGFIELD, IL 62703 |
| February 23, 2016 , 11:13 pm | Arrived at USPS Facility | SAINT LOUIS, MO 63155 |
| February 23, 2016 , 1:15 pm | Arrived at USPS Destination Facility | SAINT LOUIS, MO 63166 |
| February 23, 2016 , 2:47 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

## Manage Incoming Packages





USPS.com® - USPS Tracking®                                                                  3/23/16, 9:57 AM

| English | Customer Service | USPS Mobile |  | Register / Sign In |



# USPS Tracking®



**Customer Service ›**
Have questions? We're here to help.

**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number: RA392251399US**

**On Time**
**Expected Delivery Day: Wednesday, February 24, 2016**

## Product & Tracking Information

**Available Actions**

| Postal Product: | Features: | |
|---|---|---|
| First-Class Mail® | Registered Mail™ | Return Receipt |

**Text Updates**

See tracking for related item: **9590940301285077509458**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **February 24, 2016 , 11:25 am** | **Delivered** | **PARK RIDGE, IL 60068** |

Your item was delivered at 11:25 am on February 24, 2016 in PARK RIDGE, IL 60068.

| February 24, 2016 , 8:12 am | Out for Delivery | PARK RIDGE, IL 60068 |
| February 24, 2016 , 8:02 am | Sorting Complete | PARK RIDGE, IL 60068 |
| February 24, 2016 , 7:06 am | Arrived at Unit | PARK RIDGE, IL 60068 |
| February 24, 2016 , 4:55 am | Departed USPS Facility | PALATINE, IL 60095 |
| February 24, 2016 , 12:01 am | Arrived at USPS Facility | PALATINE, IL 60095 |
| February 23, 2016 , 3:30 pm | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

**Tracking (or receipt) number**

**Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



Registered No. BA 392251408 US

| | | | Date Stamp |
|---|---|---|---|
| Reg. Fee $ $1.64 | Special Delivery $ | | FEB 22 2016 CHICAGO |
| Handling Charge $ $12.20 | Return Receipt $ | | |
| Postage $ $2.80 | Restricted Delivery $ | | |
| Received by $0.00 $0.00 | | | Domestic Insurance Is Limited To $25,000; International Indemnity Is Limited (See Reverse) |

Customer Must Declare Full Value $ $0.00

$16.64 With Postal Insurance
02/22/ Without Postal Insurance

**FROM**
CHICAGO Blaze, LLC
3023 N. Clark Street
#214
Chicago IL 60657

**TO**
AGL Resources Inc.
c/o Paul R. Shlanta, Registered Agent
General Counsel
10 Peachtree Place, N.E.
Location 1466, Fulton
Atlanta, GA 30309

PS Form **3806**, February 1995

**Receipt for Registered Mail** (Customer Copy)
(See Information on Reverse)

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AGL Resources Inc.
c/o Paul R. Shlanta, Registered Agent
General Counsel
10 Peachtree Place, N.E.
Location 1466, Fulton
Atlanta, GA 30309

9590 9403 0128 5077 5094 65

2. Article Number (Transfer from service label)
BA 392 251 408 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Emanuel Tucker                        □ Agent
                                         □ Addressee

B. Received by (Printed Name)            C. Date of Delivery
Emanuel Tucker                           2-29-16

D. Is delivery address different from item 1?  □ Yes
If YES, enter delivery address below:    □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery (over $500)

□ Priority Mail Express®
■ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

PS Form **3811**, April 2015 PSN 7530-02-000-9053

Domestic Return Receipt

USPS.com® – USPS Tracking®

3/23/16, 9:57 AM

English      Customer Service      USPS Mobile

Register / Sign In



# USPS Tracking®

**Customer Service ›**
Have questions? We're here to help.

**Get Easy Tracking Updates ›**
Sign up for My USPS.

---

**Tracking Number: RA392251408US**

**Updated Delivery Day: Friday, February 26, 2016**

## Product & Tracking Information

**Postal Product:**
First-Class Mail®

**Features:**
Registered Mail™      Return Receipt

**See tracking for related item:** 9590940301285077509465

### Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **February 29, 2016 , 11:49 am** | **Delivered** | **ATLANTA, GA 30309** |

Your item was delivered at 11:49 am on February 29, 2016 in ATLANTA, GA 30309.

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| February 26, 2016 , 5:56 pm | Notice Left (No Authorized Recipient Available) | ATLANTA, GA 30363 |
| February 26, 2016 , 8:22 am | Out for Delivery | ATLANTA, GA 30309 |
| February 26, 2016 , 8:12 am | Sorting Complete | ATLANTA, GA 30309 |
| February 26, 2016 , 8:10 am | Arrived at Unit | ATLANTA, GA 30309 |
| February 26, 2016 , 12:22 am | Departed USPS Facility | ATLANTA, GA 30304 |
| February 26, 2016 , 12:19 am | Arrived at USPS Facility | ATLANTA, GA 30304 |
| February 25, 2016 , 10:19 pm | Departed USPS Facility | ATLANTA, GA 30320 |
| February 25, 2016 , 9:48 pm | Arrived at USPS Facility | ATLANTA, GA 30320 |
| February 23, 2016 , 9:48 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |



**Registered No.** RA 392 251 439 US

**Date Stamp**

| | | | | |
|---|---|---|---|---|
| **Reg. Fee** $ $1.64 | | **Special Delivery** $ | | |
| **Handling Charge** $ $12.20 | | **Return Receipt** $ | | |
| **Postage** $ $2.80 | | **Restricted Delivery** $ | | |
| **Received by** $0.00 $0.00 | | | | |

**To Be Completed By Post Office**

Domestic Insurance Is Limited To $25,000; International Indemnity Is Limited (See Reverse)

**Customer Must Declare Full Value** $ $0.00 — $10.00 With Postal Insurance / 02/22 Without Postal Insurance $0.00

**To Be Completed By Customer (Please Print) All Entries Must Be in Ballpoint or Typed**

**FROM**
CHICAGO Bldr. IL 60613
3023 N. Clark Street
#214
Chicago IL 60657

**TO**
600...
Loretta Lynch US Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**PS Form 3806,** February 1995    **Receipt for Registered Mail**    *(Customer Copy)* *(See Information on Reverse)*

---

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X _Carly Hess_  ☐ Agent  ☐ Addressee <br> B. Received by *(Printed Name)*  FEB 2 0 2016  C. Date of Delivery |
| 1. Article Addressed to: <br><br> Loretta Lynch US Attorney General <br> United States Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530-0001 | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ <br> 9590 9401 0011 5071 9708 68 | 3. Service Type <br> ☐ Adult Signature <br> ☐ Adult Signature Restricted Delivery <br> ☐ Certified Mail® <br> ☐ Certified Mail Restricted Delivery <br> ☐ Collect on Delivery <br> ☐ Collect on Delivery Restricted Delivery <br> ☐ Insured Mail <br> ☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express® <br> ☑ Registered Mail™ <br> ☐ Registered Mail Restricted Delivery <br> ☐ Return Receipt for Merchandise <br> ☐ Signature Confirmation™ <br> ☐ Signature Confirmation Restricted Delivery |
| 2. Article Number *(Transfer from service label)* <br> RA 392 251 439 US | |
| PS Form 3811, April 2015 PSN 7530-02-000-9053 | Domestic Return Receipt |

USPS.com® – USPS Tracking®                                                                3/23/16, 10:00 AM

English        Customer Service        USPS Mobile                                        Register / Sign In

# ✉USPS.COM®

# USPS Tracking®

 **Customer Service ›**
Have questions? We're here to help.

 **Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number: RA392251439US**

**Updated Delivery Day: Friday, February 26, 2016**

## Product & Tracking Information

## Available Actions

| **Postal Product:** | **Features:** | | |
|---|---|---|---|
| First-Class Mail® | Registered Mail™ | Return Receipt | |

See tracking for related item: 9590940100115071970868

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **February 26, 2016 , 5:30 am** | **Delivered** | **WASHINGTON, DC 20530** |

Your item was delivered at 5:30 am on February 26, 2016 in WASHINGTON, DC 20530.

| | | |
|---|---|---|
| February 26, 2016 , 1:10 am | Arrived at Unit | WASHINGTON, DC 20066 |
| February 25, 2016 , 10:20 am | Departed USPS Facility | WASHINGTON, DC 20066 |
| February 25, 2016 , 7:56 am | Arrived at USPS Destination Facility | WASHINGTON, DC 20066 |
| February 23, 2016 , 9:59 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

**Tracking (or receipt) number**

|  | **Track It** |
|---|---|

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**





**Registered No.**

RA 392 251 142 US

| | | | |
|---|---|---|---|
| Reg. Fee $ $1.64 | | Special $ Delivery | |
| Handling $ $12.20 Charge | | Return $ Receipt | |
| Postage $ $2.80 | | Restricted $ Delivery | |
| Received by $0.00 $0.00 | | | |
| Customer Must Declare $ Full Value $0.00 | | With Postal Insurance | Without Postal Insurance |

**Date Stamp**

Reg. Fee $ **To Be Completed By Post Office**

Domestic Insurance Is Limited To $25,000; International Indemnity Is Limited (See Reverse)

**FROM**
CHICAGO Blaze ELLC 60613
3023 N. Clark Street
#214
Chicago IL 60657

**TO**
Lisa Bonnett
IEPA
1021 N. Grand Ave East
P.O. Box 19276
Springfield, IL 62794-9276

**To Be Completed By Customer (Please Print) All Entries Must Be in Ballpoint or Typed**

RE 125 120 174 US

PS Form **3806,** February 1995 · **Receipt for Registered Mail** · (Customer Copy) (See Information on Reverse)

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Lisa Bonnett
IEPA
1021 N. Grand Ave East
P.O. Box 19276
Springfield, IL 62794-9276

9590 9403 0128 5077 5094 89

2. Article Number (Transfer from service label)

RE 125 120 174 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address RECEIVED from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

FEB 2 4 2016

IEPA MAIL ROOM

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Delivery Restricted Delivery
☐ Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811,** April 2015 PSN 7530-02-000-9053 · Domestic Return Receipt

USPS.com® – USPS Tracking®                                                                                     3/23/16, 9:59 AM

| English | Customer Service | USPS Mobile | | Register / Sign In |
|---------|------------------|-------------|---|---|



# USPS Tracking®



**Customer Service ›**
Have questions? We're here to help.

**Get Easy Tracking Updates ›**
Sign up for My USPS.

---

**Tracking Number: RE125120174US**

**On Time**
**Expected Delivery Day: Wednesday, February 24, 2016**

## Product & Tracking Information

## Available Actions

**Postal Product:**
First-Class Mail®

**Features:**
Registered Mail™        Return Receipt

**See tracking for related item:** 9590940301285077509489

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|-------------|----------------|----------|
| **February 24, 2016 , 7:27 am** | **Delivered, To Agent** | **SPRINGFIELD, IL 62794** |

Your item has been delivered to an agent at 7:27 am on February 24, 2016 in SPRINGFIELD, IL 62794.

| | | |
|---|---|---|
| February 24, 2016 , 2:01 am | Arrived at Unit | SPRINGFIELD, IL 62703 |
| February 23, 2016 , 11:13 pm | Arrived at USPS Facility | SAINT LOUIS, MO 63155 |
| February 23, 2016 , 1:15 pm | Arrived at USPS Destination Facility | SAINT LOUIS, MO 63166 |
| February 23, 2016 , 2:47 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |



## Track Another Package

**Tracking (or receipt) number**

[                                        ]        **Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



---

https://tools.usps.com/go/TrackConfirmAction.action?tRef=fullpage&tLc=1&text28777=&tLabels=RE125120174US                    Page 1 of 2



**Registered No.** RA 392 251 411 US

| | | | |
|---|---|---|---|
| Reg. Fee $ 1.64 | Special Delivery $ | **Date Stamp** 0131 07 | |

| To Be Completed By Post Office | Reg. Fee $ 1.64 | Special Delivery $ |
|---|---|---|
| | Handling Charge $ 12.20 | Return Receipt $ |
| | Postage $ 2.80 | Restricted Delivery $ |
| | Received by $0.00 | |
| | Customer Must Declare Full Value $ 0.00 | $16.64 With Postal Insurance Without Postal Insurance 02/22 | Domestic Insurance is Limited To $25,000; International Indemnity is Limited (See Reverse) |

FROM
CHICAGO Loop & Blazer, LLC
3023 N. Clark Street
#214
Chicago IL 60657

TO
Gina McCarthy USEPA Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460
6061

To Be Completed By Customer (Please Print) All Entries Must Be in Ballpoint or Typed

PS Form **3806**, February 1995     **Receipt for Registered Mail**     (Customer Copy) (See Information on Reverse)

---

| **SENDER:** COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. ■ Print your name and address on the reverse so that we can return the card to you. ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature X **Mail**  ☐ Agent ☐ Addressee B. Received *Management* C. Date of Delivery |
| 1. Article Addressed to: Gina McCarthy USEPA Headquarters Ariel Rios Building 1200 Pennsylvania Avenue, N.W. Mail Code: 1101A Washington, DC 20460 | D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No MAR − 1 2016 |
| ‖‖‖‖‖‖‖‖‖‖ 9590 9403 0128 5077 5094 72 | 3. Service Type ☐ Adult Signature ☐ Adult Signature Restricted Delivery ☐ Certified Mail® ☐ Certified Mail Restricted Delivery ☐ Collect on Delivery ☐ Collect on Delivery Restricted Delivery ☐ Insured Mail ☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express® ☒ Registered Mail™ ☐ Registered Mail Restricted Delivery ☐ Return Receipt for Merchandise ☐ Signature Confirmation™ ☐ Signature Confirmation Restricted Delivery |
| 2. Article Number (Transfer from service label) RA 392 251 411 US | |
| PS Form **3811**, April 2015 PSN 7530-02-000-9053 | Domestic Return Receipt |

USPS.com® - USPS Tracking®

3/23/16, 9:56 AM

English    Customer Service    USPS Mobile

Register / Sign In



# USPS Tracking®



**Customer Service ›**
Have questions? We're here to help.

**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number: RA392251411US**

**Updated Delivery Day: Tuesday, March 1, 2016**

## Product & Tracking Information

| Postal Product: | Features: | |
|---|---|---|
| First-Class Mail® | Registered Mail™ | Return Receipt |

See tracking for related item: 9590940301285077509472

### Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **March 1, 2016 , 10:50 am** | **Delivered** | **WASHINGTON, DC 20460** |

Your item was delivered at 10:50 am on March 1, 2016 in WASHINGTON, DC 20460.

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| March 1, 2016 , 3:02 am | Arrived at Unit | WASHINGTON, DC 20066 |
| February 25, 2016 , 10:20 am | Departed USPS Facility | WASHINGTON, DC 20066 |
| February 25, 2016 , 7:56 am | Arrived at USPS Destination Facility | WASHINGTON, DC 20066 |
| February 23, 2016 , 9:59 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Origin Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

**Tracking (or receipt) number**

**Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**





Registered No.
RA 392 251 425 US

Date Stamp

| Reg. Fee $ $1.64 | Special Delivery $ |
| Handling Charge $ $12.20 | Return Receipt $ |
| Postage $ $2.80 | Restricted Delivery $ |
| Received by $0.00 $0.00 | Domestic Insurance is Limited To |

Customer Must Declare Full Value $ $0.00    $16.64 With Postal Insurance   02/22/ Without Postal Insurance

$25,000; International Indemnity Is Limited To *(See Reverse)*

FROM
CHICAGO, IL 60613
3023 N. Clark Street
#214
Chicago IL 60657

TO
Robert Kaplan
USEPA Region 5
77 West Jackson Boulevard
Mail Code: R-19J
Chicago, IL 60604-3507
60613

PS Form **3806**, February 1995

**Receipt for Registered Mail** *(Customer Copy)*
*(See Information on Reverse)*



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Robert Kaplan
USEPA Region 5
77 West Jackson Boulevard
Mail Code: R-19J
Chicago, IL 60604-3507

9590 9403 0128 5077 5094 96

2. Article Number *(Transfer from service label)*
RA 392 251 425 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Rhonda Week  ☐ Agent  ☑ Addressee

B. Received by *(Printed Name)*  Rhonda Week   C. Date of Delivery  FEB 23 2016

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☑ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, April 2015 PSN 7530-02-000-9053      Domestic Return Receipt

USPS.com® – USPS Tracking®

3/23/16, 9:56 AM

English     Customer Service     USPS Mobile

Register / Sign In

# ≥USPS.COM®

# USPS Tracking®



**Customer Service ›**
Have questions? We're here to help.



**Get Easy Tracking Updates ›**
Sign up for My USPS.

**Tracking Number: RA392251425US**

**Updated Delivery Day: Tuesday, February 23, 2016**

## Product & Tracking Information

| Postal Product: | Features: | |
|---|---|---|
| First-Class Mail® | Registered Mail™ | Return Receipt |

See tracking for related item: **9590940301285077509496**

## Available Actions

**Text Updates**

**Email Updates**

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| February 23, 2016 , 11:57 am | **Delivered** | **CHICAGO, IL 60604** |

Your item was delivered at 11:57 am on February 23, 2016 in CHICAGO, IL 60604.

| February 23, 2016 , 9:16 am | Arrived at Unit | CHICAGO, IL 60603 |
| February 23, 2016 , 5:04 am | Departed USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 8:52 pm | Arrived at USPS Facility | CHICAGO, IL 60699 |
| February 22, 2016 , 11:07 am | Acceptance | CHICAGO, IL 60613 |

## Track Another Package

**Tracking (or receipt) number**

**Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

**Sign up for My USPS ›**



# EXHIBIT G

CHAPTER 12 - HAZARDOUS SUBSTANCES REMOVAL AND ABATEMENT COSTS
SECTION:

9-12-1. - DEFINITIONS:

| | |
|---|---|
| *ABANDONMENT:* | The act of leaving a thing with the intent not to retain possession of or assert ownership or control over it. The intent need not coincide with the act of leaving. It is prima facie evidence of the necessary intent to abandon a vehicle containing a hazardous substance that: |
| | (A) The vehicle has been left for more than two (2) days unattended and unmoved; or |
| | (B) License plates or other identifying marks have been removed from the vehicle; or |
| | (C) The vehicle has been damaged or is deteriorated so extensively that it has value only for junk or salvage; or |
| | (D) The owner or operator has been notified by a law enforcement agency to remove the vehicle, and it has not been removed within twenty four (24) hours after notification. |
| *FIRE CHIEF:* | The Fire Chief of the City of Evanston, or his/her authorized representative. |
| *HAZARDOUS SUBSTANCES:* | (A) Any material as designated pursuant to the Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 USC 9601(14), as amended; or |
| | (B) Any substance, material, waste, or mixture designated as a hazardous material, waste, or substance according to 49 Code of Federal Regulations (CFR) or according to 415 ILCS 5/3.215 and 5/3.220, as amended, excluding highway route-controlled quantities of radioactive materials as defined in 49 CFR 173.403(1), and excluding ores, the products from mining, milling, smelting, and similar processing of ores, and the wastes and tailings therefrom, and excluding special fireworks as defined in 49 CFR 173.88(d) when the aggregate amount of flash powder does not exceed fifty (50) pounds. |
| | (C) Any material which is listed on the list of Environmental Protection |

| | Agency pollutants, 40 CFR 401.15, as amended; or |
|---|---|
| | (D) Any material which is classified by the National Fire Protection Association (NFPA) as either a flammable liquid, a Class II combustible liquid, or a Class III combustible liquid; or |
| | (E) Any material which has been determined by the party storing it, or having control of it, through testing or other objective means, to be likely to create a significant potential or actual hazard to public health, safety, or welfare or to the environment. This definition shall not establish a requirement to test for the purposes of this Chapter; or |
| | (F) Any material which has been determined by the Fire Chief, through information based on appraisal and assessment from reliable resources, to be likely to create a significant potential or actual hazard to public health, safety, or welfare or to the environment. The fact that the material in question is not designated as a hazardous substance pursuant to paragraphs (A) through (E) of this definition or is excluded by the legislation or NFPA classifications of paragraphs (A) through (D) of this definition, does not preclude the Fire Chief from determining that the material is a hazard, given the totality of the particular facts and circumstances. |
| *HAZARDOUS SUBSTANCE INCIDENT:* | Any emergency circumstance involving the sudden release or threatened release of a hazardous substance which, in the judgment of an emergency response authority, whether said emergency response authority be the City, a MABAS agreement member unit, or a Federal or State agency or other local agency, threatens immediate and irreparable harm to the environment or the health, safety, or welfare of any individual other than individuals exposed to the risks associated with hazardous substances in the normal course of their employment. "Hazardous substance incident" includes those incidents of releasing or abandoning of a hazardous substance, whether or not such releasing or abandoning is found to threaten immediate and irreparable harm, but such term does not include any release of a hazardous substance authorized pursuant to any Federal, State, or local law or regulation. |
| *PERSON:* | Any individual, public or private corporation, partnership, association, firm, trust, or estate, the State or any department, institution, or agency thereof, any municipal corporation, county, City and county, or other political subdivision of the State, or any other legal entity whatsoever which is recognized by law as the subject of rights and duties. |

| | |
|---|---|
| *RELEASE:* | Any actual or threatened spilling, leaking pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes a) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; b) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine; c) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 1870 of such Act; and d) the normal application of fertilizer. |
| *REMOVE or REMOVAL:* | The cleanup or removal of released hazardous substances from the environment, such actions as may be necessary to be taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water suppliers, temporary evacuation and housing of threatened individuals, and any emergency assistance which may be provided under The Illinois Emergency Management Agency Act, 20 ILCS 3305/ et seq., as amended, pursuant to the MABAS agreement. |
| *RESPONSIBLE PARTY:* | A person who: |
| | (A) Owns or has custody of hazardous material that is involved in an incident requiring emergency action by an emergency response agency; or |
| | (B) Owns or has custody of bulk or non-bulk packaging or a transport vehicle that contains hazardous material that is involved in an incident requiring emergency action by an emergency response agency; and |
| | (C) Whose negligent, reckless, or willful act or omission proximately caused or substantially constituted cause of such release. |

| *VEHICLE:* | Any device which is capable of moving itself, or of being moved, from place to place upon wheels or endless tracks. The term includes, but is not limited to, any motor vehicle, trailer, or semi-trailer. |
|---|---|
| *VESSEL:* | A ship or other craft used in navigation; any structure which is made to float upon the water or which does float upon the water. |

(Ord. No. 8-0-12, (49-0-11(exh. B, § 9-12-1)), 1-23-2012; Ord. No. 31-O-15, § 1, 3-23-2015)

9-12-2. - LIABILITY FOR HAZARDOUS SUBSTANCE INCIDENT REMOVAL OR ABATEMENT COSTS.

(A) The Fire and Life Safety Services Department is authorized to remove or abate the effects of any hazardous substance incident involving the actual or threatened release of a hazardous material 1) upon or into property or facilities in the City or along its lakefront or 2) pursuant to any mutual aid box alarm system (MABAS) agreement in effect, it being understood that such aid will be rendered outside the City limits. The following described responsible party shall be jointly and severally liable a) to the City for the payment of all costs incurred by the City as a result of such removal and/or abatement activity, and b) to any member unit of the MABAS agreement rendering aid to the City pursuant to said agreement.

1. The person or persons who owned or had custody or control of the hazardous substance at the time of such release, without regard to fault or proximate cause; and

2. The person or persons who owned or had custody or control of the container, transport vehicle, or transport vessel which held such hazardous substance at the time of, or immediately prior to, such release, without regard to fault or proximate cause; and

3. Any person owning or in control of any real property from which a hazardous substance is or may be released.

(B) In the event that any responsible party undertakes, voluntarily or upon order of the Fire Chief, to remove or abate the effects of any actual or threatened hazardous substance release upon or into any property or facility in the City, or along its lakefront, the Fire Chief may take such action as is necessary to supervise or verify the adequacy of the removal or abatement. The responsible party described in subsections (A)1 through (A)3 of this Section shall be liable to the City for all costs incurred as a result of such supervision or verification.

(Ord. No. 8-0-12, (49-0-11(exh. B, § 9-12-2)), 1-23-2012; Ord. No. 31-O-15, § 2, 3-23-2015)

9-12-3. - REMOVAL OR ABATEMENT COSTS.

(A) For purposes of this Chapter, costs incurred by the City shall include, but shall not be limited to, the following, whether incurred within the City, along its lakeshore or outside the City limits as a result of rendering mutual aid pursuant to the MABAS agreement:

(a) Actual labor cost of City personnel, including benefits and administrative overhead;

(b) Costs of consultants whose expertise is required to remove or abate the incident or to assess the nature and extent of damage done;

(c) Cost of equipment operation; replacement cost of vehicles or equipment which, in the determination of the Fire Chief, is contaminated beyond reuse or repair;

(d)   Laboratory costs;

(e)   Cost of materials or equipment obtained directly by the City;

(f)   Cost of any contract or mutual aid labor and materials; and

(g)   Attorney fees incurred in collecting monies owed to the City by liable parties.

(B)   When the action to remove or abate the effects of a hazardous substance includes extinguishing a fire, the costs may include the expenses, such as:

Per each vehicle per hour .....$500.00

Per suppression member per hour .....200.00

Per administrator/inspector per hour .....100.00

A minimum of one (1) hour shall be charged. Subsequent hours will be billed at fifteen (15) minute increments.

(C)   Nothing contained in this Chapter shall be construed to change or impair any right of recovery or subrogation arising under any mutual aid agreement or any other ordinance, statute, or provision of law. No criminal quasi-criminal remedy for any wrongful action shall be excluded or impaired by this Chapter.

(D)   All payments due from a responsible party shall be reimbursed to the City within sixty (60) days after the receipt of a bill for the hazardous substance incident removal or abatement costs. If reimbursement is not received, the City Manager may direct the Corporation Counsel to take appropriate legal action.

(E)   A MABAS member unit rendering aid to the City in a hazardous substances incident pursuant to the MABAS agreement shall have its own right of action under this chapter for recovery of costs.

(Ord. No. 65-0-89; Ord. No. 8-0-12, (49-0-11(exh. B, § 9-12-3)), 1-23-2012; Ord. No. 31-O-15, § 3, 3-23-2015)

9-12-4. - LIBERAL CONSTRUCTION.

This Chapter shall be liberally construed to give effect to its purpose, which is to shift the burden of liability for the aforesaid removal or abatement costs from the citizens of Evanston to those responsible for the incident.

(Ord. No. 65-0-89; Ord. No. 8-0-12, (49-0-11(exh. B, § 9-12-4)), 1-23-2012)

9-12-5. - RESERVED.

**Editor's note—** Ord. No. 31-O-15, § 4, adopted March 23, 2015, repealed § 9-12-5 which pertained to severability and derived from Ord. No. 65-0-89; and Ord. No. 8-0-12 (4-0-11(exh. B, § 9-12-5)), adopted Jan. 23, 2012.

# EXHIBIT H

7/9/82
7/23/82

76-0-82

AN ORDINANCE

Authorizing Northern Illinois Gas Company,
Its Successors and Assigns, To Construct, Operate
and Maintain a Gas Distributing System In and Through the
City of Evanston

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF EVANSTON,
ILLINOIS:

SECTION 1: That the right, permission and authority be and
the same are hereby granted to NORTHERN ILLINOIS
GAS COMPANY, an Illinois corporation, its successors and assigns
(hereinafter referred to as the "Grantee"), to construct, operate and
maintain in and through the CITY OF EVANSTON (hereinafter referred to as
the "Municipality"), in the State of Illinois, for a term of Fifty (50)
Years, a system for the production, distribution and sale of gas for
fuel, heating, power, processing and any other purposes within and
outside the corporate limits of the Municipality, and to construct, lay,
maintain and operate such gas pipes, mains, conductors and other
devices, apparatus and equipment as may be necessary or convenient for
such system in, under, along and across each and all of the streets,
alleys, avenues and other public places in the Municipality, subject to
the conditions and regulations hereinafter set forth.

SECTION 2: All pipes, mains, conductors and other appliances,
including connections with service pipes, hereafter
laid in streets, alleys, avenues or other public places, shall be laid
under the supervision of the Director of Public Works or such other duly
authorized agent of the Municipality as the City Council may from time
to time designate. All pipes, mains, conductors and other appliances
shall be so located as not to injure unnecessarily any drains, sewers,
catch basins, water pipes, pavements or other like public improvements,
but should any drain, sewer, catch basin, water pipe, pavement or other
like public improvement be injured by such location, the Grantee shall

7/9/82
7/23/82

forthwith repair the damage caused by such injury to the satisfaction of
the Committee on Streets and Alleys, or such other duly authorized
agent, as the case may be, and in default thereof the Municipality may
repair such damage and charge the cost thereof to, and collect the same
from, the Grantee. The Grantee shall be subject to all reasonable
regulations which may now or hereafter be prescribed by general
ordinance of the Municipality with respect to the use of the public
streets, alleys, avenues and other public places of the Municipality.

SECTION 3: The Grantee shall indemnify, become responsible
for and forever save harmless the Municipality from any
and all judgments, damages, decrees, costs and expenses, including
attorneys' fees, which the Municipality may legally suffer or incur, or
which may be legally obtained against the Municipality, for or by reason
of the use and occupation of any street, alley, avenue or other public
place in the Municipality by the Grantee pursuant to the terms of this
ordinance or legally resulting from the exercise by the Grantee of any
of the privileges herein granted. This indemnity shall extend to and
include judgments, damages, decrees, costs and expenses, including
attorneys' fees which may be obtained or assessed against the
Municipality resulting from the Municipality's right of supervision and
control, whether or not exercised, over the excavation, installation or
construction carried forth by Grantee under Section 2 of this franchise.

SECTION 4: After the passage of this ordinance, and within
thirty (30) days after passage, this ordinance, if
accepted, shall be accepted by the Grantee by its filing with the City
Clerk of the Municipality an unconditional written acceptance hereof, to be
duly executed according to law, and a failure of the Grantee to so accept this
ordinance within said period of time shall be deemed a rejection hereof by

-2-

7/9/82

the Grantee, and the rights and privileges herein granted shall after the expiration of said period of thirty (30) days, if not so accepted, absolutely cease and determine, unless said period of time shall be extended by the Municipality by ordinance duly passed for that purpose and before the expiration of said period of thirty (30) days.

SECTION 5:  All provisions of this ordinance which are obligatory upon, or which inure to the benefit of, said Northern Illinois Gas Company shall also be obligatory upon and shall inure to the benefit of any and all successors and assigns of said Company, and the word "Grantee" wherever appearing in this ordinance shall include and be taken to mean not only said Northern Illinois Gas Company, but also each and all of such successors and assigns.

SECTION 6:  This ordinance, if accepted by the Grantee as hereinabove provided, shall be in full force and effect on and after September 9, 19 82   , and from and after the effective date shall supersede, cancel, repeal and be in lieu of any and all other existing or prior grants of right, permission and authority by said Municipality to said Grantee or any predecessor companies or assignors of the Grantee to construct, operate and maintain any system for the production, distribution and sale of gas for fuel, heating, power, processing and any other purposes within the corporate limits of this Municipality, and this ordinance shall likewise cancel all of the obligations under said existing or prior grants.

PASSED BY THE CITY COUNCIL OF THE CITY OF EVANSTON, ILLINOIS, THIS _9th_ DAY OF _August_ , A.D. 19 _82_

_Sandra K. Gross_
City Clerk

APPROVED BY THE MAYOR OF THE CITY OF EVANSTON, ILLINOIS, THIS _10th_ DAY OF _August_ , A.D. 19 _82_

_Mayor_

ATTEST:

_Sandra K. Gross_
City Clerk

Approved as to form:

_Ellen J. Alexander_
Corporation Counsel

- 3 -

STATE OF ILLINOIS  }

COUNTY OF COOK    }      SS.

CITY OF EVANSTON  }

     I, ___Sandra W. Gross___, City Clerk of the City of Evanston, Illinois, do hereby certify that the foregoing is a true and correct copy of an Ordinance duly passed by the City Council of said City on the __9th__ day of __August__, A.D. 19 82, and duly approved by the Mayor of said City on the __10th__ day of __August__, A.D. 19 82, the original of which Ordinance is now on file in my office.

     I do further certify that I am the legal custodian of all papers, contracts, documents and records of said City.

     WITNESS my hand and the official seal of said City this __12th__ day of __August__, A.D. 19 82.

_Sandra W. Gross_
City Clerk

_2200 Ridge Ave_
Address

(Seal)

STATE OF ILLINOIS     )
                             )
COUNTY OF **COOK**     )   SS.
                             )
CITY OF **EVANSTON**   )

I, _____ Sandra W. Gross _____ , City Clerk

of the City of      **Evanston**     , Illinois, do hereby certify

that the attached and foregoing is a true and correct copy of an

Acceptance of an Ordinance of said City, duly passed by the City

Council of said City on the   **9th**   day of   **August**  ,

A.D. 19 **82** , and duly approved by the Mayor of said City on the

  **10th**   day of   **August**  , A.D. 19 **82** , and that said

acceptance was duly filed in my office on the   24th   day of

  August  , A.D. 19 82 .

I do further certify that I am the legal custodian of all

papers, contracts, documents and records of the said City.

WITNESS my hand and the official seal of said City this

24th   day of   August  , A.D. 19 82 .


                                 Sandra W. Gross
                                   City Clerk


                             2100 Ridge Ave., Evanston
                                   Address

ACCEPTANCE OF GAS ORDINANCE

TO THE MAYOR AND CITY COUNCIL

CITY OF EVANSTON

EVANSTON , ILLINOIS

Gentlemen:

The undersigned, NORTHERN ILLINOIS GAS COMPANY, for itself, its successors and assigns, hereby accepts the Ordinance entitled:

"An Ordinance authorizing Northern Illinois Gas Company, its successors and assigns, to construct, operate and maintain a gas distributing system in and through the City of Evanston , Illinois";

duly passed by the City Council of the City of Evanston , on the 9th day of August , A.D. 19 82 , and duly approved by the Mayor of said City on the 10th day of August , A.D. 19 82 .

IN TESTIMONY WHEREOF, the undersigned has caused these presents to be signed by its Vice President, and its Corporate Seal to be hereunto affixed, attested by its Assistant Secretary, this 20th day of August , A.D. 19 82 .

NORTHERN ILLINOIS GAS COMPANY

By L. A. Boldebuck
Vice President

ATTEST:

J. Peter
Assistant Secretary