| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| | NORTHERN DISTRICT OF ILLINOIS | |
| 2 | EASTERN DIVISION | |

```
 1                  IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   CITY OF EVANSTON, an Illinois    )  Docket No. 16 C 5692
     Municipal Corporation,           )
 4                                     )
                         Plaintiff,    )
 5                                     )
                  v.                   )  Chicago, Illinois
 6                                     )  July 17, 2018
     NORTHERN ILLINOIS GAS COMPANY,    )  10:00 o'clock a.m.
 7   an Illinois Corporation; and      )
     COMMONWEALTH EDISON COMPANY,      )
 8   an Illinois Corporation,          )
                                       )
 9                       Defendants.   )

10            TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
                  BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:          SPERLING & SLATER, by
13                               MR. THOMAS DAVID BROOKS
                                 MR. TREVOR K. SCHEETZ
14                               MR. HARVEY JOEL BARNETT
                                 MS. ALLISON G. MARGOLIES
15                               55 West Monroe Street
                                 Suite 3200
16                               Chicago, Illinois 60603

17                               JEEP & BLAZER, LLC, by
                                 MR. JEFFERY D. JEEP
18                               3023 North Clark Street
                                 Suite 214
19                               Chicago, Illinois 60657

20

21
                        ALEXANDRA ROTH, CSR, RPR
22                      Official Court Reporter
                        219 South Dearborn Street
23                      Room 1224
                        Chicago, Illinois 60604
24                      (312) 408-5038

25
```

```
 1    APPEARANCES:   (Continued)

 2    For Defendant Northern        MAYER BROWN LLP, by
      Illinois Gas:                 MR. MARK R. TER MOLEN
 3                                  MS. JAIMY LEVINE HAMBURG
                                    MR. MATTHEW C. SOSTRIN
 4                                  71 South Wacker Drive
                                    Chicago, Illinois 60606
 5
      For Defendant Commonwealth    JENNER & BLOCK, LLP, by
 6    Edison:                       MS. GABRIELLE SIGEL
                                    MR. ANDREW WILLIAM VAIL
 7                                  353 North Clark Street
                                    Chicago, Illinois 60654
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings had in open court:)

2          THE CLERK:  Case 16 CV 5692, City of Evanston versus

3    Northern Illinois Gas, for Daubert hearing.

4          THE COURT:  Will counsel please step up and identify

5    themselves?

6          MR. BROOKS:  Good morning, your Honor.  Thomas Brooks

7    on behalf of plaintiff, City of Evanston.

8          MR. TER MOLEN:  Good morning, your Honor.  Mark Ter

9    Molen on behalf of defendant Nicor Gas.

10          MS. SIGEL:  Good morning, your Honor.  Gabrielle Sigel

11    on behalf of Commonwealth Edison.

12          MR. SOSTRIN:  Matthew Sostrin on behalf of defendant

13    Nicor Gas.

14          MR. VAIL:  Andrew Vail on behalf of defendant

15    Commonwealth Edison.

16          MS. HAMBURG:  Jaimy Hamburg for Nicor Gas.

17          MR. BARNETT:  Harvey Barnett on behalf of City of

18    Evanston.

19          MR. JEEP:  Your Honor, Jeffery Jeep for the City of

20    Evanston.

21          MS. MARGOLIES:  Allison Margolies, City of Evanston.

22          MR. SCHEETZ:  And Trevor Scheetz, City of Evanston,

23    your Honor.

24          THE COURT:  All right good morning, everyone.  You can

25    all take a seat now.  Thank you.

1      Who will be conducting the examination of Mr. Hendron
2  on behalf of the plaintiff?
3          MR. BROOKS:  I will, your Honor, Thomas Brooks.
4          THE COURT:  What about on behalf of the defendants?
5          MR. TER MOLEN:  I will, your Honor, Mark Ter Molen.
6          THE COURT:  All right.  Let's get to it.
7          Mr. Hendron, if you will please take the stand.
8          MR. BROOKS:  Are we dispensing with openings then or
9  would you like to --
10         THE COURT:  I don't need openings.
11     (Witness duly sworn.)
12         MR. BROOKS:  First as a procedural matter, your Honor,
13  we have some binders of exhibits.  If I can approach and give
14  the witness one and also your Honor?
15         THE COURT:  That's fine.
16         MR. BROOKS:  Thank you.
17         THE COURT:  Did you give the other side a set as well?
18         MR. BROOKS:  Yes, I will do that as well.
19         THE COURT:  Okay.  Do you have two copies for me by
20  any chance?
21         MR. BROOKS:  Sure, I have some extra.  I will be happy
22  to do that.  There is one.
23     (Brief pause.)
24         THE COURT:  You may proceed.
25         MR. BROOKS:  Thank you, your Honor.

```
 1           DAVID M. HENDRON, PLAINTIFF'S WITNESS, DULY SWORN
 2                          DIRECT EXAMINATION
 3    BY MR. BROOKS:
 4    Q.   Good morning, Mr. Hendron.
 5    A.   Good morning.
 6    Q.   Could you please state your name and spell it for the court
 7    reporter?
 8    A.   Yes.  My name is David M. Hendron, H-e-n-d-r-o-n.
 9    Q.   And where do you live, sir?
10    A.   I live in Northfield, Illinois.
11    Q.   Okay.  And where do you work?
12    A.   I work for SCS Engineers in Northfield, Illinois.
13    Q.   Okay.  And what does SCS Engineers do?  What is their
14    business?
15    A.   SCS is a consulting engineering firm that works in the area
16    of landfill gas management, geo-environmental engineering --
17    geo-environmental engineering and geotechnical engineering.
18    Q.   Okay.  And about how many employees and offices does SCS
19    have?
20    A.   I think it's a firm with about 800 employees.
21    Q.   Uh-huh.  And about how many offices?
22    A.   Twenty-five or so.
23    Q.   And, Mr. Hendron, what is the primary area of expertise
24    that you bring to this case?
25    A.   The primary expertise I bring in this case is source
```

1    identification.

2    Q.   And what is source identification?

3    A.   Source identification is the study of basically four

4    materials, soil, rock, water and chemicals, and processes from

5    industrial, commercial and other activities, to identify the

6    nature and the extent of contamination and the source of the

7    contamination in the area you are looking at.

8    Q.   Okay.  And how long have you been practicing in the field

9    of source identification?

10   A.   I -- I think my first job was about 1980.  So it will be 38

11   years.

12   Q.   And in those 38 years, approximately what percentage of

13   your overall practice has involved source identification work?

14   A.   Source identification work has been involved in literally

15   every project that I've been involved with since that time.

16   And my practice has been between 50 and 60 percent of the work

17   I do is involved in geo-environmental work where source

18   identification is a -- is a primary -- the initial part.

19   Q.   And can you give us a rough idea of how many projects

20   you've had over your career that have involved source

21   identification?

22   A.   I don't keep a number of it.  But I would say between

23   probably 300, 400 cases over the years.

24   Q.   Okay.  And can you briefly outline for us your formal

25   education?

1       THE COURT:  Before he does that, can you define for me

2  with greater specificity what you mean by source

3  identification?

4       THE WITNESS:  Yes.  Source identification is basically

5  the identification of a source of contamination that's been

6  found in the environment.

7       THE COURT:  That seems rather broad.  Is there a

8  particular area of source identification or particular media or

9  particular substances that you yourself focus on?

10       THE WITNESS:  I deal in source identification as it

11  results in soil contamination, groundwater contamination.  And

12  I say soil contamination, I mean geology, contamination of the

13  geology.  Contamination of the groundwater, surface water,

14  resources.

15       And to some extent, contamination of what we call the

16  vadose zone air phase.  I do work in that area too, your Honor.

17       THE COURT:  Go ahead.

18       MR. BROOKS:  Thank you, your Honor.

19  BY MR. BROOKS:

20  Q.  Mr. Hendron, I think we left off, if you can just briefly

21  describe for us your formal education?

22  A.  Yes.  I have a bachelor's degree in civil engineering from

23  the University of Kentucky in 1966.  I have a master's degree

24  in civil engineering specializing in geotech, they call,

25  engineering from the University of Illinois in 1968.

1    Q.   Okay.  And briefly, what is geotechnical engineering?

2    A.   Geotechnical engineering is the study and use of soil, rock

3    and water for civil engineering purposes.

4    Q.   Okay.  And do you have any professional licenses?

5    A.   I do.

6    Q.   And what are those?

7    A.   I received the professional license by test, fundamentals

8    in engineering from the -- from Kentucky, and professional

9    engineering from the State of Illinois.

10   Q.   And what is involved in becoming a licensed professional

11   engineer in Illinois?

12   A.   First thing you have to do is pass a test in fundamentals

13   of engineering, which includes a test of the fundamental topics

14   that engineers are required to understand to practice

15   engineering.  And then an afternoon exam in the fundamentals of

16   civil engineering topics, such as structural engineering,

17   geotechnical engineering, environmental engineering,

18   transportation, surveying.  And there's a few other topics that

19   are involved in that.

20        After passing that test, you have to practice four

21   years minimum under the tutelage or under the direction of a

22   licensed professional engineer.  And then you are equipped to

23   take the professional engineering exam, which again is a

24   one-day exam.

25        The opening morning exam is again some general topics.

1    And then in the afternoon it's a more extensive practical test

2    on your understanding of the various elements of civil

3    engineering.

4    Q.    And are you licensed in any states in addition to Illinois?

5    A.    I'm licensed in the State of Wisconsin and in the State of

6    Indiana.

7    Q.    Okay.  Mr. Hendron, could I ask you to turn to tab 1 in the

8    binder there before you?

9    A.    Yes.

10   Q.    Do you have that there?

11            Tab 1.

12   A.    I am.

13   Q.    Okay.  And that's -- says on the front page, Appendix G,

14   qualifications of Mr. David M Hendron, PE.  Do you see that?

15   A.    It is.

16   Q.    So what is this?

17            MR. BROOKS:  Your Honor, this was Appendix G to Mr.

18   Hendron's Rule 26 report in this case.

19   BY MR. BROOKS:

20   Q.    I'm sorry, Mr. Hendron.  What is this Exhibit 1 here?

21   A.    This is my resume.

22   Q.    And looking at the first page, there are some categories

23   there.  Education, professional history, so on, representative

24   experience.  Does that first page there accurately summarize

25   the topics that are listed there?

1   A.  Yes, it does.

2   Q.  And could you just briefly tell us what the remainder of

3   the CV includes?

4   A.  The remainder of the CV includes again my education, the

5   firms I have worked for -- with and for, and other activities

6   that I've had, my registration.  And what I try to do for each

7   of these topics at the top is to present some typical projects

8   that I worked on over my 50 years of practice of engineering.

9   Q.  Okay.  And at the last page there are some publications

10  listed?  Last two pages, excuse me.

11  A.  Yes.

12  Q.  And those are publications of yours?

13  A.  These are publications that I've had in the outside

14  literature.  It doesn't include all the reports that I have

15  written.

16  Q.  Okay.  And so the matters that are set forth in all the

17  remaining pages of the CV, are those accurate descriptions of

18  what you've listed there?

19  A.  Yes.

20          MR. BROOKS:  Okay.  Your Honor, we move Exhibit 1 into

21  evidence.

22          THE COURT:  That's fine.

23          MR. TER MOLEN:  I have no objection.

24      (Said exhibit was received in evidence.)

25  BY MR. BROOKS:

1   Q.   Mr. Hendron, focusing on the first page there up at the

2   top, there are some bolded subjects.  For example, geotechnical

3   engineering, we discussed that.

4            So firstly, what are those bolded terms in the upper

5   right-hand corner?  What do those reflect?

6   A.   Those are kind of an outline of the major practice areas

7   that I have projects listed for that I think have some

8   relevance or pertinence to what I'm going to do on the project

9   I'm getting involved in.

10  Q.   And just taking a couple of those, can you -- hydrogeology.

11  What is hydrogeology?

12  A.   Hydrogeology is groundwater.  And in that -- in that topic

13  I very frequently include interaction between groundwater and

14  surface water.

15  Q.   And geo-environmental engineering, what is that?

16  A.   Geo-environmental engineering is a combination of

17  geotechnical engineering and the environmental engineering in

18  my case and in the case of practice that we have of the mix

19  between the media of soil, rock and water.  And in that you mix

20  chemicals and deal with environmental problems that are

21  associated with the movement of chemicals through geologic

22  media.

23  Q.   And geo -- excuse me.  Geotechnical engineering,

24  hydrogeology and geo-environmental engineering, are those

25  things that factor into doing source identification work?

Hendron - direct                    12

1    A.  Yes.

2              THE COURT:  Mr. Hendron, can you get a certification

3    in geo-environmental engineering?  Does such a thing exist?

4              THE WITNESS:  A certification?

5              THE COURT:  Right, like for example a license.  You

6    are a licensed engineer, right?

7              THE WITNESS:  I'm a licensed -- yeah, licensed civil

8    engineer, your Honor.

9              THE COURT:  Right.  So is there a certification or

10   licensing procedure for -- to be a certified geotechnical

11   engineer, geo-environmental engineer?

12             THE WITNESS:  Not in the State of Illinois, no, there

13   are not -- there is not.

14             THE COURT:  How about in other states?

15             THE WITNESS:  I believe California has a GE

16   certification.  But I don't practice in the State of

17   California.  And there may be other states that have that

18   certification.  I don't know of them right now.

19             THE COURT:  Okay.  Thank you.

20   BY MR. BROOKS:

21   Q.  And, Mr. Hendron, in the field of source identification,

22   are there any recognized guidance document in that field that

23   you are familiar with?

24   A.  There -- there are a number of guidance documents that are

25   available, yes.

1   Q.   And generally what do those consist of?

2   A.   Generally what -- I'm sorry.

3   Q.   Generally what do those consist of?  I'm sorry.

4   A.   Well, they are guidance documents.  So they generally

5   consist of topics in content that we can use as practitioners

6   to develop scopes of work and understand processes that we

7   should be following or could follow, to make decisions with

8   respect to, in this instance, source identification.

9   Q.   And let me direct your attention to tab 2 in your binder

10  there.

11        Have you seen that document at tab 2 previously?

12  A.   Yes.

13  Q.   And can you tell us what is this?

14  A.   Well, this is a guidance document for conducting remedial

15  investigations and feasibility studies under CERCLA, put

16  together by U.S. EPA.

17  Q.   And have you had occasion to refer to this document during

18  the course of your career in source identification.

19  A.   Yes.

20  Q.   And what in your understanding is this document?  What

21  purpose does this document put forth in the source

22  identification field?

23  A.   Well, this document was put together by a team of people to

24  provide kind of a consistency of guidance in the documents, one

25  that U.S. EPA was getting for these subjects.  But it also was

1   put together to help practitioners have clear thoughts on

2   guidance and the who, what, when, where and how that should be

3   followed in -- in doing remedial investigations and feasibility

4   study work.

5   Q.   And when do you first recall seeing this?

6   A.   Well, that I'm sure was about 1988, because I was very

7   heavily in the practice at that time.  And we were using all

8   the guidance we could get.

9   Q.   Okay.  And that's when the document came out?

10  A.   That's correct.

11  Q.   And it talks about guidance for conducting remedial --

12  excuse me -- for conducting remedial investigations and

13  feasibility studies.  What's -- briefly what's a remedial

14  investigation?

15  A.   Very globally looking, remedial investigation is the part

16  of the work and -- in this business that identifies the nature

17  and the extent of contamination in the media that you are

18  looking at.  The media I'm concerned about is soil, rock and

19  water.

20          Feasibility study then takes that information, once

21  you've -- once you've defined the plume, the sources of that

22  plume and the receptors of that plume, the feasibility study

23  then takes that information and identifies remedial

24  technologies, ranks them and selects remedial technologies to

25  meet risk goals set in between these two activities.

1    Q.   And I'm going to direct you to Chapter 2 of the document.

2    And just for reference, there are page numbers on the top

3    margin.  For example page 1 of 188.  And Chapter 2 begins on

4    page 23.

5    A.   Yes.

6    Q.   Chapter 2 there bears the title Scoping of the RIFS?

7    A.   Yes.

8    Q.   And I take it you've seen Chapter 2 before?

9    A.   I have.

10   Q.   Familiar with the content of Chapter 2?

11   A.   Yes.

12   Q.   What does it mean to scope remedial investigation/

13   feasibility study?

14   A.   Put simply, that is identifying the elements of the work

15   that will be done to complete whatever the task is that you are

16   undertaking.  And in the limit here it would be the remedial

17   investigation, and then a separate scope for the feasibility

18   study.

19   Q.   And are steps outlined here in Chapter 2 applicable outside

20   formal remedial investigation/feasibility study under CERCLA?

21   A.   Yes.

22   Q.   And how so?

23   A.   Well, this document is a document that gives you a complete

24   set of guidance for RI and an FS, which is a huge amount of

25   work done generally under some kind of order or some agreement

1    with an agency.  Very frequently we get involved in studies for

2    clients that have a much more limited scope of work, for

3    various reasons.  But we can still use items in the guidance

4    that are relevant to the study we are undertaking.

5          So there -- it's not a pick and choose.  But you

6    can -- you can -- you can find a lot of guidance for any

7    activity that you're undertaking from this guidance and --

8    Q.  And --

9    A.  -- use it separately from a full scope.

10   Q.  Sorry, Mr. Hendron.

11         And what percentage of your overall work in your

12   career has involved scoping work, either as part of a formal

13   remedial investigation/feasibility study or otherwise?

14   A.  Well, again, most -- almost all the work that I've ever

15   done with respect to the geo-environmental work that I do has

16   been -- has included some part of the guidance that's provided

17   in this document.

18   Q.  And did any --

19   A.  And so the answer to that, 50 or 60 percent of my work over

20   the last 38 years has been involved in geo-environmental work.

21   So, you know, those projects have -- have each probably

22   involved -- and I say probably because I can't recall exactly

23   every element that I've taken from it.

24         But I know that each of the -- each of those jobs has

25   involved some aspect of what's in this document.

Hendron - direct                              17

1  Q.  And did your work related to this case involve scoping?

2  A.  Yes.

3  Q.  And briefly how so?

4  A.  Well, we were retained initially on this job to make a

5  determination of whether or not the James Park landfill was the

6  source of contamination over at the -- and I'll call it

7  Metropolitan Water Reclamation District of Greater Chicago; and

8  I'll just call it the MWRD from hereon in, if that's okay --

9  site.

10       And that's how I undertook the job.  And my first

11  scope was set to achieve that outcome, to achieve an answer to

12  that outcome.

13  Q.  And when you say to achieve an answer to the outcome to

14  what, determine what the source was of the materials?

15  A.  To basically review all the information that had led to

16  that conclusion.  And then either agree that the landfill was

17  the source of the MWRD contamination, or it was not the source.

18       So the scope was set to achieve an answer to is the

19  landfill the source of contamination at the MWRD.

20  Q.  And did the scope of the work with respect to the City of

21  Evanston change over time?

22  A.  Yes, it did.  And by definition, that's exactly what

23  happens as these projects evolve.

24  Q.  And briefly, how did the scope of the work with respect to

25  the City of Evanston change over time here?

1   A.  Well, in a nutshell, we -- first part of the scope was to

2   review all the existing literature.  And there was lot of

3   reports and a lot of workmen done by others.

4          And after I reviewed that, I recommended some

5   additional investigations be made to fill some data holes that

6   I saw in that -- in that work.  We filled those data holes, and

7   I used that information to make an opinion, to form an opinion,

8   on whether the landfill was the source of the MWRD

9   contamination or not.

10  Q.  And turning back to the EPA guidance document.  If I can

11  ask you to turn to Chapter 3, which begins on page 39 of that

12  document.

13  A.  Yes.

14  Q.  Chapter 3 is titled, Site Characterization?

15  A.  Yes.

16  Q.  Are you familiar with the contents of Chapter 3 of this

17  document?

18  A.  I am.

19  Q.  And how did you become familiar with that?

20  A.  I've used the contents of this document, this guidance

21  document, for 38 years to scope and -- scope and conduct work

22  with respect to site characterization activities.

23  Q.  And what is a site characterization, briefly?

24  A.  Again, that's the determination of the nature and the

25  extent of contamination, which includes development of a

1    relationship between a source, a pathway, and receptor or

2    receptors.  Each of these can be plural.

3    Q.  And have you done site characterizations under CERCLA

4    previously?

5    A.  I have.

6    Q.  Are the steps outlined here with respect to doing a site

7    characterization applicable outside the scope of a formal

8    remedial investigation/feasibility study?

9    A.  They are.

10   Q.  How so?

11   A.  Well, again, CERCLA or to have a site characterization is a

12   huge undertaking by the fact that these sites are in the orders

13   and so forth.  A lot of other smaller projects, exactly like we

14   are dealing with with the James Park site, you can use parts of

15   this to give you guidance, to understand the geology and the

16   groundwater and the chemistry, as part of a source ID as

17   opposed to a whole site characterization.

18   Q.  Okay.  Mr. Hendron, if I could ask you to turn to tab 3 in

19   your binder.

20          And, Mr. Hendron, can you tell us what is reflected

21   here in tab 3?

22   A.  Tab 3 is a -- I call this a source investigation flow

23   chart.  And I actually created this general chart when I

24   started my work.  And in this kind of stuff -- stuff meaning

25   these kind of projects in 1980 or so.  And it was my way of

1    kind of shaping my thinking of how do we define nature and

2    extent of contamination at contaminated sites.  This was before

3    superfund and before the 1980 guidance document.

4            And I found it very useful to keep my thinking on a

5    logical path about what I need to answer all the questions that

6    get generated in this kind of work.  And, of course, it's a

7    little different structure than the outline of the flow chart

8    in the record guidance.  But, in fact, it's -- it's just a

9    little bit of a -- of a different organization of the

10   activities you do than -- than from the RCRA guidance.

11           And the important part of this and important step

12   that's consistent in both of those is what I call the internal

13   consistency evaluation.  And in the RCRA flow chart or the

14   CERCLA flow chart, they have the similar sort of decision tree

15   box on it.  And this is a -- this is something that I followed

16   on every project that I have ever worked on with respect to the

17   geo-environmental work I do.

18   Q.  And you refer to the RCRA flow chart.  So going back to

19   tab 2, if you go to page 41 of 188 of that document?

20   A.  Yes, that's on page 41.

21   Q.  Okay.  And this is the flow chart that you were referring

22   to?

23   A.  Yes.

24   Q.  And that bears the title, Figure 3-1, Major Components of

25   Site Characterization?

Hendron - direct                                    21

1   A.   Right.

2   Q.   And so what is reflected here, to your understanding, in

3   the flow chart in the EPA guidance document?

4   A.   Well, as you can see, the scoping of it is on top of the

5   whole thing.  And then you conduct -- they say, conduct field

6   investigations.  You do the sample analyses.  You do the data

7   evaluation.

8        Well, in each one of those boxes you have -- you could

9   have subboxes for geology, hydrology and geochemistry.  It's

10  just a little bit different organization of -- of where the

11  data are put.

12       The important thing is that the diamond-shaped box

13  reevaluate data needs.  Then -- and there is a yes or no here.

14  And I look at this and say, you go through the thing in the

15  first time, and you say, do I need more data?  If the answer is

16  yes, you rescope the investigation and get into a loop of

17  getting data and making decisions.

18       If the answer is no, you have enough data to go on to

19  the next step.  That's exactly the process that I developed

20  probably in about 1980, and I follow to this day.

21  Q.   And that's a practice that you followed in connection with

22  your work on this case?

23  A.   Yes.

24  Q.   Okay.  And so you -- then you're saying that the steps --

25  steps that are reflected in this flow chart in the EPA guidance

1    document are steps that you took in connection with your work

2    here?

3    A.   Yes.

4    Q.   And you have done that in previous engagements with respect

5    to source identification also?

6    A.   Every previous investigation that I've ever had.

7    Q.   Okay.  So turning back to tab 3, the source investigation

8    flow path chart.  Three boxes there, can you just tell us,

9    geology, hydrology, geochemistry, briefly what's reflected

10   there?

11   A.   Well, these are the boxes that I filled to understand the

12   source pathway and receptor relationship in any project that I

13   am involved in.  The geology, we want to know what pathways

14   exist through the geology.  And the guidance document has very

15   good guidance on what to look for and why to look for that.

16         The hydrology, very frequently, almost always, the

17   contaminants move through the groundwater into surface water.

18   So you really have to develop an understanding of the who,

19   what, when, where and why of those two items and the

20   interaction between them.

21         And the geochemistry, there is really two elements

22   that I've always looked at.  One is, what's the source of the

23   contamination we are seeing -- source or sources of

24   contamination we see.  And what's the -- what's the nature and

25   the extent of the plume.

1        So you've got to tie those two items together, and

2   that's where that goes.

3   Q.  And so then you come to the box for internal consistency

4   evaluation.  And it has the circles yes or no.  What does that

5   refer to?

6   A.  Well, my internal consistency evaluation is not different

7   but it has different answers than -- I look at the data that I

8   develop in the three boxes above.  And I say, does the geology

9   fit with the groundwater, fit with the geochemistry to explain

10  the source I'm looking at and the plume I'm looking at.  And

11  generally speaking, the first time you go through it, the

12  answer to that is no.  They have some differences.

13       And you -- you have to define what you need then.  So

14  the answer, no, you have to go up and get some more data in one

15  or more of these areas.  And you do that, very much like the

16  guidance, until you have enough data so that there is

17  consistency between these three models.

18       And once you achieve that consistency, you're prepared

19  in this case to identify the source of what you are seeing in

20  the plume.

21  Q.  And that's a procedure that you employed in your work with

22  respect to this case?

23  A.  Yes.

24  Q.  And it's a procedure that you've employed before in many

25  other cases?

1   A.  Every other case I ever worked on.

2   Q.  Mr. Hendron, have you over the course of your career --

3   well, let me restate the question.

4         Over the course of your career, what portion of your

5   work has involved expert testimony?

6   A.  Expert testimony itself probably between five and ten

7   percent.

8   Q.  And what subject matters has that involved?

9   A.  Two general subject matters.  Geotechnical engineering and

10   geo-environmental engineering, or engineering in -- in subject

11   related to RCRA, CERCLA, and other state and federal laws and

12   regulations as it deals with contamination, contaminant

13   transport and other things like that.

14   Q.  So source identification matters?

15   A.  Source identification would be one primary part of the geo-

16   environmental area.

17   Q.  And how many times approximately have you testified in

18   court as an expert witness?

19   A.  I think -- I don't keep a track again of all this.  And

20   I've been in the -- I've testified again since 19 -- probably

21   '82 or '84 I think was my first testimony in a geo-

22   environmental case.

23         I'm going to say probably ten -- between ten and 15.

24   Q.  Okay.  And over the course of your work, have you had

25   occasion to interact with U.S. EPA, state EPAs with respect to

1    work that you are doing?

2    A.   Frequently, yes.

3    Q.   And have those agencies had occasion to review your site

4    investigation work?

5    A.   Yes.

6    Q.   To your knowledge, has any such agency ever disapproved of

7    your work in that arena?

8    A.   Not -- not that I know of, no.

9    Q.   Mr. Hendron, if you can turn back to tab 1, your CV.

10           In particular, if I can direct your attention to --

11   the pages aren't numbered but it's the fourth page in.  Has a

12   heading down at the bottom, Hydrogeology and Geo-environmental

13   Engineering?

14   A.   Okay.

15   Q.   Now, I think you indicated previously that given this

16   heading the -- the entries after this would be typical examples

17   of your work in this type of engagement?

18   A.   Yes.

19   Q.   Okay.  And -- and this continues over on through -- onto

20   page 6.  So looking at those pages, are there any examples

21   of -- in here of engagements that involved source

22   identification work?

23   A.   Well, they really all involve source identification work at

24   some level.  That was a part of each one of these.

25   Q.   Okay.  So Gilbert -- at the Gilbert and Mosley site in

1    Wichita?

2    A.   Right.

3    Q.   Monroe Automotive in Nebraska?

4    A.   Correct.

5    Q.   National Industrial Environmental site, otherwise known as

6    NIES, in Furley, Kansas?

7    A.   Yes.

8    Q.   Former Cosco plant site, Spring Valley, New York?

9    A.   Yes.

10   Q.   Gaslight Point, Racine, Wisconsin?

11   A.   Yes.

12   Q.   And Puente Valley Superfund site in California?

13   A.   Yes.

14   Q.   So if you can just take one or two examples from the

15   engagements that are listed there and describe for us what you

16   did.

17   A.   Well, with respect to this site, which is a source

18   identification expertise, there is two sites that I think will

19   illuminate what I've done in the source ID study.  And that's

20   the first one, which is the Gilbert and Mosley site in Wichita,

21   Kansas.  It was a superfund site in Wichita, Kansas.  And the

22   other was the Puente Valley Superfund site in -- in Puente

23   Valley, California.

24   Q.   And what did you do with respect to the Gilbert and Mosley

25   site?

1   A.  Well, with respect to both of these sites, both of these

2   sites had plumes of organic chemicals in groundwater, aquifers,

3   that were several miles long and several miles wide.  And there

4   were -- and I don't remember the exact number of sources in

5   each of these.  But each of these sites had -- let's just call

6   it for round numbers for what we're talking about here, I think

7   this will set -- set the picture correctly.  There was about 50

8   sources in each of these sites.

9               And my job in both of the sites was to evaluate

10  whether or not each of these sources was credible as a source

11  to the plume that was being observed in the aquifer below.

12  Q.  And how did you go about doing that?

13  A.  Well, we followed -- first of all, we followed the logic

14  flow path for -- that's outlined in the RCRA guidance and my

15  own flow path.  We developed an understanding of the geology at

16  each site.  We understand -- we developed -- first of all, we

17  developed an understanding of what chemicals were handled at

18  each site.  And each of these sites had -- they may have had

19  ten or 15 different kinds of operations and processes that were

20  used.

21              We had aircraft production parts.  We had -- we had

22  paint facilities.  We had huge manufacturing facilities for air

23  conditioners.  We had U.S. Army, U.S. military production

24  facilities in these sites.  So we had to understand what was

25  produced there, what chemicals did they use as part of that.

1          We had to then go into the geology into the

2     groundwater, and then use the chemistry stuff we found in the

3     first part to make our decision on whether any particular site

4     was a source of what we were seeing in the plume in an area

5     that could have been affected by that site.

6     Q.   And, Mr. Hendron, do you have MGP-related experience,

7     manufactured-gas-plant-related experience?

8     A.   I do.

9     Q.   And briefly, can you outline for us what that is?

10    A.   Well, the -- the item on my resume as the Gaslight Point

11    project.  And I've worked on basically three MGP products.  One

12    was Gaslight Point back in the -- I think it was 1987 or '88.

13    I worked on the site in Taylorville, Illinois, where there was

14    a lawsuit claiming health risk that involved an MGP in a

15    groundwater plume.  And I worked on another site in Wisconsin

16    for remedial investigation and a feasibility study.

17    Q.   And so briefly what did you do -- I think you mentioned the

18    Taylorville site.  What did you do in Taylorville?

19    A.   What I did at Taylorville was, I studied the groundwater

20    plume, and I looked at the source of the MGP plant to the

21    groundwater plume.  And specifically, with respect to this

22    plume, because the pathway and receptor of most -- most

23    importance to the legal case was an air -- was an air pathway.

24          And I looked at the off gassing from the groundwater

25    plume into what we call the soil vadose zone, which is the air

1   phase of the soil.  And we actually took some samples, and we

2   measured the concentration of the off gassing from the plume

3   between where the plume was and the ground surface, and made

4   a -- made a judgment that there was no release from the plume

5   to the air above the groundwater plume.

6   Q.  And was the contamination at the Taylorville site, based on

7   your observations, focused or concentrated around a particular

8   point?

9   A.  Around what?  I'm sorry.

10  Q.  Was the contamination at the Taylorville site, to your

11  observation, focused or found mostly around any particular

12  site, place on the site?

13          MR. TER MOLEN:  Objection, vague as to what

14  contamination is at issue in this question, your Honor.

15          THE COURT:  Well, that was actually one of my

16  questions was going to be, what contamination, what sort of

17  compounds were you dealing with at Taylorville?  Were you

18  dealing with VOCs or PAHs, or what were you dealing with there?

19          THE WITNESS:  We were dealing with both of those, your

20  Honor.  And one of the things, as I say, when we get involved

21  in one of these sites, even though I'm very familiar with the

22  kind of contaminants that come off of MGPs, I go back and I do

23  a research on -- on available literature to see if there has

24  been any changes to what I should expect to see in a

25  contaminant plume like this.

1          And in MGP sites then and now, the primary

2    constituents of concern are VOCs and SVOCs, and that's what we

3    were looking for at this site.

4          Now, given the fact that we were looking for airborne,

5    we were looking for VOCs and maybe some degradation, products

6    of some of the -- some of the products, the VOCs and SVOCs in

7    the groundwater.

8          So we looked -- we looked for degradation products

9    from both of them in this case.

10   BY MR. BROOKS:

11   Q.  And with respect to those contaminants, were they found

12   concentrated around any particular point there at the site?

13   A.  Well, one of the things that I've learned dealing in MGPs,

14   the MGP process was a dirty process.  And almost every part of

15   the facility you look at has some source of contamination.  The

16   primary contamination we saw from this site was coming from the

17   holder.

18   Q.  And what is the holder?

19   A.  The holder is the large tank that they pump finished gas

20   into right before it goes out in the distribution system.  And

21   it's the gas that's been cleaned and ready to be put in a

22   pipeline to get out to users.

23   Q.  And so you are saying that despite the fact that the gas

24   had been cleaned by that point, contamination was nonetheless

25   found there at the holder site?

1   A.   Yes.

2   Q.   And the Racine work, what kind of chemicals were you

3   dealing with in the Racine MGP work?

4   A.   Well, again, we were dealing with VOCs and SVOCs.  We

5   sometimes look for metals and other things as that.  But VOCs

6   and SVOCs are the two primary classes of chemicals that we

7   expect and we find.

8   Q.   And, Mr. Hendron, you -- the utilities maintain that your

9   experience at Taylorville and Racine is not relevant to your

10  work related to this case.  Do you agree with that criticism?

11  A.   No, I don't.

12  Q.   Why not?

13  A.   Well, I have been working on -- Racine project was 1987.

14  The Taylorville site, I forget the date of that, but it was in

15  the 1990s.  And the work that I did there is exactly the kind

16  of work that I see that we're doing now with respect to the MGP

17  plant that we are studying in Skokie.  VOCs and SVOCs are still

18  the contaminants of concern there.

19          And I did research to double check because while it's

20  been a while since I looked at an MGP, I wanted to make sure

21  that I was, you know, getting the best information I can get.

22          So I'm not sure at all -- I'm sure that I don't agree

23  with the criticism.  And I think the projects that I've done at

24  Gaslight Point and Taylorville are two large projects with MGP

25  operations on site.

1    Q.  And based on your experience, Mr. Hendron, and your

2    research, have there been any instances where manufactured-gas

3    distribution systems off site from an MGP plant per se have

4    been investigated as a source of contamination prior to this?

5    A.  That's one thing that I researched as part of my work in

6    this site.  And I found that there was virtually -- and I say

7    virtually -- no precedent for extension of any of these

8    remedial investigations to off-site distribution facilities at

9    MGP plants.

10           Now, having said virtually non-existent, we did find

11   one infrastructure distribution system that was studied in

12   Fargo, North Dakota.  And they did find extension to about I

13   think two or three blocks off site.  And they remediated that.

14   But that's the only instance I found.

15   Q.  Okay.  Thank you.

16           Mr. Hendron, if I can ask you to turn to the beginning

17   of the binder there?

18           MR. BROOKS:  Your Honor, there is a demonstrative

19   exhibit entitled Hendron's opinions that we put together.

20   There is way to help us walk through things, provided to

21   counsel yesterday.

22   BY MR. BROOKS:

23   Q.  Mr. Hendron, do you have that before you, the Hendron's

24   opinion chart?  Looks like this?

25   A.  I do.

1   Q.  Okay.

2              THE COURT:  Before we get to this, can we -- let's

3   take a short break.  So we will take a five-minute break.

4       (Brief recess.)

5              THE COURT:  Let proceed.

6              MR. BROOKS:  Thank you, your Honor.

7              Before I resume the questioning, your Honor, my

8   co-counsel pointed out as a housekeeping matter, I didn't move

9   Exhibits 2 and 3 into evidence.  If I may do that now?

10             MR. TER MOLEN:  No objection, your Honor.

11             MR. BROOKS:  Thank you.

12             THE COURT:  Go ahead.

13  BY MR. BROOKS:

14  Q.  So, Mr. Hendron, referring to the demonstrative here,

15  Hendron's opinions, that we put together.  It begins there with

16  I guess sort of an italicized preamble reflecting that the

17  source investigation that you did here followed protocols

18  recognized in the scientific community, and the source

19  investigation employed scientific principles generally accepted

20  in the scientific community.

21             Is that true?

22  A.  That's true.

23  Q.  How so?

24  A.  Well, the protocols that I followed are best outlined in

25  the record guidance document and the flow path that I have

Hendron - direct                                      34

1   developed over the decades I worked in this.  And all the

2   protocols that -- the sub-protocols that were used as part of

3   the work we do are recognized in the scientific community.

4   Q.  And that's -- those are the protocols that you employ here?

5   A.  Yes, it is.

6   Q.  Okay.  So turning to No. 1, the first opinion of yours in

7   this case summarized, the source investigation that you did

8   demonstrates that the 24-inch diameter NIGC pipelines in and

9   around the intersection of Dodge Avenue and Oakton Street were

10  connected to the Skokie MGP and were a principal element of the

11  distribution infrastructure of the Skokie MGP.

12          Mr. Hendron, how are you qualified to render that

13  opinion?

14  A.  Well, that -- that assessment really requires, one, we have

15  drawings that show that.  And after a long period of time in

16  the project, we were given drawings after requests that showed

17  that.

18          You have to have an ability to read those drawings.

19  And I've been involved in hundreds of projects in my

20  engineering career.  And almost all of them involve a set of

21  drawings or individual drawings of some sort of various things.

22  But a lot of drawings involve piping and that sort of thing,

23  which was the topic of this -- this exercise.

24          And I've done that on -- on a lot of jobs, reading

25  piping diagrams and beginning to understand the piping

1    terminology.  So that --

2    Q.  Can you give us some examples when you've done that in your

3    past experience?

4    A.  Oh, one of the -- one of the interesting times is, I worked

5    on the Davis-Besse Nuclear Power Plant for probably 15 years,

6    from licensing through operation through some problems it had.

7    And --

8              THE COURT:  What's the name of that power plant?

9    BY WITNESS:

10   A.  Davis-Besse Nuclear Power Plant.

11             And it involved the plant itself and the cooling

12   tower.  And every time we would get involved in that job, we

13   would have volumes of drawings that had piping all over the

14   place.

15             And it just so happened on this particular job, the

16   fill they used was soluble.  It had gypsum in it.  So we had to

17   look for areas where we had water flowing through a soluble

18   fill.

19   BY MR. BROOKS:

20   Q.  And has any of your source identification or source

21   investigation work involved identifying pipes?

22   A.  Well, both the Gilbert and Mosley and Puente Valley sites

23   with 50 or 60 -- I think I said 50 -- sites that we were

24   looking at.  A lot of those sites -- and I don't know what

25   percentage, maybe half -- had some kind of sewer pipe or some

Hendron - direct                                    36

1    kind of piping system coming into it or going out of it or

2    coming into and going out of different process areas that we

3    had to understand, not only to understand how the fluids flowed

4    from there for a process information.

5            But we had to know where the pipes were so we could

6    understand how they may have impact the contamination we were

7    seeing.  If they were broken or corroded or otherwise were

8    releasing contaminants.

9    Q.  So in that instance, you had to do work involving tracing

10   out pipes, where they went, where they came from?

11   A.  Where they went, where they came from, what their condition

12   was, what size they were, how much fluid they handled.  I don't

13   want to go on too long, but we have -- we have to develop a

14   priority, a list of things and a priority of things we want to

15   look for at each of the sites we look at.

16           But piping and that kind of infrastructure is always

17   one that we're interested in.

18   Q.  Any other types of industries you've had to look at piping

19   issues?

20   A.  In Kalamazoo, Michigan, which isn't on here.  We were in an

21   aircraft manufacturing plant that went back to the World

22   War II.  And we had to look at present day systems and systems

23   of piping and other -- other activities at the site that went

24   back into the 1940s, 1950s.

25   Q.  Any landfill or dam experience?

1   A.  Well, landfills are full of pipes.  I've done a lot of work

2   on hazardous waste and solid waste.  Landfills, they have

3   piping systems.

4         And one of the specialty areas I really enjoy working

5   in is earth dams, and both earth dams from a design point of

6   view and earth dams from a failure point of view, because

7   frequently in terms of failure, the piping system, the drainage

8   systems, are the cause of failure.  I've done a lot of causal

9   analysis for dam failures.

10        And so I've done a lot of piping work with plastic

11  pipes, cast iron pipes, steel pipes.  When I say plastic, it's

12  PVC and HDPE, which is high-density polyethylene and other

13  kinds of pipes.

14  Q.  So turning to opinion 2 there on the chart.  The source

15  investigation demonstrates that the NIGC pipelines contain MG

16  waste oils from the process used at the Skokie MGP.

17        Mr. Hendron, how are you qualified to give this

18  opinion?

19  A.  Well, this opinion requires first and foremost -- first,

20  maybe not foremost -- that you understand what the process was

21  at the plant you're looking at.  And the process meaning, MGP

22  is -- manufactured-gas plants burn different kinds of fuels.

23        We made a big effort, even on the first -- the first

24  work we did here, to understand what fuel was used at the

25  plant.  And knowing the fuel then we can -- we can get a better

1    idea on the character of the waste product that's in there.

2           So -- and I did that at -- at all the MGP plants that

3    I did look and see what the fuel was.

4           This source was different because the fuel wasn't

5    coal, for the most part.  It may have been early on, but real

6    quickly they went to use of petroleum, fuel products, to make

7    the gas.

8           And then what we did is, we connected the 24-inch pipe

9    to the plant.  And then we went out and we actually found the

10   24-inch pipe after about two years of study.  I think it was

11   two or three years of study, we found the 24-inch pipe at the

12   site.  We unearthed it.  We opened it up.  And we took samples

13   from inside the 24-inch pipe and compared the results of those

14   samples with what we expected to see based on our research.

15          But we also had a lot of data from what's called the

16   site investigation report from Skokie.  So we looked at data

17   from that report to see what they found at the Skokie plant,

18   because that gives us some idea of the signature of what we

19   should see in our 24-inch pipe.

20          So it's a process that I followed on all the MGP work

21   I've done in the past, not for pipes but for looking to make

22   that assessment.  In this case it was a pipe.  And I've done

23   that in a lot of cases in my past practice.

24   Q.  And in your past practice and here did you also do some

25   literature review?  Is that a standard thing that you do?

Hendron - direct                    39

1   A.  Well, that, like I said before, or earlier, I always make a

2   good literature review to confirm that what I had thought

3   before the job -- if this was a kind of a plan I worked on

4   before, which it is, I just wanted to confirm that those

5   classic chemicals are still current, and nothing has been added

6   or subtracted from the things.  So I did that for this too.

7   Q.  And I think you mentioned previously that you with respect

8   to your work at Taylorville and Racine had some understanding

9   of the types of waste that's -- or condensate that's generated

10  at these types of sites?

11  A.  Well, waste --

12          MR. TER MOLEN:  (Inaudible.)

13          THE COURT REPORTER:  I'm sorry?

14          THE COURT:  I'll let him answer the question.  Go

15  ahead.

16  BY WITNESS:

17  A.  Could you reask the question?  I'm sorry.

18  BY MR. BROOKS:

19  Q.  Sure.  I think you indicated previously that from your work

20  at Taylorville and Racine you had some experience with the

21  types of waste that are generated at MGP plants?

22  A.  Yes.

23  Q.  And did that touch on whether there was any condensate in

24  the gas?

25  A.  Well, the fact that we had -- the fact that we had

1    contamination in the holders at both of those sites is a

2    testament that there is condensate in the gas after it's

3    finished and purified and brought to the holder.

4    Q.   And how does what you thought the holders -- how does what

5    you saw at the holders indicate to you that there was

6    condensate?

7    A.   Well, one, at Taylorville, I think, the -- I think I -- as

8    I remember, as I recall, the holder was one of the principal

9    areas that was a site that the contamination was emanating

10   from.  It was a source, one of the -- one of the principal if

11   not the principal source at Taylorville.

12         And at Racine, again, my memory is -- has to go back

13   to 1987.  At Racine, the holder also had an area that had a lot

14   of contamination that we had to deal with at that site.  And at

15   that sight we had to -- we had to design a groundwater

16   remediation system that contained groundwater contamination

17   from the site.  And we had to plan for what chemicals we were

18   going to have in the water that we pumped out.

19         And then we had to make a decision in that site, too.

20   We knew we were going to have air, air particles, or gas

21   particles, coming off the top of the plume and would get to

22   commercial and residential structures, even though we were

23   going to put a cover over here.

24         So we had to know what chemicals were coming off that

25   plume, so we could design an air-removal system under -- for

1    under buildings for that site.

2            THE COURT:  How did you determine that the

3    manufacturer -- or the production processes at the Skokie MGP

4    was similar to the manufacturing processes at Taylorville or

5    Racine?

6            THE WITNESS:  Actually, your Honor, we -- we decided

7    that those processes were probably different.  The one at

8    Racine, as I remember, was the same.  But the one at

9    Taylorville was a coal gas.  And when I started the project,

10   coal gas tars are very thick.  So sometimes we start these jobs

11   with a -- an incorrect idea of what we are going to see.  One

12   of the ideas I had was, coal tar is thick and doesn't move very

13   far.

14           But in the process then we went and found -- well, we

15   did two things.  One, we asked the utility what fuel they used.

16   And we still don't have an answer to that.

17           Secondly, we went to the Brown's directory, which is a

18   directory that goes back long time in history, in this case to

19   1918.  And that directory said, this was a carbureted water gas

20   or Lowe process, which then translates to the use of fuel as

21   opposed to coal.  And that was part of our original study.

22   That has subsequently been confirmed by other information we've

23   received from the utility.

24           But that information was not in their site

25   investigation report.  There was no information on the

1  operation at the plant.  So we had to go out and get it.

2  BY MR. BROOKS:

3  Q.  So, Mr. Hendron, with respect to this opinion 2, the

4  utilities maintain that you have no expertise analyzing gas

5  distribution systems to determine the source and directions of

6  gas flow.  Do you agree with that criticism?

7  A.  No.

8  Q.  Why not?

9  A.  Well, I've -- I've looked at gas distribution systems for

10  landfill gas many, many times.  My basic training in civil

11  engineering, in thermodynamics, in fluid mechanics which also

12  involves understanding gas flow.  I had an introductory course

13  in mechanical engineering.  All these courses teach the

14  arithmetic or the theory of fluid flow.

15          And I've practiced fluid flow using the basic

16  equations Bernoulli and Venturi and others to understand sizing

17  pipes, valving, and other things that we need to know.

18  Q.  The utilities maintain, sir, again with respect to

19  opinion 2, that you're not qualified to opine regarding the

20  volume of tar that was left -- that left the Skokie MGP in gas

21  delivered to Evanston.  What's your response to that?

22  A.  I don't agree.

23  Q.  Why not?

24  A.  Well, again, my experience before this project was, there

25  is tar in the holder.  And that's right before it goes into the

Hendron - direct                    43

1   distribution system. And common practice knows that when you

2   put a gas in a pipeline, you're going to either get liquids

3   that form gases. If the temperature increases in the pipeline

4   or the pressure decreases, gas will form in the pipeline.

5           Well, that's not what happens in gas pipelines. What

6   happens is, the temperature decreases, and the pressure stays

7   the same. And once the temperature decreases, you get

8   condensate that forms much like condensate that forms on your

9   windows when it's hot outside and you have the air conditioning

10  up high. So -- and we find this behavior in landfill gas

11  systems all the time.

12          And then adding to that with what I do in projects

13  like this, I -- I found two real good references that dealt

14  with distribution systems for manufactured gas. And I

15  investigated those and studied those very thoroughly. One was

16  Morgan, which I -- which I said. And the other was a book by

17  an author named Hole, Walter Hole, H-o-l-e.

18          And both of those volumes confirmed my assessment that

19  there is condensate in -- in the case of Hole there is a lot of

20  condensate in the off-site gas -- in manufactured-gas

21  distribution systems.

22  Q.  And how do you go about calculating the volume of tar

23  that's in the gas in the distribution system?

24  A.  That's a simple basic engineering calculation. It's a mass

25  balance that just said, if you have one cubic foot of gas, and

1   you have condensate that forms out of that one cubic foot of

2   gas that's one percent -- and I'm not saying it's one percent

3   in the case of manufactured gas -- then you've got one percent

4   of the -- of the gas will become condensate.  Once you know the

5   molecular weight of the stuff you're doing, you can calculate

6   the weight and the volume of that gas.

7   Q.   And that's something you have done previously in your work

8   experience?

9   A.   Fundamental soil mechanics taught me to do it.  Thermo-

10  dynamics taught me to do it.  Fluid mechanics taught me to do

11  it.  And I practiced that in other elements of landfill design

12  where we do a lot of condensate calculation to size what we

13  call condensate traps.  In the manufactured-gas business are

14  called drip pots.

15       So you got to be able to calculate how much condensate

16  you're going to get out of a landfill gas-extraction system so

17  that you can design the knock-out pot to catch the water so it

18  doesn't get in the way of gas movement.  And I've done that on

19  several landfill -- landfill projects.

20  Q.   And, sir, the utilities suggest that landfill gas systems

21  are not comparable to manufactured-gas distribution systems for

22  purposes of looking at waste and condensate.  Do you agree with

23  that?

24  A.   In terms of the basic calculation?  No, I don't agree with

25  that.

1  Q.  Why not?

2  A.  Well, because manufactured gas composed -- manufactured gas

3  that leaves the distribution system is composed basically of

4  three things simply.  It's composed of the manufactured gas

5  that occurs as gas.  There is water vapor in there.  And then

6  it occurs as manufactured gas that occurs as gas at the

7  distribution point.  But because the temperature changes or

8  pressure changes or something else that goes on, it never gets

9  to the meter because it drops out as a liquid condensate.

10 Q.  And still focused on your opinion No. 2, the utilities

11 question your qualifications to employ chemistry in your source

12 investigation.  What's your response to that?

13 A.  I don't agree.

14 Q.  Why not?

15 A.  Well, my fundamental engineering education, I had two

16 courses in chemistry.  One in inorganic chemistry, one in

17 organic chemistry.  It's fundamental.  And I've been practicing

18 in the geo-environmental area, which has introduced chemistry

19 into soil, rock and water for me.  Not completely, by the way,

20 but in much more profound way.

21      And over the -- over the decades that I've practiced

22 this, I've understood and it's important, I have to understand

23 the fundamentals of organic chemistry to understand what is a

24 VOC, what is an SVOC, and how do they occur in the processes

25 that I am looking at.  And I can do that.

1      And that's -- I can't say I don't go further than that

2   with some degradation work, especially with the VOCs and the --

3   the methane generation.  I've -- I've gone further than that in

4   a lot of jobs I've worked on in terms of looking at fate and

5   transport issues.

6      But my basic training in chemistry and all the work

7   that I've done surrounded by other chemists and chemical

8   engineers have given me the capabilities I need to do what I've

9   done on this job.

10  Q.  And in fact, if I can direct you back to tab 3, your source

11  investigation flow path chart?

12  A.  Yes.

13  Q.  Which is up on the screen there, if that helps you.  I

14  mean, so -- so one of the boxes there is in fact geochemistry?

15  A.  Geochemistry, which is -- which is the application of

16  chemical principles into the geologic elements that are above

17  it.

18  Q.  And so this flow path here is something that you regularly

19  employ in doing source investigations?

20  A.  It's something I've been doing since 1980 for source

21  investigations, yes.

22  Q.  And you employed it here?  You employ this method here?

23  A.  I did.

24  Q.  In the course of your source investigation work, have you

25  in the past had occasion to consult with chemists as part of

1  that?

2  A.   Yes.

3  Q.   And generally when have you had occasion to do that?

4  A.   When I get into an area -- well, really two areas.  When I

5  get into an area that I don't feel comfortable with, I have a

6  lot of resources for chemists and chemical engineers that I

7  rely on to interact with me on specific questions that needs

8  more capabilities than I have.

9  Q.   And in your experience, is that unusual among source

10 identification professionals for them to occasionally consult

11 with a chemist?

12 A.   I don't find it unusual at all.

13 Q.   And did you in fact consult with any chemists in connection

14 with your work on this case?

15 A.   I did.

16 Q.   And who was that?

17 A.   Well, in the beginning, I consult with chemists who

18 understand the testing.  I may be able to develop a testing

19 scope of work.  But I always run that by chemists internally

20 and then chemists at the laboratory we're going to use to

21 understand that the testing I'm asking for is understandable

22 and appropriate.

23 Q.   And you did that here?

24 A.   I did that here.

25 Q.   Who -- with whom did you consult on that subject?

1   A.   I consulted with -- the lab person we were dealing with is

2   a person called -- or her name is Sandie Fredrick with Test

3   America.   And then another resource that I consulted with on

4   the testing was -- it goes back a little bit but it was Alan

5   Jeffrey.   In terms of what kind of testing we want to do.

6           And there was special element on this job.   Testing

7   had been performed by others on this job, that I wanted to use

8   the same kind of tests so that I was looking at apples and

9   apples.

10          So I relied on both of those people to guide me into

11  what test protocol would be appropriate to do that.

12  Q.   And when do you recall first consulting with Dr. Jeffrey?

13          MR. TER MOLEN:   I'm sorry.   Can you read the question

14  back, please.

15          THE COURT:   You can go ahead and -- the question was,

16  when did he first start consulting with Dr. Jeffrey.

17          MR. TER MOLEN:   Thank you.

18  BY WITNESS:

19  A.   I consulted -- as I remember, I consulted with Dr.

20  Jeffrey -- I think I consulted with Dr. Jeffrey sometime in our

21  first investigation.   And I -- I don't remember exactly what

22  that was because I wanted to replicate some testing that was

23  done over at the MWRD.

24  BY MR. BROOKS:

25  Q.   And the MWRD, that issue was being investigated back in

1    what, 2015?  Is that about right?

2    A.  Well, I started -- no.  It was actually investigated back

3    in 2012 or '13.  But I -- I start -- my work started in 2014.

4    So I think it was the summer of 2014 or it may have been the

5    summer of 2015 when we did the next phase.

6            But I did -- I did consult with Test America, Sandie

7    Fredrick about all the testing we were going to do.

8    Q.  And do you have a background employing gas chromatography

9    as part of your source identification work?

10   A.  Yes.

11   Q.  And what is your background with that?

12   A.  Well, normally I use protocols that quantify the species

13   and the concentration of chemicals.  But GC I used this time

14   and I've used it in the past because it was used over at the

15   MWRD.

16           I used GC on work that I did at NIES.  I'm sure that

17   we had GC work as part of the Gilbert and Mosley site with all

18   those sites that I -- that I looked at and I reviewed as part

19   of my -- as part of my site ID work.  And Puente Valley.

20           I've used it not frequently.  I'm not going to say I

21   used it frequently.  But I've been exposed to it on several

22   sites in the past.

23   Q.  And what role did it play in your analysis in those cases?

24   A.  Well, I don't remember specifically.  But it's -- you know,

25   it's a process where they -- they look for separation of

1    constituents in a gas that they make by molecular weight.  So

2    it's a molecular weight discrimination of constituents.  It

3    doesn't necessarily specify the constituent itself or the

4    quantity, which I'm normally more concerned about that or more

5    interested in that.

6    Q.   And, Mr. Hendron, again still focused on your opinion 2,

7    the -- are you aware that the utilities say you use what they

8    call a, quote unquote, check box approach as a sole means to --

9    for comparing PAHs?  Are you familiar with that criticism?

10   A.   I'm aware of that, yes.

11   Q.   And how do you -- what's your response to that?

12   A.   I don't use a check box approach to make site -- site

13   identification decisions, solely a check box approach at all.

14   Q.   Can you describe -- I mean, how do you consider the

15   similarity of PAH profiles in your source identification work?

16   A.   Well, the check box that they refer to is actually just a

17   tabular form of what I found to be, if you will, chemical

18   signatures of wastes from MGP plants.  And I found one from New

19   York.  I found one from U.S. EPA, the two reputable sources.

20   And they -- that brought me up-to-date on what was going on in

21   today's world with MGP, if you will.

22        And I also looked then, I said, okay, well, what

23   about -- what other source could I look at?  And I went to the

24   Skokie MGP, and I looked at their site investigation report.

25   And they had, I don't know, probably thousands of samples they

1    took.  And I made an inventory of those samples.  And where

2    waste materials showed up, I put that in my tabular form of

3    materials that I would expect to see at an MGP plant.

4             Those are the three sources I use for the comparison

5    table.  But that was just one line of evidence.  And that line

6    of evidence really was the -- the only thing I did with that

7    line of evidence is to say, are the chemicals that I am seeing

8    at wherever I'm looking, are they consistent with what I would

9    expect to see from an MGP?

10            I didn't see that table solely to say, okay, it's from

11   the Skokie MGP.

12   Q.  And using the tabular comparison that you described, is

13   that a recognized methodology in source identification work, to

14   your --

15   A.  Could you repeat the question?

16   Q.  I'm sorry.  So the use of a tabular comparison like you

17   have described, is that a recognized methodology in source

18   identification work, as far as you know?

19   A.  It's provided for in the RCRA guidance documents clearly.

20   And it's recognized -- it's recognized by everybody else I ever

21   practiced with.  But it's in the RCRA guidance for sure.

22   Q.  Let's turn to your third opinion, if we can go back to that

23   on the screen.  So third opinion, the source investigation that

24   you did demonstrates MG waste oils leaked from the 24-inch

25   diameter NIGC pipelines into the underlying geologic materials,

Hendron - direct                                          52

1    i.e., soil.

2          Mr. Hendron, how are you qualified to give this

3    opinion?

4    A.  Well, again, I've done a lot of pipeline work.  And if we

5    want to know whether a pipeline leaks, we look inside to see if

6    there are any breaks, which we did here.  Then we go around the

7    outside of the pipe where we think we might have a break.  And

8    we dig around the outside of that pipeline and see whether

9    there is conditions on the outside that would suggest a

10   release.  And then we take samples of soil, and we test the

11   soil under the pipeline.

12         That's what I did here, and that's what I do all the

13   time to make that judgment.

14   Q.  And the utilities in connection with the third opinion

15   maintain that you are not qualified to assess the condition of

16   gas distribution pipes.  Do you agree with that criticism?

17   A.  No.

18   Q.  Why not?

19   A.  Well, I have assessed the condition of hundreds or maybe

20   thousands of feet of pipe, and inside using cameras, outside by

21   digging around them, looking for physical breaks, looking for

22   corrosion that has resulted in leaks or cracks, holes.  And

23   just making a condition evaluation of the outside of the pipes

24   around a source area.

25   Q.  Can you give us just a few brief examples of types of areas

1    where you've done that?

2    A.  Well, at -- at the Gilbert and Mosley site, the newspaper,

3    which you wouldn't think newspaper would have any use for

4    organic chemicals like the ones we were looking for.  But the

5    newspaper actually had a process that used organic chemicals in

6    conjunction with an acid.  And they put that down a sewer pipe.

7            And with video we were able to show that the sewer

8    pipe had actually corroded.  It actually put a hole right

9    through an elbow of the pipe.  So the source ID identified they

10   used the chemical.  And our assessment of the pipe showed that

11   it was -- had a hole in it.

12           And we actually brought the pipe into the federal

13   courtroom in Wichita as part of an exhibit to be able to

14   demonstrate that to the Court.

15   Q.  And does any of your landfill gas work deal with assessing

16   pipe conditions?

17   A.  Yes.

18   Q.  How so?

19   A.  Well, we -- we did a lot of work at the Yeoman Creek

20   superfund site.  And our firm designed the cover for that site.

21   And the cover wasn't necessarily working as well as it was

22   supposed to in terms of removal of methane.  And there was some

23   methane extraction, or methane outside the landfill.

24           And one of the things we did is, we went into the

25   piping system and made an assessment of the performance of the

Hendron - direct                                54

1   line -- the lines themselves, the valves, the head loss.  We

2   also looked at the condensate production and the condensate

3   interference with the piping.

4   Q.  Turning to your fourth opinion, Mr. Hendron, which is that

5   the source investigation demonstrates that the MG waste oil

6   that leaked from the NIGC pipelines into the soil migrated to

7   and formed a black crust coating on the outside and the inside

8   of the Dodge Avenue water lines.

9           Sir, how are you qualified to render that opinion?

10  A.  Well, that's -- that's a pathway analysis.  This water

11  pipeline was roughly 15 feet or so from the NIGC pipeline.  So

12  it wasn't a very big distance at all.

13          And where we found the black crust, we found all kinds

14  of excavated materials.  This is at the corner of Mulford and

15  Dodges Street in Evanston.  And there had been huge amounts of

16  excavations that go on.  The thing that has to be established,

17  is there a credible pathway between the pipeline that's

18  leaking -- and by the way, we didn't know the pipeline was

19  leaking at that time.  All we knew was that there was a

20  two-inch thick black crust.

21          So then you got to make a decision, is that black

22  crust a result of corrosion of the pipe?  Or is it from leakage

23  of something from somewhere at that point?  And it's two inches

24  thick.  The pipe itself is three quarters of an inch thick.  If

25  it would have been rust, one, it would have been probably

Hendron - direct                           55

1    reddish brown or yellow.  And it wouldn't have been two inches

2    thick because you can't form a two-inch crust from a half inch

3    pipe.

4              So, I mean, it's not exactly calculus, but it's the

5    way we work to make decisions.  The decision we made about the

6    black crust then is, it's not natural to that point.  And so we

7    took a sample.  We tested it, which is the next step in that

8    decision process.  That's what I've always done.

9              And when we tested it, we found organic compounds in

10   it.

11   Q.  All right.  And so your work in arriving at opinion 4, I

12   mean, was that an example of your employing full path analysis

13   that we looked at --

14   A.  Yes.

15   Q.  -- previously?

16   A.  Well, it established using a full path analysis, and

17   particularly the internal consistency evaluation.  We don't

18   wait until we get all the models together.  We sometime -- or I

19   sometimes look and say, well, we got a two-inch thick black

20   crust on a water pipe, and I'm with the water distribution

21   manager for the area.  I kind of employ that right there.

22   Q.  When you say you employ that right there, you mean --

23   A.  I employ the internal consistency evaluation process right

24   there.  What's the -- what's the genesis of that two-inch thick

25   crust?  I couldn't answer that question.  One, I knew it wasn't

Hendron - direct                                    56

1    from the pipe itself because it was too thick, and it had some

2    wrong coloration, as simple as that sounds.  And for that

3    reason we took a sample of it, and we tested it.

4    Q.   Okay.  And the utilities maintain in connection with your

5    fourth opinion that you're not qualified to opine on the

6    condition of the Dodge Avenue water line.  Do you agree with

7    that?

8    A.   No.

9    Q.   Why not?

10   A.   Well, again, I think it's a fairly straightforward

11   assessment of looking at a pipeline and making a decision, is

12   it -- is it in good shape or is it in bad shape?  If it's in

13   good shape, well, fine.  You can make a decision.

14        If it's in bad shape, what are the factors of being in

15   bad shape that you see?  Is it corroded?  Is it -- has it

16   physically been hurt?  Is it sheared?  Is it compressed?

17        So, I mean, that's the first thing that we normally do

18   when we see a pipeline, whether we know it's there or not.

19   Q.   I think you indicated previously that you did that, for

20   example, with the newspaper at one of the other source

21   investigation work?

22   A.   That's correct.

23   Q.   Mr. Hendron, still with respect to the fourth opinion, the

24   utilities criticize your ability to distinguish between the

25   black crust that you found on the water -- on and in the water

1 line, distinguished between that and routine corrosion and

2 tuberculation.

3        What's your response to that?

4 A.  Well, the tuberculation refers to what I -- what I call the

5 black -- the crust material inside the pipeline.  I never -- I

6 don't remember referring to that as a black crust.  The black

7 crust was on the outside.  The crustal material is on the

8 inside.  We talked about the black crust.

9        With respect to the internal crust, we open the

10 pipeline.  I was a little surprised to see the volume of

11 crustal materials on the inside of the pipeline.  But the first

12 thing that stuck out to me was the inside of the pipeline crust

13 materials were black.  There was very little evidence of red or

14 yellow or other rust-colored material, oxides that are red or

15 yellow.

16        And again, my process that I use is, I just said,

17 let's sample this and see what's in there.  I didn't know what

18 the black material was.  But as an engineer, I've never said,

19 well, that -- I don't know what it is, so I don't have to

20 decide what it is.  I knew that I had to make a decision on the

21 chemical content of that, so that I could fit it into the

22 geochemistry box.

23        So we took a sample, and we found SVOC chemicals at

24 pretty high levels in this black crust material.

25 Q.  And the process that you've described of testing unknown

Hendron - direct                                    58

1   substance, that's something that you've done before as your

2   source identification work has progressed?

3   A.   Many times.

4   Q.   Mr. Hendron, do you believe you need to be a metallurgist

5   to evaluate pipe corrosion?

6   A.   No.

7   Q.   Why not?

8   A.   Well, corrosion is one of the first things that we learned

9   in inorganic chemistry.  We just studied -- and I believe it

10  was the noble chart, or I forget what the name of the chart

11  was, but it ranked metals in the order of increasing resistance

12  to corrosion.

13          And if you have two metals together and one has a

14  higher resistance to corrosion than the other, there will be

15  electric circuit set up between the two so that one would

16  become a sacrificial metal and the other will remain in tact.

17  So that's corrosion 101.

18          I've looked at -- in this case we dug the 24-inch pipe

19  out.  We dug the water pipe out.  You put cast iron or carbon

20  steel in soil environments, and they corrode unless they're

21  protected to not corrode.  Well, these pipes weren't corrosion

22  protected is the term.

23          Now, I can't design a corrosion-protection system.

24  But I understand if you have a pipe that hasn't been corrosion

25  protected, then the carbon steel and even the cast iron will

1    corrode.

2    Q.  And you say that the 24-inch gas pipeline, that you found

3    corrosion on that?

4    A.  Well, specifically with respect to the gas -- the 24-inch

5    pipe, we dug out a joint.  And 12 of the 14 bolts were corroded

6    completely through.  They were gone.  There was -- and these

7    were bolts that were intended to compress a joint between two

8    pipes.  So -- and we just dug out one joint.

9          But -- and we did carbon -- we did carbon steel

10   testing.  And I worked in a steel plant for a year.  So I know

11   carbon steel testing.  And we -- we got a report back from the

12   lab that said, it's carbon -- it's low carbon steel, and it's

13   very susceptible to corrosion.

14   Q.  And sticking with this opinion, you are aware, Mr. Hendron,

15   that the utilities criticize you for, in their view, not being

16   qualified to address whether there was a coal car coating on

17   the Dodge Avenue water line.  Are you familiar with that

18   criticism?

19   A.  Yes.

20   Q.  Do you agree with that criticism?

21   A.  No.

22   Q.  Why not?

23   A.  Well, again, I've looked at a lot of pipes, some with

24   liners, some not with liners, from various and sundry sources.

25   And I looked at the water pipe.  When we first unearthed it, we

1   cut it open.  We saw the crust.

2          And another thing I looked for was, is there a lining

3   in here?  Is there a liner?  And it -- I saw no evidence, no --

4   no visual evidence of a coal -- of coal tar or any other liner.

5   And I took my Leatherman.  I always have a Leatherman with me.

6   And I scratched it a little bit to see if I was -- my eye was

7   not seeing something that was there.  And I found pretty

8   much -- I say pretty much.  I found bare metal at virtually the

9   surface.

10  Q.  And did you in this case take other steps to look into

11  whether there was a coating on the Dodge Avenue water line?

12  A.  Yes, I contacted Tim Bartus, who is the City of Evanston

13  water department.  And I'm not sure he's in charge of it, but

14  he is in charge of all the field work they do for an

15  installation of water mains and repair of water mains.  He's

16  been doing that for a long time.

17         So I called him and talked with him, told him what I

18  found, and asked him if he had any idea of how much of the

19  system is -- has coal tar coating or any other kind of lining

20  or coating.  And he told me he knew of no other areas of the

21  city where they had lined pipes.  But he didn't -- he had no

22  information that there was any lining, coal car or otherwise,

23  on the Dodge Avenue water mains.

24         I also talked with Dave Stoneback, who had the same

25  opinion.

1   Q.   Who is Mr. Stoneback?

2   A.   Stoneback, Mr. Stoneback, I believe, is the department of

3   public works director.  I could be wrong on his title, but Tim

4   I think reports to him.

5          Then --

6   Q.   And Mr. Stoneback told you what?

7   A.   He told me that he had no evidence or no information about

8   a liner as part of a -- the water pipes in the City of

9   Evanston.

10         We made a contact with all the engineering firms that

11  had any design capacity then with the City of Evanston and as

12  it relates to their water departments.  We did find that some

13  of the more recent water department pipes at the water plant

14  itself have coal car enamel linings.  And these are very hard

15  linings that have coal tar and fly ash and other aggregate

16  materials there.  They're really hard and resistent.  They're

17  not coal tar by itself, but they have a coal tar element in it.

18         And there are some parts of the system down near the

19  treatment plant that have coal tar enamel inside.

20  Q.   But those post date the time when the Dodge Avenue water

21  line was installed.  Is that a fair statement?

22  A.   I think these were in the '60s or '70s, they put these

23  pipes in and after.  So it really post dates.

24  Q.   And the Dodge Avenue water line was installed approximately

25  when?

Hendron - direct                      62

1    A.   Approximately 1925.

2    Q.   Mr. Hendron, do you have experience looking at soil around

3    pipes?

4    A.   Soil what?

5    Q.   Soil around pipes?

6    A.   I still -- I'm sorry.

7    Q.   I'm sorry.  Do you have experience looking at soil around

8    pipes?

9    A.   Okay.

10   Q.   I think I need to lean more into the microphone.

11   A.   Yes.  For the most part, when we dig pipes out of the

12   ground, they're surrounded by soils.  And very frequently they

13   have a granular we call it bedding underneath the soil, and

14   then soil above that bedding and around the pipe.

15   Q.   And in your experience, have you previously seen an

16   exterior crust on a pipe like you saw on the Dodge water line

17   in Evanston?

18   A.   Not with that thickness or color, no, I haven't.

19   Q.   Still focused on opinion 4, the utilities question your

20   qualifications to address how the contaminants at issue here

21   got inside the water pipe.

22   A.   Yes.

23   Q.   What's your response to that criticism?

24   A.   I think I have all the capabilities necessary to make --

25   make a judgment on that possibility.

Hendron - direct                        63

1    Q.   And what's your background that would enable you to give

2    that opinion?

3    A.   Well, my background goes back to fundamental fluid

4    mechanics education that every civil engineer has to take.  We

5    have to learn the Bernoulli equation.

6    Q.   What's Bernoulli's equation?

7    A.   The Bernoulli equation is an equation that allows you to

8    calculate pressure at any point if you know the pressure head

9    itself that's in pipe, what we call the elevation head.  How

10   high or low is the pipe with respect to where the pressure is

11   input.  And then the velocity of the fluid flowing through it.

12           And, of course, the higher the pressure, the higher

13   the pressure.  The higher the elevation head, the higher the

14   elevation.  But the interesting thing is, the higher the

15   velocity in the pipe, the lower the pressure occurs in the pipe

16   itself.

17           So to understand the pressure in the pipe, you have to

18   understand all three of those factors.

19   Q.   And how did that factor into your opinion about whether the

20   contaminants at issue here got inside the Dodge Avenue water

21   line?

22   A.   Well, real simply.  I knew water flowed through the

23   pipeline.  And as simple as that sounds, I knew that it flowed,

24   and I didn't really know what velocity it flowed.  But during

25   certain flows, fire, emergency velocities, it made sense to me

1   that pressures inside the pipeline could become lower than the

2   pressures outside the pipeline, because the velocity head would

3   increase.

4          Now, why was I concerned about that?  Well, these

5   areas of crustations were much smaller flow areas than the

6   normal area of the pipe.  The normal area of the pipe was about

7   ten inches to four inches, depending on the pipe.  And the

8   ten-inch pipe was restricted to maybe six, five or six inches.

9   So the area of flow went in half.

10         What happens then is, the velocity increases.  So

11  where you have areas of pipe where the velocity increases, you

12  get drops in pressure.  And I said this could be a pathway of

13  how the organic materials on the outside of the pipe got inside

14  the pipe.  It's -- it was a possibility for me right away.

15  Q.   And that was because of the drop in pressure that would be

16  occurring?

17  A.   Yeah.

18  Q.   And how could that lead to contaminants intruding into the

19  pipe, in your experience?

20  A.   Well, if the pressure in the pipe became less than the

21  pressure outside the pipe, then it would suck the contaminants

22  in.  It's called a -- the Venturi effect.  It's used in -- I

23  hate to use this example.  It's used in perfume bottles, where

24  you pass air over a tube at give velocity, and the velocity of

25  air over the tube creates a low pressure area that sucks fluid

Hendron - direct                          65

1    up from the bottom of the bottle and then atomizes it to apply.

2              Now, that's a simplified version of what the Bernoulli

3    equation allows us to do.  And I was sure that we had to

4    investigate that possibility at this site.

5    Q.  Are you familiar with the term, cavitation?

6    A.  Yes.

7    Q.  What is cavitation?

8    A.  Cavitation is just the formation of bubbles in a flow of

9    water.  When the pressure gets low enough in a flow of water,

10   then instead of just being water, you get the combination of

11   water and liquid because of the low pressure over the top of

12   the water at that point.

13   Q.  And can cavitation within a pipe be cause for concern?

14   A.  Well, it does -- it does two things.  One, it speaks to

15   having low pressure at a given point.  So I would be concerned

16   about the ability to get intrusion at that point.

17             And cavitation creates a lot of disturbance.  So if

18   you have something in the pipe at that point, it can disturb it

19   and put it into the -- put it into the water stream.

20   Q.  And what is your background in understanding the phenomenon

21   of cavitation before your work in this case?

22   A.  Well, in the design of dams, we designed spillways.  We

23   designed drainage galleries for all kinds of things.  And we

24   are very careful to have flow conditions that don't result in

25   even the possibility of cavitation.

1          Now, some of big, high dams around the world can't

2    avoid that.  Okay, fine.  But then their structures have to be

3    designed to resist stresses from the cavitation and from the

4    high flows and low pressures.

5          And that process, even for high dams, uses the

6    Bernoulli equation.

7    Q.  And did you see a potential concern with cavitation with

8    the Dodge Avenue water line?

9    A.  I saw the possibility of low pressures, which is really

10   fundamentally what would cause the intrusion to occur.  And I

11   did see the possibility of some cavitation with the turbulent

12   flow too inside of the thing, inside the cavities I saw.

13   Q.  And what could that potentially cause?

14   A.  Well, it could -- the low pressures, if they got low

15   enough, would result in intrusion.  And the cavitation would

16   result in some -- in disturbance to the crust that could

17   release whatever is in the crust into the water stream.

18   Q.  Mr. Hendron, turning to your opinion No. 5, which is the

19   source investigation demonstrates the source of MG waste oils

20   found in the deeper soils and bedrock in the James Park area is

21   the result of migration of MG waste oils released during

22   long-term leakage from the NIGC pipelines.

23         Sir, how are you qualified to give that opinion?

24   A.  Well, I've done a lot of geologic research and all kinds of

25   projects I worked on in the past.  I did it on this.  And one

1   of the early things was, the oil is natural.  So I did that.

2   And I have come with a firm conclusion that there is no

3   naturally occurring liquid petroleum deposits in the City of

4   Chicago.

5   Q.  And how are you qualified to make that determination and

6   give that opinion?

7   A.  I've had five or six courses in geology, and I've drilled

8   hundreds of borings around the City of Chicago, worked in

9   foundations for buildings.  I've -- I have explored the geology

10  of Chicago for 40 years of my career.  And I have never found

11  any liquid petroleum in Chicago.  I don't know of any geologist

12  that has found them.  And I consulted with few geologists to

13  see if they had.

14          And I find no -- no evidence that there is credible

15  source of liquid petroleum where it -- where it exists around

16  the James Park area.

17  Q.  And did you also undertake a literature review as part of

18  your --

19  A.  Yes.

20  Q.  -- on that issue?

21  A.  Yes.

22  Q.  What did that turn up, if anything?

23  A.  Well, the literature review, I did two things.  One, I

24  said, well, where did that theory come from?  And it came from,

25  I believe, Mr. Rawlinson.  And his source was a -- was a paper

1    by a spiritualist.  And I won't go into all the details, but it

2    was not a geologist.  And it was a group that was formed back

3    in the early 1900s that said, if you drill here, you will find

4    oil.  And they drilled and they found oil.  About a hundred

5    gallons, as I remember the paper.

6         But their boring log has no association with oil.  And

7    no one -- and then they would sell shares.  And this sounds

8    outlandish, but this was to be the source that created that

9    theory.  So, I mean, that was my literature search.  Now, I did

10   more research on that group, and I have opinions on that group.

11        And then I did a literature search of the learned peer

12   reviewed articles.  And again, I don't take anything for

13   granted.  I don't know everything about Chicago.  But I've got

14   good contacts with geologists all over Chicago.  And I hate to

15   say it, but I told them about this.

16        And everything was fine until I told them about how it

17   came about.  And then we had -- you know, we had some

18   interesting discussions.

19        But through the process, I found no evidence of any

20   geologist or any paper or any source that would be credible in

21   our work that said there is liquid petroleum in the upper

22   slurried bedrock in Chicago.

23   Q.  And you've done similar literature research and background

24   review in terms of other source identification work that you

25   have done?

1    A.  Yes.

2    Q.  Turning to your opinion No. 6, the source investigation

3    demonstrates the MG waste oil in the bedrock has biodegraded to

4    form methane present at high concentrations and pressures at

5    the interface between the bedrock and the glacial till.

6            THE COURT:  Counsel, perhaps this is a good time to

7    take our lunch break.

8            MR. BROOKS:  Okay.

9            THE COURT:  We will break for an hour for lunch.  So

10   given where we are, how much more do you think you have for --

11           MR. BROOKS:  Your Honor, I think I have maybe another

12   15 minutes, 20 minutes maybe.

13           THE COURT:  Okay.  Then you can go ahead and complete

14   that after our lunch break.  And then we will do the

15   cross-examination.  So you are thinking about another 30

16   minutes on the outside?

17           MR. BROOKS:  On the outside, yeah.

18           THE COURT:  Okay.  All right.  Very good.  Let's take

19   our break.

20       (Hearing recessed until 1:00 o'clock p.m. of the same day.)

21

22

23

24

25

1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3    CITY OF EVANSTON, an Illinois    )  Docket No. 16 C 5692
     Municipal Corporation,           )
4                                      )
                         Plaintiff,    )
5                                      )
                   v.                  )  Chicago, Illinois
6                                      )  July 17, 2018
     NORTHERN ILLINOIS GAS COMPANY,    )  1:00 o'clock p.m.
7    an Illinois Corporation; and      )
     COMMONWEALTH EDISON COMPANY,      )
8    an Illinois Corporation,          )
                                       )
9                        Defendants.   )

10          TRANSCRIPT OF PROCEEDINGS - DAUBERT HEARING
                BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:          SPERLING & SLATER, by
13                               MR. THOMAS DAVID BROOKS
                                 MR. TREVOR K. SCHEETZ
14                               MR. HARVEY JOEL BARNETT
                                 MS. ALLISON G. MARGOLIES
15                               55 West Monroe Street
                                 Suite 3200
16                               Chicago, Illinois 60603

17                               JEEP & BLAZER, LLC, by
                                 MR. JEFFERY D. JEEP
18                               3023 North Clark Street
                                 Suite 214
19                               Chicago, Illinois 60657

20

21
                      ALEXANDRA ROTH, CSR, RPR
22                      Official Court Reporter
                     219 South Dearborn Street
23                           Room 1224
                      Chicago, Illinois 60604
24                         (312) 408-5038

25

```
1   APPEARANCES:   (Continued)

2   For Defendant Northern        MAYER BROWN LLP, by
    Illinois Gas:                 MR. MARK R. TER MOLEN
3                                 MS. JAIMY LEVINE HAMBURG
                                  MR. MATTHEW C. SOSTRIN
4                                 71 South Wacker Drive
                                  Chicago, Illinois 60606
5
    For Defendant Commonwealth    JENNER & BLOCK, LLP, by
6   Edison:                       MS. GABRIELLE SIGEL
                                  MR. ANDREW WILLIAM VAIL
7                                 353 North Clark Street
                                  Chicago, Illinois 60654
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings had in open court:)

2         THE COURT:  Let's proceed.

3         MR. BROOKS:  Thank you, your Honor.

4    DAVID M. HENDRON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5              DIRECT EXAMINATION (Resumed)

6    BY MR. BROOKS:

7    Q.  Mr. Hendron, before the break we were about to start on

8    No. 6 of your opinions, which states that the source

9    investigation demonstrates the MG waste oil in the bedrock has

10   biodegraded to form methane present at high concentrations and

11   pressures at the interface between the bedrock and the glacial

12   till.

13        And before we get into it, just in terms of

14   terminology, what's the glacial till?

15   A.  The glacial till is the lower most soil unit.  Glacial till

16   by definition is just a wide range of particle sizes and has

17   been overridden by various heights of ice.  In this case about

18   5,000 feet of ice set on top of this particular deposit.

19   Q.  Okay.  And so anyway with respect to opinion No. 6, how are

20   you qualified to give that opinion?

21   A.  Well, a lot of the projects that I worked on, including

22   some of the geotechnic projects I've worked on, refinery sites,

23   have included finding soils that contain high levels of

24   petroleum products, crude oil, and that kind of material.  And

25   we very frequently encounter currents of methane where we

1    encounter occurrences of petroleum product -- petroleum itself.

2    Q.   And can you give us some examples of where you've

3    encountered that in your work?

4    A.   Well, two locations.  When I first started my practice out

5    in New Jersey, we did a lot of work around refineries.  And one

6    of the refineries we did a lot of work around was Bayway

7    refinery, which I understand now is a golf course.

8            And here in the Chicago area, I was involved in a

9    project over at Whiting, an Amoco refinery, for probably five

10   or six years, and a refinery they had down at Wood River on a

11   remediation project for great deal of time.

12   Q.   And in your experience, does petroleum have a tendency to

13   biodegrade into methane?

14   A.   There -- yes.  There is a pathway.  There was a chemistry

15   that creates methane out of degradation of certain elements and

16   certain constituents into petroleum.

17   Q.   And in this case, were -- where was methane found at high

18   levels in relation to where the MG waste oils were found?

19   A.   Well, consistently where we find high levels of liquid

20   petroleum products in this case, which was at the contact of

21   the glacial till and the bedrock, we -- that's where we found

22   the high levels of methane, both in terms of concentration and

23   pressure.

24   Q.   And, Mr. Hendron, with respect to this opinion No. 6, the

25   utilities criticize your qualifications to evaluate the source

Hendron - direct                    74

1    of methane.  What's your response to those criticisms?

2    A.  I don't agree.

3    Q.  Why not?

4    A.  Well, as far as the source of methane itself, I've got

5    plenty of background in the currents of methane as part of

6    finding methane near petroleum products and whether it's there

7    as a natural product, which it could be, or degradation it's

8    there.

9             And in this case, there is a huge correlation between

10   where the methane is found and where the liquid petroleum is

11   found.  And there is no reason to believe that the degradation

12   processes that I've been exposed to at other places don't apply

13   here.

14   Q.  And does your background in geology give you qualifications

15   that you can draw on to make this opinion?

16   A.  Well, I've dealt with cases like this where there is

17   petroleum products in methane in -- at the Davis-Besse plant,

18   where -- in northern Ohio.  I just finished a project a couple

19   years ago in Columbus, Ohio, where we ran into evidence of

20   methane in bedrocks that have petroleum products at depth.

21   Q.  Did you work at a project called the Berlin & Ferro site?

22   A.  Yes.

23   Q.  Did that have any application to methane sourcing?

24   A.  It did.  There was evidence of methane in the -- in the

25   tills that was attributed to some organic chemicals that they

1  found down at the depth of about 150 feet, if I remember.  And

2  we had to evaluate the source of that -- those methane

3  detections and those, if you will, petroleum products.

4  Petroleum products that turned out to really be wood, but they

5  were identified as leakage from a hazardous waste incinerator

6  site, PAH materials from hazardous waste incinerator site.

7  Q.  And so you talked -- you talked about the wood with respect

8  to your work there.  How did that factor in?

9  A.  Well, when we went down and we -- we actually took samples

10  of the material and found out it was wood.  We also carbon

11  dated it and found out it was consistent with the glacial age

12  of that deposit.  And the fact that there was a little bit of

13  methane in the area was consistent with biodegradation of a

14  wood rather than a petroleum.

15  Q.  With respect to this opinion regarding biodegradation of

16  oil to form methane, utilities criticize your use of isotopic

17  analysis in this case.  Are you familiar with that criticism?

18  A.  Yes.

19  Q.  What's your response?

20  A.  Well, I don't agree with that.

21  Q.  Why not?

22  A.  Well, we did two -- I did two forms of isotopic analysis.

23  One I used before, and that was carbon 14 for dating.  And the

24  reason that I -- that I used actually both of these is, they

25  were also used by others on the project before I got involved.

1    So I wanted to have some data to compare with previous studies.

2            So the carbon 14 data I used as a dating method or

3    dating tool, and I used that before.

4            The other is a carbon fractionation approach that

5    prior to this project I had never used that.  But it had been

6    used at the MWRD property.  It had been used by Rawlinson, by

7    Mr. Rawlinson.

8            And I looked into that, and I found out that it was a

9    tool that I could use by getting a good sample of materials,

10   which I knew how to do; sending it to a laboratory that did the

11   test, which is in Champaign Urbana.  I checked that out.  They

12   had a protocol for that test.

13           And then getting data and fitting it in into a system

14   that would give me a line of evidence to see whether it was

15   biodegraded gas, whether it was fermented gas, which would have

16   been from a natural gas pipeline, or whether it was from

17   landfill gas.

18           So I -- I used that technique to get data to fit into

19   a system that I thought would be useful for source ID.

20   Q.   And have you done similar processes in the past in your

21   source identification investigation work?

22   A.   I had not used this particular test in any source ID that I

23   had done before, no.

24   Q.   But the process of evaluating the results that you got, was

25   that similar to work that you had done previously with

1   evaluating test results?

2   A.  Oh, yeah, many, many times for purposes other than source

3   ID, that's -- I've done a lot of work in seismic design.  And a

4   lot of testing for that is new, fits into new systems.

5        The critical element is, I have to -- before I can run

6   a test and use it, I have to also have something to fit it

7   into, like the -- like the system that this isotopic evaluation

8   here looked like we were going to be able to do.

9        This isotopic evaluation has been around since 1980,

10  so it wasn't brand new, and others had used it.

11  Q.  And in conjunction with your work into looking into whether

12  the waste oils had biodegraded to form methane, in addition to

13  the carbon 14 analysis, the carbon fractionation analysis, did

14  you have other lines of evidence that you looked at in making

15  that determination?

16        Did you consult with others?

17  A.  Well, yeah, I consulted -- I consulted with others, just to

18  make sure that my -- my background was right in terms of

19  looking at the idea from a more detailed point of view, which I

20  always do.  Other people that I worked with and other people in

21  the area.

22  Q.  And did you in this context consult with a Professor

23  Cording?

24  A.  Yes.  What I did also is, there is -- there are the papers

25  and there is a paper that does cite the fact that there is

1    naturally occurring methane in the glacial till deposits in the

2    State of Illinois.  I am -- I have been aware of that.

3            The question that I had to ask myself is, where are

4    they?  When I got the literature that really cited the fact

5    that they're mostly in downstate Illinois.

6            The second question is, is there any evidence anywhere

7    in the system that they could occur in the Evanston area?  I

8    contacted the Illinois state geological survey.  They did a big

9    study up in Lake County looking for glacial gases, glacial till

10   gases.  I talked to the state geologist.  And with him, he

11   confirmed that there is no evidence of glacial drift gas in

12   this part of Illinois.

13           A friend and a close consultant that I worked with

14   over the years from the university of Illinois, Ed Cording,

15   who's drilled tunnels all over the world, was involved with a

16   man -- excuse me -- a Ph.D. thesis for a tunnel that was driven

17   in the glacial till deposits in Evanston to be a tributary

18   tunnel to the tunnel reservoir plan along Noise Street in

19   Evanston.  That was I think about a two-mile long tunnel.

20           And I wanted to find out from Ed if they had run into

21   any evidence of gas, methane gas specifically, but any gas in

22   that tunnel, because they instrumented it and they spent a lot

23   of time in the tunnel.  And Ed told me, no, they didn't have

24   any evidence of methane during the drilling of that tunnel.

25           That was about two miles north of where we are.  So

1    that gave me some confidence that conclusion with those lines

2    of evidence that it's not glacial drift gas was a good

3    judgment.

4    Q.  And have you employed similar techniques in terms of doing

5    source identification work previously in your career?

6    A.  I -- I employ as much as -- I get as many lines of

7    evidences that I can to point toward an answer.  For instance,

8    in this case if Ed would have told me, no, we had four pockets

9    of methane or one pocket of methane, well, that would have been

10   a little inconsistent with a conclusion that there is no drift

11   gas in the area.

12          So, yes, I employ multiple lines of evidence.  And I

13   try to go to sources that are reliable and -- and knowledgeable

14   in the area.

15   Q.  Turning to opinion No. 7, it's on the next page.  It

16   states, the full extent of contamination caused by leakage of

17   MG waste oil from the distribution infrastructure from the

18   Skokie MGP is unknown, full extent is unknown.

19          Mr. Hendron, how are you qualified to give us this

20   opinion?

21   A.  Well, we know where a portion of the distribution system

22   is.  And it's in the area of Oakton and Dodge in Evanston.  We

23   also know there is a distribution pipe, 48-inch pipe, down at

24   the southwest corner of our property, or of the James Park

25   area.

1          Other than that, we've not been able to get any

2     information on a map showing where the distribution system is.

3     So, I mean, obviously we can't make any conclusion other than

4     there is parts of the distribution system that are unknown and,

5     therefore, we have not defined the full extent of where the

6     contamination may occur.

7     Q.  Opinion No. 8, the source investigation demonstrates other

8     sources, including naturally occurring petroleum liquids and

9     background contamination, are not the sources of the

10    contamination.

11         Sir, how are you qualified to give this opinion?

12    A.  Well, the whole objective of a source ID study is to first

13    look at other sources and identify where other sources are.

14    And we did that here.  One of the sources not listed here is

15    the landfill itself.  So we made a decision, have made a

16    decision, the landfill is not the source.

17         In terms of naturally occurring petroleum, I think we

18    talked about that.  There is no evidence of naturally occurring

19    petroleum.

20         And with respect to background, we did a study to look

21    for background contamination of VOCs and SVOCs in the soils.

22    It's from the State of Illinois in their TACO regulations,

23    tiered approach to cleanup objectives.  And we used those

24    background values, and we compared our values to the background

25    values.  And there is 40 or 50 percent accedence of every

Hendron - direct                                    81

1    sample from a background sample.

2           So there is great -- great accedences of background

3    values as established by the State of Illinois.  So that's the

4    basis for those conclusions.

5    Q.   And have you had prior experience considering background

6    levels when doing source investigations?

7    A.   That's a primary part of making a source ID is if the

8    source ID doesn't exceed background, you can't make it a source

9    of any of the contamination.

10   Q.   And, Mr. Hendron, opinion No. 9, and this has some

11   subparts.  The source investigation demonstrates the following

12   conditions may pose an imminent and substantial threat to human

13   health.  And then not to go word by word, but under reasonably

14   foreseeable operating conditions, hazardous constituents in the

15   MG waste oils may occur in the city's potable water supply at

16   levels above MCLs.

17          B, reference to the methane and high concentration in

18   pressure at the interface between the bedrock and glacial till.

19   And C, the possibility for workers to be exposed to MG waste

20   oil constituents.

21          So your opinion here is that these may pose an

22   imminent and substantial threat to human health.  How are you

23   qualified to give that opinion?

24   A.   Well, I've been involved in risk assessment work, or work

25   that involved very detailed, very sophisticated risk assessment

Hendron - direct                    82

1    from CERCLA sites, RCRA sites, State of Illinois sites and

2    sites in Kansas, sites on the West Coast, sites around the

3    countryside, where risk assessment was done following our

4    submittal of the remedial investigation.  And that has given me

5    a clear view of what risk assessment is, involves, what some of

6    the methods are that they used to make decisions about health

7    risk to humans.

8              And -- and that coupled with my looking at what we

9    have here with respect to the water line, we have as one

10   example, benzopyrene in the water lines.  I think a maximum

11   value is like 12,000 parts per billion in the water line.  And

12   the drinking water standard for that constituent is .2 parts

13   per billion.

14             And it's reasonably foreseeable that disturbance could

15   cause release of these constituents into the water.  And I have

16   an ability and I have a responsibility to flag that as a risk.

17             With respect to the methane in high concentrations, we

18   have methane near a grade school, within 50 feet of the front

19   door of a grade school, and near a senior center with

20   concentrations of methane of 90 percent or more in some cases,

21   and pressure of 13 PSI, which is about half the pressure of a

22   tire in your car.

23             It's just reasonably foreseeable that somebody could

24   drill something.  Something could happen to create a pathway

25   for that methane now down 40 or 50 feet down in the ground, to

Hendron - direct                                    83

1    be released.  And in fact, I have found out very recently that

2    a homeowner in the area was putting a foundation in her home,

3    and they hit a pocket of gas at 55 feet.  Surprised.

4         So, I mean, this is somewhat common sense.  But it's

5    also engineering sense.  Could this happen?  How could it

6    happen?  And if it's reasonable foreseeable, you got to -- you

7    got to pay attention to it.  And that's what I did here.

8         As far as the worker safety, when we dug these holes,

9    there was a lot of evidence of black material on the sites of

10   the excavation, water coming into the excavation.  It was

11   discolored and contaminated.  And when we sampled the soils in

12   the water line excavation and in other excavations in the area,

13   we found high levels of VOCs and SVOCs, that exceeded worker

14   standards.

15        And I'm not convinced at all that these are -- these

16   are not unique to an area around the NIGC pipelines.  I think

17   they are, and I think something is needed to be done to make

18   decisions on upgrading, things that have to be upgraded so the

19   workers know where the pipe is, and they know what the

20   conditions they may be exposed to.

21   Q.  And you made reference to a responsibility that you have to

22   call attention to these things.  What were you referring to

23   there?

24   A.  That's responsibility, the ethical responsibility, I have

25   as a professional engineer in the State of Illinois.  And it's

1   pretty much the first ethical hurdle that I have to look at.

2   Q.   Turning to opinion No. 10, the last opinion, states that

3   those conditions, ones we've discussed previously, need to be

4   addressed by means of a formal risk assessment.  And how are

5   you qualified to give that opinion, Mr. Hendron?

6   A.   One of the things I did as part of the study, as the first

7   part of this study and -- is to look for any other areas where

8   people became concerned about the occurrence of VOCs and SVOCs,

9   in water distribution systems.  There is a good study that I

10  found in this -- in Netherlands.  And this study understood

11  that these materials exist inside the water lines.  And they

12  wanted to understand how they might change with changes in

13  operating conditions in the water lines.  For instance, when

14  fire flows occur.

15          And this -- they performed a risk assessment.  I'm not

16  going to say it was relatively simple, but it was

17  straightforward.  And by means of doing this, by applying

18  engineering principles, engineering scientific principles, and

19  taking samples -- that's the operative work I like, taking

20  samples to get data, and then using that in a dose-response and

21  that kind of an assessment, they were able to show that the

22  risk was minimal for that system.

23          We're not in a position with this system to make that

24  scientific judgment quantitatively.  So it's my recommendation

25  that that be done.

1  Q.  And, Mr. Hendron, do you have to be an expert in conducting

2  a risk assessment in order to say whether a risk assessment

3  needs to be conducted?

4  A.  Well, I don't -- I don't think you have to be a risk

5  assessment expert.  I think you have to know a little bit about

6  it, which I do.  But I think you have to understand what the

7  health standards are for the things you are dealing with.  And

8  if there is a reasonably foreseeable chance that these could be

9  violated, then you -- I have a responsibility to make a

10 recommendation that somebody with the knowledge and the ability

11 do that risk assessment.

12         That's what I've done here.

13 Q.  And a risk assessment is part of a formal remedial

14 investigation and feasibility study?

15 A.  It's a -- yeah, it's a part of a formal risk -- of a

16 remedial investigation and feasibility study.  And it's a very

17 logical and necessary extension of what we've done to identify

18 what's going on in the James Park area.

19 Q.  And you have been involved in remedial investigations and

20 feasibility studies previously in your career?

21 A.  Yeah.  At the NIES site, at the Berlin & Ferro site, and

22 others.

23         MR. BROOKS:  Okay.  May I have one moment, your Honor?

24         THE COURT:  You may.

25     (Brief pause.)

```
 1           MR. BROOKS:  Your Honor, at this time we would tender
 2   Mr. Hendron pursuant to Federal Rule of Evidence 702 as a
 3   qualified expert witness in this case.
 4           MR. TER MOLEN:  Objection, your Honor.  We like to
 5   proceed with our cross.
 6           THE COURT:  The motion is taken under advisement.
 7           You may proceed.
 8           MR. TER MOLEN:  Thank you, your Honor.  If we can have
 9   just a minute, your Honor.
10       (Brief pause.)
11           MR. TER MOLEN:  Your Honor, is there a way we can put
12   it --
13           THE COURT:  That's fine.  You can open that door to
14   the jury box.  And you can prop it over with a chair or
15   something.  Move it over.
16           Counsel, if you need to kind of reposition yourselves,
17   feel free.
18           Go ahead.
19                      CROSS-EXAMINATION
20   BY MR. TER MOLEN:
21   Q.  Good afternoon, Mr. Hendron.
22   A.  Good afternoon.
23   Q.  Let's start by talking about what I understand at least
24   some of your opinions to be, okay?
25   A.  Okay.
```

Hendron - cross

87

1    Q.   Okay?  So I understand one of your opinions to be, Mr.

2    Hendron, that the MGP, which is at the far kind of upper left

3    that's labeled here, the Skokie MGP -- while that MGP was

4    operating, that there was what you define as MG waste oils that

5    were included in the gas stream that left that MGP and then

6    traveled east on Oakton, which is the purple street there,

7    okay?  Traveled east to the far east side of what's now James

8    Park, which this is a 1938 photo.  So that -- what you're

9    looking at is the clay pit there.  And then traveled on Dodge,

10   which is highlighted in green there south on Dodge.

11        Is that right?

12   A.   That's generally correct, yes.

13   Q.   Okay.  And it's fair to say, Mr. Hendron, that your opinion

14   is not that there were MG waste oils contained in the

15   groundwater plume that emanated from the manufactured gas plant

16   and went east into Dodge Avenue, is that right?

17   A.   The pathway that I've cited is the gas condensate pathway.

18   I don't -- I don't see any possibility of a groundwater plume

19   getting to that part, no.

20   Q.   That's right.

21        So as you said, you've cited, travel to the gas lines,

22   right?  That's the route that, according to you, this MG waste

23   oil took to get over to Dodge Avenue, correct?

24   A.   Yes.

25   Q.   Now let's talk about your MGP experience.  At your

1    deposition we talked about your work on two other manufactured-

2    gas plant sites. Do you recall that?

3    A.  I don't recall what two others I talked about, but --

4    Q.  Well, let's -- let's look at your -- at your report for a

5    moment.  We could show the March 28 report please.  That's

6    Exhibit D to the Hendron brief.

7            MR. TER MOLEN:  I'm sorry.  There we go.  Perfect.

8    Thanks very much.

9    BY MR. TER MOLEN:

10   Q.  Okay.  Now looking at page 14 of your report, Mr. Hendron,

11   that should be on the screen in front of you.  Do you see it?

12   A.  No, this is dark.

13   Q.  I see.  Okay.

14           THE COURT:  Hold on for one second.

15      (Brief pause.)

16           THE COURT:  Can you try plugging into the other -- is

17   there another PC cord there?

18           MR. SOSTRIN:  It's on all the other screens out here.

19      (Brief pause.)

20           THE COURT:  I wear various hats in this courtroom

21   apparently.

22           MR. TER MOLEN:  Thank you, your Honor.  Appreciate it.

23   BY MR. TER MOLEN:

24   Q.  All right.  So I'm showing you a blowup of part of page 14

25   of your March 2018 expert report, is that right, Mr. Hendron?

Hendron - cross

1  A.  That's right.

2  Q.  And in your March 2018 report, you identify the four sites

3  that you worked on that in your view were most closely related

4  to your work on this case, is that right?

5  A.  Yes.

6  Q.  Okay.  And these four sites do not include any manufactured

7  gas plant site, is that right?

8  A.  Well, the City of Detroit didn't include manufactured gas,

9  but it was a petroleum -- it was a petroleum site.

10 Q.  Okay.  So let's go through this.  The first one, the NIES

11 hazardous waste landfill -- the NEIS hazardous waste landfill

12 site in Wichita, that was not a manufactured gas plant site,

13 was that?

14 A.  No, it wasn't.

15 Q.  Okay.  The Gilbert and Mosley site, that was not a

16 manufactured gas plant site, was it?

17 A.  No.

18 Q.  Okay.  The Monroe Automotive site, that was not a

19 manufactured gas plant site, was it?

20 A.  No.

21 Q.  Okay.  The City of Detroit Airport site, as you said, that

22 was a petroleum site, but it was not a manufactured gas plant

23 site, correct?

24 A.  That's correct.

25 Q.  Okay.  Now, in your deposition we talked about your work at

1    Taylorville and Racine.  Do you recall that discussion?

2    A.  I do.

3    Q.  Okay.  And your work on each of those sites was more than

4    25 years ago, correct?

5    A.  I think that's -- that's correct.  It was -- I don't

6    remember the exact dates, but it's been a while ago.

7    Q.  That's fine.

8            At Taylorville in southern Illinois, Mr. Hendron, you

9    were retained in the context of a lawsuit to opine on whether a

10   groundwater plume from the manufactured gas plant was creating

11   vapors through vapor intrusion at a nearby park, is that

12   correct?

13   A.  That's correct.

14   Q.  Okay.  You were not part of the investigation and

15   remediation of the Taylorville site, is that correct?

16   A.  That's correct.

17   Q.  Okay.  At Racine, Wisconsin, Mr. Hendron, you were hired by

18   a developer after the site had been investigated and

19   remediated, correct?

20   A.  That's correct.

21   Q.  Okay.  And your job that you were hired to do was to

22   address vapor intrusion potential regarding construction of

23   buildings on top of this former manufactured gas plant site,

24   correct?

25   A.  I think that's generally correct.

1    Q.  Okay.

2           THE COURT:  Mr. Hendron, if you want to, you can put

3    the binder here out of your way, if you like.

4           THE WITNESS:  That's fine.

5           THE COURT:  Okay.

6    BY MR. TER MOLEN:

7    Q.  We talked earlier this morning, I believe, about the fact

8    that the Skokie site used the Lowe, initial caps L-o-w-e,

9    process to manufacture gas, right?

10   A.  That's correct.

11   Q.  Now, you never investigated the manufactured gas plant that

12   used the Lowe process before your work in this case, is that

13   right?

14   A.  I think the Racine plant may have used the Lowe process.

15   But I'm not sure about that.

16   Q.  All right.  I can show you your deposition.  Would that

17   help -- help refresh your recollection?  Why don't we put that

18   up.  It's page 18, lines 15 through 20.

19           And you were deposed in April of this year, right, Mr.

20   Hendron?

21   A.  That's correct.

22   Q.  Okay.  And at that deposition you were under oath, right?

23   A.  I was.

24   Q.  Okay.  And you were sworn to tell the truth, and you did

25   tell the truth, is that right?

1   A.   Yes.

2   Q.   Okay.

3            Question:   You were asked at your deposition, and

4   the Skokie manufactured gas plant site, the Evanston case that

5   we're here about today, that's the first time you've been

6   involved in investigating what the Lowe manufacturing process

7   was, correct?

8            Answer:   Yes.

9   A.   That's right.

10  Q.   Okay.  Does that refresh your recollection?

11  A.   It does.

12  Q.   Okay.  Now, at your deposition, Mr. Hendron, you told us

13  that it was important to learn about the Lowe process for this

14  case, is that right?

15  A.   That's correct.

16  Q.   Okay.  And you told us at your deposition that you made a

17  pretty exhaustive study to understand the basics of the Lowe

18  process, is that right?

19  A.   I did.

20  Q.   Okay.  Now, at your deposition -- if we can show the

21  document please -- you were shown a schematic of the standard

22  Lowe process, right?

23  A.   That's correct.

24  Q.   Okay.  And at your deposition you testified that you didn't

25  know what happened within any of these pieces of equipment that

Hendron - cross                                          93

1   are part of the standard Lowe process, is that right?

2   A.   My memory serves me correct, I think I testified that I

3   could not identify the specific parts that each of these tanks

4   represented in the process.  Yes.  I think I -- that's what I

5   testified to.

6   Q.   Okay.  Why don't we show the deposition, if we could

7   please.  That's page 278, lines 15 through 19.  Okay.

8           Question:   Okay.  So looking at this second page,

9   which is the page on the screen, of Exhibit -- it was on the

10  screen -- of Exhibit 414, you don't know what happened within

11  any of these columns that we use for the Lowe's process, is

12  that right?

13          Answer:   That's correct.

14          Okay.

15  A.   That's correct.

16  Q.   Okay.  And at your deposition -- if we can go back to that

17  schematic, please.

18          At your deposition, you testified that you didn't know

19  whether the process started on the left side of the schematic

20  or the right side, is that correct?

21  A.   That's right.

22  Q.   Okay.  Now, you agreed at your deposition, did you not,

23  that you are not an expert in how manufactured gas plants

24  purified the gas that they manufactured, is that right?

25  A.   I explained in the sense that I don't understand all the

1    detailed chemistry of how they purify.  No, I don't.

2    Q.  All right.  Why don't we show, if we can show the

3    deposition please, page 18, lines 21 to 23.

4              At your deposition, Mr. Hendron, you were asked:

5              Question:  Are you an expert in how manufactured gas

6    plants purify the gas they manufactured?

7              Answer:  Not really.

8              Correct?

9    A.  That's correct.

10   Q.  Okay.  Now, you had read somewhere that there was some sort

11   of filtration.  But you were more concerned with what fuels

12   were used at the manufactured gas plant, is that right?

13   A.  That's right.

14   Q.  And it's fair to say, Mr. Hendron, that you are not an

15   expert in the composition of the finished gas that left the

16   MGP, the Skokie MGP, is that right?

17   A.  I -- it depends how you define the word, expert.  I am

18   expert to the degree that I know that finished gas has

19   manufactured gas in it in air -- air form, in air phase, along

20   with some water vapor and others.  That I know.

21             As far as the different concentrations of various

22   constituents in the manufactured gas, I don't have any data.

23   And I looked for the data, part of this, to understand what the

24   concentrations were in any gas plant that I could find.

25             But I am an expert enough to know that the

1    manufactured gas does have the manufactured gas components

2    along with some water vapor and other air.

3    Q.   Okay.  If we can please show the deposition please, page

4    19, lines 10 through 22.

5             Question:   Are you an expert in the finished gas

6    that had been purified and was prepared to be sent to

7    customers by manufactured gas plants?

8             Answer:   You used the word expert, and I can't say

9    that I've been published or studied or otherwise been educated

10   extensively in this.  But expert in this case -- I've read a

11   lot of material, and I factored that in my thinking for this

12   expert opinion on the composition of the finished gas, and

13   specifically the competition -- I think you said later that's

14   composition -- of gas products and non-gas products, in this

15   case the condensate, from the process that goes out of the

16   distribution system.

17            Correct?

18   A.   I believe that's correct.

19   Q.   Okay.  Now, you used the term in your report, Mr. Hendron,

20   you used the term, quote, MG waste oils, close quote, is that

21   right?

22   A.   I did.

23   Q.   And you invented that term, is that right?

24   A.   I -- I selected that term because it was a fuel oil source

25   for the creation of the manufactured gas in this case.  It was

1    an oil source.

2    Q.  Well, you created the term, MG waste oils, isn't that

3    right?

4    A.  Yes.

5    Q.  Okay.  And you've never seen the term, MG waste oils, used

6    in the MGP literature, have you?

7    A.  I've seen tar oils or oil tars, but not MG waste oils, no.

8    Q.  You've not seen the term that you created used in the MGP

9    literature, correct?

10   A.  No.

11   Q.  Okay.  And you're not aware of anybody else in the MGP

12   field using the term, MGP waste oils, are you?

13   A.  No.

14   Q.  Okay.  And it's fair to say, Mr. Hendron, that you don't

15   know the chemical composition of the so-called MG waste oils

16   that you contend left the MGP plant contained in the gas, isn't

17   that right?

18   A.  We've tested those to compare them with the constituents we

19   found at the MWRD and the constituents that they found at the

20   Skokie MGP plant as part of our site ID investigation work.

21        So with that effort, I think the answer to that is,

22   no, I -- I have data to compare the constituent recipe for the

23   waste oils, the MG waste oils, we find in the James Park areas

24   with the MG waste oils that exist at the Skokie site.

25   Q.  Okay.  Well, perhaps you misunderstood my question.  Let me

1  ask it again.

2         You don't know the chemical composition of the MG

3  waste oils that you contend left the plant in the gas, isn't

4  that right?

5  A.  Well, if we look at the holder, which I considered some of

6  the data from the holder itself, and the SVOC and VOC

7  constituents we find in the holder area, that would be what I

8  would expect to see in the MG waste oils along the line.  And

9  that's essentially what I saw.

10  Q.  Let's show the deposition, page 348, lines 10 through 19

11  please.

12         Question:   What was the chemical composition in

13  terms of type and concentration of the MG waste oils when they

14  left the Skokie MGP?

15         Answer:   I don't have any data for me to answer that

16  question and no personal experience either to answer that

17  question.

18         Correct?

19  A.  That's what I testified to, and that answer was related to

20  having specific composition of the gas as it was put into the

21  distribution pipe.  There --

22  Q.  That's right.

23  A.  There were no data from that from -- and we asked for that

24  data -- from -- from the utility.  We didn't get any data.

25  Q.  And that was the answer you gave at your deposition.

Hendron - cross                                                    98

1    A.   That's the answer I gave at my deposition, yes.

2    Q.   Now, you define MG waste oils in your report.  We put this

3    up on the screen here.

4         You define MG waste oils as, quote, oils used and

5    wastes produced at manufactured gas plants, including without

6    limitation oils, contaminants and impurities entrained in the

7    gas manufactured and distributed from manufactured gas plants.

8    Such oils are sometimes referred to as Lowe process waste oil,

9    carbureted water gas, tar and coal tar, among other names.

10        Did I read that definition correctly?

11   A.   That's correct.

12   Q.   Okay.  And so under your definition of MG waste oils, it

13   includes Lowe process waste oil, right?

14   A.   Yes.

15   Q.   Okay.  It includes carbureted water gas, is that right?

16   A.   Yes.

17   Q.   It includes tar, is that right?

18   A.   Right.

19   Q.   And it also includes coal tar, is that right?

20   A.   What this indicates is, the process, the Lowe process,

21   waste are sometimes referred to in the literature and in other

22   places using these names.

23   Q.   And that's based on what your review of -- of the

24   literature showed, is --

25   A.   That's right.

1   Q.   Okay.   Then you also define in your report the term,

2   petroleum, is that right?

3   A.   Yes.

4   Q.   And as I read at least, Mr. Hendron, the definition that

5   you use for petroleum is word for word the same as the

6   definition that you use for MG waste oils, is that right?

7   A.   Yes.

8   Q.   Okay.   And you agree, Mr. Hendron, that petroleum is not

9   commonly referred to as Lowe process waste oil or tar or coal

10  tar, isn't that right?

11  A.   It's not commonly referred to as that, no.

12  Q.   Okay.   Now, in fact, Mr. Hendron, you agree that the Lowe

13  process that was used at the Skokie MGP would not produce coal

14  tar, isn't that right?

15  A.   It would not produce coal tar, as I understand it, no,

16  because coal tar can -- is produced by burning of coal.

17  Q.   Coal tar is produced by coal gasification, isn't that

18  right?

19  A.   Using coal as a fuel, yes.

20  Q.   Okay.   All right.   And when you say that MG waste oils were

21  in the gas that left the Skokie MGP, you're referring to tar

22  produced as a byproduct of the Lowe process, isn't that right?

23  A.   I am including a couple things in there.   The first is the

24  waste products that are produced.   But I'm also indicating that

25  some of the unburned fuel, some molecules and some of

1   constituents from the unburned fuel, that was used as the basic

2   fuel are probably also included in the gas phase leaving the

3   plant.

4   Q.   Okay.  Well, let's show page 289, lines 4 through 12

5   please.

6            Okay.

7            Question:   And so when you say, MG waste oils, does

8   that mean the tar produced by the Lowe manufacturing process?

9            Answer:   Correct.

10           Did I read that correctly?

11  A.   That's correct.

12  Q.   All right.  And then another question:

13           Does it mean anything else other than the tar used or

14  the tar created by the Lowe process?

15           Answer:   No.

16           Then you want to refer back to Exhibit 415.  Is that

17  correct?

18  A.   That's what it says, yes.

19  Q.   Okay.  Now, you testified that the tar or the MG waste oil

20  that you claim was in the gas that left the Skokie MGP was a

21  sinker, also known as a dense non-aqueous phase liquid, is that

22  right?

23  A.   What was the word you used?

24  Q.   Dense, DNAPL.

25  A.   Oh, dense.

1    Q.   Yeah, dense non-aqueous phase liquid?

2    A.   Okay, yes.

3    Q.   And just to make sure we're clear on this, you testified at

4    your deposition that the tar or MG waste oils that you claim

5    left the Skokie MGP in the gas flow was a DNAPL, also known as

6    a sinker, correct?

7    A.   That's correct.

8    Q.   Okay.  Now, it's fair to say, Mr. Hendron, that you have

9    never testified in any other case that tar left an MGP plant

10   and was carried in -- into the distribution system in the gas

11   stream, is that right?

12   A.   No.

13   Q.   Okay.  And you never published any papers to that effect,

14   is that right?

15   A.   I haven't.

16   Q.   And you've never been qualified as an expert by any court

17   in that respect, is that right?

18   A.   For that purpose?

19   Q.   Yes.

20   A.   No, I have not.

21   Q.   Okay.  And putting aside any testimony in court, Mr.

22   Hendron, you've never for another case evaluated, or another

23   job -- start over.

24        You never for another job evaluated whether tar left a

25   manufactured gas plant and entered the gas-distribution stream,

1   isn't that right?

2   A.  As it -- specific to the gas-distribution system, no, I

3   haven't.

4   Q.  Okay.  Now, in your reports, in your deposition, you've

5   identified three sources from your literature search as

6   supporting your opinion that there was tar in the gas-

7   distribution system.  And those three sources that were in

8   your -- in your report and at your deposition that we talked

9   about, sir, were, No. 1, Morgan's textbook; No. 2, paper from

10  the New York State Department of the Environment; and No. 3, a

11  report on an MGP plant in Fargo, North Dakota, is that right?

12  A.  I believe that's correct.

13  Q.  Okay.  And at your deposition you could not recall any

14  other pieces of literature that you were relying on for your

15  opinion that gas that left manufactured plant contained tar, is

16  that right?

17  A.  I couldn't remember any at that time.  But Morgan -- Morgan

18  was the primary --

19  Q.  Yes.

20  A.  -- source that I used.  And Morgan had references in it

21  that I also used.  But I included those in my reference to

22  Morgan.

23  Q.  Well, at your -- this morning I believe we heard that you

24  had also reviewed a report by Mr. Walter Hole, is that right?

25  A.  Yes.

Hendron - cross                                          103

1   Q.   You did not mention him in your deposition, did you?

2   A.   I didn't mention him in the deposition, but he was included

3   as a reference in the Morgan literature.  And I did -- I did go

4   to him and reviewed his work as part of my work with Morgan.

5   Q.   Was the Walter Hole and your reports by him identified in

6   your reliance materials, Mr. Hendron?

7   A.   It was identified as a reference in the Morgan report.

8   Q.   Well, in other words, the Morgan report included a

9   reference or footnote to Walter Hole, is that right?

10  A.   Both, yes.

11  Q.   And Walter Hole wrote a report in approximately 1907, isn't

12  that right?

13  A.   I believe it's 1912.

14  Q.   1912?  Okay.

15        So you did not separately identify that report as

16  something you relied on, isn't that right?

17  A.   I did not separately identify that, no.

18  Q.   Okay.  And now, you agree that Morgan is a very important

19  source on manufactured gas distribution, correct?

20  A.   Yes.

21  Q.   Okay.  And I think you pointed out, he has a whole volume

22  on manufactured gas distribution, right?

23  A.   He has two volumes.  The first volume in 1931 was about

24  plant, plant site.  And in 1935 he wrote a separate volume

25  outlining all the details of the distribution system.

1   Q.   Okay.   Now, Morgan specifically talks about drips that were

2   used in the distribution line of a manufactured -- of a -- for

3   a manufactured gas plant to collect condensate, isn't that

4   right?

5   A.   Yes.

6   Q.   And in fact, you sighted Morgan's discussion of drips in

7   your March 1980 report isn't that right?

8   A.   What report was -- did you cite?

9   Q.   Your March -- I misspoke.   Your March 2018 report?

10  A.   Well, I don't remember every word in that report.   So if

11  that's what you will say it's in, I have no doubt --

12  Q.   That's fine.

13  A.   -- it's in there.

14  Q.   You wouldn't disagree with me, would you, that you cited

15  that?

16  A.   If you'll show me the reference where I cited it, I -- I

17  can agree or disagree.

18  Q.   Sure, okay.

19  A.   What page?

20  Q.   I show that page, it's page 124 of the Hendron brief

21  Exhibit O.

22  A.   Okay.   And --

23  Q.   See in the second paragraph there, if you go down about the

24  middle of that second paragraph, general information, Morgan

25  textbooks indicated that the drip pots interconnection, et

1    cetera.  Right?

2    A.  Yes.

3    Q.  Okay.  So you cite to and rely on Morgan.  Let's --

4    A.  Right.

5    Q.  -- go to a -- another page of Morgan, please, if we could.

6    That's the page 124.

7         So this is from Morgan's second volume on the

8    distribution lines.  This is specifically talking about drips,

9    right, Mr. Hendron?

10   A.  That's correct.

11   Q.  Okay.  And it states here, I'll read it.  I'd like you to

12   verify I am reading this correctly:

13        In the distribution of manufactured gas, since the

14   temperature of the mains is somewhat lower for a good portion

15   of the year than that of the gas in the holders, there is

16   considerable condensation of water and light oils in the mains.

17        Isn't that right?

18   A.  That's correct.

19   Q.  Okay.  Now, this discussion of drips does not mention the

20   word, tar, does it?

21   A.  It uses the word, oils.

22   Q.  It says, light oils, doesn't it?

23   A.  It says, light oils, yes.

24   Q.  Okay.  And light oils are not sinkers, are they?

25   A.  They can be.

Hendron - cross                                          106

1   Q.  I see.  It's your testimony that light oils can be sinkers.

2   Okay.

3          Let's go to the New York State paper that you say you

4   relied on as well.  Okay?  And this is an excerpt from the New

5   York State paper that you said in your report and at your

6   deposition you relied upon.  The second type includes sites

7   where gas was stored in tanks located away -- the second type

8   includes sites where gas was stored in tanks located away from

9   the production facilities.  These are known as distribution

10  holders or holder stations.  The gas stored in these remote

11  holders had already been cooled and purified at the

12  manufacturing plant, removing the tar before the gas was piped

13  out.

14          Right?

15  A.  That's what it says, yes.

16  Q.  What it says.  Okay?

17          Now, let's look at the Fargo report that you also rely

18  on.  So the Fargo report defines separately tar.  You can see

19  it at the top.  And then below that, it defines drip oil, isn't

20  that right?

21  A.  Right.

22  Q.  Okay.  And it specifically defines tar as a black, dense

23  non-aqueous phase, also a DNAPL, right?

24  A.  That's correct.

25  Q.  And a DNAPL means it's going to sink, right?

1    A.   Right.

2    Q.   And part of your testimony is that the MG waste oils, as

3    you defined them, had to sink because your opinion needs that

4    waste oil to sink all the way down to bedrock, isn't that

5    right?

6    A.   It has to be heavy, yes.

7    Q.   Yes.  And then separately, the report defines drip oil,

8    right?

9    A.   Yes.

10   Q.   And that is a light non-aqueous phase liquid, correct?

11   A.   Well, as it's contained in this book, yes.

12   Q.   Okay.  And that's abbreviated as an LNAPL, right?

13   A.   That's what it says here.  And it's got some of the

14   compounds.  And one of the compounds they list here, which is a

15   primary compound that we find in drip oil, is naphthalene.  And

16   naphthalene has a specific gravity of 1.2, which is 20 percent

17   heavier than water.

18   Q.   So it's your testimony that this is wrong, and that in fact

19   that the drip oil would be a sinker, a DNAPL, and not an LNAPL,

20   is that right?

21   A.   What I found in my research is, this is the only place I've

22   seen this.  It's light -- light non-aqueous phase.  It's --

23   they don't call it light oil.  They say drip oil, light

24   non-aqueous phase.

25            And in the dictionary, that's where I went to start

Hendron - cross                          108

1    this thing, it says, light oil is defined by two ways.  One is,

2    it's lighter than water.  That makes sense.  That fits this

3    description.

4              And the other is that it is a compound that is

5    basically vaporized at a temperature about 200 degrees

6    Centigrade.  But it doesn't have to be lighter than water.  And

7    that's the case with naphthalene and some other elements that

8    show up in drip oil.  But naphthalene particularly is a heavy

9    oil.

10   Q.  Okay.  Mr. Hendron, let's look at this definition.  I

11   want -- have you finished your answer?

12   A.  Well, go on to the next question.

13   Q.  Okay.  This definition, drip oil, specifically defines drip

14   oil as a light non-aqueous phase liquid, isn't that right?

15   A.  That's what this defines it as, yes.

16   Q.  All right.  And by definition, and LNAPL is a floater.  It

17   floats on top of the water table, isn't that right?

18   A.  By definition of LNAPL, that's correct.

19   Q.  Okay.

20   A.  By definition of the compounds that it's listed, these --

21   this isn't an LNAPL because some of these compounds have a

22   specific gravity greater than one.  And the literature that I

23   have reviewed for this case documents that.

24             And naphthalene is the primary constituent that has a

25   specific gravity a lot greater than one.

1    Q.  So, Mr. Hendron, you relied on this Fargo report.  You say

2    you relied on it in your -- in your reports, isn't that right?

3    A.  I relied on it for some information.  It was the only --

4    hold on.  It was the only report that I found that had any

5    discussion of off-site infrastructure.  So I relied on it

6    because it was the only report.

7            Did I rely on everything and put my whole case on that

8    report?  No.

9    Q.  Okay.

10   A.  In this case, there is inconsistencies here that have to be

11   chased out.  When I went through my -- my flow chart this

12   morning, you did see the diamond at the bottom.  I don't accept

13   anything just on face value.  I look at it and I make an

14   internal consistency evaluation.

15           I did that with this, counsel.  And it's really

16   important.  I mean, this is an important point you're talking

17   about.  To be a sinker, the stuff has to have a specific

18   gravity greater than one.  But I don't buy that drip oil is not

19   a sinker because it appears in one line in the only report that

20   I found.

21           So I agree with you, that's how it's defined here.

22   But I didn't accept that as -- for face value.

23   Q.  Okay.  So your testimony is this definition of drip oil as

24   an LNAPL is wrong, is that --

25   A.  As it's laid out here with the constituents they have, I --

1    I find this to be an error.

2    Q.   Okay.  We heard this morning some testimony from you about

3    gas holders, isn't that right?

4    A.   Yes.

5    Q.   Can you tell me what the difference is between a gas holder

6    at MGP versus a relief holder?

7    A.   It -- I've got some information.  That's a site thing.  The

8    gas holder is a main unit on the site that -- where the gas is

9    distributed from.  A relief holder, I've seen those next to the

10   gas holders.

11          My presumption is that it is storage area where

12   surplus gas can be stored or, if you will, gas could be stored

13   for emergency purposes or to provide some relief from somewhere

14   in the system.

15          But I didn't concentrate on relief holders.

16   Q.   Okay.  That's your presumption, but you don't know, is that

17   correct?

18   A.   I don't know.

19   Q.   Okay.  And are you aware, Mr. Hendron, that tar was pumped

20   in to serve as a seal for gas holders?

21   A.   I am.

22   Q.   Okay.  And doesn't the fact that tar was pumped in as a

23   seal then explain why you would find tar in gas holders?

24   A.   Well, the seal would be on the exterior.  I looked at a lot

25   of interior samples.  I wouldn't think that they'd be so sloppy

1    to create a seal on the edges that would extend all the way to

2    the middle of the gas holder, no.

3    Q.  I see.

4            Now, Mr. Hendron, you agree that when you were -- when

5    you inquired and asked colleagues at your company, SCS, whether

6    or not folks at SCS had experience in manufactured gas plants,

7    you were told that MGP work is not a strong area for SCS.

8    A.  I didn't rely only on the SCS people.

9    Q.  So here is my question.  My question to you is, you agree

10   that when you asked internally at SCS if they had MGP

11   experience, you were told that MGP work is not a strong area

12   for SCS, isn't that right?

13   A.  I don't know that I was told that.  I made a survey, and I

14   did not find a lot of resources I could rely on internal to the

15   firm.

16           But I've been around for 50 years.  And I have all

17   kinds of resources that I call for -- for questions like this.

18   Q.  Okay.  Let's show page 73, please, line 18, going to page

19   74, line 6.

20           Question:   What did he tell you?

21           Answer:   You know, I don't think this is a strong

22   area for SCS.

23           Answer:   It is not a strong area for --

24           Question:   It is not a strong area?

25           Answer:   It is not a strong area for SCS.  And after

1    the conversation it was clear to me that, you know, we have

2    resources that I need in the Madison Chicago area to do what

3    has to be done.

4           Question:   And those resources did not involve

5    individuals with experience with MGPs, is that correct?

6           Answer:   I would say, with limited experience with

7    MGPs.

8           Did I read that correctly?

9    A.  You did.

10          This statement is missing some context at the

11   beginning that I don't understand or don't remember the exact

12   context of this discussion.

13   Q.  Okay.  We can go back if you like.  Let's go back earlier

14   on page 73, please.

15          Okay.  So there was a gentleman that you spoke with at

16   SCS, whose first name is Bob, Bob Isenberg.

17   A.  Yes.

18   Q.  Now do you remember the context?

19   A.  I do.  I do.

20   Q.  Mr. Isenberg, in fact, is a very long-standing member of

21   SCS, right?

22   A.  Bob and I have known each other for about 40 years, 50

23   years maybe.  He was with Sargent Lundy in Chicago.  And I was

24   doing a lot of work for Sargent Lundy.  And he and I have

25   crossed basis.

1          So I did contact him to make an inventory of the

2    resources we have in the firm.

3    Q.  Very good.  All right.  And you agree that what I read to

4    you, the he is Mr. Isenberg, right?

5    A.  That's correct.

6    Q.  Okay.  And you agree, Mr. Hendron, you testified in your

7    deposition that there are hundreds and maybe thousands of MGP

8    sites across the country.  And there are other individuals who

9    are experts on investigating and remediating MGPs, isn't that

10   right?

11   A.  Well, I know that there are other individuals that are

12   experts on that subject, yes.

13   Q.  Okay.  And when you were deposed, Mr. Hendron, you could

14   not identify anybody who worked with you on this matter who has

15   experience with other manufactured gas plants, isn't that

16   right?

17   A.  I missed a part of that question.

18   Q.  Sure.  When you were deposed in April of this year, Mr.

19   Hendron, you could not identify anybody who worked with you on

20   this matter who has experience with other manufactured gas

21   plants, isn't that right?

22   A.  I may have, yes.

23   Q.  Okay.  I can show you the question and answer.  Would that

24   refresh your recollection?

25   A.  Please.

Hendron - cross                                                114

1   Q.   Okay.  Let's show page 75, lines 12 through 16.

2          Question:   Okay.  Sitting here today, can you

3   identify anybody who works with you on this matter who has

4   experience with other manufactured gas plant sites?

5          Answer:   Not definitely, no.

6          Correct?

7   A.   Yeah.  I think that's the correct answer.  I brought people

8   in that had expertise in performing the kind of activities that

9   had to be performed, to do the borings, get the samples, ship,

10  do the field testing we had to have done.  So they had all of

11  that samples.

12         But I didn't specifically inventory everybody to know

13  whether they had worked, ever worked, on an MGP.  No, I didn't

14  do that.

15  Q.   Yeah, okay.

16         And it's fair to say, Mr. Hendron, that you attended

17  your first MGP conference in October of 2017, isn't that right?

18  A.   The conference -- I don't go to a lot of conferences,

19  counsel.  So I think -- I think that's correct.  I've been to

20  conferences in the past where MGP sites were a topic.  But this

21  particular site was an MGP remediation conference.  And I

22  thought it would be good for me to attend, and maybe I would

23  learn something.  And I did.

24  Q.   And your attendance was after you had issued your report in

25  September 2017, isn't that right?

1    A.  I believe it was, yes.

2    Q.  And the conference -- you testified at your deposition, Mr.

3    Hendron, that the conference you attended in October of 2017

4    was about the redevelopment of MGP sites, right?

5    A.  I believe that was one of the prime subjects of it, yes.

6    Q.  Okay.  Well, why don't we talk about it.  You say prime

7    subject.  If you can put up the page, please, page 89, lines 11

8    through 15.  Okay.

9            Question:   Mr. Hendron, was the October MGP

10   conference that you went to last year -- was it the

11   International Symposium and Exhibition on the Redevelopments

12   of MGP Sites?

13           Answer:   Yes.

14           Is that correct?

15   A.  That's correct.

16   Q.  Okay.  All right.  Let's talk for a moment, Mr. Hendron,

17   about gas distribution, okay?

18   A.  Okay.

19   Q.  Because again your testimony is that the MG waste oils as

20   you define them left the manufactured gas plant and then

21   traveled in the gas stream in the gas pipes east on Oakton and

22   then south on Dodge.  Isn't that right?

23   A.  Yes.

24   Q.  Okay.  Now, it's fair to say, Mr. Hendron, that other than

25   a 1965 undergraduate course you took at the University of

Hendron - cross                                    116

1    Kentucky, that you have no academic training on gas mains or

2    gas-distribution systems, correct?

3    A.   That's probably correct with respect to gas, natural gas or

4    gas mains, that transmit gas to be used for fuel to light

5    things and to cook with and so forth, yes.

6    Q.   Okay.  And other than this case, Mr. Hendron, none of your

7    work has involved a gas-distribution system outside of a

8    landfill, correct?

9    A.   I think that's a true statement.

10   Q.   Okay.  Now, we'll show you the first -- part of your

11   September 2017 report.  All right?  This is from Hendron Brief

12   Exhibit B, page 13.

13        In your September 2017 reports, you list out your view

14   of the key questions that you need to answer, isn't that right?

15   A.   I did.

16   Q.   Okay.  And the very first question you attempted to answer

17   was, quote, were the NIGC pipelines along Dodge and Oakton

18   Street part of the distribution infrastructure of the Skokie

19   MGP, close quote.  Isn't that right?

20   A.   Yes.

21   Q.   And you concluded in -- on page -- also on page 13 of that

22   same report, you concluded that the Dodge gas line was, quote,

23   an original, integral and important part, close quote, of the

24   Skokie MGP's distribution infrastructure, and that it carried

25   gas manufactured at the Skokie MGP from -- and it carried gas

Hendron - cross                                            117

1   from the Skokie MGP from 1911 to 1950s, right?

2   A.   Yeah.

3   Q.   Okay.  And at your deposition, Mr. Hendron, you told us

4   that if the Dodge gas line in fact was not part of the Skokie

5   MGP, that your chain of causation as you have this chain,

6   causal chain, going from the Skokie MGP through the gas lines

7   and down to Dodge -- you said that if the Dodge gas line was

8   not part of the Skokie MGP infrastructure, that your chain of

9   causation would be, quote, ruptured beyond repair, close quote,

10  isn't that right?

11  A.   I don't know.  If you show me my testimony in that, I don't

12  know that --

13  Q.   That's fine.  Let's go to page --

14  A.   -- used exactly those words.

15  Q.   Apologize.  I'm sorry.

16         Let's go to page 209, lines 4 through 10.

17         Question:   So it's fair to say that if those pipes on

18  Dodge and Oakton were not connected to the former Skokie MGP

19  when that MGP was operating, then the hypothesis you have would

20  fail, correct?

21         Answer:   The site model would have been ruptured

22  beyond repair.

23         Correct?

24  A.   The question posed the hypothetical that the line that you

25  have shown along Oakton Street is not connected to the Skokie

1  MGP, is that correct?

2  Q.  Well, I can read the question for you again at your

3  deposition.  The question was:

4        Question:  So it's fair to say that if those pipes

5  on Dodge and Oakton were not connected to the former Skokie

6  MGP when that MGP was operating, then the hypothesis you have

7  would fail, correct?

8        Answer:  The site model would have been ruptured

9  beyond repair.

10  A.  If they weren't connected to a gas holder somewhere, the

11  Skokie MGP here was the only gas holder we knew at that time in

12  September.  Yeah, they would be no -- there would be no

13  pathway.

14  Q.  Exactly.

15  A.  I mean, it's a pathway -- it's a pathway question.

16  Q.  Exactly right.  And if there is not a connection between

17  the gas pipe on Dodge and the Skokie MGP, then no way is there

18  a pathway, right?

19  A.  I think that's a fair conclusion.

20  Q.  Okay.  And your analysis, Mr. Hendron, as you evaluated

21  this first question, you focused on whether there was a

22  physical connection on the pipes, as opposed to whether or not

23  the gas from the Skokie MGP had actually flowed on those pipes,

24  isn't that right?

25  A.  Gas from the Skokie MGP, I'm not sure what you mean by

1    that.  Do you mean, gas produced at the Skokie MGP, or gas that

2    originated from the Skokie MGP?  And there is a distinction

3    between those two now with that.

4    Q.  So my question to you, Mr. Hendron, was, your analysis

5    focused on showing a connection to the Skokie MGP and not gas

6    flow, isn't that right?

7    A.  Well, the first thing we have to show is that there is a

8    connection between a gas source, in this case the Skokie MGP,

9    and the pipelines that we are studying where the leakage

10   occurs.  So, yes, there has to be a connection between a gas

11   source and those pipelines.

12   Q.  Okay.

13        THE COURT:  Mr. Ter Molen, why don't we take a five-

14   minute break at this time.

15        MR. TER MOLEN:  Yes.

16        THE COURT:  We're in recess.

17     (Brief recess.)

18        THE COURT:  Mr. Ter Molen, you may continue.

19        MR. TER MOLEN:  Thank you, your Honor.

20   BY MR. TER MOLEN:

21   Q.  Mr. Hendron, sitting here today, other than the -- being

22   connected, to use your terminology, you don't know whether the

23   Dodge gas line south of Oakton Street actually carried gas from

24   the Skokie MGP, do you?

25        MR. BROOKS:  Your Honor, can I object to this line of

1    questioning.  As your Honor may be familiar, there is --

2    utilities have put forth a motion to amend their answer in

3    which they admit the connection here.  So I am not --

4              THE COURT:  Objection is overruled.  I will hear the

5    testimony.  Thank you.

6    BY THE WITNESS:

7    A.  Would you restate the question, please?

8    BY MR. TER MOLEN:

9    Q.  Sure.  Mr. Hendron, sitting here today, other than being

10   connected, using your terminology, you don't know whether the

11   Dodge Avenue gas line south of Howard Street, which is the part

12   shaded there south of the purple, Oakton --

13   A.  That's Oakton Street.

14   Q.  South of Oakton, I apologize.  South of Oakton Street,

15   actually carried gas from the Skokie MGP, isn't that correct?

16   A.  Well, it was hooked up in 1911.  The only source of gas to

17   1931 or so was from the Skokie site.

18              So, yes, I do know that it was carrying gas, unless

19   someone can show me data that said that line didn't exist until

20   1938.  But my records show that that line was in place from the

21   start of the Skokie MGP at 1911, for the full duration of the

22   operation of that gas holder and the Skokie MGP plant.

23              So --

24   Q.  Mr. Hendron --

25   A.  -- I don't agree -- I don't agree with your assertion that

1  I don't have any way of knowing that was an operating gas line

2  providing gas from the Skokie MGP.  And the reason I'm going on

3  here is, that's an important point in my analysis.  And your

4  characterization is just entirely wrong.

5  Q.  Okay.  Are you finished?

6  A.  I am.

7  Q.  Okay.  You just mentioned 1938, Mr. Hendron.  What's the

8  significance of 1938?

9  A.  We have an air photo from 1938.

10  Q.  Could you repeat that please?

11  A.  We have an air photo from 1938.

12  Q.  An air flow?

13  A.  An air photo.

14  Q.  An air photo from 1938.

15  A.  Right.

16  Q.  Okay.  And what is the relevance of the fact there is a

17  photo from 1938 to whether or not there was a flow of gas on --

18  from the Skokie MGP on the Dodge Avenue gas line?

19  A.  Well, that doesn't have any significance.  But the

20  significance -- and I don't want this point obfuscated -- is

21  that that line was hooked up to the Skokie MGP at or near the

22  beginning, my records show, of the operation of the Skokie MGP.

23  And gas flowed from Skokie MGP along Oakton and up and down the

24  Dodge Avenue line beginning in or about 1911, and continued as

25  far as I can tell.

1          Flow of gas went through that line.  Later data showed

2    it may not always have been north-south.  There was an

3    agreement with the Peoples Gas where actually gas could have

4    flowed along a Peoples Gas line showing as an orange line along

5    Howard Street, into that Dodge Avenue line, and flowed from

6    south to north along the Dodge Avenue line.

7          With respect to my analysis, I don't care where the

8    gas came from necessarily to be able to say there was gas

9    flowing in that line provided by some utility.  Now, legally

10   there may be some nuances.  I can't deal with that.  But I'm

11   talking physically in engineering, that line -- but the line

12   remained hooked up to the Skokie plant.

13         The other thing I'd like to say to make sure the

14   record is clear, there was a 48-inch gas line that also isn't

15   shown on this plan, your Honor, that went from Howard Street.

16   You see the canal.  There was a 48-inch pipe that actually went

17   from Howard Street up over the elevated tracks, and then hooked

18   into the Skokie MGP.

19         I don't really have a complete operating record on

20   that line.  But there is a lot of evidence that the Peoples Gas

21   company provided gas to that holder.  And then it went out into

22   the system.

23         So I just want to make sure that -- and I agree.  If

24   the -- if the line is not hooked up to the Skokie MGP, if it's

25   definitely not hooked up, there is not a pathway and we're

1    done.  But that's not a -- that's -- that's just not a question

2    in my mind.  And some of the details of how the gas got to the

3    Skokie plant are being overlooked in this questioning and

4    testimony.

5    Q.  Okay.  Now, Mr. Hendron, you just said that your documents

6    show that the Dodge line was installed in 1911, if I heard you

7    right.  Is that what you testified to?

8    A.  We don't have a good record on that --

9    Q.  You don't?

10   A.  Counsel, we don't have a good record.  And what's the

11   reason for that?  Our record is very fragmented because the

12   utilities have not provided us any information on the history

13   of that gas line.

14          But given that, I have enough information to know that

15   that gas line was there in and operating prior to 1931.  And it

16   was -- it was in operation at some time during the 1911 and

17   1931 timeframe.

18   Q.  Okay.  It's -- your testimony now is, the gas line was in

19   operation sometime between 1911 and 1931, is that right?

20   A.  That's correct.

21   Q.  Okay.  And in fact, at your deposition you were not able to

22   point to any document that established that the pipeline, that

23   Dodge Avenue gas line, was installed in 1911, isn't that right?

24   A.  I don't remember my testimony.  But if you have it, we can

25   look at it.

Hendron - cross                                   124

1   Q.  Sure.  Let's look at page 238, line 11 through 239, line 8.

2   Okay.

3            Question:   I am not arguing with that.  My question

4   is, you've testified the Dodge line was installed originally

5   in 1911 or earlier, right?

6            Answer:   I believe that's my testimony, yes.

7            Question:   And my question to you is, what documents

8   do you base that timing on?

9            Answer:   Well, there are some documents that I just

10  recently received on that detail of Dodge Avenue.  Because up

11  until -- and I don't have the date that we received the

12  documents -- or the date that I received the documents that

13  you're talking about.  But it hasn't been very long ago where

14  I got good date confirmation on what the deal was on the line

15  going up and down Dodge, because that's the first line that we

16  had a line to.

17           Question:   Okay.

18           Answer:   But I think it was.  And I say I think.  It

19  would make sense to me to think that it was part of the

20  original construction into Evanston for the infrastructure.

21  And I know there is documentation.  I just don't have it

22  committed to memory.

23           Is that correct?

24  A.  That's what I testified, yes.

25  Q.  Okay.

1    A.  And if you remember, we talked about to the original gas

2    line ran down the middle of Dodge Avenue.  And I believe in

3    1929 it was replaced for some reason.  And it was replaced, the

4    documentation shows, that line was leaking like a sieve.  And

5    it was a bell-and-spigot design.

6             So in 1927 or '28, I don't know what the -- I don't

7    have that to memory, the line was moved over to the position

8    from the center of the street to where it is now.  And they

9    used Dresser couplings instead of bell-and-spigot couplings.

10            It had to be there a reasonable amount of time before

11   1927 or '28.

12   Q.  Okay.

13   A.  The line was there for a long time prior to 1938.

14   Q.  Okay.  Sitting here today, Mr. Hendron, it's fair to say --

15   now, let me start over again.

16            As you look at this map that's up here, Mr. Hendron,

17   you see that the Dodge line goes down south to Howard Street,

18   right?

19   A.  That's correct.

20   Q.  Okay.  And are you -- are you aware now, Mr. Hendron, that

21   Howard Street is the dividing line between Chicago to the south

22   and Evanston to the north?

23   A.  I was aware of that before this job, but I am still aware

24   of it.

25   Q.  Good.

1          And are you -- do you agree with me now that the

2    Peoples Gas is a gas company that serves Chicago?

3    A.  Yes.

4    Q.  Okay.  And sitting here today, Mr. Hendron -- well, strike

5    that.

6          At your deposition, Mr. Hendron, you did know if there

7    was a connection between the Peoples Gas system at Howard

8    Street and Dodge, and a Dodge Avenue line, did you?

9    A.  At my deposition I don't believe that I had any data that

10   showed that.

11   Q.  Okay.  And you have reviewed Mr. Dan Fox's deposition,

12   isn't that right?

13   A.  I have.

14   Q.  And you understand that Mr. Dan Fox is the director of

15   engineering for Nicor Gas, correct?

16   A.  Yes.

17   Q.  Okay.  And at your deposition when I asked you, you said

18   that you were aware that Mr. Fox testified that gas flowed

19   north from Peoples Gas along Dodge Avenue to Oakton, isn't that

20   right?

21   A.  I believe that's correct, yes.

22   Q.  Okay.  And you testified at your deposition, Mr. Hendron,

23   that you had no basis to disagree with Mr. Fox, didn't you?

24   A.  I don't have any basis now.

25   Q.  Okay.  To disagree with Mr. Fox, right?

1  A.  That's correct.

2  Q.  Okay.  Okay.  And you recall at your deposition, Mr.

3  Hendron, that I asked you whether your chain of causation

4  linking the Skokie MGP to what you say is contamination in

5  Dodge Avenue depends on gas from the Skokie MGP actually

6  flowing from the Skokie MGP along Oakton and down into Dodge

7  Avenue, right?

8  A.  Well, it could flow from another source north on Dodge

9  Avenue.  I am looking at the line itself as being the source.

10  And this -- this is -- I don't want to sound cavalier here.

11  But who provided the gas or where it was provided from is a

12  minor detail on the assessment.

13       What I want to know is, is it hooked to a gas holder

14  somewhere?  The Skokie MGP plant -- and I have records for

15  that, for the full duration -- provided about two and a half

16  billion cubic feet a year flowing in that pipeline for a long

17  time.  And it doesn't matter to me whether it's flowing south

18  to north or north to south.

19  Q.  Are you testifying, Mr. Hendron, that it doesn't matter to

20  you whether the gas in the Dodges line came from the Skokie

21  plant or from the Peoples plant?

22  A.  It -- the Peoples plant would be a gas holder, I think,

23  called the -- I don't remember the name of the holder, but it

24  was not far from there.  And we've looked into that plant, too.

25  The gas at that plant had little more indication of coal gas

Hendron - cross                                    128

1    versus CWG gas.

2              But from an assessment point of view of the source,

3    that would be a minor detail.  And we looked -- I've looked at

4    it.

5    Q.  So --

6    A.  So it's not a -- it's not a major detail about whether it

7    came from Peoples through the gas holder -- and I think it was

8    Kedzie Avenue gas holder -- or whether it came from the Skokie

9    MGP.  I think it came from both -- from -- from the Skokie

10   plant.

11   Q.  Okay.  So your testimony is, in fact, that it doesn't

12   really matter to you if the gas that was flowing through the

13   Dodge Avenue gas line came from the Skokie MGP or the

14   Peoples -- or Peoples Gas, is that right?

15   A.  No.  The gas was -- it was pretty much the same gas from

16   looking at what the holder signature was.

17   Q.  Okay.  Let's go back to the --

18             THE COURT:  I'm sorry, but by, no, you mean, you

19   disagree with that question?  Or you agree that for the

20   purposes of your study, it doesn't make a material difference

21   in your analysis as to whether or not it came from Skokie MGP

22   or came from Peoples Gas?

23             THE WITNESS:  It doesn't make a material difference in

24   the analysis that I made which holder it came from.

25             THE COURT:  Thank you.

1          MR. TER MOLEN:  Thank you, your Honor, for clarifying.

2    Appreciate that.

3    BY MR. TER MOLEN:

4    Q.  Let's go back to your 2017 report.  All right?  That's

5    Hendron Brief Exhibit B.  Looking at page 13.

6          Going back to your report, so this is on page -- the

7    Hendron report, Brief Exhibit B, page 13.  We showed it

8    earlier.  Thank you.

9          THE COURT:  Hold on, Mr. Ter Molen.

10          So talking about the Peoples Gas facility, you said

11    you looked at the process that they went through to produce the

12    gas, is that right?

13          THE WITNESS:  They meaning?

14          THE COURT:  Peoples Gas.

15          THE WITNESS:  I look at the fingerprint on the floor

16    of the holder.

17          THE COURT:  Where the gas that Peoples Gas produced

18    went through?

19          THE WITNESS:  Where it went through.  It was truly a

20    holder.  There wasn't a production unit there.  And I looked at

21    the gas characteristics based on the soil samples that were in

22    the holder, which is kind of a DNA of the gas that was in

23    there.

24          THE COURT:  Okay.

25          THE WITNESS:  And I don't mean to use that term.  But

1    it's a little like it.

2           And I compared that DNA with the DNA of the holder at

3    Skokie.  And there were differences.  All right?  But it wasn't

4    black and white or red and green.  It was various shades of

5    gray, I suppose.

6           And -- and that goes again into the assessment.  Let's

7    say there would have been a huge difference in that.  Well,

8    then it would have materially affected my assessment.  But I --

9    I apologize for going on a little bit.  But this is an

10   important point that we have to make clear.

11          But it was -- it didn't materially affect my

12   assessment.

13          THE COURT:  Okay.  Thank you.

14   BY MR. TER MOLEN:

15   Q.  Okay.  Mr. Hendron, looking back at your report, you talked

16   earlier about your -- the questions that you set out as

17   important to answer, right?

18   A.  Correct.

19   Q.  And the first question was whether or not the lines on

20   Dodge and also on Oakton were original, integral, important

21   parts of the distribution structure for the Skokie MGP, right?

22   A.  That's right.

23   Q.  You don't discuss whether or not they were parts of the

24   Peoples' system, do you?

25   A.  We had no information from the utilities, even though we

1  had requested it, that that was even a part of the operation of

2  the Skokie MGP.  We knew there was a 48-inch pipe, and we knew

3  it played a role.  But we didn't know which role.

4        So this was a factually true statement that I could

5  make at the time I wrote that report.

6  Q.  Okay.  And it's fair to say, Mr. Hendron, that you did not

7  provide as part of your reliance materials any information

8  about the Peoples -- Peoples Gas system at all, did you?

9  A.  I don't believe I did with this report, no.

10  Q.  Okay.  Now, you're testifying today that it doesn't matter

11  to you, as I understand your testimony, whether or not the gas

12  came from Skokie or from Peoples.  But at your deposition, Mr.

13  Hendron, I asked you this -- I asked you whether or not your

14  chain of causation depends on gas from the Skokie MGP actually

15  flowing through the Dodge gas line.

16        Do you recall that?

17  A.  Yes.

18  Q.  Okay.  And do you recall -- let's put your answer up here.

19  It's page 212, lines 12 through 18.  Okay.

20        Question:  Well, my question is very simple -- is a

21  very simple one, and it's focused on technical issues, not

22  focused on legal issues.  Okay?  Your hypothesis that material

23  in Oakton and Dodge is attributable to the manufactured gas

24  plant depends on gas flowing through those pipes from the

25  manufactured gas plant, correct?

1    A.  Well, that was the question.

2    Q.  Okay.  And you acknowledge that you can't say no, isn't

3    that right?  If you go to page 213, lines 1 through 18.

4              Answer:   I'm going to see this one later.  You were

5    right.  I've told you, I can't say no because I don't know all

6    the decisions that went into deciding that that pipe isn't

7    going to be used to pipe it a half a mile down or a mile and a

8    half down, and put it in a major distribution system for the

9    City of Evanston.

10             But in the event that that kind of a decision was made

11   and can be proven by a technical assessment, like looking at

12   gauging, looking at metering, looking at things that would tell

13   us specifically that not one drop of gas went in there, went to

14   Evanston, if that could be proven, well, okay.  From a

15   technical point of view, no gas flowed that way.  From a legal

16   point of view, I don't know that that will serve you very well

17   because I'm not a lawyer.

18             That's the answer you gave, correct?

19   A.  It is.

20   Q.  Okay.  And as part of that answer, you acknowledged that

21   you -- that to evaluate gas flow, you have to make a technical

22   assessment, isn't that right?

23   A.  Well, as I said, we were looking for meter information and

24   other information that would give us some idea -- not only some

25   idea but some data, to evaluate whether gas flowed in that

1    pipe.  And the only way to say it didn't flow in the pipe would

2    be to have a -- and it was a meter put down at Howard and Dodge

3    eventually in the 19 -- late 1920s or '30s.  We asked for that

4    data.  And there were no data provided.

5           But prior to 1928 or whenever the connection was made

6    to the Peoples Gas, I don't know of any valving that was put up

7    on the Dodge station that would prevent gas from flowing south

8    on Dodge from Oakton.

9    Q.  Okay.

10   A.  And in fact, as I said, the Dodge Avenue line was

11   completely replaced in 1928 or '29 or somewhere, because it was

12   leaking like a sieve between Dodge and Howard.  And it wasn't

13   leaking air.  It was leaking gas.

14          And so again, if somebody provides me data that says,

15   no gas was flowing in that line ever, fine.  Then --

16   Q.  Okay.  So sitting here today, Mr. Hendron, it's fair to say

17   that you have not done -- sitting here today, Mr. Hendron, it's

18   fair to say that you have not done a technical assessment, at

19   least in part because you say you have no data, isn't that

20   right?

21   A.  We were not provided any data from the utilities even

22   though we requested it a long time ago.

23   Q.  Now, at your deposition, Mr. Hendron, you told us that it

24   is, quote, an outrageous hypothetical to suggest that the Dodge

25   gas line did not carry gas from the Skokie MGP, isn't that

1  right?

2  A.  Without providing any data to that effect, I can't -- I

3  can't assume that.  I mean, if that would be an assumption, I

4  have to assume that to be a hypothetical.  Okay.  You put a gas

5  line in there, and then you didn't pump any gas in it for 20

6  years or ten years, whatever the number is.  I would have to

7  make a hypothetical that would be outrageous.

8         And let's just turn the tables.  Let's say I was

9  defending this as not being a source.  And my defense said,

10 well, I've assumed that there is no gas flowing down that

11 pipeline.  I don't think that would go very far in this kind of

12 a forum.

13        But my position on it is, I've got data that says that

14 gas line was leaking prior to 1931 and before.  It was

15 replaced.  It was put in in 1911 or so and then replaced in

16 1929, '28.  I don't have everything committed to memory here.

17        But why would they replace a line that's never had any

18 gas in it?  I mean, it's --

19 Q.  Are you done?

20 A.  -- again multiple lines of evidence that I look at to judge

21 whether what you're proposing is reasonable or not.  I don't

22 think it's reasonable.

23 Q.  Okay.  Let's show page 214, please, lines 4 through 13:

24        The Witness:  Again with a caveat that I don't like

25 this hypothetical at all because it's just outrageous, the

1    answer to your question is, if you can prove that, fine.  You

2    got a case that nothing that I looked at at Oakton and Dodge

3    came from the Skokie MGP.  My focus was being able to show that

4    the -- that the pipe at Skokie or at Dodge and Oakton was

5    connected to Skokie MGP.

6           Did I read that correctly?

7    A.   That's correct.

8    Q.   Okay.  Now, you never worked, Mr. Hendron -- isn't it true

9    you never worked on any project where you evaluated whether

10   contaminants had leaked out of a gas delivering, have you?

11   A.   Leaked out of what?

12   Q.   A gas main?

13   A.   Well, at landfills I have.

14   Q.   Okay.  Let's put up page 107, please, lines 4 through 9.

15   Have you worked on any --

16          Question:   Have you worked on any projects -- I'm

17   not talking about design projects; I'm talking about a

18   source-evaluation project.  Have you worked on any projects

19   where you analyzed whether contaminants leaked out of the

20   mains?

21          Answer:   Not that I recall.

22          Correct?

23   A.   As it -- as gas mains mean natural gas mains or

24   manufactured gas mains, I think that's a true statement.

25   Q.   Did I read that question and answer correctly, Mr. Hendron?

1    A.  Yes.

2    Q.  Thank you.

3         Now, Mr. Hendron, you've never testified before about

4    the corrosion on gas pipelines, isn't that right?

5    A.  No.

6    Q.  Are you agreeing with me or disagreeing with me?

7    A.  No, I never testified on that specific topic.

8    Q.  Okay.  And you've never been hired before to evaluate

9    corrosion, isn't that right?

10   A.  No.  I was hired on the Gilbert and Mosley site where

11   corrosion was actually the main -- one of the main reasons that

12   we developed leakage and -- and releases from the sources that

13   we found.

14   Q.  Okay.  Let's put up page 108, please, lines 8 through 10.

15        Question:   Have you ever been hired to study

16   corrosion?

17        Answer:   Not that I recall.

18        Did I read that correctly?

19   A.  That's correct.

20   Q.  Okay.  The oldest landfill gas system that you worked on

21   had been 25 to 30 years old, isn't that right?

22   A.  That's probably correct.

23   Q.  In contrast to the gas line -- gas lines along Oakton and

24   Dodge, which, according to you, could be older than a hundred

25   years at this stage of the game, isn't that right?

Hendron - cross                    137

1    A.  Could be, yes.

2    Q.  Okay.  And it's fair to say, Mr. Hendron, that you are not

3    a metallurgist, isn't that right?

4    A.  I am not.

5    Q.  Okay.  Let's talk a bit about forensic chemistry, Mr.

6    Hendron.  Now, when you were deposed in April of this year, you

7    were not able to define the term, forensic chemistry, isn't

8    that correct?

9    A.  I think that's correct.

10   Q.  Okay.  And it's fair to say, Mr. Hendron, that you've not

11   taken any specific courses on chemistry since you were a

12   college undergrad in the mid 1960s, right?

13   A.  No formal courses from a university, no, I have not.

14   Q.  Okay.  Well, let's put up page 128, please, line 6

15   through 8.

16          Have you taken specific courses --

17          Question:   Have the taken specific courses on

18   chemistry since your undergraduate days?

19          Answer:   Not that I remember.

20          That's correct, isn't it?

21   A.  That's correct.

22   Q.  And you've never used forensic chemistry as a source

23   evaluation tool for PAHs, isn't that right?

24   A.  Well, forensic chemistry, I think as we were talking about

25   it then, was detailed forensic chemistries of ratios and things

Hendron - cross                      138

1   like that.  The forensic chemistry that I have used is to -- it

2   follows the RCRA guidance 1988.  And they specify what you go

3   after and what you compare to identify sources of contamination

4   in given plumes.

5            I do that --

6   Q.  Okay.

7   A.  -- detail of forensic chemistry.  But I am not a Ph.D.

8   forensic chemist, is the point that I was responding to there.

9   Q.  Very good.  Let's put up page 129, please, lines 19

10  through 21:

11           Question:  Have you ever used forensic chemistry as a

12  source evaluation of PAHs?

13           Answer:  Not that I recall.

14           Did I read that correctly?

15  A.  Yes.

16  Q.  Now, the city has retained another expert, Mr. Jeffrey,

17  right?

18  A.  Correct.

19  Q.  Mr. Jeffrey is a Ph.D. chemist, isn't that correct?

20  A.  Yes.

21  Q.  You told us at your deposition that the city hired Mr.

22  Jeffrey because you, quote, needed some more specific

23  horsepower, close quote, in chemistry, isn't that right?

24  A.  That's correct.

25  Q.  However, it's fair to say that you did not rely on Mr.

Hendron - cross

139

1  Jeffrey in forming your own opinions in this case, isn't that

2  right?

3  A.  Well, the report that has finalized my -- my opinions in

4  this case was March 23 of this year, prior to that.  I don't

5  know when I got him involved to look at the other work that I

6  did in the forensic chemistry or the comparative forensic

7  chemistry that I did.

8          But I wanted him to look at that also.  And he did,

9  and he -- I wanted him to confirm that what I had done was

10  correct from a basic fundamental chemistry reason.

11  Q.  Did I hear you testify this morning that you initially

12  spoke with Mr. Jeffrey sometime in the 2015, 2016 timeframe?

13  Did I hear that correctly?

14  A.  Yes.

15  Q.  Okay.  And is that in fact your testimony, that you spoke

16  to Mr. Jeffrey in 2016, 2017?

17  A.  Sometime in that timeframe, yes.

18  Q.  Okay.  Let's put up page 130, please, line 6 through 17.

19  All right.

20          Question:  When did you first speak with Mr. Jeffrey

21  about this case?

22          Answer:  I don't remember the date.  But it was much

23  like my discussions with Professor Erdal, E-r-d-a-l.

24          Question:  Erdal?

25          Answer:  Yes.

1          Question:   So sometime this calendar year?  Meaning

2    2018.

3          Answer:   Sometime this calendar year.

4          Question:   So it's safe to say you did not rely on

5    Mr. Jeffrey in forming your own opinions in this case,

6    correct?

7          Answer:   I did not.

8          Did I read this correctly?

9    A.   Yes.

10   Q.   Okay.  Now, I also think we heard this morning about an

11   additional chemist with whom you were in contact.  Is it Ms.

12   Sandie Fredrick?

13   A.   Yes.

14   Q.   But Ms. Fredrick, you don't mention in Ms. Fredrick in any

15   of your reports, do you?

16   A.   Well, we included her reports from Test America in our

17   report.  But my consultation with Ms. Fredrick was just to

18   discuss the type of testing that we were doing and questioning

19   her on the -- on the quality and on questions I had from the

20   test results.

21   Q.   Okay.  And it's fair to say, Mr. Hendron, that you don't

22   say in any of your reports that you rely on Ms. Sandie

23   Fredrick, isn't that right?

24   A.   Other than she certified the reports that we used that have

25   the data, no.

1   Q.  She certified the lab results, isn't that right?

2   A.  That's right.

3   Q.  Okay.  Now, one of the tools of forensic chemistry, Mr.

4   Hendron, is using gas chromatography to identify the

5   constituents of a particular substance, right?

6   A.  That's correct.

7   Q.  And you talked about gas chromatography some this morning,

8   did you not?

9   A.  I did.

10  Q.  Yet it's fair to say, Mr. Hendron, is it not, that you are

11  not really conversant in reading the chromatograms that are

12  generated by gas chromatography, right?

13  A.  Well, in this case, I had a system that was employed at

14  MWRD for interpretation of those gas chromatograms.  I ran the

15  same tests that they ran or tested -- resulted in the same

16  data.  And I interpreted them the same way, so I could compare

17  apples with apples on the two sites.

18  Q.  Very good.

19          Can we please show page 87, lines 2 through 13.

20          Question:   And are you someone -- are you conversant

21  in reading the scans?

22          Answer:   Not really.  Not unless someone else has

23  done the analysis of it to show me the molecular weights that

24  these things correspond to.  I didn't do that.

25          But that's why I rely on people like Alan to dig

1    deeper into that in terms of the questions we have about those

2    spectra.

3            Question:   So by scans, I'm referring to gas

4    chromatograms.  Is that your understanding as well?

5            Answer:   Yes, GCMS.

6            Did I read that correctly?

7    A.   Yes.

8    Q.   And, Mr. Hendron, at your deposition you testified that gas

9    chromatography -- how gas chromatography works is, quote,

10   beyond your pay grade, close quote, correct?

11   A.   The details of it.  I've had -- I think on two occasions I

12   had people from GC labs come in and explain the basics of it.

13   But the detailed interpretation of chromatograms themselves are

14   not something that I do.

15   Q.   Right.  And you became literate on some of the fundamentals

16   for gas chromatography for purposes of this case, isn't that

17   right?

18   A.   For purposes of comparison of data in this case, yes.

19   Q.   Okay.  But you needed more help, you said, and that's why

20   you selected Alan Jeffrey, right?

21   A.   That's correct.

22   Q.   You testified at your deposition that you don't know

23   whether the chromatogram -- pardon me -- you don't know whether

24   a -- I'm sorry.  I'll start over again.

25           You testified at your deposition that you don't know

1    whether a chromatogram of coal tar would be different from a

2    chromatogram of tar generated by the Lowe process, right?

3    A.  I don't -- I don't think that that would be something I

4    could look and see the nuances of difference, no.

5    Q.  Okay.  That's not your area, is it?

6    A.  That's not the determination I would make.

7    Q.  Okay.  Now, we talked -- you talked a bit this morning

8    about this chart that you put together in your September 2017

9    report.  I believe it's Table 5 from that report.  Why don't we

10   put that -- put that up, please, if we could.

11          This is Table 5 from your September 2017 report,

12   correct?

13   A.  Yes.

14   Q.  Okay.  And you testified that this chart was a, quote,

15   foundation for your opinions, did you not?

16   A.  It's one line of evidence for my opinion, yes.

17   Q.  Well, you agreed that it was the foundation, did you not?

18   A.  I may have used that term.

19   Q.  Okay.  Well, why don't we refresh your recollection.  Let's

20   put up page 322 please, lines 12 through 15:

21          And we talked before about Table 5 to your September

22   2017 report was your foundation for your source ID in this

23   case, correct?

24          Answer:   Correct.

25          Did I read that correctly?

1    A.   Yes.

2    Q.   Okay.   You also testified that this chart, Table 5, was a,

3    quote, pretty acid test, close quote, did you not?

4    A.   I could have, yes.

5    Q.   Okay.   And it's fair to say, Mr. Hendron, that if you

6    testified that if this chart showed that two samples were

7    consistent, meaning they contained the same PAHs, that you

8    would consider them to be from the same source, isn't that

9    right?

10   A.   That's one line of evidence, yes.

11   Q.   Okay.   Let's show page 264, please, lines 12 through 15 --

12   I'm sorry.   Different one.   Page 265, line 20, through 266,

13   line 1.   Okay.

14        Question:   You testified earlier that in your view

15   "consistent with" means in this case that they are the same?

16        Answer:   They are from the same source.

17        Question:   Okay.

18        Answer:   It means they are from the same source.   I

19   conclude they are from the same source.

20        Did I read that correctly?

21   A.   I believe you did, yes.

22   Q.   Okay.   Now, let's go to your September -- after this, fine.

23        In this chart -- let's put Table 5 back up there,

24   please.

25        This chart simply identifies -- this chart simply

1    identifies whether a particular substance contains certain

2    PAHs, isn't that right?

3    A.   That's correct.

4    Q.   It does not purport to show relative PAH concentrations,

5    does it?

6    A.   No.

7    Q.   Okay.  Now, at your deposition, Mr. Hendron, you testified

8    did you not, that you have never seen anybody else use this

9    sort of a check box approach for a source identification,

10   correct?

11   A.   Not by itself, no.

12   Q.   Okay.  All right.  And you've not seen any literature,

13   saying -- well, strike that.

14           And at your deposition, Mr. Hendron, you agreed that

15   if you did the same evaluation for a factory-applied coal-tar

16   lining on the water main, that the same PAHs, the same

17   consistency, would be shown as is shown on your chart, isn't

18   that right?

19   A.   Yes, it would, or may.  It would -- I think it would

20   compare favorably.

21   Q.   It would be consistent under your terminology, right?

22   A.   For these -- for these constituents it would -- it would

23   compare favorably, yes.

24   Q.   By compare favorably, you mean consistent, right?

25   A.   Yes.

1    Q.   Okay.  Now, we looked earlier at this New York State report

2    that you relied on in your literature.  And that same report

3    also says that PAHs are present in many forms in the

4    environment, right?

5    A.   It does.

6    Q.   Okay.  And you agree with that statement, right?

7    A.   Yes.

8    Q.   Okay.  Okay.  Now, after your deposition, Mr. Hendron, we

9    had the opportunity to depose Mr. Jeffrey as well, the Ph.D.

10   chemist retained by the city.  You are -- you were aware of

11   that, were you not?

12   A.   I am aware of that, yes.

13   Q.   Did you attend that deposition?

14   A.   No.

15   Q.   Okay.  Have you been given a copy of that deposition?

16   A.   I believe I have.

17   Q.   Have you read it?

18   A.   Not in its full detail, no.

19   Q.   Okay.  Are you aware that Mr. Jeffrey said that relying on

20   a chart like your -- like your Table 5 would not be

21   determinative for purposes of identifying a source?

22   A.   I think I saw that part of it, yes.

23   Q.   Okay.  Now, Mr. Hendron, you're aware, are you not, that

24   you can use concentrations in ratios of individual PAHs as part

25   of a source evaluation?

1   A.  That -- that's a way that the engineers work.  Yes, I'm

2   aware of that.

3   Q.  Okay.  But you've never performed that kind of a ratio

4   analysis, have you?

5   A.  Not prior to this project, no.  I mean, in terms of the

6   ratios you're talking about were eventually looked at here, I

7   had not done that before this project, no.

8   Q.  Okay.  And you testified that in fact this ratio analysis

9   is outside of your expertise, correct?

10  A.  Prior to this project, yes, it was.

11  Q.  Well, let's show page 347, please, line 20 through page

12  348, line 3.  This is talking about ratio analysis.

13          Question:  Is that a valid technique?

14          Answer:  I can't make a comment on that because that

15  would involve a chemical analysis, and I don't know where it

16  came from.  I don't know the logic or the method behind it.

17          Question:  And you're not an expert in that kind of

18  chemical analysis, correct?

19          Answer:  I'm not a chemist.

20          Did I read that correctly?

21  A.  Yes, I believe you did.

22  Q.  Thank you.

23          Let's shift gears now, Mr. Hendron, to drinking water

24  mains.

25  A.  I'm sorry.  I didn't understand that.

1    Q.  I'm sorry.  We are going to shift our focus to drinking

2    water mains.

3    A.  Okay.

4    Q.  And specifically the drinking water main along Dodge Avenue

5    that's the focus of your reports, right?

6    A.  I didn't understand the --

7    Q.  Quite all right.

8    A.  -- drinking water.

9         THE COURT:  Mr. Ter Molen, how much longer do you

10    think you have for this witness?

11         MR. TER MOLEN:  Your Honor, I would estimate that it

12    would be about another 45 minutes, your Honor, 30 minutes, 45

13    minute, somewhere in that range.  I am doing my best to speak

14    more slowly understandably, but somewhere in that range.

15         THE COURT:  So what I will do is, it is 3:05 now.  I

16    will give you to about 4:00 o'clock.  And then I will allow

17    plaintiff's counsel to redirect.

18         MR. TER MOLEN:  Thanks very much.

19         THE COURT:  Okay.

20    BY MR. TER MOLEN:

21    Q.  Okay.  Mr. Hendron, at your deposition you told us that you

22    concluded that, quote, every sample that you took from a Dodge

23    Avenue water line that contained PAHs was due to MG waste oils,

24    isn't that right?

25    A.  I believe so, yes.

1   Q.   Okay.  Now, it's fair to say that you're not an expert in

2   the construction of water mains, correct?

3   A.   I think that's a correct statement.

4   Q.   Very good.

5            And it's fair to say that you are not an expert in the

6   operation and maintenance of water mains, correct?

7   A.   I have not had a practice in that, no.

8   Q.   Okay.  You agree -- you agree with me you are not an expert

9   in those areas, right?

10  A.   I've never done that in my practice.  I've done a lot of

11  work in piping and stuff, which is relatively similar to things

12  that you do for a water main.  But I can testify that I've

13  never worked on the design or the maintenance and operation of

14  a water system.

15  Q.   Okay.  Let's go to page 99, please, lines 21 to 23.

16           Question:   Are you an expert in the operation and

17  maintenance of water mains?

18           Answer:   No.

19           Did I --

20           MR. BROOKS:  Objection, your Honor.  Not impeachment.

21           THE COURT:  I understand the objections.  This is a

22  Daubert hearing, so I am just going to let it go.

23           Go ahead.

24           MR. TER MOLEN:  Thank you, your Honor.

25  BY MR. TER MOLEN:

1    Q.   Now, Mr. Hendron, you've not worked on any other project

2    that involved analyzing the composition of water mains, have

3    you?

4    A.   No.  I think specific to water mains, no.

5    Q.   Okay.  And before this project, Mr. Hendron, it's fair to

6    say that you had never seen the inside of a historic iron main

7    -- pardon me -- of a historic water main that had been in

8    service for many years, isn't that right?

9    A.   Not that I recall, no.

10   Q.   Okay.  And before this project, you had never been involved

11   in analyzing whether contaminants had entered into water mains,

12   correct?

13   A.   I -- I had not been involved in that, no, I have not.

14   Q.   Okay.  And before this project, you have never seen or

15   analyzed any crust on a water main, correct?

16   A.   No.

17   Q.   That's correct, you have not done that, right?

18   A.   I have not done that.  I'm sorry.

19   Q.   Very good.

20         And you told us at your deposition, did you not, that

21   it would be unprecedented for liquid MG waste oils to transform

22   into a solid crust on a water main, right?

23   A.   I have to see testimony on that.  I don't recall.

24   Q.   Okay.  Let's show page 626, please, lines 10 through 16.

25         Question:   Have you ever seen this material, this

Hendron - cross                          151

1   type of material -- and we were talking about MG waste oil.

2   We can go back if you want to -- transform from a liquid to a

3   solid at any other location?

4           Answer:   As I say, I don't think this situation is

5   unprecedented -- pardon me.

6           As I say, I don't think this situation is precedented.

7   I think it's unprecedented.  I haven't seen it, and I looked

8   all over for others who have seen it, and I didn't find

9   anybody.

10          Did I read that correctly?

11  A.   That's correct.  But I don't know whether we're talking

12  about the inside or the outside of the water main.

13  Q.   Okay.  Does that matter for you?

14  A.   Yes.

15  Q.   Okay.  The previous question we were focusing on crust on a

16  water main.  So let's talk about the exterior.  Okay?

17  A.   Fine.

18  Q.   From your standpoint, is it unprecedented -- is the

19  transformation of MG waste oils from a liquid to a solid on the

20  exterior of the water main -- is that unprecedented in this

21  case?

22  A.   Well, I hadn't seen it.  And I checked resources around the

23  countryside.  And it hadn't been seen.  But it did occur on

24  this water main.

25  Q.   Very good.  And --

Hendron - cross                                    152

1    A.   And there was no other source in the area.

2    Q.   Okay.  So let's talk about the interior, because you

3    mentioned the interior.  I want to make sure we're being

4    complete here.

5              Is it also unprecedented for liquid MG waste oils to

6    transform from a liquid to a solid on the interior of the water

7    main from your standpoint, Mr. --

8    A.   I don't know of anybody that I found that ever dealt with

9    the intrusion of MG waste oils or organic materials at all from

10   the outside to the inside of a water main.  Again, I didn't

11   find anybody that had studied that.

12   Q.   Very good.  So whether it's the outside or the inside, both

13   would be unprecedented, right?

14   A.   Yeah, I don't remember the -- the transformation from

15   liquid to solid discussion we had --

16   Q.   Okay.

17   A.   -- in our conversation.  And I really don't know what

18   context we were discussing that with.

19   Q.   Okay.  In your November 2017 report, Mr. Hendron, you

20   included some pictures showing what you called the, quote,

21   typical appearance of the black crust, close quote, right?

22   A.   Right.

23   Q.   Put that in your report?

24   A.   Right.

25   Q.   Call those up, please.  That's Hendron Brief Exhibit C at

1    Exhibit 4.

2              And those are the pictures that you use to show what

3    you call black crust, right?

4    A.   What -- with respect to the inside of the water main, I

5    don't know that we called it black crust.  I think we called it

6    crust material.

7              On the outside of the water main, I called it black

8    crust because it was black and it was crustal.

9    Q.   I see.  Okay.

10             And then at your deposition, Mr. Hendron, we showed

11   you images from a Google search of water main tuberculation,

12   right?

13   A.   Right.

14   Q.   Okay.  Show those.

15             At your deposition you agreed that these images are

16   similar, right?

17   A.   Visually they are -- they are similar.

18   Q.   Okay.  And in your investigation in this case, Mr. Hendron,

19   you pulled up pieces of the Dodge Avenue -- or the historic

20   Dodge Avenue water main you testified was installed in 1925,

21   right?

22   A.   Yeah.

23   Q.   Okay.  And you had those pipe segments available to you,

24   correct?

25   A.   Correct.

Hendron - cross                    154

1    Q.  Okay.  Yet, it's fair to say, Mr. Hendron, that you did not

2    send any of those segments of the old water pipe to a pipe

3    coating specialist to be examined, correct?

4    A.  I didn't see any visual evidence of any coating on those

5    pipe samples.  I didn't believe it necessary to send it out to

6    have a test performed of a crust or a coating.

7    Q.  Okay.  And it's fair so say, Mr. Hendron, you've not had

8    any of those pipe segments examined by anyone outside of you

9    and your team at SCS, right?

10   A.  Myself and my field people, yes.

11   Q.  Uh-huh.  And you agree, do you not, Mr. Hendron, that a lab

12   could analyze one of those water main segments and determine in

13   fact whether or not it has a coal-tar coating, right?

14   A.  Well, if my visual observation did not show any coal-tar

15   coating and I scratched it and there was no coating on the

16   outside of it.  So I didn't have anything to sample and test

17   going forward.

18           I did take samples of the crustal materials.  I did

19   not make any decision on the content of the crustal materials

20   inside the pipe.  I did take samples of those and sent those

21   off to the lab, because I had a material to sample.

22   Q.  Okay.  But you agree with me, Mr. Hendron, that a lab could

23   analyze a pipe segment from this 1925 water main and determine

24   whether or not it had a coal-tar coating, right?

25   A.  Probably.

1    Q.  Okay.  And that's not something that you did.

2    A.  I did not do that.

3    Q.  Okay.  Now, you were just talking about scratching the

4    interior of the water main.  I think you said this morning you

5    used a device.  You called it a Leatherman?

6    A.  Right, it's a knife.

7    Q.  A knife.  Okay.

8           Now, did you say anywhere in any of your reports that

9    you used a Leatherman or a knife to scratch and examine the

10   inside of the water main?

11   A.  No.

12   Q.  Okay.  And in fact, Mr. Hendron, this is the first case in

13   which you've testified on the historic use of coatings in water

14   mains, isn't that right?

15   A.  It is.

16   Q.  Now, since 1965, when you took an undergrad -- a general

17   undergraduate course, you've not taken any classes that relate

18   to water main historic coatings, correct?

19   A.  I have not.

20   Q.  Okay.  Now, as part of your reading in this case, you

21   looked at specifications provided by the American Water Works

22   Association on the use of coal-tar coatings, isn't that right?

23   A.  Yes, several, several papers.

24   Q.  But you only looked at AWWA specifications from 1962 and

25   the 2010s, isn't that right?

1   A.  I did look at other specifications, but those two talked

2   about coal-tar coatings in the most complete form.

3   Q.  And you agree, do you not, Mr. Hendron, that there is an

4   AWWA specification that calls for the use of coal tar as it

5   relates to water mains that would have been manufactured and

6   installed in approximately 1925.

7   A.  There was an AWWA specification for coal-tar pitch varnish

8   coating.

9   Q.  Okay.  Let's --

10  A.  I think it's dated 1908.

11  Q.  Very good.  Let's pull that up please.

12          Section 13, coating -- this is from the AWWA spec.

13  And it says:  Every pipe and special casting shall be coated

14  inside and out with coal-tar pitch varnish.  The varnish shall

15  be made from coal tar.  To this material sufficient oil shall

16  be added to make a smooth coating, tough and tenacious when

17  cold and not brittle nor with any tendency to scale off,

18  correct?

19  A.  Yes.

20  Q.  And you testified that that's a specification that would

21  have been in effect when the Dodge Avenue water line was

22  installed in 1925, right?

23  A.  I believe so.

24  Q.  Okay.  Okay.  Now, you agree, Mr. Hendron, that you are not

25  qualified to address how your so-called MG waste oils got from

Hendron - cross                                      157

1   the outside of the water main to the inside of the water main,
2   right?
3   A.  Not qualified.  This is a qualification.  I am qualified
4   to -- to understand that that is a very reasonable, foreseeable
5   possibility and decide what additional work that we have to do
6   to examine that probability.  And that's what I did.
7   Q.  Okay.  Let's show, please, page 124, line 13, through 124,
8   line 20.  This is from one of your answers:
9        There were two areas that I personally didn't feel
10  qualified to present testimony in this case.  One was how does
11  the crustal material and other materials on the outside of the
12  pipe get inside the pipe.  And the other was, risk assessment,
13  the health risk assessment, given what I was looking at in my
14  data.
15       Did I read that correctly?
16  A.  You did.
17  Q.  And in fact, your view that you were not qualified is why
18  the city retained LeChevallier, is it not?
19  A.  Dr. LeChevallier for the intrusion questions --
20  Q.  Yes.
21  A.  -- and testimony on that.  And Dr. Erdal for the health
22  risk assessment.
23  Q.  Yes.
24       But Mr. Hendron, you reached your conclusions that in
25  fact MG waste oils had gone from the outside of the pipe to the

1   inside of the pipe in September 2017, before the city had hired

2   Dr. LeChevallier, correct?

3   A.  That's correct.

4   Q.  Now, let's talk about methane.  You've never had any

5   specific training in identifying the origin or sources of stray

6   methane, isn't that right?

7   A.  Would you read the question again please?

8   Q.  Sure.  You've never had any specific training in

9   identifying the origin or sources of stray methane, correct?

10  A.  I don't know that there are any courses or training.

11  Q.  Are you disagreeing with me or are you agreeing with me?

12  A.  I've no courses.  But I don't know that there are any

13  courses.

14  Q.  I see.

15          So you agree with me that you've never taken any such

16  courses, right?

17  A.  I have not.

18  Q.  Okay.  Now, you relied on isotopic data in this case to

19  rule out naturally occurring methane, correct?

20  A.  I used isotopic analysis for the potential of ruling out

21  naturally occurring methane.  But I really didn't use that data

22  because it did not fall into one of the boxes that would allow

23  me to say, it's landfill methane or naturally occurring methane

24  or thermotic methane from a natural gas pipeline.  It fell way

25  outside the boxes that were shown in the papers that I was

Hendron - cross                     159

1    going to rely on.

2              I didn't -- I didn't really use that isotopic data,

3    for that assessment.

4    Q.   So your testimony today is, you did not rely on isotopic

5    data for any methane evaluation in this case, is that right?

6    A.   The carbon fractionation isotopic data were just not

7    useable for that -- for that purpose.

8    Q.   I see.

9              Did you use any kind of isotopic data evaluation for

10   purposes of this case, Mr. Hendron?

11   A.   I used carbon 14 data.

12   Q.   Okay.  And this case was the first time that you used

13   carbon 14 data for purposes of a methane source identification,

14   correct?

15   A.   It may have been.

16   Q.   Okay.

17   A.   I don't -- well, I don't know.  We -- we did methane source

18   evaluation at Yeoman Creek, and we did some methane work at

19   Hillside.  But -- and I don't remember that we used carbon 14.

20   Q.   Okay.  I can show you a deposition excerpt if that would

21   help you?

22   A.   Well, if I testified that I didn't know of any then, then

23   I'm sitting here today, I'm in the same position.

24   Q.   Okay.  So I'll represent to you that you said at your

25   deposition this was the first time.  So do you agree with me

1    that this case is the first time you used isotopic analysis for

2    methane identification?

3    A.   My memory both times is the same, yes.  I don't remember

4    any other cases.

5    Q.   Okay.  And in fact, for this case, Mr. Hendron, you read up

6    on isotopic testing by looking up that topic in Wikipedia,

7    right?

8    A.   That's where I started.

9    Q.   Okay.

10   A.   Wikipedia is a good place to start.

11   Q.   Now, you told us at your deposition when we asked you about

12   the different types of methanogenesis --

13          MR. TER MOLEN:  Be happy to spell that for you in a

14   minute.

15   BY MR. TER MOLEN:

16   Q.   When we asked you about the different types of

17   methanogenesis, you told us that that's beyond your pay grade,

18   right?

19   A.   The different pathways for methanogenesis is -- are the

20   chemistry, the detailed chemistry, of how certain chemicals are

21   then transformed from their original form to carbon, to methane

22   and other elements, yes.  That's detailed chemistry that I am

23   not familiar with.

24   Q.   So that the specific process by which materials in the

25   environment undergo methanogenesis and decompose or become

1    methane is beyond your expertise, right?

2    A.   That's correct.

3    Q.   Okay.  And in a similar vein, Mr. Hendron, you told us that

4    you do not know if methane produced by different kinds of

5    methanogenesis have different chemical markers or signatures,

6    right?

7    A.   Again, when -- that -- get into that detail,

8    methanogenesis, that's -- that's beyond my capabilities.

9    Q.   Very good.

10            Now, you testified earlier, I think, Mr. Hendron, that

11   there were thousands of MGP sites in the country, right?

12   A.   I believe so, yes.

13   Q.   Okay.  And you did a literature review to see if anywhere

14   in the literature related to MGP sites there was any discussion

15   of methane being formed at MGP sites, right?

16   A.   Yes.

17   Q.   Okay.  And that literature review didn't find any

18   discussion of methane being observed at any manufactured gas

19   site, isn't that right?

20   A.   I don't recall any occasion where that was a consideration,

21   yes.

22   Q.   Okay.  So you agree with me, right, that it never came up?

23   A.   Never came up.

24   Q.   Okay.  Now, you mentioned some sites during your testimony

25   today, I believe a Bayway -- Bayway Refining, a Bayo (phonetic)

Hendron - cross                    162

1    Ferro site, and a site in Columbus, right?

2    A.   Yes.

3    Q.   And you said those were sites where you saw petroleum

4    products, and you were encountering methane, right?

5    A.   They were refineries that had crude oil.  And then there

6    was -- the Davis-Besse site was a site in northern Ohio that

7    had methane produced out of bedrock, with some petroleum in the

8    area.  And the same with the Columbus, Ohio site.

9    Q.   And none of those were manufactured gas plant sites,

10   correct?

11   A.   They were not.

12   Q.   Okay.  And none of those sites you discussed in your

13   reports in the context of being related to methane, did you?

14   A.   I didn't discuss those sites, if that's the question --

15   Q.   Yes.

16   A.   -- in my report, no.

17   Q.   Very good.

18            THE COURT:  Mr. Ter Molen, we have been going a little

19   bit, about an hour and 15 minutes.  Let's take a break now.

20            MR. TER MOLEN:  Very good.

21            THE COURT:  We will take a very short, five-minute

22   break.

23       (Brief recess.)

24            THE COURT:  Let's continue.

25            MR. TER MOLEN:  Thank you, your Honor.

1   BY MR. TER MOLEN:

2   Q.  Mr. Hendron, we were talking about methanogenesis.  And you

3   agree, right, that for purposes of your theory that MG waste

4   oils decomposed into methane, that the methanogenesis position

5   would have involved microbes eating the MG waste oils and

6   producing methane, right?

7   A.  Yes, that's the way it happens.

8   Q.  Okay.  But at your deposition, Mr. Hendron, you agreed that

9   you don't know whether there is some percentage amount of PAHs

10  contained in the MG waste oils that you say migrated onto

11  bedrock that would have been fatal to microbes trying to eat

12  the MG waste oils, right?

13  A.  I don't know that detail of -- it's a pretty specific

14  detail of understanding the rate of production of methane from

15  various organic materials.  And that's -- that's not something

16  that I have any knowledge of at this point.

17  Q.  Right.  You don't --

18  A.  That is a real detailed assessment.  I can't say I can make

19  it.

20  Q.  And you don't know, in fact, what particular constituents

21  of the MG waste oil the microbes would consume, right?

22  A.  They tend to not like the heavy constituents and gravitate

23  towards the lighter constituents.  I know that.  And we have

24  both in the tar.  But to speciate the ones that are good,

25  moderate or bad, I don't know.

1  Q.  Right.  And you said at your deposition, right, that you

2  don't know what constituents of MG waste oils are more

3  favorable than others, right?

4  A.  I may have.  I may have said that in my deposition.

5  Q.  Okay.

6  A.  I'm not -- could you repeat the question?

7  Q.  Sure.

8       You don't know what constituents of MG waste oils are

9  more favorable for being eaten by microbes than others, right?

10 A.  Specific constituents, no.  But like I say, I'm familiar

11 with the fact that the heavy constituents are not good.  The

12 lighter constituents are good.  But the specific constituents,

13 no, I don't know.

14 Q.  Okay.  And you don't know, Mr. Hendron, what volume of MG

15 waste oils migrating down from the surface to bedrock would be

16 necessary to create the methane that's been found in the James

17 Park subsurface, correct?

18 A.  We didn't do that assessment here.  I don't think it's

19 needed.

20 Q.  Okay.  And you don't know, right?

21 A.  I don't know from the work that I've done up to now, no, I

22 don't.

23 Q.  Okay.  And, Mr. Hendron, it's also fair to say that you

24 don't know what length of time would be necessary for the

25 microbes to be eating away at the MG waste oils to produce the

1   methane that's been found in the James Park subsurface, isn't

2   that right?

3   A.  We didn't do that assessment here, no.

4   Q.  Very good.

5        So you don't know?

6   A.  We don't know.

7   Q.  Okay.  And, in fact, Mr. Hendron, you didn't do any

8   research into the microbial consumption of materials in MG

9   waste oils, right?

10  A.  I don't believe I did, no.

11  Q.  Okay.  In fact, you just relied on your experience,

12  correct?

13  A.  I relied on my knowledge of basic chemistry and bio-

14  chemistry of how the reaction goes on, the microbes, the

15  anaerobic conditions, and my experience in finding methane in

16  these kind of materials and past projects, yes.

17  Q.  Okay.  Well, your deposition you testified that you just

18  relied on your experience, right?

19  A.  I may have, yes.

20  Q.  Okay.  Now, let's talk about risk assessment, Mr. Hendron.

21  I think you testified or you agree, right, that you are not an

22  expert in chemical risk assessment, correct?

23  A.  I am not a risk assessor.

24  Q.  Okay.  And you're not an expert in chemical risk

25  assessment, correct?

1    A.  Yes, that fits into the I'm not a risk assessor.  Yes, I

2    would say that is the definition.

3    Q.  And you never testified as an expert on risk assessment,

4    correct?

5    A.  I have not.

6    Q.  You don't have any academic training on risk assessment,

7    correct?

8    A.  No.

9    Q.  Now, the city hired Ms. Erdal as a risk assessor, correct?

10   A.  That's correct.

11   Q.  But you did not rely on her in forming your opinions,

12   correct?

13   A.  I did not rely on Dr. Erdal to form my opinions on the

14   assessment of risk.  It's preliminary assessments of risk.

15   Q.  All right.  Well, that's a good segue, Mr. Hendron.

16           In November, November 29 of 2017, you issued a

17   document that you titled a, quote, preliminary assessment of

18   risk, close quote, correct?

19   A.  That's correct.

20   Q.  And that report I believe you've agreed with us is not a

21   formal risk assessment, right?

22   A.  It is not.

23   Q.  Now, you've never seen the term that you used, a

24   preliminary risk assessment, anywhere in the technical risk --

25   in the technical literature, have you?

1   A.   A preliminary assessment of risk term?

2   Q.   Yes.

3   A.   I don't recall seeing it in a technical paper, no.

4   Q.   Okay.  You've never seen anybody else use that term, have

5   you?

6   A.   I haven't, no.

7   Q.   Okay.  Now, in your November 2017 report you said that

8   there is a risk to drinking water because a concentration of

9   benzoapyrene in the crust on the Dodge water main exceeds the

10  maximum contaminant level for benzoapyrene and drinking water,

11  right?

12  A.   It does, yes.

13  Q.   Okay.  Now, the MCL is a standard specifying the maximum

14  allowable concentration of a chemical in drinking water, right?

15  A.   Yes.

16  Q.   And the MCL is a standard that is set under the Federal

17  Safe Drinking Water Act, right?

18  A.   Yes.

19  Q.   And you agree that you were not an expert in the Safe

20  Drinking Water Act, correct?

21  A.   I -- I am capable of comparing a drinking water standard

22  with what we are finding at the site.  But I have not testified

23  as a safe drinking water expert, no.

24  Q.   Well, and you are not an expert in safe drinking water --

25  in the Safe Drinking Water Act or Safe Drinking Water Act

1    compliance, right?

2    A.  I think that's a fair statement.

3    Q.  Okay.  You also testified, or you stated in this so-called

4    preliminary assessment of risk, you looked at methane migration

5    into commercial, residential and educational buildings around

6    James Park, right?

7    A.  Right.

8    Q.  And, in fact, the city has conducted excavations in and

9    around James Park many times since the Skokie manufactured gas

10   plant first went into operation in the early 1900s, right?

11   A.  Correct.

12   Q.  And the city has never encountered methane in any

13   excavation in and around James Park, correct?

14   A.  I don't think the city has found any methane in their

15   excavations which --

16   Q.  Okay.

17   A.  -- they've done in James Park, no.

18   Q.  Okay.  And the city, you talked about the school, the Dawes

19   Elementary School, the Levy Senior Center.  And in fact the

20   city has methane monitors in those building, do they not?

21   A.  We do.

22   Q.  Okay.  And those alarms have never been triggered, correct?

23   A.  I don't believe they have.

24   Q.  Okay.  Then the third area of risk you identified is a risk

25   to construction workers, working in the soil in and around

1  James Park, right?

2  A.  Correct.

3  Q.  And it's fair to say, Mr. Hendron, that you don't consider

4  yourself an expert in what OSHA requires for particular worker

5  exposure scenarios?

6  A.  I've had OSHA safety training.  I'm not an expert, but I

7  have had OSHA safety training for worker exposure to hazardous

8  chemicals as part of the -- part of the work that I've done on

9  hazardous waste sites.  Several of the sites you had to have

10  OSHA training for that.

11  Q.  Well, sir --

12  A.  I have knowledge, and I -- through that knowledge, I looked

13  at what we have in the excavations here.  And that formed the

14  basis for my concern about what I saw in there in terms of

15  worker safety.

16  Q.  Okay.  All right.  Well, you testified in your deposition,

17  right, that you do not consider yourself an expert in what OSHA

18  requires for particular worker scenarios, correct?

19  A.  I don't.

20  Q.  You do not consider yourself an expert, right?

21  A.  That's correct.

22  Q.  Okay.  And you don't know what type of worker exposure

23  would require an employer under OSHA regulations to wear -- to

24  have their employees wear a respirator, right?

25  A.  I don't remember -- I don't have those numbers committed to

1   memory, no.

2   Q.   Well, you're not an expert in that area, right?

3   A.   I'm not.

4   Q.   Okay.  Now, does the City of Evanston have its own worker

5   safety program?

6   A.   I believe they do.

7   Q.   Okay.  But you've never seen a copy of that, have you?

8   A.   I have not.

9   Q.   Okay.  You've never even asked to see a copy of that,

10  right?

11  A.   We may have seen copies of it in some of the works we've

12  done.  But I am not familiar with all the details of Evanston

13  city worker safety program.

14  Q.   And my question, Mr. Hendron, is, you've not even asked to

15  see a copy of Evanston's worker safety program, isn't that

16  right?

17  A.   I think -- I think we have gotten copies of that for some

18  work that we've done at the site.  For instance, the work that

19  we did to dig the water line out, we had to have a health and

20  safety plan for our people and the contractors' people.  So

21  that was provided to us.

22          Some -- we asked for a copy of that.  And then we

23  prepared our health and safety plans accordingly.

24  Q.   Okay.  Let's show, please, page 603, lines 3 through 5.

25          Question:   Have you asked to see a copy of the City

1    of Evanston standard worker safety program?

2            Answer:   No.

3    A.  I personally have never asked the City of Evanston to see

4    that.  We did -- I know we did use that in the work we did in

5    preparing our health and safety plans at the site.

6    Q.  Okay.  And sitting here today, Mr. Hendron, you don't know

7    if the city's existing worker safety program protects workers

8    against the risks of encountering chemicals such as MG waste

9    oils in the soil, is that right?

10   A.  I don't know all the content of the city's safety program,

11   no, I don't.

12   Q.  Right.  So you don't know if that program is already

13   sufficient to protect city workers, do you?

14   A.  No.  But I think an assessment should be made.  That's

15   my -- that's my recommendation.

16   Q.  I see.

17           Now, you testified I think this morning with respect

18   to some documents that the City's counsel provided to us.  And

19   I think Exhibit 2 is a -- this 1988 EPA guidance, right?

20   A.  Yes.

21   Q.  Okay.  You don't cite this EPA guidance in any of your

22   reports, do you, Mr. Hendron?

23   A.  I don't.

24   Q.  Now, let's look quickly at your CV.  If we could pull that

25   up please.

1          Do you see your CV, Mr. Hendron?

2   A.   I do.

3   Q.   Just showing the top part here, and just briefly, under

4   education, the very first line under education says,

5   Massachusetts Institute of Technology Special Studies, right?

6   A.   Correct.

7   Q.   That was just a two-day course, right?

8   A.   Two- or three-day course, yes.

9   Q.   Okay.  You did not receive any diploma or anything, right?

10  A.   I didn't.

11  Q.   Okay.  And then you testified that you got some areas, some

12  substantive areas of expertise in the top right corner of your

13  CV, correct?

14  A.   Correct.

15  Q.   And you told us that all of your CVs include those same six

16  areas, right?

17  A.   Not all my CVs contain those six areas.  Sometimes I

18  indicate other areas that are more pertinent to the projects

19  that I am involved in.

20  Q.   Really?  Okay.

21          Well, let's -- if we can show page, please, 132, line

22  22, to 133, line 7.  Okay.

23          Question:   Maybe I misunderstood what you said.  So

24  the areas on the top left-hand side there -- I misspoke.  It's

25  the top right-hand side -- see those six areas?

1          Right.

2          Do those areas appear on all of your CVs, or  were

3    those selected for this CV?

4          Answer:   They appear on all my CVs.

5          Question:   So there is nothing that you changed or

6    altered about those areas for this CV?

7          Answer:   No.

8          Question:   That's right?

9          Answer:   That's correct.

10         Did I read that correctly?

11   A.  You did read it correctly.

12   Q.  Okay.  And you talked this morning about source, source

13   evaluation, right?

14   A.  Right.

15   Q.  Okay.  And I'm sorry.  Put that back up please, the CV.  Go

16   back to the CV.  I'm sorry.

17         Okay.  Source evaluation isn't separately called out

18   as an area in that group of six, is it?

19   A.  It is not.

20   Q.  Right?

21         Nor are MGP plants, right?  There is nothing

22   highlighted there for MGP plants?

23   A.  No.

24   Q.  Nor is stray methane identification called out, is it?

25   A.  No.

1 Q.  Okay.  You -- we talked earlier, Mr. Hendron, about gas

2 flow and Peoples Gas.  And I believe you agreed with me that

3 nowhere in any of your reports do you talk about the

4 possibility that the gas in the Dodge Avenue pipeline between

5 Howard Street and Oakton could have come from the Peoples --

6 from a Peoples Gas source, isn't that right?

7 A.  I believe that -- I believe that's right.

8         MR. TER MOLEN:  Okay.  Okay.  If I can just have a

9 minute, your Honor?

10         THE COURT:  You may.

11     (Brief pause.)

12         MR. TER MOLEN:  Nothing further, your Honor.  We

13 tender the witness to the -- for any redirect.

14         THE COURT:  Very good.

15                     REDIRECT EXAMINATION

16 BY MR. BROOKS:

17 Q.  Mr. Hendron, do you recall in response to Mr. Ter Molen's

18 questions there was a question about whether you had listed

19 documents related to the -- I think he's called it the Kedzie

20 Gas Holder in your list of documents considered?

21 A.  Yes.

22 Q.  And I think you said you didn't recall?

23 A.  I may have, yes.

24 Q.  If I can ask in the binder that I gave you this morning,

25 turn to page -- excuse me -- tab 8.

Hendron - redirect                              175

1          And that is your -- excuse me -- March 23, 2018 expert

2     report in this case.  If I can ask you to flip back.  There are

3     page numbers.  I guess it's in the top right-hand -- well, top

4     right-hand corner if you are holding the binder like this, page

5     242.  Very near the end of Tab 8.

6     A.   Page 243?

7     Q.   242.

8     A.   The Bates numbers?

9     Q.   Yes.

10    A.   Okay.

11    Q.   And the heading there is, Facts or Data Considered?

12    A.   Yes.

13    Q.   So is this a page from your listing of the facts or data

14    considered in forming your opinions?

15    A.   Yes.

16    Q.   If I can direct your attention to entry 241.  Can you tell

17    us what that is?

18    A.   Yes, that's the -- a report on the former North Shore

19    Avenue station at North Kedzie.  That's the Peoples Gas & Light

20    station.

21    Q.   Okay.  So that's a document that you considered in the

22    course of arriving at your opinions?

23    A.   Yeah, there were two -- two reports, this one and then

24    there was another report.

25    Q.   Right.  I guess if you turn a few pages back, page 247,

1   line 360.  U.S. EPA superfund site information on Peoples Gas

2   North Shore Avenue station?

3   A.   What number is that?

4   Q.   360.

5   A.   360.  Okay.  I got it.  Yes.

6   Q.   And is that another document that you considered in the

7   course of arriving your opinions that deals with the Peoples

8   Gas order that was discussed?

9   A.   Yes, I considered both those.

10  Q.   While we have the binder, if I can ask you to turn to

11  tab 7.  And I won't make you dig back too far on this one.

12          So you remember some questions from Mr. Ter Molen

13  about the definitions of MG waste oil and petroleum?

14  A.   Yes.

15  Q.   Did you use the term, petroleum, in your 2015 report?

16  A.   Yes.  The reason that those definitions were the same as we

17  had formerly used the word petroleum because that came out of

18  the original reports.  It was referred to as methane and

19  petroleum.

20          So my original report was methane and petroleum.  And

21  I wanted to make sure that the two terms were the same for

22  future reports.

23  Q.   And so looking at tab 7, this is the first page, the cover

24  letter.  And the last paragraph of this cover letter is -- does

25  it address this use of the terminology?

1    A.  Yes, it does.

2    Q.  And so at this point in the analysis, that you were two,

3    almost three years later into your analysis?

4    A.  Excuse me?

5    Q.  By the time you issued this November 29, 2017 report, you

6    were two, almost three years further into your analysis as

7    compared to January 2015?

8    A.  Right.

9    Q.  Okay.  And so by this point you had refined the

10   terminology?

11   A.  We had refind the terminology, and we had enough

12   information to tie the source, I believe, to the Skokie plant

13   at this point.

14   Q.  Okay.  But you -- but you wanted the language of your

15   reports to be internally consistent?

16   A.  Well, internally consistent and reflecting term -- the term

17   of -- the term that was specific to the source wasn't a

18   petroleum source from the Skokie.  It was a tar.  It was a MGP

19   waste oil from that process.

20   Q.  Mr. Ter Molen asked how long ago you had done the work at

21   the Taylorville and Racine sites?

22   A.  Yes.

23   Q.  And you said that was -- how long ago was that, if you

24   recall?

25   A.  Well, we started in late 1980s and finished it in the mid

Hendron - redirect

1   1990s, early to mid 1990s, I believe.  The Racine site is what

2   you're talking about, correct?

3   Q.   And Taylorville as well.

4   A.   Taylorville, I really don't remember the dates on that, but

5   it may have been the mid 1990s, early to mid 1990s.

6   Q.   And so since the mid 1990s, up to today, has what occurred

7   at MGP plants back in the '20s and '30s -- did that change?

8   A.   No, not materially.

9   Q.   With respect to your previous work on MGPs, what are -- I

10  mean, did you learn from that information regarding fuels that

11  are used at MGPs that were as pertinent to your work on this

12  case?

13  A.   Well, that was one of the first things that I cited.  One

14  of the things I learned from a former -- former life in MGP

15  work is, these sites are dirty.  And they have SVOCs and VOCs.

16       The unusual thing about what I was looking at here

17  initially was, quite frankly, the -- the fact that these were

18  deep in soil and deep in rock.  And I found out that the

19  consistency of tars from carbureted water gas, which uses fuel,

20  are thin.  They're basically like a vegetable oil, and they are

21  heavy.  That's what the -- that's what the literature is clear

22  about.

23       And I provided a -- I provided a reference in my very

24  first report because I had -- I wanted to know that.  And I

25  found out, the specific gravity, your Honor, is about 1.15,

1    about 15 to 20 percent heavier than water.

2            And as I said, I came into this thinking it's coal

3    tar, it's going to be thick.  Well, it's not.  Carbureted water

4    gas is thin, and it's heavy.

5            And, you know, the -- I certainly learned all of that

6    from that.  And I learned from the other things that the holder

7    was a main contributor to -- that the holder was dirty.  The

8    only way the holder can get dirty is if there is condensate in

9    the tar.

10           And I just will tell you that anyone that would

11   conclude that there is no condensate in the tar, he just didn't

12   understand what happens to gas when it leaves the holder.  In

13   fact, the one reference Mr. Ter Molen used said, the

14   temperature in the pipeline is reduced from the temperature in

15   the holder.

16           Well, guess what happens when temperature of gas is

17   reduced, when you look at the universal gas log.  It forms

18   condensate.

19           So I learned a lot of things from my early gas work

20   site.  But those three things really stick out, the dirty

21   sites, fuel matters, and there is condensate in the gas that

22   leaves the site.

23   Q.  And Mr. Ter Molen showed you an old picture of a -- what he

24   represented to be a Lowe process site.  And is it pertinent for

25   your analysis, your work in this case, to know each and every

1   one of the steps reflected in that drawing?

2   A.   That's really outlined in the -- in the guidance, for RCRA

3   guidance and the CERCLA guidance.  They're very clear.  You've

4   got to know enough about the processes.

5        And normally, the thing he showed me then and today

6   are just a picture.  And to be blunt, that could be a picture

7   of some other complete process.  He pulled that kind of thing

8   on me and -- in the deposition.

9        But it had nothing -- and I admitted.  I don't know

10  what the retort is.  I don't know what the condenser is.  I

11  don't know this.  But to be blunt it doesn't matter.

12       What I have to look at is, what's the contamination

13  that results from each of the processes.  And if I had a plan

14  with -- I look for plans that have these different processes

15  identified.  That's what I look for.

16       I don't go for a picture of basic an elevation view.

17  And I was honest.  I said, I don't really know.  I don't know

18  if it goes left to right or right to left.  But it doesn't

19  matter with my understanding of what I need to know to make a

20  source ID.

21       So -- and I still don't know.  He showed it to me

22  today.  And I still don't know what the individual pieces are

23  in there.  But again, it's still -- it doesn't matter.  I know

24  what the general chemistry is of the waste products in there.

25  And that's what I have to know.

1      And by the way, that depiction did not show a holder.

2  Q.  Mr. Ter Molen asked you some questions about whether there

3  was anyone else working with you on the project who had MGP

4  experience.  Remember those questions?

5  A.  Yes.

6  Q.  Okay.  So you have MGP experience, right?

7  A.  I do.

8  Q.  And are you familiar with the fact that -- of Dr. Jeffrey

9  having MGP experience?

10 A.  Well, yes.

11 Q.  And Dr. Jeffrey is somebody that you consulted with on this

12 case?

13 A.  It is.  I thought he was referring to SCS people when he

14 formed the question in my dep and today.

15      MR. TER MOLEN:  Your Honor, I object to this line of

16 questioning.  This -- Mr. Hendron does not cite Mr. Jeffrey in

17 any of his reports at all as someone he relied on with respect

18 to MGP issues.

19      THE COURT:  I understand the objection.  I will weigh

20 the answer accordingly.

21 BY MR. BROOKS:

22 Q.  And when you were asked about Mr. Jeffrey in your

23 deposition, has your recollection since then, your deposition

24 three months ago, been refreshed?

25 A.  Yes.

1    Q.   And similarly, with respect to -- what was the name, Sandie
2    Fredrick at Test America?
3    A.   Right.
4    Q.   And is it unusual in your experience doing source
5    identification, source investigation work, for someone in your
6    position to be consulting with somebody at the lab who is going
7    to be running the test that you are going to be considering?
8    A.   It's not unusual.  And it's one of the things that I do
9    with any lab, including geotech labs that run soil tests for
10   me.  I talk with the lab people, ask what the protocols are,
11   and work with them to understand what I'm doing.  It makes
12   sense, and it follows protocol.
13   Q.   And is it fairly routine for you to talk with the lab
14   people about subjects like that?
15   A.   Yes, I always do.
16   Q.   In connection with some questions about MWRD site, Mr. Ter
17   Molen was asking you about gas chromatography, GCMS, results
18   and reports.  Are you familiar with reading GCMS reports?
19   A.   Yes.
20   Q.   You've done that before as part of your source
21   investigation work?
22   A.   Yes, I've done it in prior cases.  And for this -- for this
23   case, I had a formula that I was following to read the GCMS
24   that were given to me.
25   Q.   Mr. Ter Molen asked you some questions about your Table 5,

1    that comparison table of the various PAHs?

2    A.   Yes.

3    Q.   Did you use that comparison table as the sole determinative

4    factor in your source identification here?

5    A.   I think I testified today that that was not only not the

6    sole factor.   That was a factor, probably one of -- one of the

7    factors of about four or five, maybe more, factors that I used

8    in the eventual decisions that I made with respect to the NIGC

9    pipelines as being the source.   I did not use that table alone

10   at all to do that.

11   Q.   Okay.   And that table can -- or tables like it can be used

12   to include or exclude potential sources?

13   A.   It -- that table was very important in the beginning

14   because the first two I had was New York DEC and U.S. EPA.   And

15   it gave me the signature, updated the signature, of MGP plants

16   for me.   And that gave me something to measure my results

17   against and updated -- gave me something to measure the results

18   that they got from the Skokie MGP against these two sources of

19   a signature.

20          But that wasn't -- that -- that's not where I stopped

21   to -- to identify that the MGP pipes were the source.

22   Q.   Right.   You did further analysis after that, which we

23   discussed today?

24   A.   Correct.

25   Q.   With respect to the interior crust that you found inside

Hendron - redirect                    184

1    the Dodge water line, did you undertake to analyze that

2    interior crust based solely on a visual examination?

3    A.   No.  I took samples and we did SVOC and VOC testing and

4    other testing on that to -- we did testing on all of our

5    samples, and then compared that -- those test results with the

6    signatures we had for what was the Skokie MGP, or the MGP

7    signature.

8              THE COURT:  And by signature, you just -- you mean the

9    list of constituents that you would typically find in MGP waste

10   per the EPA documents and the documents you found?

11             THE WITNESS:  That's correct.

12             THE COURT:  And you also said that when you were

13   reviewing the GCMS reports, that you're familiar with reading

14   those reports from your past work, and that you used a formula

15   that was given to you to read it.  What are you referring to

16   there?

17             THE WITNESS:  The original report that started this

18   whole thing, your Honor, was a report by Tetra Tech.  And they

19   did a GCMS scan from that site.  And there is a nice

20   description in there of what they saw in the GCMS signature.

21   And it was, we have this -- this molecular weight to this

22   molecular weight.  And period.  That was -- I mean, it's more

23   detailed than that, but that's what they found.

24             And so when I ran -- had these run, we looked at every

25   GCMS scan to see what the range of -- the carbon range.  What

1    was the molecular weight range that we need in the oils.  And

2    they were all very tight between the two -- the two things that

3    they found at there.  So that was my formula was outlined in a

4    chemistry report by others.

5              So I used that as my formula to see, are my oils of

6    similar molecular weights and similar signature as they found

7    at the MWRD.  And then we eventually tied that into a signature

8    from the site investigation report at Skokie.

9              THE COURT:  Okay.

10   BY MR. BROOKS:

11   Q.  Mr. Hendron, with respect to intrusion of contaminants into

12   the pipe, does your background in fluid mechanics and your

13   understanding of cavitation, does that factor into your

14   qualifications to talk about that in your opinions?

15   A.  Yes.

16   Q.  And does it qualify you to say whether further consultation

17   with somebody like Dr. LeChevallier would be worth doing?

18   A.  I -- I looked at it.  And as I think I testified, I said

19   there is a potential for intrusion under these conditions.  And

20   I did a research again like I normally do.  And Dr.

21   LeChevallier's name came up for sediment intrusion into potable

22   water pipes.  And he's one of the leading authorities in the

23   country on that issue.

24             I talked to him, and it was obvious that he was the

25   fellow to come in and -- and bolster the assessment of whether

1    or not it was possible to have intrusion in -- in the system.

2    Q.   Mr. Ter Molen asked you some questions about whether you

3    did a technical assessment of the Dodge water line.  Did you

4    review drawings, for example, or -- with respect to that?

5    A.   We -- yeah, I reviewed drawings and -- and was there when

6    they dug the water line out of the ground and looked at -- I'm

7    not going to say I looked at all the water pipe.  But I looked

8    at lot of sections in that water pipe to have my own visuals on

9    what was there.

10   Q.   And similarly, you looked at plenty of drawings with

11   respect to gas pipelines that were of concern here?

12   A.   I looked at drawings, yes.

13   Q.   And that was part of your assessing of the various

14   pipelines that you encountered?

15   A.   It's -- it's something you have to do.  I do it all the

16   time.

17   Q.   And did your assessment of the drawings with respect to the

18   pipelines lead you to conclude that it was those pipelines

19   that -- the gas pipelines were in fact connected to the Skokie

20   MGP?

21   A.   Yes.  That's clear on the drawings.  And that's really

22   where we -- where we have data to show that the pipelines are

23   connected.

24   Q.   Mr. Ter Molen asked you some questions about whether

25   methane monitors that are inside Dawes School and inside the

Hendron - redirect                    187

1    Levy Senior Center have gone off?   Remember those questions?

2    A.   Okay.

3    Q.   The -- is there a monitoring probe near the front door of

4    Dawes Elementary School?

5    A.   There is really -- there is two -- two probes there.   One

6    is GMP 10, and the other is Well 19S -- or --

7    Q.   And --

8    A.   -- excuse me -- Well 19, not 19S.

9    Q.   I'm sorry.

10   A.   Yes.

11   Q.   And how close are those to the school?

12   A.   Rough numbers, they're between probably 50 feet -- well,

13   close to the school.   Nineteen is about 25 feet from the

14   boundary of the school.   But both of them, about 50 feet from

15   the front door of the school.

16   Q.   And did any of those gas monitoring probes indicate the

17   presence of methane at high pressure and concentration near the

18   school?

19   A.   They both -- they both did.   Well 10 has been basically

20   compromised for some reason.   May have got hit by a lawnmower

21   or something.   But Well 19S still shows that we have about 90

22   percent methane.   And we have pressure of I think 10 or 12 PSI,

23   which is very high.

24   Q.   Okay.   If I can direct your attention briefly to your CV,

25   tab 1 in the binder that I gave you this morning.

1  A.  Yes.

2  Q.  So on the first page of your CV, there are those bolded

3  terms up in the top right corner?

4  A.  Yes.

5  Q.  Mr. Ter Molen was asking you whether things like MGPs and

6  stray methane are specifically listed there, right?  Remember

7  those questions?

8  A.  Yes, I do.

9  Q.  Would things like that, in your review, be subsumed within

10  one of the -- within one of the terms that you have listed

11  there?

12  A.  It -- all the terms he talked about are really subsumed, I

13  think, in probably the geo-environmental engineering.  But I

14  couldn't possibly list every capability that I -- that I have.

15  So I put broad categories in there.

16  Q.  Mr. Ter Molen asked you some questions about worker safety

17  toward the end of his cross-examination.  Do you recall that?

18  A.  Yes.

19  Q.  And he asked you in particular some questions relating to

20  the City of Evanston worker safety plan.  Remember that?

21  A.  Yes.

22  Q.  And whether that -- the City of Evanston's worker safety

23  plan protects the City of Evanston workers?

24  A.  Yes.

25  Q.  Are there others -- other workers other than city employees

1  who work in trenches and utility corridors in and around James

2  Park, as far as you know?

3  A.  Yes.

4  Q.  And is that presence of non-city workers one of the risk

5  factors that you addressed in your opinions?

6  A.  Yes, any --

7  Q.  And --

8  A.  -- worker.

9  Q.  -- do you think there is risks posed for workers other than

10  city workers in addition to city workers?

11  A.  Yes, I do.

12  Q.  Okay.  Why is that?

13  A.  Well, because the -- anyone that excavates or drills in

14  that area is going to be exposed to the same risk that I see

15  the possibility of punching and getting methane from the

16  bedrock up to the ground surface.  It's already happened.

17         And the worker safety is, there is a lot of trenches

18  dug in the city.  We don't know where the pipelines are.  We

19  don't know what their condition is.  And you could -- you could

20  very easily conceive that a work crew could dig next to a

21  pipeline.  In fact, it has happened in the city.

22         The joints are so fragile that it's very easy to see

23  the pipeline may break and cause contaminated fluids to go into

24  the excavation.  But just the conditions are -- that they have

25  around these pipes would pose problems with PAHs and VOCs that

1  we know exist in the area to workers.

2              MR. BROOKS:  May I have one moment, your Honor?

3              THE COURT:  You may.

4       (Brief pause.)

5  BY MR. BROOKS:

6  Q.  Mr. Hendron, you recall Mr. Ter Molen asking you some

7  questions about the 1908 AWWA coal-tar pitch coating spec?

8  A.  I do.

9  Q.  Is there any significance in your view of that -- the

10  nature of that coating from that spec?

11  A.  Well, there is no -- there is really no thickness for what

12  the coating is supposed to be.  There is no recipe for the

13  coal-tar pitch.  And I looked for both.  And the best I could

14  come up with is, maybe a thicknesses of 1 mill or two mills,

15  which is one thousandths to two thousandths of an inch thick of

16  a mixture of coal tar and what they call oils.  Coal-tar pitch.

17  And it's a coal-tar pitch coating.

18              I've done some research on coal-tar pitch.  Coal-tar

19  pitch is coal tar made from coal, distilled under very high

20  temperature, so that only the very heaviest of the PAH -- the

21  materials remain.  And one of the absent materials is

22  naphthalene.  It's just not in coal-tar pitch.

23              So going back to all the data we have from the inside

24  and the outside of the water main and from the gas pipe inside

25  and outside, all the samples we took have -- I say all the

1   samples.  I hate the word all.

2           But the vast majority of the samples that we took have

3   naphthalene in it, but specifically inside water pipe.  There

4   is -- there is naphthalene in the crustal material that we have

5   inside the water line.

6           So it's kind of another line of evidence that I have

7   looked at for the -- for the assessment of whether the PAHs

8   that were seen in the water line are from a lining.  It really

9   doesn't go very high on my consistency evaluation chart.  But

10  with the naphthalene absence in the coal-tar pitch coating

11  itself, it is consistent.  It is consistent with my

12  observations and all the work I've done that there was -- there

13  was not a coal-tar coating on the inside of that pipe.

14  Q.  So if I'm understanding correctly, you're saying a coal-tar

15  pitch coating would not have naphthalene in it?

16  A.  Strictly a coal-tar pitch itself has -- and I'm going to

17  say little or no naphthalene, because some people -- some

18  places say it has very, very small amounts compared to all the

19  others.  But literally no naphthalene.

20          So the fact we have really pretty high levels of

21  naphthalene -- and naphthalene appears in coal tar and in MG

22  waste oils.  It's one of the biggest components.  And it

23  certainly appears in drip oil.

24  Q.  And you found naphthalene inside the Dodge Avenue water

25  line --

1    A.   Yeah.

2    Q.   -- crust?

3              MR. BROOKS:  No further questions, your Honor.

4              THE COURT:  So, Mr. Hendron, getting back to the issue

5    of whether the Dodge Avenue gas main conveyed gas from produced

6    by the Skokie MGP versus the gas from the holding area owned by

7    Peoples Gas or both, I'm just trying to figure out the basis

8    for your opinion that the more likely source is the Skokie MGP.

9    I recognize that one of the things you considered is that based

10   upon the diagrams you reviewed that Dodge Avenue line was

11   connected to the Skokie MGP, right?  That's --

12             THE WITNESS:  That's correct.

13             THE COURT:  And then you also looked at all the

14   samples that you did.  And you looked at what one would

15   typically find in MGP waste by looking at the studies that EPA

16   did and that you found in New York.  And then you determined

17   based upon comparing basically a list of constituents that

18   those studies noted that they found MGP waste with the

19   particular constituents that you found in your sampling of the

20   contamination, right?

21             THE WITNESS:  Right.

22             THE COURT:  And so from that you drew the conclusion

23   that, well, at least it's not inconsistent with the fact that

24   it may have come from the gas produced by the MGP.

25             THE WITNESS:  What I came to the conclusion, before I

1    had all the data that I have now, your Honor, is that one of

2    the assumptions that I was bound by is, all the gas was

3    produced by the Skokie MGP, the best data I had.  Well, I found

4    out that's not true.  From about 1931, Skokie MGP was actually

5    buying gas from Peoples.

6          Now, we don't know, we don't have enough data yet even

7    to know, whether the gas went up a 48-inch pipeline, which

8    isn't shown on this.  And if I can get up, I can show you very

9    quickly where the 48-inch pipeline is located.

10         THE COURT:  Please.

11         THE WITNESS:  Because I think that's important.

12         There is a 48-inch pipeline that was constructed.  And

13   I take these dates a little bit loose, but I'm going to say

14   1930 or so.  And it was connected to the -- to the Howard

15   Street line.  And it went up.  Here is the channel.  It went

16   up.  And here is the Skokie MGP.  It went up here.  Here is the

17   elevated tracks.

18         It made a turn here.  It went up, went over the

19   bridge, and then kind of went into the plant right here.  And

20   here is the holder.  It -- we don't have a plan, but I'm pretty

21   sure that this holder then -- or this line went into the

22   holder.

23         Now, we don't -- we don't know.  It would seem to make

24   sense from evaluation that the gas came down here, went to the

25   holder, went here and went wherever.  We don't know that.

1          The other thing that we now know is that they had a

2     meter at this location.  And we do -- I think we know the gas

3     came down here and went up this line, went through a meter.

4     Okay?

5          So we've asked for data from meter, and we don't have

6     it.  We don't have -- to be blunt, we don't have a clue how

7     much gas went up here or whether gas came from here and went

8     down here.

9          THE COURT:  And is there actually evidence of a line

10    that went up through the canal?

11         THE WITNESS:  Here?

12         THE COURT:  Yes.

13         THE WITNESS:  Well, you asked, so I'm going to tell

14    you what we know.  There is a line that comes up here.  And it

15    goes here, and it goes here -- no, excuse me.  Here is the

16    elevated track.  The line --

17         THE COURT:  Hold on for a second.  Does anyone have a

18    black marker?  Come on, there must be someone with a black

19    marker in this phalanx of lawyers in this -- no.

20       (Brief pause.)

21         THE COURT:  You know what?  Again, I wear many hats.

22         THE WITNESS:  Boyscout, be prepared.

23         So the two lines we're talking about, I'm going to

24    take my time here because I want to make sure you have a good

25    idea what this is.  And this is not exact.  Okay.

1          So we have a 48 pipeline that our data show ran up

2    here.  Then it makes a turn.  It goes up here, goes across this

3    bridge, down to the ground.  It goes down to the ground and

4    then cuts across and goes in the plant about right there.

5          How do we know that?  Well, we have a 48-inch pipe

6    they found during the clean-up of this site.  And this pipeline

7    we don't know whether gas flowed this way or this way in that

8    pipeline.  But it's a 48-inch pipe, so it supplied a lot of gas

9    somewhere.

10         And then, this meter, again I'm -- we've got plans

11   that show this.  But it's somewhere down in this area, to meter

12   gas and measure metered gas through here.  Mr. Fox will talk

13   about this, I'm sure, tomorrow.

14         But we don't have any data from either of these lines

15   to tell us quantities of gas that went to and from the two

16   utilities.  This was built in I think -- I don't want to put

17   dates but it's like the 1930s.

18         THE COURT:  Okay.

19         THE WITNESS:  This was the same vintage.  And all of

20   this corresponded to when the natural gas supply was coming

21   into this area.  So --

22         THE COURT:  So your assessment is, given the fact that

23   the -- well, one of the things you looked that was, given the

24   fact that the Dodge Avenue line was replaced in the 20s, right,

25   '28 or so -- is that what you're saying?

1    THE WITNESS:  Excuse me.  Dodge Avenue line we think

2 was placed pretty contemporary with when they built the Skokie

3 MGP.  But it may have been as late as sometime in the '20s.

4 We -- I admit I don't know.

5    THE COURT:  But it was before the -- from the records,

6 it's before the people -- that you believe that Peoples Gas

7 started to supply gas to the Skokie MGP?

8    THE WITNESS:  Well, yeah, because this line -- there

9 was a line here that was leaking.  I mean, it was really badly

10 leaking.  And it was a whole different construction, was down

11 the middle of the street, very near the pipeline, the water

12 pipeline, down the center of the street.  And they said, this

13 is not working.

14    So they replaced that line, and they moved it from the

15 middle of the street over to the west side of the street and

16 used a whole different design for that coupling.

17    THE COURT:  And was that before or after Peoples Gas

18 started supplying gas to Skokie MGP?

19    THE WITNESS:  That was about the same time, 1930,

20 1931.  So a lot of this stuff was done about that time.

21    THE COURT:  But before that line was replaced, there

22 was a preexisting line that was connected to the Skokie MGP.

23    THE WITNESS:  Well, I mean, I'm sure that we'll have

24 an argument over that.  But my conclusion is it was connected

25 to the Skokie MGP.

Hendron - redirect                    197

1    THE COURT:  All right.  Thank you.

2    Any follow-up given those questions to --

3    MR. BROOKS:  Briefly, your Honor.

4    THE COURT:  Sorry?

5    MR. BROOKS:  I said briefly, yes, I do, if I may.

6    THE COURT:  Go ahead.

7            REDIRECT EXAMINATION (resumed)

8    BY MR. BROOKS:

9    Q.  So, Mr. Hendron, with respect to the lines we have been

10   talking about, Dodge and Oakton, regardless of where the gas is

11   coming from, it's your -- based on your review of all the

12   drawings and all the other information, those are -- the lines

13   in Dodge and Oakton are lines that belong to the utilities?

14   A.  That's right.

15   Q.  Okay.  And they were connected to the Skokie MGP?

16   A.  Yes.

17   Q.  So regardless of what gas -- where the gas came from, it

18   was leaking from lines that were owned by the utilities?

19   A.  Could you repeat that?

20   Q.  Yeah.  Regardless of where the gas in the lines originally

21   came from, you indicated that these lines were leaking, right?

22   A.  Right.

23   Q.  I think you said at least one of them was leaking like a

24   sieve?

25           I think you said at least one of them was leaking like

1    a sieve?

2    A.   Right.   The line from Dodge south towards Howard.

3    Q.   And so regardless of where the gas originally came from,

4    the waste was leaking from lines that were the lines of the

5    utilities in this case?

6    A.   I believe so, yes.

7              MR. BROOKS:   Okay.

8              THE COURT:   Mr. Ter Molen, anything further?

9              MR. TER MOLEN:   Nothing further at this stage, your

10   Honor.   We will be talking more tomorrow about these lines.

11   And I think it will be some additional information, your Honor.

12             THE COURT:   All right.   So I take it then you can

13   leave that here?

14             MR. TER MOLEN:   That would be fine, if that's all

15   right with your Honor.

16             THE COURT:   That's fine.

17             All right.   Very good.   Thank you very much.   You may

18   step down.

19      (Witness excused.)

20             THE COURT:   So tomorrow, we have Mr. Fox coming to

21   speak with us, is that correct?

22             MR. TER MOLEN:   Yes, sir.

23             THE COURT:   And I think I have allotted a couple hours

24   for Mr. Fox.   That should be more than sufficient time.   Don't

25   the parties think so?

1          MR. TER MOLEN:  I do, your Honor.

2          THE COURT:  The testimony is pretty limited.

3          MR. TER MOLEN:  I agree.

4          THE COURT:  And I think the issue is pretty limited,

5    right?  So we will start at 10:00 o'clock, and we will just

6    proceed to noon.

7          MR. TER MOLEN:  Sounds good, your Honor.

8          THE COURT:  With an hour for each side.

9          Is there anything else that I can address with the

10   parties today?

11         MR. BROOKS:  Your Honor, our original order talked

12   about closing.  If you want closings today, tomorrow, ever?

13   It's up to you obviously.

14         THE COURT:  Let me think about it.  At this point I

15   think I have enough information, particularly given the briefs.

16   And the briefs submitted by the parties I thought were both

17   very helpful.  And I did appreciate all the hurdles that

18   everyone jumped through to get me the USB files.  Those are

19   really helpful.  That's what I have loaded on my iPad, and

20   that's how I view things.

21         And the briefs were clear.  And so I think I have

22   everything.  If I don't, I will let's the parties know.

23         MR. TER MOLEN:  Thank you, your Honor.  And appreciate

24   your taking time over the holiday week, your Honor.

25         THE COURT:  No problem at all.  So we'll see you

1    tomorrow at 10:00 o'clock.

2              MR. BROOKS:  Speaking of USB, we have USB of the

3    materials we offered up today, if you want.

4              THE COURT:  I think at this point I --

5              MR. BROOKS:  You got enough?  Okay.

6              THE COURT:  Thank you.

7              MR. TER MOLEN:  Thank you, your Honor.

8         (Which were all the proceedings heard in this case.)

9                            CERTIFICATE

10             I HEREBY CERTIFY that the foregoing is a true, correct

11   and complete transcript of the proceedings had at the hearing

12   of the aforementioned cause on the day and date hereof.

13

14    /s/Alexandra Roth                        7/24/2018
     _____    _____
15    Official Court Reporter                    Date
     U.S. District Court
16    Northern District of Illinois
     Eastern Division

17

18

19

20

21

22

23

24

25