IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| City of Evanston, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-5692 |
| | ) | |
| v. | ) | |
| | ) | Judge John Z. Lee |
| Northern Illinois Gas Company and | ) | |
| Commonwealth Edison Company, | ) | Magistrate Judge Maria Valdez |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
REVISED MOTION FOR PRELIMINARY INJUNCTION**

*October 12, 2018*

| | |
|---|---|
| Jeffrey D. Jeep | Harvey J. Barnett |
| Jeep & Blazer, L.L.C. | Thomas D. Brooks |
| 3023 N. Clark Street | Trevor K. Scheetz |
| Suite 214 | Allison G. Margolies |
| Chicago, IL 60657 | Sperling & Slater, P.C. |
| | 55 West Monroe |
| | Suite 3200 |
| | Chicago, IL 60603 |

*Attorneys for Plaintiff, City of Evanston*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

A.    The Utilities' Generation, Distribution and Abandonment of
MG Waste Oils ............................................................................................................2

B.    The City's Discovery and Investigation of the Contamination ........................................5

C.    Investigation Findings ...................................................................................................8

        1.    Overview of Hendron's Findings .............................................................................8

        2.    Summary of Evidence Supporting Hendron's Findings .........................................9

                a.    Presence and Migration of Condensate .......................................................9

                b.    Presence of Naphthalene.............................................................................13

                c.    Dr. Jeffrey's Conclusions ...........................................................................14

                d.    Migration of Waste Oils to Bedrock, and Formation of Methane ...........15

D.    The Risks Present ........................................................................................................16

E.    The Need for Further Investigation ..............................................................................16

APPLICABLE STANDARD ...............................................................................................17

ARGUMENT ......................................................................................................................18

A.    The City Is Likely to Succeed on the Merits of its RCRA Claim. ...................................18

        1.    The Utilities Are Past or Present Generators, and Owners and Operators
of a Storage or Disposal Facility. .........................................................................19

                a.    Ownership and Operation of the Skokie MGP and the NIGC
Pipelines ..................................................................................................... 19

                b.    The NIGC Pipelines Carried MG Waste Oils from the Skokie
MGP into the City. ......................................................................................20

2.      The Utilities Contributed to the Handling, Storage and Disposal of
        Hazardous and Solid Wastes. .................................................................20

3.      The Utilities' Wastes May Present an Imminent and Substantial
        Endangerment to Health or the Environment. ........................................23

        a.      Endangerment of Human Health *via* Drinking Water .............................25

        b.      Endangerment of Human Health *via* Unsafe Levels of Methane ............27

        c.      Endangerment of Human Health *via* Soil Contamination .......................28

        d.      Endangerment of the Environment ...........................................................29

B.      The City Has No Adequate Remedy at Law and Will Suffer Irreparable
        Harm Absent an Injunction ................................................................................29

        1.      The City Has No Adequate Remedy at Law. .......................................30

        2.      The City and Its Constituents Will Suffer Irreparable Harm Absent
                an Injunction ........................................................................................31

C.      The Balance of Equities Favors Enjoining the Utilities. ...................................33

        1.      The Court Need Not Engage in Balancing the Equities if it
                Determines the Utilities' Conduct "Has Been Willful." .......................33

        2.      Even Setting Aside the Utilities' Willfulness, an Injunction Is
                Appropriate Here. ................................................................................34

D.      Relief Requested ..............................................................................................37

E.      The Court Need Not, and Should Not, Require a Bond. ...................................38

CONCLUSION .............................................................................................................39

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albany Bank & Trust Co. v. Exxon Mobil Corp.*,
    310 F.3d 969 (7th Cir. 2002) ................................................................. 23

*Amoco Prod. Co. v. Village of Gambell,*
    *Inc.*, 480 U.S. 531 (1987)................................................................. passim

*City of Evanston v. Northern Illinois Gas Co.*,
    229 F. Supp. 3d 714 (N.D. Ill. 2017) ................................................ passim

*Cox v. City of Dallas*,
    256 F.3d 281 (5th Cir. 2001) ................................................................. 24

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) .............................................................. 39

*Deckers Outdoor Corp. v. Does 1-100*,
    2013 WL 169998 (N.D. Ill. Jan. 16, 2013) ...................................... 17, 29

*EPA v. Environmental Waste Control, Inc.*,
    917 F.2d 327 (7th Cir. 1990) ............................................................ passim

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................................... 17, 29

*Forest Park Nat'l Bank & Trust v. Ditchfield*,
    881 F. Supp. 2d 949 (N.D. Ill. 2012) ..................................................... 24

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*,
    549 F.3d 1079 (7th Cir. 2008) .......................................................... passim

*Greenpeace, Inc. v. Waste Technologies Indus.*,
    1993 WL 128732 (N.D. Ohio Jan. 21, 1993)......................................... 38

*Habitat Educ. Center v. U.S.F.S.*,
    607 F.3d 453 (7th Cir. 2010) ................................................................. 39

*Helter v. AK Steel*,
    1997 WL 34703718 (S.D. Ohio Mar. 31, 1997)..................................... 30

*Illinois v. Milwaukee*,
    599 F.2d 151 (7th Cir. 1979) ........................................................................... 33

*Interfaith Community Organization v. Honeywell Int'l, Inc.*,
    399 F.3d 248 (3d Cir. 2005) ........................................................................... 24

*Maine People's Alliance v. Mallinckrodt, Inc.*,
    471 F.3d 277 (1st Cir. 2006) ................................................................... passim

*Matter of Environmental Waste Control, Inc.*,
    125 B.R. 546 (N.D. Ind. 1991) ....................................................................... 35

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996) ................................................................................. 17, 30

*Milwaukee Inner-City Congregations Allied for Hope v.* Gottlieb,
    944 F. Supp. 2d 656 (W.D. Wisc. 2013) ........................................................ 30

*Mitts v. Martin*,
    2016 WL 1211919 (S.D. Ill. Mar. 29, 2016) .................................................. 32

*Parker v. Scrap Metal Processors, Inc.*,
    386 F.3d 993 (11th Cir. 2004) ....................................................................... 24

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ................................................................................. 18, 36

*Sanchez v. Esso Standard Oil Co.*,
    572 F.3d 1 (1st Cir. 2009) ........................................................................ 31, 36

*Sierra Club v. Norton*,
    207 F. Supp. 2d 1342 (S.D. Ala. 2002) .......................................................... 39

*Temple University v. White*,
    941 F.2d 201 (3d Cir. 1991) ........................................................................... 39

*Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*,
    2014 WL 6613116 (N.D. Ill. Nov. 21, 2014) .................................... 17, 18, 34

*U.S. v. Apex Oil Co., Inc.*,
    2008 WL 2945402 (S.D. Ill. 2008) .......................................................... passim

*U.S. v. Bethlehem Steel*,
    38 F.3d 862 (7th Cir. 1994) ....................................................... 18, 33, 35

*U.S. v. Valentine*,
  856 F. Supp. 621 (D. Wyo. 1994) ........................................................................................... 22

*United States v. Price*,
  688 F.2d 204 (3d Cir. 1982) ................................................................................................... 31

*US v. Cinergy Corp.*,
  582 F. Supp. 2d 1055 (S.D. Ind. 2008) ............................................................................ 18, 36

**Statutes**

42 U.S.C. § 6902(b) ................................................................................................................ 36
42 U.S.C. § 6903 ............................................................................................................... passim
42 U.S.C. § 6972 ............................................................................................................... passim
415 ILCS 5/22.40a ................................................................................................................. 21

**Rules**

Fed. R. Civ. P. 65(c) .............................................................................................................. 38

## INTRODUCTION

After several months of discovery and eight days of evidentiary hearings, the assertions of the City's preliminary injunction motion have been borne out. The Court has heard about the Utilities' Skokie manufactured gas plant (the "Skokie MGP"), about the abandoned NIGC Pipelines that once distributed manufactured gas from the Skokie MGP, but which for decades have been leaking hazardous wastes ("MG Waste Oils"), and about the risks the Utilities' wastes pose to the public. The evidence has shown three ways in which the escape of wastes from the Utilities' pipelines may endanger human health (in addition to the ways such wastes may endanger the environment *per se*): (1) the MG Waste Oils infiltrate the City's water lines and can release hazardous contaminants into the drinking water; (2) the methane resulting from biodegradation of the fugitive MG Waste Oils can cause death or serious bodily injury by explosion or asphyxiation; and (3) utility and construction workers, including employees of the Utilities and City who frequently work in excavations in the City's rights of way, can be exposed to dangerous concentrations of the hazardous MG Waste Oils.

As discussed below, the City is likely to succeed on the merits of its Resource Conservation and Recovery Act ("RCRA") claim, and the balance of harms weighs heavily in favor of protecting human health. For purposes of obtaining a preliminary injunction under RCRA, the evidence more than sufficiently demonstrates (1) that the Utilities are "past or present generator[s], past or present transporter[s], or past or present owner[s] or operator[s] of a treatment, storage, or disposal facility;" (2) that they have "'contributed' to the handling of a solid or hazardous waste"; and (3) that their wastes "'may present an imminent and substantial danger to health or the environment.'" *City of Evanston v. Northern Illinois Gas Co.*, 229 F. Supp. 3d 714, 720-21 (N.D. Ill. 2017) (quoting 42 U.S.C. § 6972(a)(1)(B)). A preliminary injunction should accordingly issue, in the form discussed below.

1

## FACTUAL BACKGROUND

**A.  The Utilities' Generation, Distribution and Abandonment of MG Waste Oils**

The Skokie MGP was built and began operating in or about 1911, and distributed manufactured gas into the City thereafter via gas lines running under Oakton Street, Dodge Avenue and elsewhere, with the MGP ultimately ceasing operations in the 1950s. (Tr. 293:25-294:6, 297:19 – 299:12, 310:12-23, 525:3-14; PX 1021; *see also* PX 1020 (overview map of gas lines and Skokie MGP in relation to City's James Park).) The Oakton and Dodge gas lines were subsequently "retired" in the late 1960s / early 1970s – that is, they were abandoned in place under the City's rights of way, where, forgotten by the Utilities, they continued to decay and leak condensate wastes into the ground and onto the City's water lines. (*See, e.g.*, PX 1011 (memos regarding retirement of lines, describing history of extensive leakage); PX1021 at 608-003 to -005 (indicating pipe footage to be retired); and *see infra* at 9-16.

A 1969 Nicor memo recounting the history of the gas distribution pipelines going from the Skokie MGP and along Oakton and Dodge gives an idea of what the Utilities were leaving behind when they abandoned these lines.  According to the memo, it had previously been necessary to install numerous clamps in an effort to repair leaks along Oakton from the MGP (Station 28) to Dodge. (PX1011 at Nicor_0024117.) The memo also describes more than 3,500 feet of main on Dodge from Howard Street northbound as being "in dire need of replacement," with "bolts deteriorating on the previously installed bell and spigot clamps and also holes in the barrels of the Dresser sleeves." (*Id.* at Nicor_0024119.) The conditions described in the memo were very similar to conditions found when such a Dresser coupling was excavated from beneath Dodge Avenue near James Park as part of the City's later investigation. (Tr. 398:5-15.)

Decades after the 1969 memo, when the Utilities were in the process of remediating the Skokie MGP site *per se*, the abandoned distribution lines came to the attention of the Utilities

themselves – but the Utilities did nothing. While the MGP site was being excavated as part of the remediation, various pipes, including the beginning section of the lines at issue here, were encountered leaving the site. Utilities witness Nancy Huston, who was ultimately responsible for remediation of the Skokie MGP, including any contaminants that had migrated off-site (Tr. 189:24 – 191:16), testified that a visual inspection of these pipes found no evidence of contamination. But, as the record reveals, that so-called inspection – which consisted only of (1) exposing and cutting open the pipes, (2) videotaping inside the larger pipes until an obstruction was encountered, and (3) surveying the pipes and sealing them off (Tr. 198:19 – 199:20) – was perfunctory at best, and ignored evidence of contamination extending off-site. While air samples were taken of the pipes at the site boundary, no solid or liquid samples were taken from them. (Tr. 200:20 - 201:5) Indeed, the Utilities did not consider it at all important to inspect the pipes any meaningful distance past the MGP site property line. (Tr. 201:6 – 202:9)  But had Huston or those reporting to her taken more than a perfunctory look at the pipes, or actually paid attention to the video of the gas line exiting the MGP site into Oakton Street and toward Evanston, they would have seen remnant waste condensate (which should have been sampled and analyzed, but which was not) like that later encountered inside the Utilities' abandoned Dodge Avenue gas line by City expert Dave Hendron during his investigation in the James Park area. (*See* Tr. 364:2 – 372:22; PX 1021, PX 1022 at Nicor_0008511, PX 1031, PX 1032 (video inside abandoned pipeline exiting Skokie MGP into Oakton Street, and related documents).)

Instead, the Utilities and Ms. Huston chose to ignore not just what was present in the pipes exiting the Skokie MGP, but also other evidence showing that wastes like those encountered by the City were known to migrate via such distribution pipelines, and that the Utilities' pipelines had, in fact, leaked severely over time. (*See, e.g*., Tr. 201:6 – 206:7, 207:4 – 208:21, 276:9 – 277:6; PX 1011 (describing pipeline leaks along Oakton and Dodge); PX 1014

3

at COMED00011450 (Nicor was aware, before remediating the Skokie MGP, that operators had reported tar "did accumulate at drip stations throughout the distribution system"); Tr. 670:5 *et seq*. and DX 1011 at 136 (1988 USEPA study noting that drip oils could leak into soil); DX 1047 at 702 (excerpt from Morgan's treatise regarding manufactured gas stating that, in the finished gas, "[t]here is … a considerable portion of … tar and water which persists in the form of a mist or fog of suspended particles"); Tr. 209:23 – 210:14 (Huston did no historical analysis); *see also* 277:7-20 and PX 1012.)   The Utilities never investigated whether drip oils accumulated in distribution pipelines or associated drip pots, and Huston even claimed ignorance that drip pots collected oils. (Tr. 210:23 – 211:16, 222:21 – 223:14; *compare* Tr. 674:11 – 676:15 (Nicor drawings show numerous drip pots along Dodge and Oakton in the James Park area) and PX1041, PX1042 (examples of such drawings).)

Huston and the Utilities chose to proceed with blinders on despite the fact that, before the Skokie MGP was remediated, Huston herself had reviewed an environmental consulting firm's flow chart – adapted from Morgan's treatise regarding the manufactured gas industry – showing drip oil escaping the distribution mains, and polycyclic aromatic hydrocarbon ("PAHs") being among the wastes generated by MGPs; while Huston characterized the flow chart as "generic," she made no effort to determine whether it was somehow inapplicable to the Skokie MGP. (PX 1012 at COMED00011482-83; Tr. 213:8-16, 215:9 – 220:19; *see also* PX 1013 at 124, 165, 166, 168 (Morgan excerpts confirming presence of drip pots on distribution lines, from which oil had to be drained into drip wagons); Tr. 411:1 – 413:6 (Hendron explains presence and significance of drip pots as documented by Morgan).)[1] Indeed, Huston herself wrote a letter noting that

---

[1]  In addition to finding contamination in close proximity to the failed Dresser couplings on the old gas line (Tr. 426:16 – 427:16), City expert Dave Hendron also found it in proximity to sites where Nicor engineering drawings showed drip pots to have been located.  (*See* Tr. 407:15-408:22 and PX 1041 (work order shows a drip pot on the Dodge gas line (before it was relaid in 1927) near the front of Dawes

"[t]ars and/or oily materials are usually associated with … gas holders" at MGP sites, with an enclosure further stating that, "Despite the many purification steps, the gas [in the station holder, the last stop before distribution] still contained condensable material." (PX 1012 at COMED 00011472, 11478.) As of the time of the Skokie MGP remediation, Huston claims, she had forgotten about this information – but she nonetheless testified that, even if she had remembered it, she *still* would not have ordered an inspection of the distribution pipelines beyond what was actually done. (Tr. 220:20 – 222:16.)

## B. The City's Discovery and Investigation of the Contamination

Meanwhile, Tim Bartus[2] and other City water department employees were encountering the wastes that the Utilities had long ago sent to the City, and long ignored.  As Mr. Bartus testified, he was involved in water main repairs along Dodge Avenue from 2004 through 2014, including approximately seven main break repairs to that section of water line. (Tr. 141:9-142:3.) On the first occasion, when Bartus was a laborer, he participated in the repair of a water main break in the 300 block of Dodge (near James Park) by getting into the trench to do the work. (Tr. 142:5-143:2) He recalled an odor in the trench he described as "[r]otting tar." (Tr. 143:5-24) Bartus also discovered a "heavy inch-and-a-half, two-inch" thick black crust on the pipe that he had not encountered before. (Tr. 144:1-24; *see also* Tr. 145:19 – 146:6.) And as he worked, the odor had a bad effect:

---

School, where gas monitoring probe ("GMP") 10 was later drilled as part of the source investigation; GMP-10 "had a methane concentration in the high 80 percent level, and a pressure … at 13 and a half PSI…. They are high numbers."); Tr. 409:8-24 and PX 1042 (showing newly-placed drip pot along the relaid line, a little south and west of the original, and at the corner of Howard and Dodge); Tr. 410:6-17 (contamination was found in the vicinity of such drip pots at Howard and Dodge, and near GMP-10 and GMP-19 (which is in the parking lot of Dawes School, a little north of GMP-10)).)

[2]  Mr. Bartus has been employed by the City's water department for 16 years, starting as a Water Worker 1 (laborer) in 2002, and serving as Distribution Supervisor for the last ten years. (Tr. 135:14-25.) In his supervisory role, Mr. Bartus is responsible for repair, maintenance and rehabilitation of the City's water distribution infrastructure. (Tr. 136:6-8.)

Q. Okay. And with respect to this odor, did the odor go away?

A. No.

Q. It persisted?

A. Yes.

Q. How did that -- how did this whole condition affect you, if at all?

A. The smell, it did get in your nostrils and you do remember that smell. But after being in excavation for awhile, your eyes would begin to burn.

(Tr. 145:3-12.)  The odor, as it turned out, was notorious in the City's water department, even though no one understood what it was or what was causing it:

Q. … So what occurred -- do you have a recollection of what occurred when you finally got out of there, got to the top?

A. When I got out of the hole … I remember getting out and complaining about the smell, and a couple of the senior guys that had been working there longer than me laughed and said, "Welcome to Dodge Avenue."

(Tr. 146:14-147:1.) Bartus recalls five or six other water main repairs on Dodge Avenue in which he encountered the same black crust and the same smell. (Tr. 147:3-15.)  Bartus was an on-site supervisor on those other repairs, so he was not in the trench himself, but the crew had the same issue Bartus had with the smell and their eyes burning. (Tr. 147:16 – 148:10.) Bartus and another water department employee also recognized a similar odor in 2012 when they drove past the Skokie MGP site while it was being remediated. (Tr. 148:20-149:24.)

At the last water main break repair he conducted on Dodge Avenue, in 2014, at the corner of Mulford and Dodge, Bartus met Hendron on-site and gave him a piece of the black crust. (Tr. 149:25-151:20, 420:10-421:21 (describing crust characteristics and testing); PX1044 (photo of crust piece).)  By this point, Hendron, an engineer with extensive experience in environmental source investigation and attribution, had been retained by the City to investigate an assertion by the Metropolitan Water Reclamation District ("MWRD") that a former landfill under the City's James Park was the source of petroleum and methane that had been encountered at a nearby

MWRD treatment plant. (PX 1019; Tr. 284:15-23.) The crust on the exterior of the Dodge Avenue water line, along with Bartus noting that there was an unidentified 24-inch pipe running underneath Dodge, prompted Hendron to investigate further. (Tr. 289:13 – 290:11.)

Mr. Hendron proceeded to conduct a thorough investigation, including opening the 24-inch pipeline, videotaping, and sampling in and outside the pipe, underneath and from within one of the joints, including at locations on Dodge at Lee Street, and south on Dodge at Howard Street. (Tr. 290:21-291:10, 337:21-338:7, 338:24-339:25.) Hendron had chemical testing conducted on the samples, which showed volatile and semi-volatile organic compounds ("VOCs" and "SVOCs") with the same chemical signature as samples taken at the Skokie MGP. (Tr. 340:7-11, 340:16-20, 380:5-12; *see also* PX 1002 (summary of SVOC results); PX 1020 (overview map of investigation); PX 1023 (diagram of all sampling events); PX 1024 – PX 1026 (diagrams of sampling); PX 1027 (table compiling sample test results from investigation along Dodge Avenue, including interior pipe crust and sediment sampling); PX 1028 (showing SVOCs found in the samples tested during investigation); Tr. 392:3-6, 11 (tests showed materials with same chemical signature as far north as Lee and Dodge (northernmost point of investigation) and as far south as Dodge and Howard (southernmost point)); PX 1040 (photo 32, black crust on exterior of water main at Dodge and Howard).)

Hendron prepared a table compiling compounds found in the test results, and compared those both to what is typically found at MGP sites (based on New York Department of Environmental Conservation ("NYDEC") and U.S. EPA data), and to what was found at the Skokie MGP site in particular. (PX 1003; Tr. 349:8 – 350:10.) The table – which was prepared according to well-accepted practice in the source attribution field – indicated (1) the likely presence of MGP wastes from the Skokie site in the James Park area, and (2) the need for further investigation, which Hendron, employing recognized methodologies and accepted scientific

principles, then undertook over the course of four years, setting forth his findings in multiple reports. (*See, e.g*., PX 1017 (Source Investigation Flow Path flowchart); PX 1018 (EPA Guidance for Conducting Remedial Investigations and Feasibility Studies); Tr. 916:4-14 (Utilities' witness Vandeven endorses EPA Guidance that Hendron employed); PX 1019 (chronology of investigation); Tr. 281:22-283:9, 283:22-284:9, 293:16-19, 351:12-21, 352:2-18; PX 1048 and Tr. 446:11-447:8 (map and description of subsurface borings undertaken).) Hendron considered all potential sources of the contamination, even re-checking his work upon discovering additional potential sources. (Tr. 286:22-287:3 (considered the landfill); 287:4-10 (considered 5-6 additional sources, including possibility of naturally-occurring petroleum deposits); 287:18-21 (concluded by January 2015 that subsurface oil in James Park area was not naturally-occurring); 287:22-288:12 (narrowed to two possibilities: natural gas pipelines and leaks from Skokie MGP 24-inch gas pipeline); 291:16-18 (eliminated the natural gas pipeline); 292:20-293:15 (considered Rust-oleum plant); 437:4 – 442:2 (considered possibility of crust on water pipe being an applied coating); 478:23 – 480:23 (ruled out background contamination); 704:21 – 706:20 (listing other potential sources considered and ruled out).)

## C. Investigation Findings

### 1. Overview of Hendron's Findings

As a result of his investigation, Hendron reached the following conclusions:

1) The 24-inch-diameter NIGC Pipelines in and around the intersection of Dodge Avenue and Oakton Street were connected to the Skokie MGP and were a principal element of the Distribution Infrastructure of the Skokie MGP.

2) The NIGC Pipelines contain MG Waste Oils[3] from the process used at the Skokie MGP.

---

[3]  As Hendron explained, "MG Waste Oils" refers to condensate that formed in the gas, consisting of unburned fuel oil and related burn wastes from the gas manufacturing process. (Tr. 444:25-446:9.)

3) MG Waste Oils leaked from the 24-inch-diameter NIGC Pipelines into the underlying geologic materials (soil).

4) The MG Waste Oil that leaked from the NIGC Pipelines into soil migrated to and formed a "black crust" coating on the outside and inside of the Dodge Avenue Water Lines.

5) The MG Waste Oils found in the deeper soils and bedrock in the James Park area are the result of migration of MG Waste Oils released during long-term leakage from the NIGC Pipelines.

6) The MG Waste Oils in the bedrock have biodegraded to form methane present at high concentrations and pressures at the interface between the bedrock and the glacial till.

7) The full extent of contamination caused by leakage of MG Waste Oils from the Distribution Infrastructure from the Skokie MGP is unknown.

8) Other sources, including naturally-occurring petroleum liquids and background contamination, are not the sources of the contamination.

(PX 1016 (summary of Hendron's opinions); *see* Hendron testimony generally)

### 2. Summary of Evidence Supporting Hendron's Findings

#### a. Presence and Migration of Condensate

Contemporaneous literature detailing operations and distribution in the manufactured gas industry confirms there was condensate in the off-site distribution infrastructure. (Tr. 356:8-11, 18-23.) Hendron's investigation found such condensate in the abandoned 24-inch pipeline underneath Dodge Avenue, and in the abandoned pipeline beneath Oakton Street, along with corrosion and separation of pipeline joints, resulting in leakage of the MG Waste Oils from the pipeline. (PX 1029; PX 1030; PX 1034 (photo 1, showing discolored soils immediately beneath the 24-inch gas line); PX 1035 and PX 1036 (photos of pipeline joint showing corrosion and failure of Dresser coupling including corroded and broken coupling bolts); PX 1037 (same, also showing missing collar from coupling); Tr. 360:11-25, 361:13 - 363:25, 373:1-6, 374:14-375:20, 376:3-15, 376:22-377:5, 381:4-7, 381:11-15 (stained soils indicate MG Waste Oils because they also have a petroleum odor), 381:19 – 382:7, 384:9 – 385:15.) As Mr. Hendron summarized his

findings regarding the representative Dresser coupling from the abandoned Dodge gas line that

was excavated and examined:

> Q. … And so given that 12 of the 14 bolts were either broken or missing, do you have an opinion to a reasonable degree of certainty as to what happened as a result of that?
>
> A. Well, the pipe -- the pipe joint opened and released the MG waste materials that were on the bottom of this pipe as a result of the condensation that was occurring at the top, flowing down the side walls when it got high enough or heavy enough during the operation, which flowed down to the bottom. And the original system was set so these liquids would flow to the drip pots, be collected and carried off. But with the joints open, the joints themselves kind of became a drip pot for this operation. And so the broken -- the broken bolts and the open joints resulted in release from joints that were in this condition.

(Tr. 388:10-23; *see also* PX1038 (diagram of broken bolts on the Dresser coupling, showing only

two unbroken bolts at the top); Tr. 387:22-388:4.) Indeed, as Hendron further testified, the

deterioration of the couplings on the Dodge gas line was rapid, given the nature of the steel they

were made of. (Tr. 765:24 - 767:14 ("[W]ithin a matter of a few years that corrosion happened,

the bolts started failing and this joint opened up.").)

As Hendron also explained, the Skokie MGP employed the Lowe (or carbureted water

gas ("CWG")) process to manufacture gas, a byproduct of which is "fuel oil waste and waste oils

that come off that … have the consistency of vegetable oil. So, they're very thin. And they have

the capacity to migrate through cracks and fissures of the geology and the geologic formations in

the area." (Tr. 336:20 – 337:8; *see also* Tr. 668:2-21 and DX 1017 (NYDEC FAQ similarly

noting that "CWG tars are more likely to migrate through soils [than one would expect] and

appear at different locations from where they were originally leaked or disposed of.") Likewise,

the nature of the subsurface where the abandoned gas lines were found also contributed to the

migration of the waste oils. (Tr. 668:22 – 669:21 (presence of laterals and trenches under Dodge

Avenue and other streets where the NIGC pipelines are buried further contributes to mobility of

MG waste oils); 695:9 – 696:6 (same; groundwater can also enhance migration potential in the direction of drainage); 691:9 – 694:24 (explaining how disturbed and weathered nature of soil near pipelines facilitated lateral migration from gas line to water line, and noting that sampling also detected waste materials at locations between those two pipelines); PX 1002A (highlighting, in green, soil and communication pipe and conduit crust samples between the NIGC Pipelines and the water lines); Tr. 698:5 – 699:1 (sand content and fractured nature of surface below James Park area provided "pathways for this migration to occur" down to bedrock).

Ultimately, the investigation determined the Utilities' abandoned 24-inch gas line was the source of MG Waste Oils and black crust on and in the City's water line, in the intermediate soils and in the bedrock below; and of subsurface methane in the James Park area, which was the result of biodegradation of MG Waste Oils that had migrated down through the subsurface. (*See, e.g.*, Tr. 291:17-23, 335:19-22; PX 1016 (summary of Hendron's findings); PX 1033 (schematic showing how the contaminants moved through the subsurface, onto the water line, to the bedrock, and resulted in methane accumulation); 416:17 – 420:6 (describing migration of wastes from gas line onto water line, and presence of such wastes inside water line); 690:9 – 691:8 and PX 1023 ("not unusual" that MG Waste Oils migrated 40 to 50 feet or more, from gas line to water line and beyond); 714:1 – 718:16 (describing how black crust formed); 435:1 – 436:3 and PX 1046 (photo of black crust inside water line); 427:22 – 428:4 (contamination on outside of water line consistent with that inside water line); 703:13 – 704:20 (stating that oil in James Park area is not naturally-occurring, and summarizing source attribution conclusions); 442:12 – 444:6 (describing how the dense waste oils sink to bedrock); PX 1033; *see* Hendron testimony generally.)[4] The crust that had formed on and in the City's water line was, again, chemically

---

[4] As noted above, Hendron considered whether the black crust on the water line was the result of an applied pipe coating, and concluded that it was not. He inspected the pipe, and he did find a cement lining

consistent with wastes found at the Skokie MGP site, in the abandoned gas line, and in the intermediate soils; and contained PAH contaminants at high levels.[5] (PX 1002A[6] (highlighted table of testing data showing exceedances of TACO background for priority pollutant PAHs in yellow, calling out crustal samples on and in the water line (in orange) and samples from the soils and communication pipe and conduit crust samples between the NIGC Pipelines and the water lines (in green)); and PX 1028A (highlighted table of testing data showing exceedances of TACO background for priority pollutant PAHs in yellow, calling out samples in gas line crusts and sediment (in pink) and water line (in orange)).); Tr. 422:14-24, 423:15-424:14, 424:22-426:15.) As Hendron summed up his conclusions at the hearing:

> Q. Mr. Hendron, based on your investigations, is there a common link among all the places in the James Park area where your investigations found contaminants and methane?
>
> A. Yes.
>
> Q. What is it?

---

inside the newly-installed service pipe from the water line to the Levy Center, but he found no evidence of pipe coatings on the older pipes at issue in this case. (Tr. 437:4-17.) He reviewed photographs from a Dutch study that showed pipes with no lining and pipes with some lining intact (PX 1047 at 603), finding the photo of a pipe with no coating to have a "very high similarity between what we saw in the pipe that we investigated in Evanston, which in my visual examination showed no evidence of any coal tar or other coating." (Tr. 438:25-439:5.) Hendron talked with Mr. Bartus in the City's water department, and Dave Stoneback, the City's Public Works Director, and neither knew of any such applied coatings on the water pipes. He also asked the City to search its files for engineering drawings from prior to the 1950s to see if any indicated that there were linings on the pipes, and the City found none from the timeframe relevant to this case. The City was able to verify only that it used coal tar enamel coatings on pipes installed in or after the 1960s, *i.e.*, not the pipes at issue here. (Tr. 439:13-440:16, 440:23-442:2.)

[5] Contrary to the Utilities' assertions, using a total of background levels is not how conformance with background is determined in Illinois. (Tr. 552:22-553:8; 562:12-19.) Rather, IEPA has devised "a level for each one of these constituents," and therefore one uses the concentrations TACO sets out for each PAH, not the total, which is a figure not even set forth in the regulation. (*See* PX 1059, TACO Table H.)

[6] The City has highlighted exhibits PX 1002 and PX 1028, both tables introduced at hearing, in order to call attention to certain of the many laboratory test results. These highlighted exhibits have been designated with the letters "A", "B" or "C," and descriptions are provided for each. All contain highlights indicating which sample results exceed TACO background for priority pollutant PAHs. Additionally, the last sample is crossed out in PX 1002A and 1002B. It was addressed at hearing as an "outlier" (Tr. 579-80) and should not be confused with the similarly-labeled sample test result above it in the chart, which was taken from the interior of the pipe.

A. All the areas that I found the contamination, which was the liquid petroleum and methane in the soil -- or in the bedrock, the crust on the water main, the contamination in the soils, they were all located in close proximity to the MG infrastructure that was used out of the Skokie plant. (Tr. 481:15-24.)

**b.  Presence of Naphthalene**

One contaminant that consistently showed up in test results was naphthalene, in the NIGC gas lines, in the soil, in the water lines, along Dodge, from Lee to Howard. (*See* PX 1028B (highlighted table showing TACO concentration exceedances throughout samples; naphthalene in red box, calling out highest naphthalene exceedances *in NIGC pipeline* (in pink); *and* PX 1002B (highlighted table showing TACO concentration exceedances throughout samples, naphthalene in red box, calling out samples with exceedances of naphthalene *inside the water line* (in orange)); PX 1027; Tr. 345:25 - 348:1, 357:15 – 358:2, 414:3 - 416:16, 673:1 – 674:10 and DX 1047 at 677 (Morgan's treatise confirms that condensate and drip oil contained naphthalene); Tr. 670:5 – 672:10 and DX 1011 at 69 (USEPA manufactured gas study notes naphthalene would crystallize within the gas distribution system, plugging orifices and reducing flow through the pipes); Tr. 939:1 – 940:3 (Utilities' witness Vandeven testified that naphthalene was "largely" – *i.e.*, not entirely – removed at the plant, and was a "significant concern").)

Finding naphthalene on and in the water line is significant, because ***coal-tar pitch*** – which the Utilities contend was used to coat the water line, and which they maintain is the real "culprit" here – ***does not contain naphthalene***, which boils off in the process of making the pitch. (*See* Tr. 68:19-23 (Jeffrey: "[T]here are certain PAHs like naphthalene … that coal-tar pitch could not explain."), 122:22 – 124:3 ("Coal-tar pitch is a residue after two distillations to remove lighter hydrocarbons…. [T]he second distillation … would remove naphthalene."); Tr. 1058:3-15, 1060:8-12 and DX 1057 at 41, 62 (Utilities witness Nixon testifying that, assuming the city applied a coal tar-based coating to water line, it is a coating of coal-tar pitch varnish);

13

DX 1057 at COE0342378 (1908 AWWA standard describing coal-tar pitch coating).) The Utilities tried to suggest otherwise during their cross-examination of Mr. Hendron, but that attempt was misleading and ultimately unsuccessful.[7]

### c. Dr. Jeffrey's Conclusions

In addition to Mr. Hendron, Dr. Alan Jeffrey, a forensic and hydrocarbon geochemist with experience in MGP issues, reviewed and interpreted various data collected as part of the source investigations undertaken here. Dr. Jeffrey concluded, among other things, that the analytical methods employed by Hendron were reliable, and that the chemistry data he reviewed support the conclusion that hydrocarbons in and around the Dodge Avenue water line on the perimeter of James Park came from the Skokie MGP and the Utilities' abandoned gas line. (Tr. 24:25 – 25:10, 51:13-17, 53:7-14, 54:24 – 55:12, 78:3-15; PX 1003.) As Dr. Jeffrey also explained, with respect to PAHs present in the samples tested here, about half of those samples had a fluoranthene-to-pyrene ratio of less than one, which is associated with carbureted water gas waste. (Tr. 64:4-8, 65:7-20; *see also* Tr. 1130:18 – 1131:1 (Utilities witness Gauthier agreeing that "the ratio of those two compounds is a pretty useful diagnostic ratio for discriminating between a coal tar and a carbureted water gas tar…. [C]arbureted water gas tars have fluoranthene/pyrene ratio less than one."); 1156:13-1157:13; PX 1097 at v.) Similarly, the fact petrogenic materials were found is consistent with the wastes originating from the Skokie MGP, since "it's a well established fact that carbureted water gas processes [which use petroleum oils, a petrogenic product, as a feedstock/fuel to produce the gas] often result in ... unreacted, unburned

---

[7] In their cross-examination, the Utilities cited a 2002 Agency for Toxic Substances and Disease Registry report that made reference to naphthalene and coal tar pitch. But the report's reference to naphthalene being present in coal tar pitch was, per the report itself, tentative at best. The Utilities also withheld from Hendron and the Court the fact that the report, in listing the components of coal-tar pitch, relied upon a 1992 scientific study – in which naphthalene was actually *added* to the sample being tested as a standard / reference point. (Tr. 676:19 – 681:7; DX 1033 at 225, 228; PX 1061 at 288, 290.) No wonder, then, that the sample tested positive for naphthalene.

feedstock being included in the waste." (Tr. 71:21 – 72:18; *see also* Tr. 1155:13 – 1156:12 (Gauthier: CWG plants were known to generate wastes containing substantial amounts of unreacted petrogenic feedstock oil); PX 1096 at 1-16; PX 1023A (annotated version of PX 1023 designating sample locations with a fluoranthene/pyrene ratio less than one).)

### d.  Migration of Waste Oils to Bedrock, and Formation of Methane

Mr. Hendron also determined the Utilities' MG Waste Oils were DNAPLs (dense non-aqueous phase liquids), *i.e*., heavier than water. (Tr. 447:22-448:12; *see also* 986:22 – 987:15 (Vandeven agreeing that CWG tar is usually heavier than water and sinks).) Borings along the perimeter of James Park encountered oil in the bedrock below; but rather than indicating widespread naturally-occurring oil and methane, the borings pointed to there being a specific source of contamination – namely the old MG pipelines leaking at certain locations. (PX 1048 (map of boring locations); Tr. 449:1 – 461:5; PX 1049, PX 1050 and PX 1051 (rock core photos showing presence of oil); PX 1052 (unstained rock core where Hendron concluded no leak was present); PX 1053 (oil-stained rock core and oil-containing water removed from GMP-19 and GMP-19S, near Dawes School).) Hendron had GC-MS (gas chromatography-mass spectrometry) tests run on these samples, which showed that the waste oil found in the James Park area was chemically consistent with the fuel oil waste previously found at the MWRD site near the Skokie MGP. (Tr. 461:6 – 464:23; PX 1054 at COE0313779, 3782 (MWRD site assessment); PX 1055, PX 1056 and PX 1057 (GC-MS results from James Park samples).)

Hendron further concluded that MG waste oils in bedrock have biodegraded to form methane at high concentrations and pressures at the interface between the bedrock and the glacial till. (Tr. 466:22 – 467:24 ("[A]t the MWRD site and at our site, the only place that we encountered high concentrations of methane … is where we also encountered distinct and large evidence that there was liquid petroleum at that same location."); 474:24475:5 (same).)

15

Numerous gas monitoring probes in the James Park area show "unusually high" concentrations of methane below ground. (PX 1058 (summary of gas monitoring data).) The oil is not naturally-occurring or from the former landfill beneath James Park. (Tr. 468:4 – 472:5, 475:11-16 (carbon-14 testing confirmed methane found was not naturally occurring glacial drift gas).)

**D. The Risks Present**

As set forth below in the context of the imminent and substantial endangerment prong of the injunction analysis, the City – including through the expert testimony of Dr. Mark LeChevallier, who discussed intrusion of the Utilities' wastes into the City's water lines and the resulting risks, and Dr. Serap Erdal, who discussed the need for a formal risk assessment – presented credible and substantial evidence that the Utilities' wastes may present an imminent and substantial endangerment of (1) contaminating the City's drinking water, (2) degrading into unsafe concentrations of methane, (3) contaminating soil around utility lines, and (4) otherwise contaminating the environment. This included evidence that the Utilities' wastes being in contact with drinking water may endanger public health; that the highly pressurized and concentrated methane resulting from these wastes may likewise endanger public health; that the Utilities' wastes are contaminating the environment, including utility corridors; and that the presence of the wastes in these utility corridors may similarly endanger worker health.

**E. The Need for Further Investigation**

As Mr. Hendron testified, the full extent of contamination caused by leakage of MG Waste Oils from the Skokie MGP's distribution infrastructure is currently unknown. (Tr. 475:19-477:5; *see also* PX 1020 (overview map of City's investigation to date); Tr. 1237:24 – 1240:15 (Utilities' witness Dan Fox conceding that Utilities themselves have not explored how far the old NIGC Pipelines extend beyond a one-mile radius from the intersection of Oakton and Dodge); PX 1106 (Evanston map highlighted by Mr. Fox showing the limited extent of Utilities' inquiry

regarding the location of the old pipelines); Tr., *e.g.*, 819:18-821:8; 824:1-825:2, 825:10-21 (Dr. LeChevallier calling, at minimum, for further investigation and study); Tr. 881:9-19, 882:4-11, 910:2-19 (Dr. Erdal calling for same); 478:9-22 (Mr. Hendron outlining further work to be done).) As discussed below, financial responsibility for the relief requested – which is set forth in the draft Implementing Order submitted herewith – is appropriately placed upon the Utilities.

## APPLICABLE STANDARD

RCRA authorizes the Court to both "'restrain[]' a responsible party from further violating RCRA," and "order[] a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996) (citing 42 U.S.C. § 6972(a)(1)(B)). The City asks the Court to restrain further violation and order the Utilities to take action via an investigation of the full nature and extent of their contamination, and via the design of a remedial action plan to address any such contamination.

The City is entitled to such relief, since it has demonstrated "(1) that its case has 'some likelihood of success on the merits,' and (2) that it has 'no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied.'" *Deckers Outdoor Corp. v. Does 1-100*, 2013 WL 169998, *1 (N.D. Ill. Jan. 16, 2013) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)); *see also Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*, 2014 WL 6613116, *2 (N.D. Ill. Nov. 21, 2014) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008)). The City has also "demonstrate[d] that its harm in the absence of [an injunction] outweighs any harm that may be suffered by the [Utilities] if the injunction is granted." *Tuf-Tite*, 2014 WL 6613116, at *3 (citing *Girl Scouts*, 549 F.3d at 1086). Where, as here, the plaintiff is a unit of government "and is seeking to protect the public interest … the Court's equitable powers are even broader and more flexible than if only private parties were seeking relief." *US v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1060 (S.D.

Ind. 2008) (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *see also U.S. v. Bethlehem Steel*, 38 F.3d 862, 868 (7th Cir. 1994) ("lesser need" to balance equities where "the activity in question is the underground disposal of a characteristic hazardous waste").

The decision whether to grant the City's request for preliminary injunction falls within this Court's discretion. *Tuf-Tite*, 2014 WL 6613116, at *3 (quoting *Girl Scouts*, 549 F.3d at 1086). In exercising its discretionary power, the Court should bear in mind that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell, Inc.*, 480 U.S. 531, 545 (1987); *see also EPA v. Environmental Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990).

## ARGUMENT

### A. The City Is Likely to Succeed on the Merits of its RCRA Claim.

To ultimately prevail on its RCRA claim, the City must show (1) the Utilities are "past or present generator[s], past or present transporter[s], or past or present owner[s] or operator[s] of a treatment, storage, or disposal facility"; (2) the Utilities have "'contributed' to the handling of a solid or hazardous waste"; and (3) this waste "may present an imminent and substantial danger to health or the environment." *City of Evanston*, 229 F. Supp. 3d at 720-21 (quoting RCRA § 6972(a)(1)(B) and collecting cases). The record amply demonstrates that the City "has some likelihood of succeeding on the merits of its claim." *Tuf-Tite*, 2014 WL 6613116, at *3.

18

1. **The Utilities Are Past or Present Generators, and Owners and Operators of a Storage or Disposal Facility.**

   a. **Ownership and Operation of the Skokie MGP and the NIGC Pipelines**

The Utilities' admissions and the hearing record show that the Utilities own(ed) and operated the Skokie MGP and the NIGC Pipelines connected to the MGP, from which the MG Waste Oils leaked. ComEd admits in its Answer that it previously owned the Skokie MGP. (Dkt. #46, ¶ 9.) When Nicor was formed, the Skokie MGP was conveyed to it, and the Utilities later agreed to share liability related to that MGP, among others. (*See* PX 1008 at 20; ComEd Answer, Dkt. #46, ¶ 26 & Nicor Answer, Dkt. #45, ¶ 26; ComEd Answer, Dkt. #46, ¶ 30 & Nicor Answer, Dkt. #45, ¶ 30 (admitting the authenticity of a Final Allocation Agreement ("FAA"), attached to the City's Complaint as Exhibit D, establishing *inter alia* that both Utilities owned and operated the Skokie MGP).)[8] Similarly, it is clear the Utilities own(ed) and operated the NIGC Pipelines running along Oakton Street and Dodge Avenue abutting the City's James Park. As with the Skokie MGP *per se*, ComEd acquired the pipelines from Public Service Company of Northern Illinois ("PSCNI") and subsequently transferred ownership of the lines to Nicor. (PX 1008 at 20; PX 1009 at 2-3; PX 1010 at 2-3; Tr. 195:9 – 198:16 (Huston).)

The Utilities do not dispute that the Skokie MGP was built and began operating in or about 1911, that the 24-inch gas line running along Oakton Street, which was laid in 1911, was connected to the Skokie MGP, or that the Oakton gas line was connected to another 24-inch gas line running south along Dodge Avenue to Howard Street. (Tr. 293:25-294:6, 297:19 – 299:12,

---

[8] Attachment A to the FAA (Ex. A to Ex. D of the Complaint, PageID #72-73) lists 24 sites, including the Skokie MGP, for which the Utilities agreed to split responsibility 51.73% (ComEd) / 48.27% (Nicor), as set forth in Section 2.1 of the FAA (PageID #65). As set forth in Paragraph 10 of the ICC Petition jointly submitted by the Utilities in this regard, that division of responsibility applies to "sites that had been transferred to Nicor Gas pursuant to the 1954 General Conveyance" referred to in Paragraph 9 of ComEd's Answer. (Ex. D to Complaint, PageID #59.)

299:25 – 300:3, 301:3-22, 302:2-14, 306:6-12, 310:12-23, 525:3-10; PX 1021 (engineering drawings showing locations of lines).) While the Utilities maintain that the Dodge gas line running south to Howard was not laid until 1924, the evidence, as Mr. Hendron explained, is to the contrary, and indicates that the Dodge line was likewise initially laid in 1911.[9] The Skokie MGP operated into the 1950s, and the Oakton and Dodge gas distribution lines were not retired until the late 1960s / early 1970s, when they were abandoned under the City's rights of way.

### b. The NIGC Pipelines Carried MG Waste Oils from the Skokie MGP into the City.

As set forth above, the Skokie MGP produced manufactured gas, which contained MG Waste Oils; the Utilities owned and operated the pipelines that carried such gas and wastes from the Skokie MGP into the City; and these pipelines leaked the wastes. Accordingly, and as further discussed below, (1) the Utilities are "generators" under the statute; and (2) the Utilities are likewise past and present "owners" and "operators" of a storage or disposal facility.

### 2. The Utilities Contributed to the Handling, Storage and Disposal of Hazardous and Solid Wastes.

The Utilities also "contributed or [are] contributing to the past or present handling, storage … or disposal of any solid or hazardous waste." *City of Evanston*, 229 F. Supp. 3d at 720 (quoting 42 U.S.C. § 6972(a)(1)(B)). RCRA defines many of these terms. *See* 42 U.S.C. §§

---

[9] *See* Tr. 722:9 – 729:12, PX 1020, PX 1022 at Nicor_0008511, PX 1066, PX 1067 at Nicor_0008466, PX 1068 at Nicor_0008240, PX 1069 at Nicor_0008209 (Hendron testimony that Dodge and Oakton gas lines were first installed in 1911, referencing maps and ICC reports reflecting that PSCNI had length of 24-inch line in service from 1914-1925 commensurate with distance from Skokie MGP east along Oakton to Dodge, and south along Dodge to Howard); Tr. 729:13 – 740:10 and PX 1070 (Hendron testimony and demonstrative exhibit recounting development of greenhouses near Dodge Avenue in southwest Evanston, and those greenhouses' transition away from coal as a heating fuel; "[T]he only other source of heat for this kind of operation in that time frame that I know of would be manufactured gas."). In any event, as Mr. Hendron explained, even assuming *arguendo* that the Dodge line was first installed in 1924, that would not change his opinions, since it would still leave "plenty of time" for the leakage and migration of contaminants found in the James Park area to have occurred. (Tr. 743:17 – 744:9.)

6903(5) (defining "hazardous waste"), 6903(27) (defining "solid waste"), 6903(3) (defining "disposal"), 6903(33) (defining "storage"). Others are easily understood.

MG Waste Oils are hazardous and solid wastes. MG Waste Oils are hazardous wastes because (1) they are presumptively hazardous under Illinois law as "manufactured gas plant waste" (415 ILCS 5/22.40a), and, as demonstrated by the record and further discussed below, (2) they "may … pose a substantial present or potential hazard to human health or the environment," 42 U.S.C. § 6903(5)(B)). Since MG Waste Oils are a condensate from the gas manufactured at the Skokie MGP and distributed through the NIGC Pipelines, they also constitute solid wastes when they leak from the pipelines into the environment. *See* 42 U.S.C. § 6903(3) (disposal includes leakage); 42 U.S.C. § 6903(27) (solid waste "means any … discarded material, including solid, liquid, semisolid or contained gaseous material resulting from any industrial [or] commercial … activities"); *see also U.S. v. Apex Oil Co., Inc.*, 2008 WL 2945402, *81 (S.D. Ill. 2008) (holding that "[p]etroleum hydrocarbon products" leaking from pipes "constitute[d] 'discarded materials' that are a 'solid waste' within the meaning of RCRA") (citing 42 U.S.C. § 6903 and collecting cases). Moreover, the NIGC Pipelines themselves, and the waste condensate inside them, are similarly solid waste because the pipelines have likewise been abandoned (discarded) by the Utilities under the City's rights of way.

The record, as summarized above, establishes that the Utilities at the very least contributed to the handling, storage and/or disposal of such wastes. Again, the Utilities manufactured and distributed the gas and the waste products contained therein ("handling" them). They also stored that gas and those wastes, both onsite at the Skokie MGP (*e.g.*, in the station holder just before it was distributed) and in the NIGC Pipelines themselves, where the waste materials resided until they eventually leaked out. *See, e.g.*, 42 U.S.C. § 6903(33) ("The term 'storage', when used in connection with hazardous waste, means the containment of

hazardous waste, either on a temporary basis or for a period of years….”). Finally, the Utilities disposed of the wastes when they allowed them to leak out of their distribution lines, and when they left those lines to rot beneath the City's streets. *See, e.g.*, 42 U.S.C. § 6903(3) (“The term ‘disposal’ means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.”).

The Utilities try to escape liability by arguing that some of the gas distributed in their Dodge Avenue gas line came from a Peoples Gas storage facility to the south of Evanston, on the north side of Chicago. The Utilities' argument fails legally and factually. Legally, regardless of the source of the gas, the Utilities are still liable under RCRA for leakage of contaminants entrained in the gas from the pipelines, since there is no dispute that the Dodge and Oakton pipelines are *the Utilities'* pipelines. *See* 42 USC § 6972(a)(1)(B) (liability under RCRA for “any person … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment”) (emphasis added); 42 USC §6903(3) (definition of “disposal” includes “leaking”) (emphasis added); *U.S. v. Valentine*, 856 F. Supp. 621, 626-27 (D. Wyo. 1994) (leaks from pipe gave rise to RCRA liability). Thus, even assuming for argument's sake that gas came northbound from Peoples along Dodge for a period of time, since the wastes entrained in the gas condensed in, and leaked out of, the Utilities' pipelines, the Utilities would still be liable under RCRA.

Factually, the Utilities' “northbound from Peoples” argument fares no better. As the testimony of Utilities witnesses Jay Vandeven and Thomas Gauthier and related exhibits established, the gas that came from the Peoples Gas holder was manufactured gas (or, at the very

least, after about 1931, a mixture of manufactured and natural gas) that carried wastes just like those emanating from the Skokie MGP.  (Tr. 994:6 – 1000:20, 1013:4 – 1014:11 (Vandeven); PX 1081 at BMcD_0674469-71, -73, -75, -78, -80, -83, -86 (Brown's directory pages regarding 1931-39 "mixed  gas" purchases), PX 1082 (*Evanston Review* article indicating that Skokie MGP did not start delivering straight natural gas to Evanston until 1946 at the earliest); PX 1083 at 1-1, 3-1 (site investigation report ("SIR") for Peoples Gas holder, providing information regarding type of gas held there, and showing tar being present); Tr. 1157:14 – 1161:4 and PX 1098 at COE0059148, -158, -168, -170, -239 (Gauthier understood that Skokie MGP purchased gas from Peoples storage facility south of Evanston, and spent about 15 or 20 minutes searching on Google for the SIR, which he didn't find, but which shows presence of wastes with fluoranthene/pyrene ratios less than one, indicating CWG tar).)  As Hendron further explained, prior to 1931, (1) the Skokie MGP sold large amounts of gas ***to*** Peoples, which could have been transported then via the Utilities' Dodge line, and (2) any gas coming north from Peoples into Evanston likewise could have come via the Dodge pipeline.  (Tr. 740:11 – 741:12)

### 3.  The Utilities' Wastes May Present an Imminent and Substantial Endangerment to Health or the Environment.

As the Court explained in denying the Utilities' motion to dismiss, "a plaintiff bringing a RCRA endangerment claim need not allege an already existing harm, a harm that is certain to occur, or a harm that will manifest immediately." *City of Evanston*, 229 F. Supp. 3d at 722 (citing *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002)). Instead, "any substantial ongoing threat of future harm"—such as "present and future contamination of drinking water" with MG Waste Oils, or "degradation" of MG Waste Oils "into potentially dangerous levels of methane," to use the Court's examples—is sufficiently imminent and substantial to give rise to RCRA liability. *Id.* (citing *Albany Bank*, 310 F.3d at 972 and

*Forest Park Nat'l Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 976 (N.D. Ill. 2012)). In other words, "any substantial ongoing threat of future harm" satisfies this element under RCRA. *Id.* Numerous federal appellate courts hold the same. *See Interfaith Community Organization v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005) ("Because the operative word is 'may,' … the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm.") (alteration in original, quoting *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004)); *Cox v. City of Dallas*, 256 F.3d 281, 299-300 (5th Cir. 2001) (same); *Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 279 & n.1, 296 (1st Cir. 2006) ("It is the <u>threat</u> that must be close at hand, even if the perceived <u>harm</u> is not. For example, if there is a reasonable prospect that a carcinogen released into the environment today may cause cancer twenty years hence, the threat is near-term even though the perceived harm will only occur in the distant future.... [A] reasonable prospect of future harm is adequate to engage the gears of RCRA[.]") (emphasis in original).

RCRA's plain language informs what constitutes an endangerment, as well. RCRA's endangerment section "is 'intended to confer upon the courts the authority to eliminate ***any*** risks posed by toxic wastes,'" and "courts should 'recogniz[e] that risk may be assessed from suspected, but not completely substantiated, relationships between imperfect data, or from probative preliminary data not yet certifiable as fact." *Interfaith*, 399 F.3d at 260 (quoting legislative history) (emphasis added). "Proof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases," but the fact that a particular contamination has not exceeded state standards ***yet*** is not fatal to a RCRA claim. *Id.* at 261 (emphasis added). Accordingly, "if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." *Id.* at 259 (citation omitted). Similarly, the First Circuit explained in *Maine*

24

*People's Alliance* that a preliminary injunction requiring investigation of environmental contamination was entirely appropriate where the plaintiffs' expert believed it "'highly likely' that [potential] harms would prove to be both real and severe," even though the plaintiffs' expert admitted that "no one could know with certitude 'if there is a problem' or 'what the problem is,' and the plaintiffs themselves acknowledged "that remediation might eventually prove to be either unnecessary or infeasible." 471 F.3d at 281.

At hearing, the City presented substantial evidence in support of the very same allegations the Court determined "are more than enough to support the 'imminent and substantial' element" under RCRA. *City of Evanston*, 229 F. Supp. 3d at 722. Specifically, the City's evidence confirms that the Utilities' wastes may present an imminent and substantial endangerment by (1) contaminating drinking water, (2) degrading into unsafe concentrations of methane, (3) contaminating soil around utility lines, and (4) otherwise contaminating the environment—any of which merits injunctive relief, and all of which, taken together, require it.

### a. Endangerment of Human Health *via* Drinking Water

The City presented evidence at hearing that the Utilities' wastes are coming into contact with the City's drinking water:

- Mr. Hendron testified that the Utilities' wastes migrated from the NIGC Pipelines to the City's water lines. (*See, e.g.*, Tr. 392:3-11, 407:15-408:22, 410:6-17, 414:3-415:25, 416:17-419:14, 420:10-426:15, 427:22-428:4, PX 1002, PX 1016, PX 1043-44.)

- Dr. LeChevallier testified as to how the Utilities' wastes likely entered the City's water lines after migrating to those water lines. (Tr. 783:14-19, 784:18-25, 785:8-17, 785:22-786:15, PX 1074 (describing mechanisms of intrusion); 780:19-781:8 (pressure transients are very common in water systems); 782:19-783:8 (independently verified materials inside and outside water line are chemically similar); 777:12-17 (presence of similar materials inside and outside water line is best explained by intrusion *via* pressure transients); 786:16-18, 787:2-5 (presence of black crust on outside of water line may be further evidence that a liquid had been there previously); 787:8-15 (wastes inside water line would be expected to attach to the interior surface and form the black crust material observed now); 791:8-13, 791:21-25, 793:18-25, 794:8-13, 794:23-795:17, 796:1-4, PX 1046 (black material inside water line does not appear to be a coal-tar coating).)

25

- Dr. Jeffrey testified that the contaminants on and in the City's water lines are consistent with the contaminants inside the NIGC Pipelines. (Tr. 59:23-60:9, 120:9-11, 120:20-22 (most samples are pyrogenic, ruling out, *inter alia*, crude oil and gasoline); 62:24-63:2, 64:4-8, 65:7-13, 65:18-20, 69:13-70:1, 78:3-15 (PAH ratios confirm certain samples are consistent with Lowe process wastes and inconsistent with burn residues or background); 68:19-23, 122:22-124:15, 125:1-12 (presence of naphthalene rules out coal-tar pitch as potential source); 53:7-14, 78:3-15 (source of PAHs analyzed is more likely than not NIGC Pipelines).)

- Dr. LeChevallier further testified as to how the City's water lines, outside the vicinity of Dodge and Oakton, could have been impacted as well—through external contact with the Utilities' wastes, migration of those wastes within the water lines from the vicinity of Dodge and Oakton, or both. (Tr. 806:9-19, 820:23-821:8 (testifying he expects other parts of the City's water system have been affected in these ways).)

The City also presented evidence at hearing that the presence of the Utilities' wastes in contact with drinking water may present an imminent and substantial endangerment to health:

- Dr. LeChevallier testified as to how the Utilities' wastes could both adhere to the interior surfaces of the City's water lines after entering those lines, and detach from those interior surfaces and flow to places where they could affect consumers. (Tr. 787:8-15 (adherence to interior surface); 797:14-798:21 (describing numerous reasons why materials might detach); 796:8-16 (not reasonable to assume material adhered inside would stay put; to the contrary, causes of detachment occur routinely); 799:5-21, 800:4-801:2, PX 1074 (describing mechanics of adhered materials detaching and flowing through line and either re-attaching downstream or flowing to users).)

- Dr. LeChevallier further testified to the limitations surrounding the City's water testing to date, as well as further testing that can and should be done to more accurately characterize the risks presented by the presence of the Utilities' wastes in the City's drinking water system. (Tr. 802:10-13, 802:15-804:18, 807:5-808:2 (water testing to date has not been sufficient to assess risks); 816:18-22, 817:4-15, 823:2-825:2 (describing particulate nature of contaminants and how exposure analysis can be tailored to it); 817:23-818:11, 818:21-819:10, 847:2-848:19, PX 1045, PX 1075 (presence of trace levels of PAHs in drinking water samples to date does not confirm water is safe; to the contrary, it is indicative of a potentially greater problem); 854:19-855:22 (it is likely that the Utilities' wastes are attaching and detaching from the interior surface of the City's water lines and traveling through the lines, even if the precise probability cannot be identified); 801:16-20, 804:19-805:7, 806:9-19, 819:18-821:8, 822:3-18, 825:4-21, 825:22-826:10, 829:13-22, 849:1-19, 855:23-856:6 (describing further risk assessment needed); 826:12-19, 827:2-13 (removal of NIGC Pipelines and contaminated soil would help prevent re-contamination of remediated or replaced water lines).)

- Dr. Erdal confirmed that further water testing is needed to characterize and assess risks associated with the Utilities' wastes being in contact with drinking water. (Tr. 876:24-877:23, 881:14-19, 912:2-7.)

26

- Dr. Erdal also testified that it is problematic for humans to be exposed to the Utilities' wastes and the constituents thereof. (Tr. 867:16-24, 868:23-869:14, 874:5-19 (presence of PAHs in drinking water is a cause for concern, potentially indicates an external industrial source, and requires a human health risk assessment); 872:4-19, 873:8-11 (constituents of Utilities' wastes include one known human carcinogen and six probable or possible human carcinogens); 872:25-873:1, 873:12-16 (other PAHs can also cause adverse health effects); 868:23-869:14, 874:23-875:21 (drinking water system may be an active exposure pathway).)

- Laboratory testing revealed particulate benzo(a)pyrene in excess of drinking water Maximum Contaminant Levels (MCLs), and various constituents of the Utilities' wastes (including benzo(a)pyrene) in excess of remediation objectives for ingestion, inside the City's water lines. (PX 1043)

**b. Endangerment of Human Health *via* Unsafe Levels of Methane**

The City presented evidence at hearing that the Utilities' wastes are degrading into highly

pressurized and concentrated methane underground:

- Hendron testified that the Utilities' wastes sank down to bedrock and degraded into methane that has accumulated at high concentrations and pressures. (*See, e.g.*, Tr. 336:20-337:8, 373:1-6, 442:12-444:6, 446:11-448:12, 449:1-454:19, 457:10-458:1, 466:22-469:1, 470:10-471:20, 474:24-475:16, PX 1016, PX 1033, PX 1049-51, PX 1058.)

- Hendron also testified that the oil encountered at bedrock is not naturally-occurring. (Tr. 458:19-459:10, 469:2-21, 699:2-704:20, PX 1052-53.)

- Jeffrey testified that the Utilities' wastes are capable of degrading into methane. (Tr. 47:17-19.)

- Baldassare, the ***Utilities'*** expert, confirmed that there is peer-reviewed research explaining that petroleum products can degrade into methane in the environment at issue here. (Tr. 1208:24-1209:13, 1211:1-12, PX 1102.)

- Baldassare also confirmed that the methane detected around the perimeter of James Park ***is not*** from the former landfill under a portion of James Park. (Tr. 1226:10-14.)

The City also presented evidence at hearing that the presence of the highly pressurized

and concentrated methane resulting from the Utilities' wastes may present an imminent and

substantial endangerment to public health:

- Baldassare, the Utilities' expert, confirmed that the methane at issue here could explode and/or asphyxiate someone. (Tr. 1219:14-18, 1221:4-11, 1223:8-17, PX 1105 at 30 (explosion can be the first sign of a methane problem and the methane at issue here could

27

explode if released into a confined space); 1223:11-13, 1224:7-10 (asphyxiation can also be the first sign of a methane problem and the methane at issue here could asphyxiate someone if released into a confined space).)

- Dr. Erdal confirmed the risks associated with methane, including explosion and asphyxiation. (Tr. 881:24-883:1.)

- Mr. Hendron testified that, as a factual matter, it remains unknown where methane resulting from the Utilities' wastes may be encountered. (Tr. 475:19-478:22, PX 1016.)

- Baldassare also confirmed that it remains unknown where the methane at issue may be encountered, he cannot say with certainty that vertical flow is completely restricted, and he does not know where methane released from the subsurface would reach the surface. (Tr. 1223:2-7, 1224:16-1225:22.)

### c. Endangerment of Human Health *via* Soil Contamination

The City presented evidence at hearing that the Utilities' wastes are contaminating utility corridors, *i.e.*, portions of the subsurface occupied by water, gas, electric, telecommunication, and other utility lines:

- Hendron testified that the Utilities' wastes leaked out of the NIGC Pipelines and into the soils around the NIGC Pipelines, the soils around other pipelines (including the City's water lines), and the soils between the various affected pipelines. (Tr. 374:14-375:20, 376:1-15, 376:22-377:5, 380:5-12, 381:4-7, 381:11-382:7, 385:7-15, 387:22-388:23, 407:15-408:22, 410:6-17, 414:3-415:25, 416:17-419:14, 420:10-426:15, 427:22-428:4, 690:9-694:24, PX 1002, PX 1016, PX 1023, PX 1033, PX 1034, PX 1036, PX 1038, PX 1043-44.)

- Jeffrey testified that the contaminants in these utility corridors are consistent with the contaminants inside the NIGC Pipelines. (*See* record cites *supra* at 26.)

The City also presented evidence at hearing that the presence of the Utilities' wastes in these utility corridors may present an imminent and substantial endangerment to health:

- Erdal testified that it is problematic for humans to be exposed to the Utilities' wastes and the constituents thereof. (Tr. 872:4-19, 873:8-11 (constituents of Utilities' wastes include one known human carcinogen and six probable or possible human carcinogens); 872:25-873:1, 873:12-16 (other PAHs can also cause adverse health effects); 881:24-882:3 (workers can be exposed to the wastes and their constituents in utility trenches).)

- Laboratory testing revealed contaminants in excess of worker ingestion and inhalation standards. (PX 1043.)

### d. Endangerment of the Environment

The foregoing evidence also shows that the Utilities' wastes are contaminating the environment. There is no dispute that the constituents at issue here are contaminants, nor that those constituents are individually present in excess of Illinois state regulations.[10] (*See* PX 1002C and PX 1028C, tables showing exceedances of TACO background levels for priority pollutant PAHs among Hendron's samples.) Contamination of the environment is, itself, sufficient to warrant relief under RCRA. *See, e.g., Apex Oil*, 2008 WL 2945402, at *80 ("[A]n endangerment to the environment is established if contamination ***could*** leach into groundwater, even if the groundwater does not flow into any source of drinking water.") (collecting cases); *Environmental Waste Control*, 917 F.2d at 331-32 (affirming grant of injunction based on disposal of contaminants that contaminated groundwater).

## B. The City Has No Adequate Remedy at Law and Will Suffer Irreparable Harm Absent an Injunction.

The City also "has 'no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied.'" *Deckers Outdoor Corp.*, 2013 WL 169998, at *1 (quoting *Ezell*, 651 F.3d at 694). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co.*, 480 U.S. at 545; *see also Environmental Waste Control*, 917 F.2d at 332 (suggesting it was "beyond question ... that a remedy at law would have been inadequate" given threat of environmental contamination, particularly in light of the Supreme Court's holding in *Amoco*.).

---

[10] The Utilities have suggested that NIGC Pipelines regularly take on and release groundwater as the water table rises and falls. (Tr. 103:13-104:2) If that is the case, there should be no dispute that groundwater is exposed to whatever is in the NIGC Pipelines, as well.

1. **The City Has No Adequate Remedy at Law.**

The City, as a RCRA plaintiff, cannot "seek pecuniary relief" under RCRA and consequently has "no other adequate remedy available at law." *Apex Oil*, 2008 WL 2945402, at *84; *Milwaukee Inner-City Congregations Allied for Hope v.* Gottlieb, 944 F. Supp. 2d 656, 664 n.1 (W.D. Wisc. 2013) ("traditional legal remedies" are "inadequate" when "only equitable remedies are available" under a federal statute); *see also Amoco Prod. Co.*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."). Nor can the City simply remediate the Utilities' wastes and seek to recoup the costs it would expend in doing so. *See*, *e.g.*, *Meghrig*, 516 U.S. at 487-88; *Helter v. AK Steel*, 1997 WL 34703718, *9 (S.D. Ohio Mar. 31, 1997) (petroleum exclusion also precludes an action in cost recovery or contribution under CERCLA).

Separately, it is settled law that legal remedies are inadequate "when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages," such as when "loss of real property" is at issue. *Girl Scouts*, 549 F.3d at 1095. Here, among other things, the Utilities are preventing the City from making full use of its real property; as Baldassare agreed, nobody knows where or how deep the City can dig into the ground without encountering potentially-unsafe levels of methane, inside James Park or otherwise. (Tr. 475:19-478:22, PX 1016 (Hendron); Tr. 1223:2-7, 1224:16-1225:22 (Baldassare).)

The only way the City can be made whole is for the Utilities to be held responsible for the potential endangerments they have created, *via* an order restraining them from further contaminating the City's property and requiring them "to take such ... action as may be necessary," including determining the full extent of their contaminations and developing any needed remediation plan—all as expressly contemplated by RCRA. *See* 42 U.S.C. § 6972(a).

30

**2. The City and Its Constituents Will Suffer Irreparable Harm Absent an   Injunction.**

As set forth above, both the Supreme Court and the Seventh Circuit have held that environmental injuries often are irreparable. *Amoco Prod. Co.*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."); *Environmental Waste Control*, 917 F.2d at 332. Thus, the threat of further environmental contamination—for example, from further leakage of the Utilities' wastes from the NIGC Pipelines, or from groundwater entering into and exiting from those contaminated pipelines and carrying those contaminants elsewhere—is sufficient, standing alone, to warrant the Court's intervention and the City's requested injunction. As the First Circuit has explained:

> Even though preliminary injunctive relief is typically intended to preserve the status quo, the status quo in cases of potential environmental contamination is not a 'condition of rest,' but one 'of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury.' *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) (quotation marks and citation omitted). Thus, the fact that 'an injunction may require the payment or expenditure of money' does not foreclose the possibility of equitable relief; 'the funding of a diagnostic study, though it would require monetary payments, would be preventive rather than compensatory.' *Id.* Accordingly, the Third Circuit in *Price* recognized that a district court, in appropriate circumstances, would have the authority to order a diagnostic environmental study, funded by the defendant, in the context of preliminary injunctive relief. Other courts have agreed.

*Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 20-21 (1st Cir. 2009) (collecting cases).

Furthermore, harm that cannot be remedied following a final determination on the merits is irreparable as a matter of law. *See*, *e.g.*, *Girl Scouts*, 549 F.3d at 1089. Dr. Erdal testified that certain constituents of the Utilities' wastes are known and/or suspected carcinogens, (Tr. 872:4-19, 873:8-11), and Dr. LeChevallier testified that constituents of the Utilities' wastes may be detaching from the interior walls of the City's drinking water lines and reaching consumers (Tr. 797:14-798:21, 796:8-16, 798:22-799:21, 800:4-801:2, PX 1074). Development and progression

of cancer is one of many things that "could not be undone after a final determination on the merits of Plaintiff's claim, which places Plaintiff in the position to suffer irreparable harm if [its] injunction is denied." *Mitts v. Martin*, 2016 WL 1211919, at *3 (S.D. Ill. Mar. 29, 2016).

Before the Court is a case in which there is ample evidence of a problem—the Utilities' wastes contaminating drinking water, degrading into unsafe levels of methane, contaminating utility corridors, and otherwise threatening the environment—and uncertainty as to precisely when and how that problem will manifest itself. If it manifests as cancer or some other ill for someone who drinks contaminated water, that harm will be irreparable. If it manifests as a fatal explosion or asphyxiation in a school or senior center, that harm will be irreparable. Thus, the ***threat*** of irreparable harm is real and concrete, and only by ordering the Utilities both to refrain from further contamination, and to investigate the nature and extent of their contamination to date—all as authorized under RCRA—can the Court ascertain what further relief is needed.

Finally, the First Circuit's decision in *Maine People's Alliance v. Mallinckrodt, Inc.* is instructive. There, the plaintiffs sought a preliminary injunction, requiring the same type of study and analysis the City requests here, in light of testimony from the plaintiffs' expert that he believed it "'highly likely' that [potential] harms would prove to be both real and severe," even though "no one could know with certitude 'if there is a problem' or 'what the problem is.'" 471 F.3d at 281. The plaintiffs acknowledged that "remediation might eventually," after a study was conducted and data reviewed, "prove to be either unnecessary or infeasible." *Id.* The district court granted the preliminary injunction and required the defendant to fund the requested study. *Id.* at 282. The First Circuit acknowledged that irreparable harm should be considered—albeit "colored by the nature of the case and the purposes of the underlying environmental statute (here, RCRA)"—and affirmed the preliminary injunction in full. *Id.* at 296, 298. This Court should reach the same conclusion here: the City has presented substantial evidence that the Utilities are

responsible for contaminations in and around James Park, threatening numerous endangerments, and any uncertainty in that evidence should be addressed through a comprehensive study of the nature and extent of the contaminations at issue, as further discussed below.

**C. The Balance of Equities Favors Enjoining the Utilities.**

**1. The Court Need Not Engage in Balancing the Equities if it Determines the Utilities' Conduct "Has Been Willful."**

The Court need not engage in a balancing analysis if it determines that the Utilities' conduct "has been willful." *Environmental Waste Control*, 917 F.2d at 332.[11] Here, the Utilities did nothing to investigate—let alone remediate—any damage that might have occurred to the environment beyond the borders of the Skokie MGP while remediating its operations. Further, the Utilities left the NIGC Pipelines in the ground when they "retired" (*i.e.*, abandoned) those lines, and <u>again</u> when they dismantled the Skokie MGP, failing to either inspect the pipelines to ensure they were not leaking, or to remediate the soil surrounding them. The Utilities' willfulness in refraining from discovering the contamination emanating from the NIGC Pipelines, much less addressing it, is plain.

As set forth above, the testimony of Nancy Huston, who was responsible for the Utilities' investigation and remediation efforts, demonstrates the Utilities were aware of the possibility that contamination had migrated offsite. Yet, they conducted only a perfunctory investigation of what contamination may have occurred offsite, stopping at the border of the Skokie MGP and insisting that there was no need to make any further effort. (*See, e.g.*, Tr. 222:21-223:14.) This despite the fact that the video evidence of the pipes' interiors ***did*** indicate contamination in the gas line. (Tr. 370:19-371:3 (Hendron saw the "remnant condensate" in the video); 372:20-22

---

[11] *See also Bethlehem Steel*, 38 F.3d at 868 ("Where the plaintiff is a sovereign and where the activity may endanger the public health, 'injunctive relief is proper, without resort to balancing.'") (quoting *Illinois v. Milwaukee*, 599 F.2d 151, 166 (7th Cir. 1979), *rev'd on other grounds*, 451 U.S. 304 (1981)).

(Hendron found the same condensate on the pipe roof and in the sediment at the bottom of the pipe nearby in the City); 361:13-19 (Hendron sampled condensate for laboratory testing); *see also* PX 1032 (video showing condensate droplets in the gas pipeline leaving the Skokie MGP).) Samples taken from the NIGC Pipelines indicate that these pipelines did, in fact, contain condensate from the manufactured gas. (*See* PX 1028B (highlighting all TACO exceedances in yellow, and calling out in pink those containing Skokie MGP waste signatures).)

Further, despite the proximity of the Skokie MGP to a residential populace, Huston conducted <u>no</u> historical analysis, such as looking at Nicor documents that discussed leaks in the distribution lines coming from the Skokie MGP, to assess any potential issues that may exist relating to contamination from the Skokie MGP's distribution system off-site from the facility. (Tr. 209:23-210:14; *see also, e.g.*, PX1011 (Nicor memo detailing leaks).) In closing a facility that manufactured and distributed contaminants through pipelines *that were left in place*, Huston and the Utilities conducted no review of the company's own documents—or even basic manufactured gas plant literature, like J.J. Morgan's manufactured gas treatise—to determine potential issues of concern for public health and safety. (*Id.*; *see also* Tr. 220:11-19.)

## 2. Even Setting Aside the Utilities' Willfulness, an Injunction Is Appropriate Here.

In balancing the equities, "the court weighs the irreparable harm that the [City] would endure without the protection of the preliminary injunction against any irreparable harm the [Utilities] would suffer if the court were to grant the requested relief." *Tuf-Tite*, 2014 WL 6613116, at \*9 (quoting *Girl Scouts*, 549 F.3d at 1086). "The more likely it is that [the City] will win its case on the merits, the less the balance of harms need weigh in its favor." *Id.* (citing *Girl Scouts*, 549 F.3d at 1100). The Court also should consider "the potential impact of the injunction on the public interest" as part of its analysis, *id.* (citing *Girl Scouts*, 549 F.3d at 1100), bearing in mind that "the public interest would be disserved by ... delay in corrective action" regarding an

environmental contamination under RCRA, *Matter of Environmental Waste Control, Inc.*, 125 B.R. 546, 551 (N.D. Ind. 1991). Where "entry of the requested injunction would benefit the citizens" in the area at issue "and promote the Congressionally-expressed public interest in 'minimiz[ing] the present and future threat to human health and the environment' posed by solid and hazardous wastes"—while a defendant "would suffer [no] particular hardship (other than its obvious need to bear the cost of complying with the order)"—the balance of equities favors the plaintiff. *Apex Oil*, 2008 WL 2945402, at *84 (balancing of the equities in a RCRA case "is heavily influenced by a congressional thumb on the scale in favor of remediation" (citation omitted)); *see also Bethlehem Steel*, 38 F.3d at 868 (there is "a lesser need" to balance equities where "the activity in question is the underground disposal of a characteristic hazardous waste").

Regarding the relief sought here (*infra* at 37), the First Circuit's opinion in *Maine People's Alliance* is again instructive. There, as here, the plaintiff brought suit under 42 U.S.C. § 6972(a)(1)(B) and asked the court to enter an injunction requiring the alleged contaminator "to fund an 'independent, comprehensive, scientific study to determine the precise nature and extent of the endangerment'" at issue. 471 F.3d at 281. Acknowledging that the requested study likely would require the defendant to spend $4 million on laboratory analyses alone, the trial court granted the requested relief—at least in part because (1) the problems caused by the contamination could not be fully understood without such a study, and (2) the plaintiffs' expert testified it was "highly likely" that remediation would be both necessary and desirable. *Id.* at 281-82. On appeal, the First Circuit affirmed the district court's entry of an injunction requiring the defendant to investigate the precise nature and extent of the endangerment caused by its contaminations, noting that (1) there was evidence that the defendant's contaminants were present in the area alleged to have been affected, (2) the applicable standard under RCRA requires only "a reasonable prospect of a near-term threat of serious potential harm," (3) the

plaintiff presented evidence that the defendant's contamination included toxic contaminants that were capable of impacting health and the environment for decades, and (4) requiring an environmental contaminator to spend at least $4 million to investigate the potential harms flowing from its contamination is not "so vastly disproportionate to the threatened harm" flowing from environmental contaminations as to render the injunction inappropriate. *Id.* at 280, 296-98; *see also Sanchez*, 572 F.3d at 21 ("[w]e applaud the [district] court for taking th[e] sensible step" of ordering the defendant to investigate the extent of its contaminations under RCRA) (*citing Amoco Prod. Co.*, 480 U.S. at 545).)

The Court's equitable powers are particularly broad and flexible given the circumstances of this case. Where, as here, the plaintiff is a unit of government "and is seeking to protect the public interest ... the Court's equitable powers are even broader and more flexible than if only private parties were seeking relief." *Cinergy*, 582 F. Supp. 2d at 1060 (citing *Porter*, 328 U.S. at 398). "[T]he equitable balance tips strongly in favor of entry of the injunction sought by" a unit of government where "the requested injunction would benefit" the public and "'minimiz[e] the present and future threat to human health and the environment' posed by solid and hazardous wastes." *Apex Oil*, 2008 WL 2945402, at *84 (quoting 42 U.S.C. § 6902(b)). Indeed, the Utilities themselves profess dedication to safety, the public and the environment – interests which must be taken into account here. *See* https://www.nicorgas.com/about-us ("[T]he safety of our employees, the public and our pipelines is our highest priority."), and https://www.comed.com/AboutUs/Pages/LeadershipValues.aspx ("We are dedicated to safety.... We act with integrity and are accountable to our communities and the environment.") (both last visited October 12, 2018).

The City has shown that: (1) the Skokie MGP generated and distributed MG Waste Oils through the NIGC pipelines, which (2) leaked from those pipelines, (3) formed a black crust on

the inside and outside of the Dodge Avenue water lines, (4) migrated down to bedrock in the James Park area, and (5) biodegraded into methane present at high concentrations and pressures. (S*upra* at 9-16; *see also* PX 1016.) Each component of this environmental harm, for which there is a serious risk of direct harm to human health, is and will be irreparable.

This Court has agreed with the First Circuit (as well as the Seventh Circuit and many other courts) that "any substantial ongoing threat of future harm" is sufficient to constitute an endangerment, regardless of whether the harm "already exist[s]," "is certain to occur," or "will manifest immediately." *City of Evanston*, 229 F. Supp. 3d at 722. The MG Waste Oils that the Utilities have allowed to leak into the City's property are toxic contaminants, and they are capable of causing harm well into the future. Requiring the Utilities to investigate the potential harms flowing from what they have allowed to continue for years is no more burdensome than the work the First Circuit required of defendants in *Maine People's Alliance* and *Sanchez*.

In contrast, the Utilities would suffer no irreparable harm; their role would consist of providing information regarding the Skokie MGP's distribution network, and funding an investigation of the environmental contamination stemming therefrom and development of any needed remediation plan. Those costs pale in comparison to the irreparable harm to human health and the environment at issue here. *See*, *e.g.*, *Maine People's Alliance*, 471 F.3d at 296-98.

**D. Relief Requested**

The City provides herewith a draft Implementing Order, in alternative forms, setting forth the injunctive relief it seeks. (*See* Exs. A and B to City's Revised Motion.) As set forth therein, the City asks that a three-member Study Panel be appointed to investigate and identify the location of the NIGC Pipelines; to investigate the extent of contamination on and in the water lines, in the subsurface in the form of methane, and in excavation areas; to study exposure to the public resulting therefrom; to undertake risk assessment as appropriate; to design (for possible

later implementation) any remediation plans the panel deems necessary in light of the foregoing work; and to undertake related tasks.[12]  These efforts, which would take place incrementally, would be funded by the Utilities, via an escrow mechanism set forth in both orders.  The more detailed of the two alternatives (Exhibit A to the Motion), which are based on the implementing order from the *Maine People's Alliance* case (Exhibit C to the Motion), provides a more detailed procedure for exactly how these steps would be accomplished.  The other alternative provides more discretion to the Study Panel.  In either case, the Study Panel's work would be subject to the Court's approval, with opportunity for comment from the parties.  To the extent the Court deems that one of the endangerments addressed at the hearing does not warrant preliminary injunctive relief, the Court would have the option, under either alternative, to strike the corresponding portions of the draft implementing order(s).

**E.  The Court Need Not, and Should Not, Require a Bond.**

No bond is required here: RCRA permits, but does not require, security to be posted for an injunction. *See* 42 U.S.C. § 6972(e) ("The court ***may***, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.") (emphasis added); Fed. R. Civ. P. 65(c) (regarding injunction bonds). Courts have accordingly granted preliminary injunctions under RCRA without requiring a bond. *See Greenpeace, Inc. v. Waste Technologies Indus.*, 1993 WL 128732, *3-*4 (N.D. Ohio Jan. 21, 1993) (granting preliminary injunction and finding that requiring a bond would undermine private attorney general element of RCRA); *Maine People's Alliance, supra* (awarding an environmental study likely to cost $4 million; no discussion of any bond being required). As in these cases, imposition of a bond here would undercut both the policy underlying RCRA and the City's good-faith efforts to protect the public.

---

[12]  The City reserves the right to seek an award of fees and costs under 42 U.S.C. § 6972.

Were the Court to require a bond, it should be minimal in light of the public interest served by private enforcement of the federal environmental laws. *See Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) (abrogated on other grounds by *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281-82 (10th Cir. 2016)) (NEPA action); *Sierra Club v. Norton*, 207 F. Supp. 2d 1342, 1343 (S.D. Ala. 2002) (NEPA action). The Court can consider "the impact that a bond requirement would have on enforcement of [a federal health and welfare law], in order to prevent undue restriction of it." *Temple University v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991) (finding no error where district court did not require a bond); *but see Habitat Educ. Center v. U.S.F.S.*, 607 F.3d 453, 456 (7th Cir. 2010) (suggesting Rule 65(c) bonds generally should be set "on the high side").  Accordingly, because the City has pursued this litigation in an effort to protect its citizens and the environment pursuant to a federal statute intended to protect public health and safety, any bond required here should be truly minimal. *See e.g., Davis*, 302 F.3d at 1126; *Temple University*, 941 F.2d at 219-20. Further, the Court can consider the City's proposed remedy structure, which limits the Utilities' exposure to costs *via* monitored investigation; the City has attempted to craft a remedy that provides necessary information and relief without creating excessively costly or needlessly open-ended work.

## CONCLUSION

For the foregoing reasons, the City respectfully requests that this Court enter a preliminary injunction order requiring (1) the investigation and identification of the location(s) of NIGC Pipelines; (2) determination of the extent of contamination caused by leakage of MG Waste Oils from the NIGC Pipelines; and (3) development of any needed remedial action plan to address the contamination at issue here, as set forth in the draft Implementing Order submitted with the City's Motion. The City additionally requests such other and further relief as this Court deems appropriate.

Dated: October 12, 2018           s/ Thomas D. Brooks

Jeffrey D. Jeep                     Harvey J. Barnett
Jeep & Blazer, LLC            Thomas D. Brooks
3023 N. Clark Street           Trevor K. Scheetz
Chicago, IL  60657            Allison G. Margolies
(773) 857-1843                Sperling & Slater, P.C.
                              55 West Monroe Street, Suite 3200
                              Chicago, IL  60603
                              (312) 641-3200

*Attorneys for Plaintiff*
*City of Evanston*

40